*β 12*

*The American Journal of Forensic Medicine and Pathology*   22(1):1–12, 2001.   ©2001 Lippincott Williams & Wilkins, Inc., Philadelphia

# Fatal Pediatric Head Injuries Caused by Short-Distance Falls

John Plunkett, M.D.

Physicians disagree on several issues regarding head injury in infants and children, including the potential lethality of a short-distance fall, a lucid interval in an ultimately fatal head injury, and the specificity of retinal hemorrhage for inflicted trauma. There is scant objective evidence to resolve these questions, and more information is needed. The objective of this study was to determine whether there are witnessed or investigated fatal short-distance falls that were concluded to be accidental. The author reviewed the January 1, 1988 through June 30, 1999 United States Consumer Product Safety Commission database for head injury associated with the use of playground equipment. The author obtained and reviewed the primary source data (hospital and emergency medical services' records, law enforcement reports, and coroner or medical examiner records) for all fatalities involving a fall.

The results revealed 18 fall-related head injury fatalities in the database. The youngest child was 12 months old, the oldest 13 years. The falls were from 0.6 to 3 meters (2–10 feet). A noncaretaker witnessed 12 of the 18, and 12 had a lucid interval. Four of the six children in whom funduscopic examination was documented in the medical record had bilateral retinal hemorrhage. The author concludes that an infant or child may suffer a fatal head injury from a fall of less than 3 meters (10 feet). The injury may be associated with a lucid interval and bilateral retinal hemorrhage.
**Key Words:** Child abuse—Head injury—Lucid interval—Retinal hemorrhage—Subdural hematoma.

Many physicians believe that a simple fall cannot cause serious injury or death (1–9), that a lucid interval does not exist in an ultimately fatal pediatric head injury (7–13), and that retinal hemorrhage is highly suggestive if not diagnostic for inflicted trauma (7,12,14–21). However, several have questioned these conclusions or urged caution when interpreting head injury in a child (15,22–28). This controversy exists because most infant injuries occur in the home (29,30), and if there is history of a fall, it is usually not witnessed or is seen only by the caretaker. Objective data are needed to resolve this dispute. It would be helpful if there were a database of fatal falls that were witnessed or wherein medical and law enforcement investigation unequivocally concluded that the death was an accident.

The United States Consumer Product Safety Commission (CPSC) National Injury Information Clearinghouse uses four computerized data sources (31). The National Electronic Injury Surveillance System (NEISS) file collects current injury data associated with 15,000 categories of consumer products from 101 U.S. hospital emergency departments, including 9 pediatric hospitals. The file is a probability sample and is used to estimate the number and types of consumer product–related injuries each year (32). The Death Certificate (DC) file is a demographic summary created by information provided to the CPSC by selected U.S. State Health Departments. The Injury/Potential Injury Incident (IR) file contains summaries, indexed by consumer product, of reports to the CPSC from consumers, medical examiners and coroners (Medical Examiner and Coroner Alert Project [MECAP]), and newspaper accounts of product-related incidents discovered by local or regional CPSC staff (33). The In-Depth Investigations (AI) file contains summaries of investigations performed by CPSC staff based on reports received from the NEISS, DC, or IR files (34). The AI files provide details about the incident from victim and witness interviews, accident reconstruction, and review of law enforce-

Manuscript received April 10, 2000; revised September 15, 2000; accepted September 24, 2000.

From the Departments of Pathology and Medical Education, Regina Medical Center, 1175 Nininger Road, Hastings MN 55033, U.S.A.; Email: plunkettj@reginamedical.com.

2                                                    J. PLUNKETT

ment, health care facility, and coroner or medical examiner records (if a death occurred).

## METHODS

I reviewed the CPSC, DC, IR, and AI files for all head and neck injuries involving playground equipment recorded by the CPSC from January 1, 1988 through June 30, 1999. There are 323 entries in the playground equipment IR file, 262 in the AI file, 47 in the DC file, and more than 75,000 in the NEISS file. All deaths in the NEISS file generated an IR or AI file. If the file indicated that a death had occurred from a fall, I obtained and reviewed each original source record from law enforcement, hospitals, emergency medical services (EMS), and coroner or medical examiner offices except for one autopsy report. However, I discussed the autopsy findings with the pathologist in this case.

## RESULTS

There are 114 deaths in the Clearinghouse database, 18 of which were due to head injury from a fall. The following deaths were excluded from this study: those that involved equipment that broke or collapsed, striking a person on the head or neck (41); those in which a person became entangled in the equipment and suffocated or was strangled (45), those that involved equipment or incidents other than playground (6 [including a 13.7-meter fall from a homemade Ferris wheel and a 3-meter fall from a cyclone fence adjacent to a playground]); and falls in which the death was caused exclusively by neck (carotid vessel, airway, or cervical spinal cord) injury (4).

The falls were from horizontal ladders (4), swings (7), stationary platforms (3), a ladder attached to a slide, a "see-saw", a slide, and a retaining wall. Thirteen occurred on a school or public playground, and five occurred at home. The database is not limited to infants and children, but a 13-year-old was the oldest fatality (range, 12 months–13 years; mean, 5.2 years; median, 4.5 years). The distance of the fall, defined as the distance of the closest body part from the ground at the beginning of the fall, could be determined from CPSC or law enforcement reconstruction and actual measurement in 10 cases and was 0.6 to 3.0 meters (mean, 1.3 ± 0.77; median, 0.9). The distance could not be accurately determined in the seven fatalities involving swings and one of the falls from a horizontal ladder, and may have been from as little as 0.6 meters to as much as 2.4 meters. The maximum height for a fall from a swing was assumed to

be the highest point of the arc. Twelve of the 18 falls were witnessed by a noncaretaker or were videotaped; 12 of the children had a lucid interval (5 minutes–48 hours); and 4 of the 6 in whom funduscopic examination was performed had bilateral retinal hemorrhage (Table 1).

## CASES

### Case 1

This 12-month-old was seated on a porch swing between her mother and father when the chain on her mother's side broke and all three fell sideways and backwards 1.5 to 1.8 meters (5–6 feet) onto decorative rocks in front of the porch. The mother fell first, then the child, then her father. It is not known if her father landed on top of her or if she struck only the ground. She was unconscious immediately. EMS was called; she was taken to a local hospital; and was ictal and had decerebrate posturing in the emergency room. She was intubated, hyperventilated, and treated with mannitol. A computed tomography (CT) scan indicated a subgaleal hematoma at the vertex of the skull, a comminuted fracture of the vault, parafalcine subdural hemorrhage, and right parietal subarachnoid hemorrhage. There was also acute cerebral edema with effacement of the right frontal horn and compression of the basal cisterns. She had a cardiopulmonary arrest while the CT scan was being done and could not be resuscitated.

### Case 2

A 14-month-old was on a backyard "see-saw" and was being held in place by his grandmother. The grandmother said that she was distracted for a moment and he fell backward, striking the grass-covered ground 0.6 meters (22.5 inches) below the plastic seat. He was conscious but crying, and she carried him into the house. Within 10 to 15 minutes he became lethargic and limp, vomited, and was taken to the local hospital by EMS personnel. He was unconscious but purposefully moving all extremities when evaluated, and results of funduscopic examination were normal. A CT scan indicated an occipital subgaleal hematoma, left-sided cerebral edema with complete obliteration of the left frontal horn, and small punctate hemorrhages in the left frontal lobe. There was no fracture or subdural hematoma. He was treated with mannitol; his level of consciousness rapidly improved; and he was extubated. However, approximately 7 hours after admission he began to have difficulty breathing, both pupils suddenly dilated, and he was rein-

**TABLE 1.** *Summary of cases*

| No. | CPSC No. | Age | Sex | Fall from | Distance M/F | Witnessed | Lucid interval | Retinal hemorrhage | Subdural hemorrhage | Autopsy | Cause of death | FP |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 1 | DC 9108013330 | 12 mos | F | Swing | 1.5–1.8/5.0–6.0 | No | No | N/R | Yes +IHF | No | Complex calvarial fracture with edema and contusions | No |
| 2 | AI 890208HBC3088 | 14 mos | M | See-saw | 0.6/2.0 | No | 10–15 minutes | No | No | No | Malignant cerebral edema with herniation | No |
| 3 | IR F910368A | 17 mos | F | Swing | 1.5–1.8/5.0–6.0 | No | No | N/R | Yes +IHF | Yes | Acute subdural hematoma with secondary cerebral edema | Yes |
| 4 | AI 921001HCC2263 | 20 mos | F | Platform | 1.1/3.5 | No | 5–10 minutes | Bilateral multilayered | Yes +IHF | Limited | Occipital fracture with subdural/subarachnoid hemorrhage progressing to cerebral edema and herniation | Yes |
| 5ª | DC 9312050661 | 23 mos | F | Platform | 0.70/2.3 | Yes | 10 minutes | Bilateral, NOS | Yes +IHF | Yes | Acute subdural hematoma | Yes |
| 6 | DC 9451016513 | 26 mos | M | Swing | 0.9–1.8/3.0–6.0 | Yes | No | Bilateral multilayered | Yes +IHF | Yes | Subdural hematoma with associated cerebral edema | Yes |
| 7ª | AI 891215HcC2094 | 3 yrs | M | Platform | 0.9/3.0 | Yes | 10 minutes | N/R | Yes | No | Acute cerebral edema with herniation | No |
| 8 | AI 910515HCC2182 | 3 yrs | F | Ladder | 0.6/2.0 | yes | 15 minutes | N/R | Yes (autopsy only) | Yes | Complex calvarial fracture, contusions, cerebral edema with herniation | Yes |
| 9 | DC 9253024577 | 4 yrs | M | Slide | 2.1/7.0 | Yes | 3 hours | N/R | No | No | Epidural hematoma | Yes |
| 10 | AI 920710HWE4014 | 5 yrs | M | Horizontal ladder | 2.1/7.0 | No | No | N/R | Yes | No | Acute subdural hematoma with acute cerebral edema | Yes |
| 11 | AI 960517HCC5175 | 6 yrs | M | Swing | 0.6–2.4/2.0–8.0 | No | 10 minutes | No | Yes +IHF | No | Acute subdural hematoma | Yes |
| 12 | AI 970324HCC3040 | 6 yrs | M | Horizontal ladder | 3.0/10.0 | Yes | 45 minutes | N/R | No | No | Malignant cerebral edema with herniation | Yes |
| 13 | AI 881229HCC3070 | 6 yrs | F | Horizontal ladder | 0.9/3.0 | Yes | 1+ hour | N/R | Yes +IHF | Yes | Subdural and subarachnoid hemorrhage, cerebral infarct, and edema | Yes |
| 14 | AI 930930HWE5025 | 7 yrs | M | Horizontal ladder | 1.2–2.4/4.0–8.0 | Yes | 48 hours | N/R | No | Yes | Cerebral infarct secondary to carotid/vertebral artery thrombosis | Yes |
| 15 | AI 970409HCC1096 | 8 yrs | F | Retaining wall | 0.9/3.0 | Yes | 12+ hours | N/R | Yes (autopsy only) | Yes | Acute subdural hematoma | Yes |
| 16 | AI 890621HCC3195 | 10 yrs | M | Swing | 0.9–1.5/3.0–5.0 | Yes | 10 minutes | Bilateral multilayered | Yes | Yes | Acute subdural hematoma contiguous with an AV malformation | No |
| 17 | AI 920428HCC1671 | 12 yrs | F | Swing | 0.9–1.8/3.0–6.0 | Yes | No | N/R | No | Yes | Occipital fracture with extensive contra-coup contusions | Yes |
| 18 | AI 891016HCC1511 | 13 yrs | F | Swing | 0.6–1.8/2.0–6.0 | Yes | No | N/R | Yes +IHF | Yes | Occipital fracture, subdural hemorrhage, cerebral edema | Yes |

ªThe original CT scan for case #7 and the soft tissue CT windows for case #5 could not be located and were unavailable for review.

CPSC, Consumer Products Safety Commission; AI, accident investigation; IR, incident report; DC, death certificate; M, male; F, female; Distance, the distance of the closest body part from the ground at the start of the fall (see text); M/F, meters/feet; Witnessed, witnessed by a noncaretaker or videotaped; N/R, not recorded; IHF, including interhemispheric or falx; FP, forensic pathologist–directed death investigation system.

tubated. A second CT scan demonstrated progression of the left hemispheric edema despite medical management, and he was removed from life support 22 hours after admission.

### Case 3

This 17-month-old had been placed in a baby carrier–type swing attached to an overhead tree limb at a daycare provider's home. A restraining bar held in place by a snap was across her waist. She was being pushed by the daycare provider to an estimated height of 1.5 to 1.8 meters (5–6 feet) when the snap came loose. The child fell from the swing on its downstroke, striking her back and head on the grassy surface. She was immediately unconscious and apneic but then started to breathe spontaneously. EMS took her to a pediatric hospital. A CT scan indicated a large left-sided subdural hematoma with extension to the interhemispheric fissure anteriorly and throughout the length of the falx. The hematoma was surgically evacuated, but she developed malignant cerebral edema and died the following day. A postmortem examination indicated symmetrical contusions on the buttock and midline posterior thorax, consistent with impact against a flat surface; a small residual left-sided subdural hematoma; cerebral edema with anoxic encephalopathy; and uncal and cerebellar tonsillar herniation. There were no cortical contusions.

### Case 4

A 20-month-old was with other family members for a reunion at a public park. She was on the platform portion of a jungle gym when she fell from the side and struck her head on one of the support posts. The platform was 1.7 meters (67 inches) above the ground and 1.1 meters (42 inches) above the top of the support post that she struck. Only her father saw the actual fall, although there were a number of other people in the immediate area. She was initially conscious and talking, but within 5 to 10 minutes became comatose. She was taken to a nearby hospital, then transferred to a tertiary-care facility. A CT scan indicated a right occipital skull fracture with approximately 4-mm of depression and subarachnoid and subdural hemorrhage along the tentorium and posterior falx. Funduscopic examination indicated extensive bilateral retinal and preretinal hemorrhage. She died 2 days later because of uncontrollable increased intracranial pressure. A limited postmortem examination indicated an impact subgaleal hematoma overlying the fracture in the mid occiput.

### Case 5

A 23-month-old was playing on a plastic gym set in the garage at her home with her older brother. She had climbed the attached ladder to the top rail above the platform and was straddling the rail, with her feet 0.70 meters (28 inches) above the floor. She lost her balance and fell headfirst onto a 1-cm (⅜-inch) thick piece of plush carpet remnant covering the concrete floor. She struck the carpet first with her outstretched hands, then with the right front side of her forehead, followed by her right shoulder. Her grandmother had been watching the children play and videotaped the fall. She cried after the fall but was alert and talking. Her grandmother walked/carried her into the kitchen, where her mother gave her a baby analgesic with some water, which she drank. However, approximately 5 minutes later she vomited and became stuporous. EMS personnel airlifted her to a tertiary-care university hospital. A CT scan indicated a large right-sided subdural hematoma with effacement of the right lateral ventricle and minimal subfalcine herniation. (The soft tissue windows for the scan could not be located and were unavailable for review.) The hematoma was immediately evacuated. She remained comatose postoperatively, developed cerebral edema with herniation, and was removed from life support 36 hours after the fall. Bilateral retinal hemorrhage, not further described, was documented in a funduscopic examination performed 24 hours after admission. A postmortem examination confirmed the right frontal scalp impact injury. There was a small residual right subdural hematoma, a right parietal lobe contusion (secondary to the surgical intervention), and cerebral edema with cerebellar tonsillar herniation.

### Case 6

A 26-month-old was on a playground swing being pushed by a 13-year-old cousin when he fell backward 0.9 to 1.8 meters (3–6 feet), striking his head on hard-packed soil. The 13-year-old and several other children saw the fall. He was immediately unconscious and was taken to a local emergency room, then transferred to a pediatric hospital. A CT scan indicated acute cerebral edema and a small subdural hematoma adjacent to the anterior interhemispheric falx. A funduscopic examination performed 4 hours after admission indicated extensive bilateral retinal hemorrhage, vitreous hemorrhage in the left eye, and papilledema. He had a subsequent cardiopulmonary arrest and could not be resuscitated. A postmortem examination confirmed the retinal hemorrhage and indicated a right parietal scalp impact injury but no calvarial frac-

ture, a "film" of bilateral subdural hemorrhage, cerebral edema with herniation, and focal hemorrhage in the right posterior midbrain and pons.

## Case 7

This 3-year-old with a history of TAR (thrombocytopenia–absent radius) syndrome was playing with other children on playground equipment at his school when he stepped through an opening in a platform. He fell 0.9 meters (3 feet) to the hard-packed ground, striking his face. A teacher witnessed the incident. He was initially conscious and able to walk. However, approximately 10 minutes later he had projectile vomiting and became comatose, was taken to a local hospital, and subsequently transferred to a pediatric hospital. A CT scan indicated a small subdural hematoma and diffuse cerebral edema with uncal herniation, according to the admission history and physical examination. (The original CT report and scan could not be located and were unavailable for review.) His platelet count was 24,000/mm$^3$, and he was treated empirically with platelet transfusions, although he had no evidence for an expanding extra-axial mass. Resuscitation was discontinued in the emergency room.

## Case 8

This 3-year-old was at a city park with an adult neighbor and four other children, ages 6 to 10. She was standing on the third step of a slide ladder 0.6 meters (22 inches) above the ground when she fell forward onto compact dirt, striking her head. The other children but not the adult saw the fall. She was crying but did not appear to be seriously injured, and the neighbor picked her up and brought her to her parents' home. Approximately 15 minutes later she began to vomit, and her mother called EMS. She was taken to a local emergency room, then transferred to a pediatric hospital. She was initially lethargic but responded to hyperventilation and mannitol; she began to open her eyes with stimulation and to spontaneously move all extremities and was extubated. However, she developed malignant cerebral edema on the second hospital day and was reintubated and hyperventilated but died the following day. A postmortem examination indicated a subgaleal hematoma at the vertex of the skull associated with a complex fracture involving the left frontal bone and bilateral temporal bones. There were small epidural and subdural hematomas (not identifiable on the CT scan), bilateral "contra-coup" contusions of the inferior surfaces of the frontal and temporal lobes, and marked cerebral edema with uncal herniation.

## Case 9

A 4-year-old fell approximately 2.1 meters (7 feet) from a playground slide at a state park, landing on the dirt ground on his buttock, then falling to his left side, striking his head. There was no loss of consciousness, but his family took him to a local emergency facility, where an evaluation was normal. However, he began vomiting and complained of left neck and head pain approximately 3 hours later. He was taken to a second hospital, where a CT scan indicated a large left parietal epidural hematoma with a midline shift. He was transferred to a pediatric hospital and the hematoma was evacuated, but he developed malignant cerebral edema with right occipital and left parietal infarcts and was removed from the respirator 10 days later. A postmortem examination indicated a small residual epidural hematoma, marked cerebral edema, bilateral cerebellar tonsillar and uncal herniation, and hypoxic encephalopathy. There was no identifiable skull fracture.

## Case 10

A 5-year-old was apparently walking across the horizontal ladder of a "monkey bar," part of an interconnecting system of homemade playground equipment in his front yard, when his mother looked out one of the windows and saw him laying face down on the ground and not moving. The horizontal ladder was 2.1 meters (7 feet) above compacted dirt. EMS were called, he was taken to a local hospital, and then transferred to a pediatric hospital. A CT scan indicated a right posterior temporal linear fracture with a small underlying epidural hematoma, a 5-mm thick acute subdural hematoma along the right temporal and parietal lobes, and marked right-sided edema with a 10-mm midline shift. He was hyperventilated and treated with mannitol, but the hematoma continued to enlarge and was surgically evacuated. However, he developed uncontrollable cerebral edema and was removed from life support 10 days after the fall.

## Case 11

A 6-year-old was on a playground swing at a private lodge with his 14-year-old sister. His sister heard a "thump," turned around, and saw him on the grass-covered packed earth beneath the swing. The actual fall was not witnessed. The seat of the swing was 0.6 meters (2 feet) above the ground, and the fall distance could have been from as high as 2.4 meters (8 feet). He was initially conscious and talking but within 10 minutes became comatose and was taken to a local emergency room, then transferred to a tertiary-care hospital. A CT

6                                   *J. PLUNKETT*

scan indicated a large left frontoparietal subdural hematoma with extension into the anterior interhemispheric fissure and a significant midline shift with obliteration of the left lateral ventricle. There were no retinal hemorrhages. He was treated aggressively with dexamethasone and hyperventilation, but there was no surgical intervention. He died the following day.

## Case 12

This 6-year-old was at school and was sitting on the top crossbar of a "monkey bar" approximately 3 meters (10 feet) above compacted clay soil when an unrelated noncaretaker adult saw him fall from the crossbar to the ground. He landed flat on his back and initially appeared to have the wind knocked out of him but was conscious and alert. He was taken to the school nurse who applied an ice pack to a contusion on the back of his head. He rested for approximately 30 minutes in the nurse's office and was being escorted back to class when he suddenly collapsed. EMS was called, and he was transported to a pediatric hospital. He was comatose on admission, the fundi could not be visualized, and a head CT scan was interpreted as normal. However, a CT scan performed the following morning approximately 20 hours after the fall indicated diffuse cerebral edema with effacement of the basilar cisterns and fourth ventricle. There was no identifiable subdural hemorrhage or calvarial fracture. He developed transtentorial herniation and died 48 hours after the fall.

## Case 13

This 6-year-old was playing on a school playground with a 5th grade student/friend. She was hand-over-hand traversing the crossbar of a "monkey bar" 2.4 meters (7 feet 10 inches) above the ground with her feet approximately 1 meter (40 inches) above the surface. She attempted to slide down the pole when she reached the end of the crossbar but lost her grip and slid quickly to the ground, striking the compacted dirt first with her feet, then her buttock and back, and finally her head. The friend informed the school principal of the incident, but the child seemed fine and there was no intervention. She went to a relative's home for after-school care approximately 30 minutes after the fall, watched TV for a while, then complained of a headache and laid down for a nap. When her parents arrived at the home later that evening, 6 hours after the incident, they discovered that she was incoherent and "drooling." EMS transported her to a tertiary-care medical center. A CT scan indicated a right parieto-occipital skull frac-

ture, subdural and subarachnoid hemorrhage, and a right cerebral hemisphere infarct. The infarct included the posterior cerebral territory and was thought most consistent with thrombosis or dissection of a right carotid artery that had a persistent fetal origin of the posterior cerebral artery. She remained comatose and was removed from the respirator 6 days after admission. A postmortem examination indicated superficial abrasions and contusions over the scapula, a prominent right parietotemporal subgaleal hematoma, and a right parietal skull fracture. She had a 50-ml subdural hematoma and cerebral edema with global hypoxic or ischemic injury ("respirator brain"), but the carotid vessels were normal.

## Case 14

A 7-year-old was on the playground during school hours playing on the horizontal ladder of a "monkey bar" when he slipped and fell 1.2 to 2.4 meters (4–8 feet). According to one witness, he struck his forehead on the bars of the vertical ladder; according to another eyewitness he struck the rubber pad covering of the asphalt ground. There are conflicting stories as to whether he had an initial loss of consciousness. However, he walked back to the school, and EMS was called because of the history of the fall. He was taken to a local hospital, where evaluation indicated a Glasgow coma score of 15 and a normal CT scan except for an occipital subgaleal hematoma. He was kept overnight for observation because of the possible loss of consciousness but was released the following day. He was doing homework at home 2 days after the fall when his grandmother noticed that he was stumbling and had slurred speech, and she took him back to the hospital. A second CT scan indicated a left carotid artery occlusion and left temporal and parietal lobe infarcts. The infarcts and subsequent edema progressed; he had brainstem herniation; and he was removed from life support 3 days later (5 days after the initial fall). A postmortem examination indicated ischemic infarcts of the left parietal, temporal, and occipital lobes, acute cerebral edema with herniation, and thrombosis of the left vertebral artery. Occlusion of the carotid artery, suspected premortem, could not be confirmed.

## Case 15

This 8-year-old was at a public playground near her home with several friends her age. She was hanging by her hands from the horizontal ladder of a "monkey bar" with her feet approximately 1.1 meters (3.5 feet) above the ground when she attempted to swing from the bars to a nearby 0.9-

meter (34-inch) retaining wall. She landed on the top of the wall but then lost her balance and fell to the ground, either to a hard-packed surface (one witness) or to a 5.1-cm (2-inch) thick resilient rubber mat (a second witness), striking her back and head. She initially cried and complained of a headache but continued playing, then later went home. Her mother said that she seemed normal and went to bed at her usual time. However, when her mother tried to awaken her at approximately 8:30 the following morning (12 hours after the fall) she complained of a headache and went back to sleep. She awoke at 11 a.m. and complained of a severe headache then became unresponsive and had a seizure. EMS took her to a nearby hospital, but she died in the emergency room. A postmortem examination indicated a right temporoparietal subdural hematoma, extending to the base of the brain in the middle and posterior fossae, with flattening of the gyri and narrowing of the sulci. (The presence or absence of herniation is not described in the autopsy report.) There was no calvarial fracture, and there was no identifiable injury in the scalp or galea.

## Case 16

A 10-year-old was swinging on a swing at his school's playground during recess when the seat detached from the chain and he fell 0.9 to 1.5 meters (3–5 feet) to the asphalt surface, striking the back of his head. The other students but not the three adult playground supervisors saw him fall. He remained conscious although groggy and was carried to the school nurse's office, where an ice pack was placed on an occipital contusion. He suddenly lost consciousness approximately 10 minutes later, and EMS took him to a local hospital. He had decerebrate posturing when initially evaluated. Funduscopic examination indicated extensive bilateral confluent and stellate, posterior and peripheral preretinal and subhyaloid hemorrhage. A CT scan showed a large acute right frontoparietal subdural hematoma with transtentorial herniation. The hematoma was surgically removed, but he developed malignant cerebral edema and died 6 days later. A postmortem examination indicated a right parietal subarachnoid AV malformation, contiguous with a small amount of residual subdural hemorrhage, and cerebral edema with anoxic encephalopathy and herniation. There was no calvarial fracture.

## Case 17

A 12-year-old was at a public playground with a sister and another friend and was standing on the seat of a swing when the swing began to twist. She lost her balance and fell 0.9 to 1.8 meters (3–6 feet) to the asphalt surface, striking her posterior thorax and occipital scalp. She was immediately unconscious and was taken to a tertiary-care hospital emergency room, where she was pronounced dead. A postmortem examination indicated an occipital impact injury associated with an extensive comminuted occipital fracture extending into both middle cranial fossa and "contra-coup" contusions of both inferior frontal and temporal lobes.

## Case 18

This 13-year-old was at a public playground with a friend. She was standing on the seat of a swing with her friend seated between her legs when she lost her grip and fell backwards 0.6 to 1.8 meters (2–6 feet), striking either a concrete retaining wall adjacent to the playground or a resilient 5.1-cm (2 inch) thick rubber mat covering the ground. She was immediately unconscious and was given emergency first aid by a physician who was nearby when the fall occurred. She was taken to a nearby hospital and was purposefully moving all extremities and had reactive pupils when initially evaluated. A CT scan indicated interhemispheric subdural hemorrhage and generalized cerebral edema, which progressed rapidly to brain death. A postmortem examination indicated a linear nondepressed midline occipital skull fracture, subdural hemorrhage extending to the occiput, contusion of the left cerebellar hemisphere, bifrontal "contra-coup" contusions, and cerebral edema.

## DISCUSSION

### General

Traumatic brain injury (TBI) is caused by a force resulting in either strain (deformation/unit length) or stress (force/original cross-sectional area) of the scalp, skull, and brain (35–37). The extent of injury depends not only on the level and duration of force but also on the specific mechanical and geometric properties of the cranial system under loading (38–40). Different parts of the skull and brain have distinct biophysical characteristics, and calculating deformation and stress is complex. However, an applied force causes the skull and brain to move, and acceleration, the time required to reach peak acceleration, and the duration of acceleration may be measured at specific locations (36,41). These kinematic parameters do not cause the actual brain damage but are useful for analyzing TBI because they are easy to quantify. Research in TBI using physical models and animal experiments has shown that a force resulting in angular acceleration pro-

8                                                         J. PLUNKETT

duces primarily diffuse brain damage, whereas a
force causing exclusively translational acceleration
produces only focal brain damage (36). A fall from
a countertop or table is often considered to be ex-
clusively translational and therefore assumed inca-
pable of producing serious injury (3,7–9). However,
sudden impact deceleration *must* have an angular
vector unless the force is applied only through the
center of mass (COM), and deformation of the
skull during impact *must* be accompanied by a vol-
ume change (cavitation) in the subdural "space"
tangential to the applied force (41). The angular
and deformation factors produce tensile strains on
the surface veins and mechanical distortions of the
brain during impact and may cause a subdural
hematoma without deep white matter injury or even
unconsciousness (42–44).

Many authors state that a fall from less than 3
meters (10 feet) is rarely if ever fatal, especially if
the distance is less than 1.5 meters (5 feet)
(1–6,8,9). The few studies concluding that a short-
distance fall may be fatal (22–24,26,27) have been
criticized because the fall was not witnessed or was
seen only by the caretaker. However, isolated re-
ports of observed fatal falls and biomechanical
analysis using experimental animals, adult human
volunteers, and models indicate the potential for se-
rious head injury or death from as little as a 0.6-
meter (2-foot) fall (48–52). There are limited
experimental studies on infants (cadaver skull frac-
ture) (53,54) and none on living subadult nonhu-
man primates, but the adult data have been extrap-
olated to youngsters and used to develop the
Hybrid II/III and Child Restraint–Air Bag Interac-
tion (CRABI) models (55) and to propose standards
for playground equipment (56,63). We simply do
not know either kinematic or nonkinematic limits
in the pediatric population (57,58).

Each of the falls in this study exceeded estab-
lished adult kinematic thresholds for traumatic
brain injury (41,48–52). Casual analysis of the falls
suggests that most were primarily translational.
However, deformation and *internal* angular acceler-
ation of the skull and brain *caused by the impact*
produce the injury. What happens during the im-
pact, not during the fall, determines the outcome.

### Subdural Hemorrhage

A "high strain" impact (short pulse duration and
high rate for deceleration onset) typical for a fall is
more likely to cause subdural hemorrhage than a
"low strain" impact (long pulse duration and low
rate for deceleration onset) that is typical of a
motor vehicle accident (42,61). The duration of de-
celeration for a head-impact fall against a nonyield-

ing surface is usually less than 5 milliseconds
(39,59–61). Experimentally, impact duration longer
than 5 milliseconds will not cause a subdural
hematoma unless the level of angular acceleration
is above $1.75 \times 10^5$ rad/s$^2$ (61). A body in motion
with an angular acceleration of $1.75 \times 10^5$ rad/s$^2$
has a tangential acceleration of 17,500 m/s$^2$ at 0.1
meters (the distance from the midneck axis of rota-
tion to the midbrain COM in the Duhaime model).
A human cannot produce this level of acceleration
by impulse ("shake") loading (62).

An injury resulting in a subdural hematoma in an
infant may be caused by an accidental fall
(43,44,64). A recent report documented the findings
in seven children seen in a pediatric hospital emer-
gency room after an accidental fall of 0.6 to 1.5
meters who had subdural hemorrhage, no loss of
consciousness, and no symptoms (44). The charac-
teristics of the hemorrhage, especially extension
into the posterior interhemispheric fissure, have
been used to suggest if not confirm that the injury
was nonaccidental (9,62,65–68). The hemorrhage
extended into the posterior interhemispheric fissure
in 5 of the 10 children in this study (in whom the
blood was identifiable on CT or magnetic reso-
nance scans and the scans were available for re-
view) and along the anterior falx or anterior inter-
hemispheric fissure in an additional 2 of the 10.

### Lucid Interval

Disruption of the diencephalic and midbrain por-
tions of the reticular activating system (RAS)
causes unconsciousness (36,69,70). "Shearing" or
"diffuse axonal" injury (DAI) is thought to be the
primary biophysical mechanism for immediate
traumatic unconsciousness (36,71). Axonal injury
has been confirmed at autopsy in persons who had
a brief loss of consciousness after a head injury and
who later died from other causes, such as coronary
artery disease (72). However, if unconsciousness is
momentary or brief ("concussion") subsequent de-
terioration *must* be due to a mechanism other than
DAI. Apnea and catecholamine release have been
suggested as significant factors in the outcome fol-
lowing head injury (73,74). In addition, the cen-
tripetal theory of traumatic unconsciousness states
that primary disruption of the RAS will not occur
in isolation and that structural brainstem damage
from inertial (impulse) or impact (contact) loading
*must* be accompanied by evidence for cortical and
subcortical damage (36). This theory has been vali-
dated by magnetic resonance imaging and CT scans
in adults and children (75,76). Only one of the chil-
dren in this study (case 6) had evidence for any
component of DAI. This child had focal hemor-

rhage in the posterior midbrain and pons, thought by the pathologist to be primary, although there was no skull fracture, only "a film" of subdural hemorrhage, no tears in the corpus callosum, and no lacerations of the cerebral white matter (grossly or microscopically).

The usual cause for delayed deterioration in infants and children is cerebral edema, whereas in adults it is an expanding extra-axial hematoma (77). If the mechanism for delayed deterioration (except for an expanding extra-axial mass) is venospasm, cerebral edema may be the only morphologic marker. The "talk and die or deteriorate (TADD)" syndrome is well characterized in adults (78). Two reports in the pediatric literature discuss TADD, documenting 4 fatalities among 105 children who had a lucid interval after head injury and subsequently deteriorated (77,79). Many physicians believe that a lucid interval in an ultimately fatal pediatric head injury is extremely unlikely or does not occur unless there is an epidural hematoma (7,8,11). Twelve children in this study had a lucid interval. A noncaretaker witnessed 9 of these 12 falls. One child had an epidural hematoma.

### Retinal Hemorrhage

The majority of published studies conclude that retinal hemorrhage, especially if bilateral and posterior or associated with retinoschisis, is highly suggestive of, if not diagnostic for, nonaccidental injury (9,14–21). Rarely, retinal hemorrhage has been associated with an accidental head injury, but in these cases the bleeding was unilateral (80). It is also stated that traumatic retinal hemorrhage may be the direct mechanical effect of violent shaking (15). However, retinal hemorrhage may be caused experimentally either by ligating the central retinal vein or its tributaries or by suddenly increasing intracranial pressure (81,82); retinoschisis is the result of breakthrough bleeding and venous stasis not "violent shaking" (15,83). Any sudden increase in intracranial pressure may cause retinal hemorrhage (84–87). Deformation of the skull coincident to an impact nonselectively increases intracranial pressure. Venospasm secondary to traumatic brain injury selectively increases venous pressure. Either mechanism may cause retinal hemorrhage irrespective of whether the trauma was accidental or inflicted. Further, retinal and optic nerve sheath hemorrhages associated with a ruptured vascular malformation are due to an increase in venous pressure not extension of blood along extravascular spaces (81,83,88). Dilated eye examination with an indirect ophthalmoscope is thought to be more sensitive for detecting retinal bleeding than routine examination and has been recommended as part of the evaluation of any pediatric patient with head trauma (89). None of the children in this study had a formal retinal evaluation, and only six had funduscopic examination documented in the medical record. Four of the six had bilateral retinal hemorrhage.

### Pre-existing Conditions

One of these children (case 16) had a subarachnoid AV malformation that contributed to development of the subdural hematoma, causing his death. One (case 7) had TAR syndrome (90), but his death was thought to be caused by malignant cerebral edema not an expanding extra-axial mass.

### Cerebrovascular Thrombosis

Thrombosis or dissection of carotid or vertebral arteries as a cause of delayed deterioration after head or neck injuries is documented in both adults and children (91,92). Case 14 is the first report of a death due to traumatic cerebrovascular thrombosis in an infant or child. Internal carotid artery thrombosis was suggested radiographically in an additional death (case 13) but could not be confirmed at autopsy. However, this child died 6 days after admission to the hospital, and fibrinolysis may have removed any evidence for thrombosis at the time the autopsy was performed.

### Limitations

1. Six of the 18 falls were not witnessed or were seen only by the adult caretaker, and it is possible that another person caused the nonobserved injuries.
2. The exact height of the fall could be determined in only 10 cases. The others (7 swing and 1 stationary platform) could have been from as little as 0.6 meters (2 feet) to as much as 2.4 meters (8 feet).
3. A minimum impact velocity sufficient to cause fatal brain injury cannot be inferred from this study. Likewise, the probability that an individual fall will have a fatal outcome cannot be stated because the database depends on voluntary reporting and contractual agreements with selected U.S. state agencies. The NEISS summaries for the study years estimated that there were more than 250 deaths due to head and neck injuries associated with playground equipment, but there are only 114 in the files. Further, this study does not include other nonplayground equipment–related fatal falls, witnessed or not witnessed, in the CPSC database (32).

*Am J Forensic Med Pathol, Vol. 22, No. 1, March 2001*

*10*                            *J. PLUNKETT*

## CONCLUSIONS

1. Every fall is a complex event. There must be a biomechanical analysis for any incident in which the severity of the injury appears to be inconsistent with the history. The question is not "Can an infant or child be seriously injured or killed from a short-distance fall?" but rather "If a child falls (x) meters and strikes his or her head on a nonyielding surface, what will happen?"

2. Retinal hemorrhage may occur whenever intracranial pressure exceeds venous pressure or whenever there is venous obstruction. The characteristic of the bleeding cannot be used to determine the ultimate cause.

3. Axonal damage is unlikely to be the mechanism for lethal injury in a low-velocity impact such as from a fall.

4. Cerebrovascular thrombosis or dissection must be considered in any injury with apparent delayed deterioration, and especially in one with a cerebral infarct or an unusual distribution for cerebral edema.

5. A fall from less than 3 meters (10 feet) in an infant or child may cause fatal head injury and may not cause immediate symptoms. The injury may be associated with bilateral retinal hemorrhage, and an associated subdural hematoma may extend into the interhemispheric fissure. A history by the caretaker that the child may have fallen cannot be dismissed.

**Acknowledgements:** The author thanks the law enforcement, emergency medical services, and medical professionals who willingly helped him obtain the original source records and investigations; Ida Harper-Brown (Technical Information Specialist) and Jean Kennedy (Senior Compliance Officer) from the U.S. CPSC, whose enthusiastic assistance made this study possible; Ayub K. Ommaya, M.D., and Werner Goldsmith, Ph.D., for critically reviewing the manuscript; Jan E. Leestma, M.D., and Faris A. Bandak, Ph.D., for helpful comments; Mark E. Myers, M.D., and Michael B. Plunkett, M.D., for review of the medical imaging studies; Jeanne Reuter and Kathy Goranowski, for patience, humor, and completing the manuscript; and all the families who shared the stories of their sons and daughters and for whom this work is dedicated.

## APPENDIX

Newtonian mechanics involving constant acceleration may be used to determine the impact velocity in a gravitational fall. However, constant acceleration formulas cannot be used to calculate the relations among velocity, acceleration, and distance traveled *during* an impact because the deceleration is not uniform (45). This analysis requires awareness of the shape of the deceleration curve, knowledge of the mechanical properties and geometry of the cranial system, and comprehension of the stress and strain characteristics for the specific part of the skull and brain that strikes the ground. A purely translational fall requires that the body is rigid and that the external forces acting on the body pass only through the COM, i.e., there is no rotational component. A 1-meter-tall 3-year-old hanging by her knees from a horizontal ladder with the vertex of her skull 0.5 meters above hard-packed earth approximates this model. If she looses her grip and falls, striking the occipital scalp, her impact velocity is 3.1 m/second. An exclusively angular fall also requires that the body is rigid. In addition, the rotation must be about a fixed axis or a given point internal or external to the body, and the applied moment and the inertial moment must be at the identical point or axis. If this same child has a 0.5-meter COM and has a "matchstick" fall while standing on the ground, again striking her occiput, her angular velocity is 5.42 rad/second and tangential velocity 5.42 m/second at impact. The impact velocity is higher than predicted for an exclusively translational or external-axis angular fall when the applied moment and the inertial moment are at a different fixed point (slip and fall) or when the initial velocity is not zero (walking or running, then trip and fall), and the vectors are additive. However, the head, neck, limbs, and torso do not move uniformly during a fall because relative motion occurs with different velocities and accelerations for each component. Calculation of the impact velocity for an actual fall requires solutions of differential equations for each simultaneous translational and rotational motion (45). Further, inertial or impulse loading (whiplash) may cause head acceleration more than twice that of the midbody input force and may be important in a fall where the initial impact is to the feet, buttock, back, or shoulder, and the final impact is to the head (46,47).

The translational motion of a rigid body at constant gravitational acceleration (9.8 m/s$^2$) is calculated from:

$$F = ma \qquad v^2 = 2as \qquad v = at$$

where F = the sum of all forces acting on the body (newton), m = mass (kg), a = acceleration (m/s$^2$), v = velocity (m/s), s = distance (m), and t = time (s).

The angular motion of a rigid body about a fixed axis at a given point of the body under constant gravitational acceleration (9.8 m/s$^2$) is calculated from:

$$M = I\alpha \qquad \omega = v^1/r \qquad \alpha = a^1/r$$

*FATAL HEAD INJURIES WITH SHORT-DISTANCE FALLS*                    *11*

where M = the applied moment about the COM or about the fixed point where the axis of rotation is located, I = the inertial moment about this same COM or fixed point, $\alpha$ = angular acceleration (rad/s$^2$), $\omega$ = angular velocity (rad/s), r = radius (m), v$^t$ = tangential velocity (m/s), and a$^t$ = tangential acceleration (m/s$^2$).

The angular velocity $\omega$ for a rigid body of length L rotating about a fixed point is calculated from:

$$\tfrac{1}{2}I_0\omega^2 = maL/2 \qquad I_0 = (1/3)\,mL^2$$

where $I_0$ = the initial inertial moment, $\omega$ = angular velocity (rad/s), m = mass (kg), a = gravitational acceleration (9.8 m/s$^2$), and L = length.

## REFERENCES

1. Chadwick DL, Chin S, Salerno C, et al. Deaths from falls in children: how far is fatal? *J Trauma* 1991;31:1353–5.
2. Williams RA. Injuries in infants and small children resulting from witnessed and corroborated free falls. *J Trauma* 1991;31:1350–2.
3. Duhaime AC, Alario AJ, Lewander WJ, et al. Head injury in very young children: mechanisms, injury types, and ophthalmologic findings in 100 hospitalized patients younger than 2 years of age. *Pediatrics* 1992;90:179–85.
4. Lyons TJ, Oates RK. Falling out of bed: a relatively benign occurrence. *Pediatrics* 1993;92:125–7.
5. Swalwell C. Head injuries form short distance falls. *Am J Forensic Med Pathol* 1993;14:171–2.
6. Sheridan F, Anthony RM, Rieber GD, et al. Head injuries from short distance falls. *Am J Forensic Med Pathol* 1993; 14:172–3.
7. Duhaime AC, Christian CW, Rorke LB, et al. Non-accidental head injury in infants: the "shaken baby syndrome." *N Engl J Med* 1998;338:1822–1829.
8. Case ME, Graham MA. Corey Handy T. et al. Position paper on shaken baby. Adopted by the Board of Directors, United States National Association of Medical Examiners, San Francisco, October 30, 1998. St. Louis: The National Association of Medical Examiners.
9. Showers J. Never shake a baby. The Second National Conference on Shaken Baby Syndrome. National Association of Children's Hospitals and Related Institutions, 1999. Available at: www.childrenshospitals.net/nuchri/news/pr%5Fsbs.html.
10. Tulloss M, Walker MD, Wright LC. Evaluation and treatment of head injuries in children. In Fuhrman BP, Zimmerman JJ, eds. *Pediatric critical care*. St. Louis: Mosby Year Book, 1992:1165–82.
11. Willman KY, Bunk DE, Senac M, Chadwick DL. Restricting the time of injury in fatal inflicted head injury. *Child Abuse Negl* 1997;21:929–40.
12. Amaya M, Bechtel K, Blatt SD, et al. Shaken baby syndrome and the death of Matthew Eappen. (November 11, 1997). Available at: www.silcon.com/&thksim;ptuve/shaken.htm.
13. Jenny C, Hymel KP. Recognizing abusive head trauma in children. *JAMA* 1999;282:1421–2.
14. Eisenbrey AB. Retinal hemorrhage in the battered child. *Childs Brain* 1979;5:40–4.
15. Greenwald MJ, Weiss A, Oesterle CS, et al. Traumatic retinoschisis in battered babies. *Ophthalmology* 1986;93:618–24.
16. Rao N, Smith RE, Choi JH, et al. Autopsy findings in the eyes of fourteen fatally abused children. *Forensic Sci Int* 1988;39:293–9.
17. Elner SG, Elner VM, Arnall M, Albert DM. Ocular and as-
sociated systemic findings in suspected child abuse: a necropsy study. *Arch Opthalmol* 1990;108:1094–101.
18. Williams DF, Swengel RM, Scharre DW. Posterior segment manifestations of ocular trauma. *Retina* 1990;10 (suppl):535–44.
19. Rosenberg NM, Singer J, Bolte R, et al. Retinal hemorrhage. *Pediatr Emerg Care* 1994;10:303–5.
20. Swenson J, Levitt C. Shaken baby syndrome: diagnosis and prevention. *Minn Med* 1997;80:41–4.
21. Altman RL, Kutscher ML, Brand DA. The "shaken-baby syndrome." *N Engl J Med* 1998;339:1329–30.
22. Hall JR, Reyes HM, Horvat M, et al. The mortality of childhood falls. *J Trauma* 1989;29:1273–5.
23. Rieber GD. Fatal falls in childhood: how far must children fall to sustain fatal head injury: report of cases and review of the literature. *Am J Forensic Med Pathol* 1993;14:201–7.
24. Root I. Head injuries from short distance falls. *Am J Forensic Med Pathol* 1992;13:85–7.
25. Nashelsky MB, Dix JD. The time interval between lethal infant shaking and onset of symptoms: a review of the shaken baby syndrome literature. *Am J Forensic Med Pathol* 1995;16:154–7.
26. Wilkins B. Head injury: abuse or accident? *Arch Dis Child* 1997;76:393–7.
27. Shaken babies (editorial). *Lancet* 1998;352:335.
28. Plunkett J. Restricting the time of injury in fatal inflicted head injuries. *Child Abuse Negl* 1998;22:943–4.
29. Sweeney TB. X-rated playgrounds? *Pediatrics* 1979;64:961.
30. Tursz A, LeLong N, Crost M. Home accidents to children under 2 years of age. *Paediatr Perinatol Epidemiol* 1990;4:408–21.
31. National Injury Information Clearinghouse. US Consumer Product Safety Commission (1997). Washington DC 20207. Available at: www.cpsc.gov/about/clrnghse.html.
32. Consumer Product Safety Review 1999;4:#2:3–7. Available at: www.cpsc.gov/cpscpub/pubs/cpsr.html.
33. A description of the injury or potential injury incident data base (IPII). Division of Hazard and Injury Data Systems. US Consumer Product Safety Commission (1997). Washington DC 20207. Available at: www.cpsc.gov/about/guide.html#OIPA.
34. A description of the indepth investigation database (INDP), fiscal year 1987–fiscal year 1991. Division of Hazard and Injury Data Systems. US Consumer Product Safety Commission (1992). Washington D.C. 20207. Available at: www.cpsc.gov/about/guide.html#OIPA.
35. Ommaya AK, Gennarelli TA. Cerebral concussion and traumatic unconsciousness. *Brain* 1974;97:633–54.
36. Ommaya AK. Head injury mechanisms and the concept of preventive management: a review and critical synthesis. *J Neurotrauma* 1995;12:527–46.
37. Gurdjian ES, Hodgson VR, Thomas LM, Patrick LM. Significance of relative movements of scalp, skull and intracranial contents during impact injury of the head. *J Neurosurg* 1968;29:70–2.
38. Ommaya AK, Grubb RL, Naumann RA. Coup and contra-coup injury: observations on the mechanics of visible brain injuries in the rhesus monkey. *J Neurosurg* 1971;35:503–16.
39. Gurdjian ES. Recent advances in the study of the mechanism of impact injury of the head: a summary. *Clin Neurosurg* 1972;19:1–42.
40. Gennarelli TA, Thibault LE, Adams JH, et al. Diffuse axonal injury and traumatic coma in the primate. *Ann Neurol* 1982;12:564–74.
41. McElhaney JH. Roberts VL, Hilyard JF. Head injury tolerance and criteria. In *Handbook of human tolerance*. Yatabecho, Tukuba-gun, Ibaraki, Japan: Japan Automobile Research Institute, Inc., 1976:237–335.
42. Gurdjian ES, Hodgson VR, Thomas LM, Patrick LM. Impact head injury: mechanism and prevention. In Brinkhous

*B 13*

**From:**      Vincent Dimaio[SMTP:dimaio@CO.BEXAR.TX.US]
**Reply To:**  National Association of Medical Examiners
**Sent:**      Thursday, February 07, 2002 2:44 PM
**To:**        NAME-L@LISTSERV.CC.EMORY.EDU
**Subject:**   Position Paper Fatal Abusive head injuries

I have just been given a copy of a Internet posting by The National Center on Shaken
Baby Syndrome. In it they cite "Position paper on fatal abusive head injuries in infants
and young children". I have been dreading this. I would like to clarify some aspects of
this position paper.

As editor of the AJFMP, I had serious misgivings about publishing this paper, not
because of its contents but in that it is described as a position paper. Position papers in
NAME reflect the opinions of the Board of Directors, not necessarily the membership or
even the forensic pathology literature.

The AJFMP is a peer review journal. If one bothers to read the box in the lower left
corner of the first page of the article, one will see that the paper was rejected as a position
paper by the three reviewers. They felt that it should be published as a regular paper if
published. As an aside, the paper in its original form was rejected by 4 of 5 reviewers
(the reason for so many reviewers was the fact that this was a position paper). Thus, the
"peers" rejected it as a position paper. The paper was published because (1) whether one
agrees or not, the authors have a right to their opinion and (2) as a courtesy to the Board
of Directors (though with the stipulation that the peer reviewers opinion also be printed).

Shaken baby syndrome is controversial in that a number of individuals doubt its existence
- including Gennarelli whose research is cited by many as an explanation for the injuries
produced.

**From:** Gregory G. Davis [gdavis@path.uab.edu]
**Sent:** Tuesday, October 17, 2006 9:43 AM
**To:** 'plunkettj@frontiernet.net'; 'rkwrightmd@gmail.com'
**Subject:** NAME position paper renewal process

Dear John and Ron,

Having returned from the NAME meeting, I am now able to answer your questions, mostly.

Beyond the details that Randy has already related to you, I do not know how the "Shaken Baby" position paper was renewed. No mechanism for renewal of position papers existed at that time. The Board of Directors of NAME has addressed the matter by taking the following two steps.

1. A new addition to the guidelines for position papers was adopted. The ten points listed on the NAME website remain in effect, and to those ten points has been added an eleventh point, which is quoted below.

"11. NAME's endorsement of a position paper ends five years from publication of the position paper. NAME may renew its endorsement of a position paper by following steps 2-10 above, with revision of the original manuscript as appropriate for changes in knowledge or understanding that occur during the five year life of the original position paper."

2. The Board rescinded the renewal of the Shaken Baby position paper, because that paper did not go through the approved renewal process. The Shaken Baby paper may be revised and resubmitted, whereupon it will go through steps 2-10 listed below.

1. Position papers state positions officially endorsed by the National Association of Medical Examiners (NAME) as authorized by the Board of Directors and are intended to assist in the practice of medicolegal death investigation. Position papers discuss subjects in the field of forensic pathology of vital interest to the public and to the membership at large. A position paper will discuss not only the majority opinion about its subject but will also address accepted (mainstream) minority opinions.

2. A position paper is initiated by the President or by direction of the Board of Directors.

3. The President, with the Executive Committee's approval, appoints the lead author.

4. The lead author, with the Executive Committee's approval, selects experts and co-authors to assist in preparing the first draft of the paper.

5. The first draft is submitted to the Board of Directors for review and comment. The Board of Directors votes (simple majority) to accept or reject the paper in concept.

6. The draft is re-edited and posted on the NAME website for 30 days during which time the general membership has the opportunity to review and comment.

7. The authors re-edit the paper based on members' comments and then submit it to the Executive Committee for approval. The Executive Committee votes (simple majority) to accept, accept with additional revisions, or reject the paper.

8. Following Executive Committee approval, the position paper is presented to the Board of Directors no less than 1 month prior to the next Board of Directors' meeting for final approval. Final approval requires a super-majority (3/4) for acceptance.

9. Accepted position papers will be published as approved (with the exception of stylistic changes) in the American Journal of Forensic Medicine and Pathology as a position endorsed by the National Association of Medical Examiners for five years.

10. A paper rejected by the Executive Committee or Board of Directors may be submitted to any medical journal as the product of the authors, but it may not be identified as an endorsed opinion of NAME.

*Position paper was never re-submitted due to controversy*

B 14

*Topics in Magnetic Resonance Imaging*
13(2): 85–94
© 2002 Lippincott Williams & Wilkins, Inc., Philadelphia

# Ethical Issues in Imaging Nonaccidental Injury: Child Abuse

### Patrick D. Barnes, M.D.

**Summary:** One of the most controversial areas of nonaccidental injury is the medical diagnosis of inflicted central nervous system injury and its impact on medical, social, and legal outcomes for children and families. This review addresses the role of the neuroradiologist in the clinical care of the pediatric patient and as an expert medical witness in the area of nonaccidental injury. **Key Words:** Magnetic resonance imaging—Pediatric neuroradiology—Nonaccidental injury—Child abuse.

## INTRODUCTION

Traumatic central nervous system (CNS) injury is reportedly the leading cause of morbidity and mortality in children, accounting for nearly 100,000 emergencies per year in the United States and half the deaths from infancy through puberty (1,2). The major causes in this age group are accidental and include falls, vehicular accidents, and recreational mishaps. However, nonaccidental, inflicted, or intentional, trauma (nonaccidental injury [NAI]) is said to be an increasingly frequent cause of CNS injury and is stated to be responsible for about 80% of the deaths (estimated 3,000 per year) from brain injury in children less than 2 years old (3,4). The peak incidence of child abuse resulting in CNS injury is about 6 months of age. The acute life-threatening consequences of CNS injury as well as the long-term effects on the development of the child have been a focus of major interest since the landmark article by Caffey (5) in 1946 and the Rigler lecture by Silverman (6) in 1972. Computed tomography (CT) and, more recently, magnetic resonance imaging (MRI) reportedly have provided data that allow more accurate estimates of the incidence of CNS trauma associated with abuse, with a reported range from 7% to 19% (2,7–35).

From the Lucile Packard Children's Hospital, Department of Radiology, Stanford University Medical Center, Palo Alto, California, U.S.A.
Address correspondence and reprint requests to Dr. Patrick D. Barnes, Lucile Packard Children's Hospital, Department of Radiology, Stanford University Medical Center, 725 Welch Road, Palo Alto, CA 94304, U.S.A., or pbarnes@stanford.edu

## MECHANISMS AND MANIFESTATIONS OF CNS INJURY IN NAI

Direct contact, or impact, phenomena are said to result in localized cranial distortion and thus produce focal injury, such as fracture, contusion, or an epidural hemorrhage. Accidental injury is said to be typically associated with this mechanism (10,23,36–38). Although common in abuse, it has been reported that impact injury (except for epidural hematoma) usually is not life threatening. In child abuse, it is indirect trauma (i.e., independent of skull deformation) that is considered responsible for the most severe CNS injury (10,23,36–38). Inertial loading accompanying sudden angular acceleration or deceleration of the head on the neck, as with shaking, results in shear strain deformation, disruption at tissue interfaces, and, therefore, diffuse injury. Such a mechanism would seem logical in the susceptible young infant who is predisposed by weak neck muscles, a relatively large head, and the vulnerability of an immature brain (10,23,36–38). It is this shaking mechanism that traditionally has been postulated to produce the primary injury pattern (i.e., subdural hematoma, retinal hemorrhages, and diffuse axonal injury) and secondary injury pattern (i.e., edema, swelling, hypoxia-ischemia, herniation) stated to be characteristic, if not pathognomonic, of the shaken baby syndrome (SBS) (10,23,36–51). Such patterns of damage often are associated with the most severe and fatal CNS injuries and are readily demonstrated by neuroimaging, surgical neuropathology, and postmortem neuropathology (7–57). It has further been declared that retinal hemorrhages of a par-

P.D. BARNES

ticular pattern are diagnostic of SBS/NAI; that such CNS injury on an accidental basis can only be associated with a massive force equivalent to a motor vehicle accident or a fall from a two-story building; that such injury is immediately symptomatic and cannot be followed by a lucid interval; and that changing symptoms in a child with prior head injury is due to newly inflicted injury and not just a rebleed (22,23,45,46,51,52,58–65). Therefore, from this reasoning, the last caretaker with the injured child is automatically considered guilty of abusive injury, especially if the incident is unwitnessed (43,59,63,64).

Imaging evidence of CNS injury may occur with, or without, other clinical findings of trauma (e.g., bruising) or other "higher specificity" imaging findings associated with violent shaking (e.g., metaphyseal, rib, or other typical skeletal injuries) (10,23). Therefore, clinical and imaging findings of injury out of proportion to the history of trauma and injuries of different ages have become two of the key diagnostic criteria indicating the "probability" of NAI/SBS or child abuse, particularly when encountered in a young infant (10,23,37). Such clinical and imaging findings have formed the basis on which radiologists and other health professionals have provided a medical diagnosis and offered expert testimony that such findings are "proof" of NAI/SBS.

## CONTROVERSY

Despite imaging advances, fundamental difficulties persist in extracting a definitive diagnosis of NAI/SBS based on a causative event (i.e., shaking) that is inferred, in a number of cases, from clinical, radiologic, and pathologic findings in the absence of witnessed or admitted violent shaking (22,23,43,51,61,63,64). This problem is magnified further by the lack of consistent and reliable criteria for the diagnosis of NAI/SBS, and that the vast body of literature on child abuse is composed of anecdotal case series, case reports, reviews, opinions, and position papers (2,23,43,56,51,63,64). Furthermore, many reports include cases having impact injury that not only raises doubt regarding the "shaking only" mechanism but also questions that this injury is always "nonaccidental." From an evidence-based medicine perspective, quality of evidence ratings for diagnostic criteria regarding the literature on SBS reveal that few published reports merit a rating above class IV (any design where the test is not applied in blinded evaluation, where evidence is provided by expert opinion alone, or in descriptive case series without controls) (66,67). Such quality of evidence ratings hardly earn a diagnostic criteria recommendation level of "optional," much less as a "guideline" or a "standard." This is particularly true of the neuroimaging literature on SBS/NAI,

the clinical SBS/NAI literature that uses neuroimaging, and the forensic pathology literature (7–35,44,45,52,53–56,63,64,66). The inclusion criteria for many of these series often encompass arbitrary diagnostic categories beyond "definite or confirmed abuse," such as "suspected abuse," "presumed abuse," "likely abuse," and "indeterminate."

The only attempt at a scientific study to test NAI/SBS used a biomechanical approach and measured stresses from shaking versus impact in a doll model. The study correlated those stresses with injury thresholds in subhuman primate experiments established in another study (38). Only stresses associated with impact, whether using an unpadded or padded surface, exceeded the injury thresholds that correlated with the pathologic spectrum of concussion, subdural hematoma, and diffuse axonal injury. The authors concluded that CNS injury in SBS/NAI in its most severe form usually is not caused by shaking alone. These authors also concluded that fatal cases of SBS/NAI, unless in children with predisposing factors (e.g., subdural hygroma, atrophy), are not likely to result from shaking during play, feeding, or swinging, or from more vigorous shaking by a caretaker given for discipline. Although subsequent reports substantiated that CNS injury in NAI from shaking usually is associated with impact, those and other publications also provided evidence that shaking alone can produce serious intracranial injury (23,33,57).

## NAI/SBS REVISITED

Some past and more recent reports have brought forward information based upon clinical, surgical, imaging, pathologic, biomechanical, social, and legal observations that raise serious doubt regarding NAI/SBS as the cause in all cases of infant CNS injury otherwise attributed to abuse using traditional diagnostic criteria for NAI/SBS (10,37,38,43,64,66,68–77). These reports include skull fracture and/or acute subdural hematoma from accidental simple falls in young infants, such as those associated with wide extracerebral spaces (e.g., benign external hydrocephalus, benign extracerebral collections of infancy, subdural hygromas) (49,72–74), and fatal pediatric head injuries caused by witnessed, accidental short-distance falls, including those with a lucid interval and retinal hemorrhages (75). Updated neuropathologic studies indicate the following: (1) cerebral swelling in young infants (<1 year of age) with "SBS," as compared with older infants, more often is due to diffuse axonal injury of hypoxic-ischemic origin rather than traumatic origin (the latter more appropriately termed multifocal traumatic axonal, or shear, injury); (2) although fractures, subdural hemorrhage (e.g.,

interhemispheric), and retinal hemorrhages commonly are present, the usual cause of death was increased intracranial pressure from brain swelling associated with hypoxia-ischemia; and (3) cervical epidural hemorrhage and focal axonal brain stem, cervical cord, and spinal nerve root injuries are characteristically seen in these infants (presumably due to shaking) and may be associated with apnea and responsible for the hypoxic-ischemic brain injury (53–56). Reports of neurosurgical, neuroradiologic, and neuropathologic findings in head trauma as correlated with biomechanical analyses indicate that subdural hematoma and retinal hemorrhages occur with rotational deceleration injuries, whether "accidental" (e.g., axis or center of rotation internal to the skull, including those due to short-distance falls) or "nonaccidental" (i.e., axis of rotation external to the skull, e.g., at the craniocervical junction or cervical spinal level in SBS) (33,68,78–81). To date, there is no scientific basis that indicates how much, or how little, force is necessary to produce traumatic injury to the developing CNS. Furthermore, the specificity of retinal hemorrhages for child abuse and their dating has been questioned. Such hemorrhages reportedly may be seen with a variety of conditions, including accidental trauma, resuscitation, increased intracranial pressure, increased venous pressure, subarachnoid hemorrhage, sepsis, coagulopathy, certain metabolic disorders, systemic hypertension, and other conditions (10,23,48,43).

In view of the medical imaging data available, it is clear that we do not have an established scientific platform from which to distinguish nonaccidental from accidental CNS injury and, in some cases, traumatic from nontraumatic CNS injury. It is obvious that carefully conducted research is needed to establish a sound scientific foundation for CNS injury in NAI, especially in those circumstances in which other characteristic injuries are not present (e.g., skeletal). The immaturity of the young infant brain (e.g., undermyelinated, larger extracerebral spaces) makes it more vulnerable to traumatic CNS injury than that of the older child or adult, whether accidental or nonaccidental, and relies on the attention of caretakers for its safety. However, as the infant becomes more mobile (rolling, crawling, walking), the risk of accidental CNS injury (e.g., from falls) becomes greater. The medical and imaging evidence, particularly when there is only CNS injury, cannot accurately diagnose presumed intentional injury. Only the social investigation may provide the basis for inflicted injury in the context of supportive medical, imaging, or pathologic findings. Furthermore, biomechanical factors must be considered when determining the mechanism of trauma. It should be remembered that there are nonabuse traumatic, as well as nontraumatic, causes of subdural collections, hemorrhagic or nonhemorrhagic, and retinal

hemorrhages. One classic example is the newborn following labor and delivery. Such manifestations of birth trauma may persist beyond the neonatal period and mimic abuse. Other examples are infants following extracorporeal membrane oxygenation (ECMO) therapy and infants with other processes associated with increased intracranial venous pressure (e.g., infectious or postinfectious meningoencephalitis, venous thrombosis) (10,23,82,83).

## PEDIATRIC NEURORADIOLOGY IN THE CLINICAL EVALUATION OF NAI

The child with suspected abuse must not only receive protective evaluation, but also deserves a timely and complete clinical and imaging workup to evaluate the pattern of injury and timing issues and to exclude the mimics of abuse. For CNS injury, this includes not only CT but also MRI and, in some cases, ultrasound (US). Serial imaging, particularly with MRI, also may be necessary. Imaging protocols, utilization guidelines, and interpretative principles are presented in greater detail in a number of recent publications (10,22,23,31,32,76,84,85).

### Computed tomography

In general, CT is used primarily to identify acute or subacute hemorrhage, other collections, edema, skull fracture, and scalp injury (10,22,23,32). CT, particularly as a single examination, often cannot provide precise information with regard to the character and age of collections, particularly in the presence of anemia or coagulopathy and depending upon the nature and number of traumatic events (Fig. 1). Acute to subacute clotted hemorrhage appears high density (age range: 3 hours to 7 days, or sometimes up to 10 days). Hyperacute "unclotted" hemorrhage (<3 hours old), very chronic hemorrhagic collections (>10 to 14 days old), and nonhemorrhagic collections (e.g., subdural effusions or hygromas) all appear hypodense, or occasionally isodense, depending upon protein and cell content. The subarachnoid cerebrospinal fluid (CSF) spaces may be prominent in infants (e.g., normal infantile subarachnoid spaces, benign external hydrocephalus, or benign extracerebral collections) and appear low density on CT. US with Doppler may be used to separate out the fluid compartments, but MRI usually is needed for more definite evaluation (10,23,86–88).

Bone CT algorithms and display techniques are used along with skull films to evaluate for scalp and skull injuries. Scalp and skull injuries are difficult to time precisely by CT, unless serial CTs are available and depending upon the nature and number of traumatic events (10,23). In acute neurologic presentations, CT is indicated emergently to evaluate the need for immediate neurosur-

88                                            P.D. BARNES



**FIG. 1.** Probable hyperacute-acute subdural hematoma (SDH), evolving chronic SDH, and chronic SDH with rehemorrhage in a 3-month-old boy. The child presented with seizures, lethargy, and retinal hemorrhages. A: Unenhanced axial computed tomography (CT) at initial presentation shows a large interhemispheric high-density hemorrhage (arrows), smaller left convexity extracerebral high-density hemorrhages (single crossed arrows) within low-density extracerebral collections, and a diastatic left parietal fracture (double crossed arrows) with overlying scalp swelling and hemorrhage. Magnetic resonance imaging (MRI) was not done at that time to assist with timing assessment. Following recovery from the acute injury, the infant was placed in protective custody for supervised visits by the parents. Seventeen days later, the child was readmitted to the hospital for acute seizures and neurologic deterioration. B: Unenhanced axial CT at that time shows a large high- and low-density left extracerebral collection (arrows) with swelling of the underlying left cerebral hemisphere and rightward shift of the midline markers. High-density hemorrhage also is seen in the interhemispheric fissure (single crossed arrow) and in the cavum velum interpositum (double crossed arrow). Two days later, axial T1 (C, D) and T2 (E) MRI show that the left extracerebral collection has T1-isointense and T2-hyperintense components (hyperacute unclotted portion; arrows) plus T1-hyperintense and T2-hypointense components (acute-to-early-subacute clotted portion; single crossed arrows). These findings are more consistent with a hyperacute-acute SDH (<3 days old) plus an early subacute SDH (<7 days old) than with an evolving chronic SDH or a chronic SDH with rehemorrhage (Table 1). In the latter, even higher T1 and T2 hyperintensities would be expected in a hemorrhage that is 19 days old. MRI findings with regard to the interhemispheric and left posterior parietooccipital convexity collections are most consistent with a combination of chronic subdural hemorrhage and more recent rehemorrhage (double crossed arrows). Extensive hematologic workup ruled out a coagulopathy. F: Axial diffusion trace MRI shows a high-intensity ischemic left parasagittal cerebral infarction (arrow) likely related to subfalcine herniation.

gical intervention (e.g., an expanding hemorrhagic collection) and as an additional guide for the medical management of increased intracranial pressure (e.g., cerebral edema). Repeat or serial imaging may be necessary. Particularly in the unstable infant, initial and repeat cranial US with Doppler at the bedside may not only be an effective method of evaluating structural abnormalities (e.g., white matter tears), but also may be used for monitoring

alterations in cerebral blood flow and intracranial pressure (23).

## Magnetic resonance imaging

Multiplanar MR probably is the most important technique for assessing the pattern, extent, and timing of the injury(s), particularly in the absence of characteristic findings on CT (10,22,23,31,32,76,84,85). MRI should be done as soon after the presentation as the child's condition allows, and a follow-up examination within 7 to 10 days may be needed. T1 and T2 spin-echo (SE) sequences are necessary for characterizing the nature and timing of hemorrhages and other collections as to hyperacute, acute, subacute, or chronic using established criteria (Table 1 and Fig. 1) (10,23,32,85). Fluid-attenuated inversion recovery (FLAIR) imaging is preferred over proton-density images because of its superior ability to specifically suppress CSF signal to assist in the identification of abnormal subarachnoid collections and very chronic subdural collections. FLAIR imaging also provides enhanced conspicuity for non-CSF lesions having long T2 relaxation times (e.g., subdural hematomas or hygromas, shear injury). Magnetically susceptible gradient-echo sequences (T2*) are important for identifying hemorrhagic lesions not shown by some SE techniques (e.g., fast SE), but cannot provide information on timing without supportive T1 and T2 findings, because acute hemorrhage (e.g., deoxyhemoglobin) and chronic hemorrhage (e.g., hemosiderin) both may appear T2* hypointense. Gadolinium-enhanced sequences may assist in the identification of otherwise subtle leptomeningeal changes. Magnetic resonance (MR) angiography and venography also may be important (i.e., to evaluate for venous thrombosis as a mimic of NAI/SBS) (10,23,32). Advanced MR techniques, such as diffusion, perfusion, and spectroscopy, may assist further with the detection, characterization, and timing of the injury components, especially for traumatic or hypoxic-ischemic

axonal injury (10,23,32,84). However, there may be a significant interval (hours to days?) between one or more episodes of trauma, resulting in CNS hemorrhage(s) as the primary injury and subsequent deterioration of the child associated with progression of the hemorrhage, brain swelling, and/or hypoxic-ischemic injury as the secondary injury. To date, none of the current or advanced MRI techniques alone can reliably distinguish NAI from accidental injury to the CNS.

## EXPERT MEDICAL TESTIMONY IN NAI

### Expert medical witness

Expert witnesses are persons who have expertise on the subject at issue and who are designated according to qualifications by the court to instruct the jury (89,90). From a point of ethics, it is not only acceptable, but it is encouraged, for physicians to serve as expert witnesses in civil and criminal cases. The code of medical ethics of the council on ethical and judicial affairs of the American Medical Association (AMA) states that physicians are professionals with special training and experience and have an ethical obligation to assist in the administration of justice (91). The American College of Radiology (ACR) also states that it is in the public interest for medical expert testimony (by radiologists) be readily available (92). The AMA and ACR also have provided guidelines on the ethical and professional manner upon which expert medical witnesses conduct themselves. The AMA states that medical experts should have recent and substantive experience in the area in which they testify. The expert should testify honestly and truthfully to the best of his or her medical knowledge; should not become an advocate or a partisan in the legal proceeding; and should inform the attorney(s) for the party who calls upon the expert to provide all favorable and unfavorable information developed by the physician's evaluation. It is unethical for a physician to

TABLE 1. *Magnetic resonance imaging of intracranial hemorrhage and thrombosis[a]*

| Stage | Biochemical form | Site | T1-MRI | T2-MRI |
|---|---|---|---|---|
| Hyperacute[b] (+edema) (<24 hours) | Fe II oxyHb | Intact RBCs | Iso-Low I | High I |
| Acute (+edema) (1–3 days) | Fe II deoxy Hb | Intact RBCs | Iso-Low I | Low I |
| Early subacute (+edema) (3–7 days) | Fe III metHb | Intact RBCs | High I | Low I |
| Late subacute (–edema) (1–2 weeks) | Fe III metHb | Lysed RBCs (extracellular) | High I | High I |
| Early chronic (–edema) (>2 weeks) | Fe III transferrin | Extracellular | High I | High I |
| Chronic (cavity) | Fe III ferritin and hemosiderin | Phagocytosis | Iso-Low I | Low I |

[a] Modified from Barnes PD, Wolpert. MRI in Pediatric Neuroradiology. St. Louis: Mosby Year-Book, 1992; Kleinman P, Barnes P. Head trauma. In: Kleinman PK, ed. Imaging of Child abuse, 2nd ed. St. Louis: Mosby Year-Book. 1998; Bradley WG Jr. MR appearance of hemorrhage in the brain. Radiology 1993;189:15–26; does not include influence of fetal Hb.

[b] Computed tomography is more sensitive and more specific than magnetic resonance imaging or ultrasound for hyperacute/acute hemorrhage in all compartments.

RBCs, red blood cells; I, signal intensity; +, present; –, absent; Hb, hemoglobin; Fe II, ferrous; Fe III, ferric; Iso, isotense.

accept compensation that is contingent upon the outcome of the litigation (91). The ACR adds that the radiologist expert witness must maintain an active practice of radiology and be certified, familiar with, and actively involved in the clinical practice of the subject matter of the case for 3 of the previous 5 years at the time of the testimony (92). The testimony offered by the expert witness must be based upon a reasonable degree of medical or scientific certainty. That is, in the judgment of the expert witness, the causal relationship between an event and the outcome is probable, or more likely than not. The quality of the evidence, therefore, rises above speculation and conjecture and may be considered by the jury.

### Expert medical review, consultation, and testimony

Theoretically, the opinion of the medical expert should be the same whether rendered for the defense or for the prosecution (or plaintiff) (89,90,93). An expert medical review for a criminal (or civil) case may involve the viewing of imaging examinations, imaging reports, medical records, chronology of events, complaint or charges filed, expert letters of opinions, and depositions of the clients, providers, treating physicians, and expert witnesses. In a consultation with a legal representative of the party(s) involved, the expert radiologist's findings and opinions are conveyed and discussed with regard to causation, including pattern of injury and timing (and/or standard of care when appropriate). Occasionally, legal counsel requests that the radiology expert confer directly with other experts retained by counsel. A formal letter of opinion may be requested that details the imaging findings and their significance with regard to causation. Imaging evidence should always stand independent of the clinical evidence. If the imaging findings or opinions alone cannot provide support for, or against, causation, then the case must be tried on the basis of the clinical evidence/opinions alone.

After the expert review, the attorney may request permission to officially designate the radiologist as an expert witness and submit the expert's qualifications and official letter of opinion to the court. Many, but not all, jurisdictions require that the expert witness be qualified according to certain guidelines. Federal guidelines (Daubert, Supreme Court 1993) require that the expert witness be qualified by providing certain credentials, which include a curriculum vita, documentation of clinical experience (>50% of practice in the field of expert testimony), an accounting of previous deposition and trial testimony, a fee schedule, percentage (or amount) of income derived annually from expert testimony, and a detailed written letter of opinion that includes a list of the pertinent medical literature (89–93). The letter of opinion may be offered along with other "evidence" for review by a screening

panel or for mediation to effect resolution, a settlement, or a trial.

A discovery deposition then may be scheduled to "discover" the basis for the opinions offered by the expert witness to prepare for possible mediation, settlement, or trial (89,90,93). In some criminal cases, expert medical testimony may be presented as part of a grand jury investigation. During the recorded deposition under oath, the expert witness is questioned regarding qualifications, clinical and expert witness experience, expert fees and income, all materials reviewed (offered as numbered exhibits) and relied upon as the basis for the expert's opinions in the case at hand, and the expert's opinions. The expert is specifically questioned regarding his or her intention to offer opinions on causation or standard of care, when applicable. The expert witness may be asked to assist the referring counsel in preparing strategy for the depositions of the adversary expert witnesses testifying in the same field of expertise.

In preparation for trial, the expert witness organizes and re-reviews all materials and exhibits, including the expert's own discovery deposition transcript. The expert may be asked to review certain medical records, other expert opinions, and other depositions, including those of the adversarial expert witnesses (89,90,93). Occasionally, legal counsel requests that the radiology expert confer with other experts before testifying. A pretrial conference often is scheduled for expert testimony preparation and rehearsal and to assist counsel in preparing strategy for cross-examination of adversarial expert witnesses. At trial, the expert witness is initially presented to the court (judge and/or jury) for direct examination by the retaining legal counsel to establish the expert's qualifications and to present the expert's opinions as supported by the evidentiary exhibits (89,90,93). The witness then undergoes cross-examination by the adversary legal counsel. The judge may allow for "re-direct" and for "re-cross" by the retaining and adversary counsels, respectively. It is advisable to use only the imaging films (i.e., direct evidence) as exhibits and not to use "artist-rendered" medical illustrations (i.e., indirect or potentially "fabricated" evidence) for presentation to the jury.

It is important for the expert witness to give the entirety of his or her opinion during direct examination by the retaining counsel and to address all pertinent issues (89,90,93). This will prevent the witness from being ambushed by the adversarial counsel during the cross-examination regarding issues not covered in the expert's direct testimony. The expert otherwise must rely on subsequent re-direct examination by the retaining counsel to clarify certain parts of the testimony. The expert witness must speak directly to the jurors in clear and understand-

able language, and with respect. Although the testimony is conveyed in response to questions (including hypotheticals) posed by counsel, the expert should avoid being led or translated by counsel. The expert should testify by presenting the findings/opinions in a logical sequence or chronology and by specifying the level of medical and/or scientific certainty based upon the expert's cited experience and/or published literature (if allowed). Repeating important points and providing a summary may be critical. During cross-examination, the expert witness must be especially careful not to hastily agree with adversarial counsel's translation of the expert's testimony.

## Irresponsible medical testimony: Jurors and jurists beware

Irresponsible medical testimony may be manifested in a number of ways (93,94). The irresponsible expert may not possess the proper qualifications. Unique theories of causation may be offered that are not supported by the pertinent medical literature, or the expert may use nonpertinent literature or may misrepresent the literature. The witness may offer unique or unusual interpretations of medical findings, or may allege nonexistent findings. The expert may misquote well-known journals or texts, make false statements, or omit important facts or knowledge pertinent to opinions being offered. Jurors and jurists should be beware of the following: complicated and technical expert testimony; constant leading or translation by counsel; use of manufactured and elaborate exhibits instead of the original medical evidence; expert opinions based upon the opinions of other experts retained by the same counsel; expert opinions offered outside one's specific field of expertise; not providing an expert in a field pertinent to the case; scripted or choreographed testimony by experts retained by same counsel; experts offering unique theories that are contrary to the prevailing literature and are not supported by the pertinent literature; expert testimony that contradicts expert's own publications; counsel's use of the phrase "experts on both sides agree"; and constant misrepresentation of expert testimony and scientific evidence by counsel in an attempt to confuse the jury. A number of remedies have been offered or instituted to deal with irresponsible medical testimony, including Federal guidelines (see earlier), peer review of expert testimony by professional societies, establishment of a general pool for expert witness fees, and use of expert panels or screening panels.

## Recommendations for pediatric neuroradiology

The pediatric neuroradiologist should describe the imaging findings in detail, including the pattern, distribution, and severity of injury with regard to scalp, skull, and intracranial abnormalities, including extracerebral collections and brain injury. A differential diagnosis is given and timing ranges are provided if possible. If NAI is at issue or suspected, then the radiologist must directly communicate the imaging findings to the primary care team and be available to consult with child protection services, other medical or surgical consults, including the pathologist or biomechanical specialist, law enforcement investigators, and attorneys for all parties, as appropriate. Pattern of injury and time parameters, as may be provided by MRI, are particularly important with regard to correlations with events as reported by witnesses and potential suspects. For example, such information may exonerate the last individual who was with the victim and implicate others who had access to the child before that time. This classically occurs when a previously injured child is left with a baby-sitter or at day care and then later collapses. The last caretaker then is charged with assault. In one such "homicide" case, a CT performed within a few hours of the alleged assault by a baby-sitter showed that the infant had a high-density subdural hemorrhage consistent with "acute" injury (95). An MRI performed shortly thereafter showed that the subdural hemorrhage was T1 hyperintense with some areas of T2 hypointensity and T2 hyperintensity. Using established criteria (Table 1), the MRI findings indicated that the injury was at least 3 days old. The State's expert witnesses ignored the MRI findings regarding timing and testified that the injury was acute SBS and could only be inflicted by the defendant. Nonetheless, the baby-sitter who had only been with the infant for a short time before the collapse was acquitted (95).

The radiologist must be aware of certain conditions that are known to have clinical and imaging features that may mimic abuse (16,32). These include accidental injury, certain coagulopathies, vascular diseases, infectious or postinfectious conditions (e.g., postvaccinal), metabolic disorders, neoplastic diseases, certain therapies, and some congenital and dysplastic disorders. The physician should not only rule them out, but also must consider the possibility of combined, or multifactorial, mechanisms with synergistic effects (i.e., an underlying condition with superimposed nonaccidental, or accidental, trauma). A case in point is that of a young infant who became progressively ill following a diphtheria-pertussis-tetanus (DPT) vaccination and subsequently became apneic. The father attempted to revive the child by "shaking" and then attempted cardiopulmonary resuscitation (CPR). The infant also received CPR by the rescue team at the home and again at the hospital. Retinal hemorrhages were present on ophthalmologic examination. The father was charged with abuse. Subsequent CT imaging with CT venography showed a combination of enhancing cerebral infarctions,

venous thromboses, and subdural hemorrhages. An MRI was not done, although the CT findings were verified by postmortem neuropathologic examination. The evidence was consistent with a hemorrhagic meningoencephalitis, likely postvaccinial, although additional trauma, either accidental (e.g., CPR) or nonaccidental (e.g., shaking) could not be ruled out. The father was convicted on the basis that the State's experts testified that the injuries could only be caused by SBS (96). The conviction is under appeal.

## CONCLUSION

Timely and thorough evaluation of alleged NAI cases clinically and radiologically, in addition to the social assessment, can make the difference between appropriate child protection and an improper breakup of the family or a wrongful indictment and conviction (10,23). Pediatric neuroradiology often plays a major role in this assessment.

## REFERENCES

1. Kraus J, Fife D, Cox P, et al. Incidence, severity, and external cause of pediatric head injury. Am J Dis Child 1986;140:687–693.
2. Zimmerman RA, Bilaniuk L. Pediatric head trauma. Neuroimaging Clin N Am 1994;4:349–366.
3. Bruce DA, Zimmerman RA. Shaken impact syndrome. Pediatr Ann 1989;18:482–494.
4. Harwood-Nash DC. Abuse to the pediatric central nervous system. AJNR Am J Neuroradiol 1992;13:569–575.
5. Caffey J. On the theory and practice of shaking infants. Its potential residual effects of permanent brain damage and mental retardation. Am J Dis Child 1972;124:161–169.
6. Silverman FN. Unrecognized trauma in infants, the battered child syndrome, and the syndrome of Ambroise Tardieu. Rigler lecture. Radiology 1972;104:337–353.
7. Alexander RC, Schor DP, Smith WL Jr. Magnetic resonance of intracranial injuries from child abuse. J Pediatr 1986;109:975–979.
8. Ball WS Jr. Nonaccidental craniocerebral trauma (child abuse): MR imaging. Radiology 1989;173:609–610.
9. Barlow KM, Gibson RJ, McPhillips M, et al. Magnetic resonance imaging in acute nonaccidental head injury. Acta Paediatr 1999;88:734–740.
10. Barnes PD, Robson CD. CT findings in hyperacute nonaccidental brain injury. Pediatr Radiol 2000;30:74–81.
11. Bird CR, McMahan JR, Gilles RH, et al. Strangulation in child abuse: CT diagnosis. Radiology 1987;163:373–375.
12. Chabrol B, Decarie JC, Fortin G. The role of cranial MRI in identifying patients suffering from child abuse and presenting with unexplained neurologic findings. Child Abuse Negl 1999;23:217–228.
13. Cohen RA, Kaufman RA, Myers PA, et al. Cranial computed tomography in the abused child with head injury. AJNR Am J Neuroradiol 1985;6:883–888.
14. Dias MS, Backstrom J, Falk M, et al. Serial radiography in the infant shaken impact syndrome. Pediatr Neurosurg 1998;29:77–85.
15. Ewing-Cobbs L, Kramer L, Prasad M, et al. Neuroimaging, physical, and developmental findings after inflicted and noninflicted traumatic brain injury in young children. Pediatrics 1998;102:300–307.
16. Ewings-Cobbs L, Prasad M, Kramer L, et al. Acute neuroradiologic findings in young children with inflicted or noninflicted traumatic brain injury. Child Nerv Syst 2000;16:25–33.
17. Feldman KW, Weinberger E, Milstein JM, et al. Cervical spine MRI in abused infants. Child Abuse Negl 1997;21:199–205.
18. Greenberg J, Cohen WA, Cooper PR. The hyperacute extra-axial intracranial hematoma: Computed tomographic findings and clinical significance. Neurosurgery 1985;17:48–56.
19. Hart BL, Dudley MH, Zumwalt RE. Postmortem cranial MRI and autopsy correlation in suspected child abuse. Am J Forensic Med Pathol 1996;17:217–224.
20. Huseler LJ, Arenue E, Danielsen ER, et al. Evidence from proton MR spectroscopy for a metabolic cascade of neuronal damage in shaken baby syndrome. Pediatrics 1997;99:4–14.
21. Hymal KP, Rumack CM, Hay TC, et al. Comparison of intracranial CT findings in pediatric abusive and accidental head trauma. Pediatr Radiol 1997;27:743–747.
22. Kemp AM. Investigating subdural hemorrhage in infants. Arch Dis Child 2002;86:98–102.
23. Kleinman PK, Barnes PD. Head Trauma. In: Kleinman PK, ed. Diagnostic Imaging of Child Abuse, 2nd ed. St. Louis: Mosby Year-Book, 1998;285–342.
24. Merten DP, Osborne DRS, Radkowski MA, et al. Craniocerebral trauma in the child abuse syndrome: Radiological observations. Pediatr Radiol 1984;14:272–277.
25. Mogbo KI, Slovis TL, Canady AI, et al. Appropriate imaging in children with skull fractures and suspicion of abuse. Radiology 1998;208:521–524.
26. Petitti N, Williams DW. CT and MRI of nonaccidental pediatric head trauma. Acad Radiol 1998;5:215–223.
27. Sato Y, Yuh WT, Smith WL, et al. Head injury in child abuse: Evaluation with MRI. Radiology 1989;173:653–657.
28. Rao P, Carty H, Pierce A. The acute reversal sign: Comparison of medical and nonaccidental injury patients. Clin Radiol 1999;54:495–501.
29. Rooks VJ, Sisler C, Burton B. cervical spine injury in child abuse: Report of two cases. Pediatr Radiol 1998;28:193–195.
30. Zimmerman RA, Bilaniuk LT, Bruce D, et al. Interhemispheric acute subdural hematoma. A computed tomographic manifestation of child abuse by shaking. Neuroradiology 1979;16:39–40.
31. Suh DY, Davis PC, Hopkins KL, et al. Nonaccidental pediatric head injury: Diffusion weighted imaging. Neurosurgery 2001;49:309–320.
32. Blousse V, Suh DY, Newman NJ, et al. Diffusion-weighted MRI in shaken baby syndrome. Am J Ophthalmol 2002;133:249–255.
33. American College of Radiology. Imaging of the child with suspected physical abuse. In: American College of Radiology appropriateness criteria for imaging and treatment decisions. Ann Coll Radiol 2000;805–809.
34. American Academy of Pediatrics. Section on radiology: Diagnostic imaging of child abuse. Pediatrics 2000;105:1345–1348.
35. American Academy of Pediatrics. Committee on child abuse and neglect. Shaken baby syndrome: Rotational cranial Injuries—Technical report. Pediatrics 2001;108:206–210.
36. Duhaime AC, Alairo AJ, Lewander WJ, et al. Head injury in very young children: Mechanisms, injury types, and ophthalmologic findings in 100 hospitalized patients younger than 2 years of age. Pediatrics 1992;90:179–185.
37. Duhaime AC, Christian CW, Rorke LB, et al. Nonaccidental head injury in infants—The "shaken-baby syndrome." N Engl J Med 1998;338:1822–1829.
38. Duhaime AC, Gennarelli TA, Thibault LE, et al. The shaken baby syndrome: A clinical, pathological, and biomechanical study. J Neurosurg 1987;66:409–415.
39. Aldrich EF, Eisenberg HM, Saydjari C, et al. Diffuse brain swelling in severely head injured children. J Neurosurg 1992;76:450.
40. Barkovich AJ. MR and CT evaluation of profound neonatal and infantile asphyxia. AJNR Am J Neuroradiol 1992;13:959.
41. Bruce DA, Alavi A, Bilaniuk L, et al. Diffuse cerebral swelling following head injuries in children: The syndrome of "malignant brain edema." J Neurosurg 1981;54:170–178.
42. Dashti SR, Decker DD, Razzaq A, et al. Current patterns of inflicted head injury in children. Pediatr Neurosurg 1999;31:302–306.

43. David TJ. Shaken baby syndrome: Nonaccidental head injury in infancy. J R Soc Med 1999;92:556–561.

44. Feldman KW, Bethel R, Shurgerman RP, et al. The cause of infant and toddler subdural hemorrhage: A prospective study. Pediatrics 2001;108:636–646.

45. Jenny C, Hymel KP, Ritzen A, et al. Analysis of missed cases of abusive head trauma. JAMA 1999;281:621–626.

46. Levit CJ, Smith WL, Alexander RC. Abusive head trauma. In: Reece RM, ed. Child Abuse: Medical Diagnosis and Management. Philadelphia: Lea & Febiger, 1994:1–22.

47. Luerssen TG. Acute traumatic cerebral injuries. In: Cheek WR eds. Pediatric Neurosurgery. Philadelphia: W.B. Saunders, 1994:266–278.

48. Morris MW, Smith S, Cressman J, et al. Evaluation of infants with subdural hematoma who lack external evidence of abuse. Pediatrics 2000:105:549–453.

49. Parent AD. Pediatric chronic subdural hematoma: A retrospective comparative analysis. Pediatric Neurosurg 1992:18:266–271.

50. Reece RM, Sege R. Childhood head injuries. Arch Pediatr Adolesc Med 2000;154:11–15.

51. Shannon P, Becker L. Mechanisms of brain injury in infantile child abuse [Commentary]. Lancet 2001:358:686–687.

52. Case ME, Graham MA, Handy TC, et al. Position paper on fatal abusive head injuries in infants and young children. Am J Forensic Med Pathol 2001;22:112–122.

53. Geddes JF, Hackshaw AK, Vowles GH, et al. Neuropathology of inflicted head injury in children. I. Patterns of brain injury. Brain 2001;124:1290–1298.

54. Geddes JF, Vowles GH, Hackshaw AK, et al. Neuropathology of inflicted head injury in children. II. Microscopic brain injury in infants. Brain 2001;124:1299–1306.

55. Geddes JF, Whitwell HL, Graham DI. Traumatic axonal injury: Practical issues for diagnosis in medicolegal cases. Neuropathol Appl Neurobiol 2000:26:105–116.

56. Graham DI. Pediatric head injury [Editorial]. Brain 2001;124:1261–1262.

57. Hadley MN, Sonntag VKH, Rekate HL, et al. The infant whiplash-shake injury syndrome: A clinical and pathological study. Neurosurgery 1989;24:536–540.

58. American Academy of Pediatrics. Committee on Child Abuse Neglect. Distinguishing sudden infant death syndrome from child abuse fatalities. Pediatrics 2001;107:437–440.

59. Brown J, Minns R. Non-accidental head injury, with particular reference to whiplash shaking injury and medicolegal aspects. Dev Med Child Neurol 1993;35:849–869.

60. Gilliland MGF, Luckenbach MW, Chenier TC. Systemic and ocular findings in 169 prospectively studied child deaths: Retinal hemorrhages usually mean child abuse. Forensic Sci Int 1994;68:117–132.

61. Leventhal JM. The challenges of recognizing child abuse: Seeing is believing. JAMA 1999;281:657–659.

62. Leventhal JM. The prevention of child abuse and neglect: Successfully out of the blocks. Child Abuse Neglect 2001;25:431–439.

63. Plunkett J. Shaken baby syndrome and the death of Matthew Eappen: A forensic pathologist's response. Am J Forensic Med Pathol 1999;20:17–21.

64. Wilkins B. Head injury—Abuse or accident? Arch Dis Child 1997; 76:393–397.

65. Richman HA. From a radiologist's judgment to public policy on child abuse and neglect: What have we wrought? Pediatr Radiol 2000;30:219–228.

66. Donohue M. Shaken baby syndrome and non-accidental injuries [Personal communication]. August 2001.

67. The Evidence-Based Radiology Working Group. Evidence-based radiology: A new approach to the practice of radiology. Radiology 2001;220:566–575.

68. Greenes DS, Schutzman SA. Clinical indicators of intracranial injury in head-injured infants. Pediatrics 1999;104:861–867.

69. Greenes DS, Schutzman SA. Clinical significance of scalp abnor-

malities in asymptomatic head-injured infants. Pediatr Emerg Care 2001;17:88–92.

70. Greenes DS, Schutzman SA. Occult intracranial injury in infants. Ann Emerg Med. 1998;32:680–686.

71. Gnaskin KD, Schutzman SA. Head trauma in children younger than 2 years: Are there predictors for complications? Arch Pediatr Adolesc Med 1999;153:15–20.

72. Hwang SK, Kim SL. Infantile head injury, with special reference to the development of chronic subdural hematoma. Child Nerv Syst 2000;16:590–594.

73. Kim KA, Wang MY, Griffith PM, et al. Analysis of pediatric head injury from falls. Neurosurg Focus 2000;8:1–9.

74. Priatt JH Jr. A pitfall in the diagnosis of child abuse: External hydrocephalus, subdural hematoma, and retinal hemorrhages. Neurosurg Focus 1999;7:1–8.

75. Plunkett J. Fatal pediatric head injuries caused by short-distance falls. Am J Forensic Med Pathol 2001;22:1–11.

76. Schutzman SA, Barnes P, Duhaime A-C, et al. Evaluation and management of children younger than two years old with apparently minor head trauma: Proposed guidelines. Pediatrics 2001;107:983–993.

77. Schutzman SA, Greenes DS. Pediatric minor head trauma. Ann Emerg Med 2001;37:65–74.

78. Reiber GD. Fatal falls in childhood: How far must children fall to sustain fatal head injuries? Report of cases and review of the literature. Am J Forensic Med Pathol 1993;14:201–207.

79. Hall JR, Reyes HM, Horvat M, et al. The mortality of childhood falls. J Trauma 1989;29:1273–1275.

80. Aoki N, Masuzawa H. Infantile acute subdural hematoma: Clinical analysis of 26 cases. J Neurosurg 1984;61:273–280.

81. Howard MA, Bell BA, Uttley D. The pathophysiology of infant subdural hematomas. Br J Neurosurg 1993;7:355–365.

82. Deveber G, Andrew M, Adams C, et al. Cerebral sinovenous thrombosis in children. N Engl J Med 2001;345:417–423.

83. Lynch JK, Hirtz DG, DeVeber G, et al. Report of the National Institute of Neurological Disorders and Stroke Workshop on Perinatal and Childhood Stroke. Pediatrics 2002;109:116–123.

84. Barnes PD. State of the art: Neuroimaging and the timing of fetal and neonatal brain injury. J Perinatol 2001;21:44–60.

85. Bradley WG Jr. MR appearance of hemorrhage in the brain. Radiology 1993;189:15–26.

86. Veyrac C, Couture A, Baud C. Pericerebral fluid collections and ultrasound. Pediatr Radiol 1990;20:236–240.

87. Wilms G. CT and MR in infants with pericerebral collections and macrocephaly: Benign enlargement of the subarachnoid spaces versus subdural collections. Am J Neuroradiol 1993;14:855–860.

88. Chen CY, Chou TY, Zimmerman RA, et al. Pericerebral fluid collections: Differentiation of enlarged subarachnoid spaces from subdural collections with color doppler US. Radiology 1996;201:389–392.

89. Berlin L. Expert witness. Am Coll Radiol ACR Bulletin 1999;55:17–22.

90. Berlin L. Malpractice issues in radiology. On being an expert witness. AJR Am J Roentgenol 1997;168:607–610.

91. American Medical Association. Code of Medical Ethics, Section 9.07. Medical Testimony. Chicago, IL: American Medical Association, 1997:148–149.

92. American College of Radiology. Digest of council actions, 1986–1997, section II K1–3, testimony. Reston, VA: American College of Radiology, 1997;121–123.

93. Barnes PD. The pediatric radiologist as expert witness: How I do it. In: Shearer LT, Lebowitz RL, eds. Syllabus of the Society for Pediatric Radiology, Pediatric Imaging Course, Vancouver, BC, Canada, May 12, 1999, pp. 11–13.

94. Chadwick D, Krous HF. Irresponsible medical testimony. Child Maltreat 1997:2:313–321.

95. State of New Jersey v Ehnbuhm. 2000.

96. State of New York v Scoon, 1998.