(3) Did you receive an evidentiary hearing on your petition, application, motion, etc.? Yes _____ No *X*

(4) Result: _____ N/A _____

(5) Date of result: _____ N/A _____

(b)  As to any second petition, application, motion, etc., give the same information:

(1) Nature of the proceeding: _____

_____

(2) Grounds raised: _____

_____

_____

(3) Did you receive an evidentiary hearing on your petition, application, motion, etc.?   Yes _____ No *X*

(4) Result: _____

(5) Date of result: _____

12.  Other than a direct appeal from the judgment of conviction and sentence, have you previously filed any petitions, applications, motion, etc. with respect to this judgment in any other court? Yes _____ No *X*

13.  If your answer to number 12 was "yes", give the following information:

(a)  (1) Name of court: _____

(2)  Nature of the proceeding: _____

_____

_____

(3)  Grounds raised: _____

_____

3.

(4)   Did you receive an evidentiary hearing on your petition, application, motion, etc.?   Yes _____ No  _X_

(5)   Result: _____

(6)   Date of result: _____

(b)  As to any second petition, application, motion, etc., give the same information:

(1)   Name of court: _____

(2)   Nature of the proceeding: _____

_____

_____

(3)   Grounds raised: _____

_____

_____

(4)   Did you receive an evidentiary hearing on your petition, application, motion, etc.?   Yes _____ No  _X_

(5)   Result: _____

(6)   Date of result: _____

(c)  As to any third petition, application, motion, etc., give the same information:

(1)   Name of court: _____

(2)   Nature of the proceeding: _____

_____

_____

(3)   Grounds raised: _____

_____

_____

4.

(4)   Did you receive an evidentiary hearing on your petition, application, motion, etc.?     Yes _____ No X

(5)   Result: _____

(6)   Date of result: _____

14.   State concisely every ground on which you claim that the judgment or sentence is unlawful.  Summarize briefly the facts supporting each ground.  If necessary, you may attach pages stating additional grounds and the facts supporting them. For your information, the following is a list of the most frequently raised grounds for postconviction relief. Each statement preceded by a letter constitutes a separate ground for possible relief.  You may raise any grounds that you may have other than those listed. However, you should raise in this motion all available grounds (relating to this conviction) on which you base your allegations that your conviction or sentence is unlawful.

### DO NOT CHECK ANY OF THESE LISTED GROUNDS

   If you select one or more of these grounds for relief, you must allege facts. The motion will not be accepted by the court if you merely check (a) through (i).

   (a)   Conviction obtained by plea of guilty or nolo contendere that was unlawfully induced or not made voluntarily with understanding of the nature of the charge and the consequences of the plea.
   (b)   Conviction obtained by the unconstitutional failure of the prosecution to disclose to the defendant evidence favorable to the defendant.
   (c)   Conviction obtained by a violation of the protection against double jeopardy.
   (d)   Denial of effective assistance of counsel.
   (e)   Denial of right of appeal.
   (f)   Lack of jurisdiction of the court to enter the judgment or impose sentence (such as unconstitutional statue).
   (g)   Sentence in excess of the maximum authorized by law.
   (h)   Newly discovered evidence.

5.

(i)    Changes in the law that would be retroactive.

A.    Ground 1: <u>NEWLY DISCOVERED EVIDENCE</u>

Supporting FACTS (tell your story briefly without citing cases or law): 

CONTINUED ON PAGE 6-A

B.    Ground 2: <u>INEFFECTIVE ASSISTANCE OF COUNSEL</u>

<u>STRICKLAND V. WASHINGTON 466 U.S 668, 104 S.Ct 2052 (1984)</u>

Supporting FACTS (tell your story briefly without citing cases or law): 

CONTINUED ON PAGE 6-C

C.    Ground 3: <u>FUNDAMENTAL ERROR</u>

Supporting FACTS (tell your story briefly without citing cases or law): CONTINUED ON PAGE 7-A

6.

# GROUND ONE
## -CONTINUED-

ON MAY 1, 2001, THE DEFENDANT QIHARD COLLINS SR. WAS CHARGED BY FELONY INDICTMENT WITH ONE COUNT OF FIRST DEGREE FELONY MURDER FOR THE DEATH OF HIS SON QIHARD COLLINS JR. IT WAS ALLEGED BY THE STATE OF FLORIDA THAT QIHARD SR. KILLED THE VICTIM BY HITTING AND/OR SHAKING AND/OR STRIKING SAID VICTIM ABOUT HIS HEAD CAUSING ABUSIVE HEAD INJURIES.

IN THE DECEMBER 3, 2001 PRETRIAL DEPOSITION GIVEN BY DR. TERRENCE STEINER MEDICAL EXAMINER FOR ST. JOHNS COUNTY FLORIDA. DR. STEINER TESTIFIED THAT THE CAUSE OF THE VICTIMS DEATH WAS DUE TO ABUSIVE HEAD INJURIES AND THAT THE VICTIM SUFFERED INTERNAL BRUSING UNDER THE SCALP IN AT LEAST EIGHT DIFFERENT PLACES, MASSIVE SWELLING OF THE BRAIN AND HEMORRAGE INTO THE MEMBRANES COVERING THE BRAIN. THE VICTIM SUFFERED BLEEDING INTO THE OPTIC NERVE SHEATHS AND THE HEAD AND EYE INJURY SUFFERED WERE DETERMINED BY DR. STEINER TO BE CLASSIC OF SHAKEN BABY SYNDROME [1]

THROUGH PERSONAL CORRESPONDENCE WITH INMATE ROBERT BASSETT, WASHINGTON CORRECTIONAL INSTITUTION, 4455 SAM MITCHELL DRIVE, CHIPLEY, FL. 32428. ON OR ABOUT APRIL 4. 2004 THE DEFENDANT DISCOVERED FACTS THAT WERE UNKNOWN TO THE DEFENDANT WHEN MR. COLLINS PLEAD NOLO CONTENDERE TO THE CHARGE OF SECOND DEGREE MURDER.

UPON READING SEVERAL MEDICAL JOURNALS AND/OR DOCUMETARIES WRITTEN BY DR. HARLD BUTTRAM, et. ol. THE DEFENDANT

---

HEREINAFTER: S.B.S

6·A

HAS LEARNED THAT MEDICAL VACCINATIONS ADMINISTERED TO
INFANTS AT BIRTH HAVE BEEN LINKED TO CAUSING INFANT MORTALITY
WITH INJURIES OFTEN MISCHARACTERIZED AS RESULTING FROM
CHILD ABUSE. (EXHIBIT A )

SOME OF THE SYMPTOMS IDENTIFIED IN DR. BUTTRAM'S
MEDICAL REPORT THAT WERE FOUND TO BE CAUSED BY AN ADVERSE
VACCINE REACTION WERE INTRACRANIAL AND OCULAR HEMORRHAGE
AND SEVERE BRAIN SWELLING. THESE INJURIES WERE OF THE
SAME TYPE SUFFERED BY THE VICTIM QINARD COLLINS JR AS
FOUND BY DR. TERRANCE STEINER'S AUTOPSY. THE DEFENDANTS
SON QINARD JR WAS VACCINATED BY SHANDS MEDICAL CENTER
JACKSONVILLE FLORIDA.

WHEN MR. COLLINS ENTERED THE PLEA OF NOLO CONTENDR
THE DEFENDANT WAS TOTALLY UNAWARE THAT A POSSIBLE
LINE OF DEFENSE IN ADVERSE VACCINE REACTION WAS AVAILABLE
TO BE INVESTIGATED AND RAISED TO THE CHARGED OFFENSE.

HAD THE DEFENDANT KNOWN THERE EXIST A POTENTIAL
VIABLE DEFENSE OF ADVERSE VACCINE REACTION. THE DEFENDANT
WOULD NOT HAVE PLEAD NOLO CONTENDERE TO SECOND DEGREE
MURDER. THE DEFENDANT WOULD HAVE FIRST REQUEST DEFENSE
COUNSEL TO INVESTIGATE THE VIABILITY OF SAID DEFENSE
AGAINST THE FACTS OF THE STATES CASE, AND SUBSEQUENTLY
PROCEEDED TO TRIAL BY JURY HAD COUNSELS INVESTIGATION
PROVED THE VACCINATION GIVEN THE VICTIM WAS THE CAUSE OF
DEATH. THE DEFENDANT IS INNOCENT OF KILLING THE VICTIM,
AND BASED ON THE NEWLY DISCOVERED EVIDENCE ALLEGED HEREIN
THE WITDRAWL OF DEFENDANTS NOLO CONTENDERE PLEA IS
NECESSARY TO CORRECT A MANIFEST INJUSTICE

6-B

# GROUND TWO
## -CONTINUED-

THE DEFENDANTS ATTORNEY MR. JOSEPH ANTHONY RENDERED SUBSTANDARD ASSISTANCE WHEN COUNSEL FAILED TO INVESTIGATE WHETHER AN ADVERSE VACCINE REACTION IN THE VICTIM QIWARD COLLINS JR WAS A CONTRIBUTING CAUSE OF THE VICTIMS DEATH.[2]

MEDICAL STUDIES HAVE SHOWN THAT NEO NATAL VACCINATIONS ADMINISTERED TO INFANTS HAVE BEEN LINKED TO CAUSING INTERNAL INJURIES THAT ARE COMMONLY RULED TO HAVE OCCURRED FROM PHYSICAL CHILD ABUSE. See (Exhibit A )

PRIOR TO PLEADING NOLO CONTENDERE TO THE NEGOTIATED PLEA OF SECOND DEGREE MURDER. THE DEFENDANTS ATTORNEY INFORMED MR. COLLINS THERE WAS NO PLAUSIBLE DEFENSE TO THE OFFENSE OF FIRST DEGREE FELONY AS ALLEGED AGAINST THE DEFENDANT. QIWARD COLLINS REPEATEDLY MAINTAINED TO DEFENSE COUNSEL THAT HE WAS INNOCENT OF THE CHARGED OFFENSE BUT DISPITE THE DEFENDANTS CONCESSION OF INNOCENCE. DEFENSE COUNSEL TOLD THE DEFENDANT THAT PLEADING NOLO CONTENDERE TO THE CHARGE OF SECOND DEGREE MURDER WOULD BE DEFENDANTS BEST OPTION DUE TO THE ABSENSE OF A VIABLE DEFENSE. THE DEFENDANT TOOK COUNSELS ERRONEOUS ADVISE AND ULTIMATELY PLEAD NOLO CONTENDERE. BASED SOLELY ON DEFENSE COUNSEL ASSERTION THAT DEFENDANT WOULD HAVE NO DEFENSE IN THE EVENT DEFENDANT CASE PROCEED TO TRIAL.

CONTRARY TO THE INFORMATION CONVEYED TO MR. COLLINS BY DEFENSE COUNSEL AND DEFENDANTS STANDING BELIEF OF NO POTENTIAL DEFENSE UPON PLEADING NOLO CONTENDERE.

---

[2.] The Defendant Incorperates Herein Any And All Facts That Are Aired In Ground One Of The Foregoing Motion.

THE DEFENDANT HAS DISCOVERED SUBSEQUENT TO PLEADING NOLO CONTENDERE THAT THERE WAS A POTENTIALY VIABLE DEFENSE OF ADVERSE VACCINE REACTION THAT COULD HAVE BEEN USED TO COMBAT THE CHARGE OF FIRST DEGREE FELONY MURDER.

BECAUSE OF DEFENSE COUNSELS FAILURE TO CONDUCT AN INVESTIGATION INTO THE FOREMENTIONED DEFENSE PRIOR TO THE DEFENDANT PLEADING NOLO CONTENDERE. MR. COLLINS MADE AN UNKNOWING DECISION TO PLEA TO SECOND DEGREE MURDER BECAUSE THE DEFENDANT PLEAD WITHOUT THE BENEFIT OF A THOROUGH INVESTIGATION INTO NOR A COMPLETE UNDERSTANDING OF WHETHER THERE WAS ACTUALLY AN ALTERNATIVE CAUSE FOR THE VICTIMS DEATH THAT WOULD INTURN PROVIDE A DEFENSE TO THE STATES CASE. BASED ON THE FACTS ALLEGED IN THE FORE-GOING MOTION. DEFENDANTS NOLO CONTENDERE PLEA WAS NOT A FULLY INFORMED. INTELLIGENT CHOICE TO FORGO THE RIGHT TO TRIAL BY JURY

HAD DEFENSE COUNSEL CONDUCT AN INVESTIGATION INTO THE POSSIBILITIES OF WHETHER AN ADVERSE VACCINE REACTION COULD HAVE CAUSE THE VICTIMS DEATH, AND SUCH INVESTIGATION YIELD FAVORABLE INFORMATION TO SUPPORT A VACCINATION DEFENSE. THE DEFENDANT WOULD NOT HAVE PLEAD NOLO CONTENDERE BUT ALTERNATIVELY PLEAD NOT GUILTY AND INSISTED ON A TRIAL BY JURY.

6-D

_____

_____

_____

_____

_____

_____

D.   Ground 4: _____

_____

_____

Supporting FACTS (tell your story briefly without citing cases or

law): _____

_____

_____

_____

_____

_____

15.  If any of the grounds listed in 14 A, B, C and D were not

previously presented on your direct appeal, state briefly what

grounds were not so presented, and give your reasons why they

were not so presented: _____

_____

_____

_____

_____

_____

7.

## GROUND THREE
### -CONTINUED-

THE DEFENDANT CONTENDS THAT HIS PLEA OF NOLO CONTE-NDERE ENTERED AUGUST 8, 2003 IS DEFICIENT AND SUBJECT TO WITHDRAL BECAUSE THE HONORABLE JUDGE ROBERT K. MATHIS FAILED TO INDICATE ON RECORD IN OPEN COURT WHAT IF ANY EVIDENCE WAS RECEIVED THAT ESTABLISHED THE CHARGE OF SECOND DEGREE MURDER. DURING THE PLEA COLLOQUY, A DETAILED INQUIRY WAS MADE BY THE PRESIDING JUDGE INTO RELEVANT MATTERS SUCH AS, WHETHER THE DEFENDANT UNDERSTOOD THE RIGHTS WAIVED BY PLEADING NOLO CONTENDERE, THE APPLICABLE SENTENCE ON SUCH PLEA, AND DEFENDANTS SATISFACTION WITH SAID PLEA.

FURTHER ON INTO THE PLEA COLLOQUY. IN AN EFFORT TO ILLUSTRATE THE FACTS OF THE CASE AGAINST THE DEFENDANT THE STATE ALLEGED READY TO PROVE, THE STATES ATTORNEY PROFFERED THE FOLLOWING FACTS TO THE TRIAL COURT:

THE COURT: What's the State Prepared to Prove?

MS. CHRISTINE: Your Honor, The States Prepared To Prove That On Or About The 2nd Day Of April 2001. WITHIN St. Johns County, Florida. Qinard Lamar Collins Did Then And There Unlawfully, While Engaged In The Prepetration Of The Offense Of Aggrivated Child Abuse, Did Kill And Murder Qinard Collins. Jr., A Human Being, By Hitting Him And/or Shaking And/or Striking Said Child On Or About His Head Causing Abusive Head Injury.

7-A

Nothing In The Substance of the Above Facts Tendered By The States Attorney Proved That The Defendant Committed The Crime of Second Degree Murder. In Order To Have Proved A Sufficient Bases For The Charge of Second Degree Murder, The State Had To Show That There Was Evidence That Would Prove The Defendant Killed The Victim With A Depraved Mind Regardless of Human Life.

Because of The Trial Courts Failure To Determine Whether A Factual Bases Exist On Which To Accept The Defendants Plea of Nolo Contendere To Second Degree Murder And Further Indicate On The Record The Bases For Accepting Such Plea. The Defendant Has Plead Nolo Contendere To An Offense That Had No Factual Bases In The Record To Support The Charge.

The Court Was In Error In Failing To Inquire Into The Factual Bases For The Defendants Plea And By Not Indicating On Record The Source of The Factual Bases Used To Accept Defendants Plea. And Absent A Bases In The Record To Support The Charge of Second Degree Murder, Coupled With The Trial Courts Noncompliance With Florida Rule of Criminal Procedure 3.170(k), 3.172(o) The Withdrawl of Defendants Plea Is Necessary To Correct A Manifest Injustice.

7-B

16.  Do you have any petition, application, appeal, motion, etc. now pending in any court, either state or federal, as to the judgment under attack? Yes _____ No _X_

17.  If your answer to number 16 was "yes", give the following information:

    (a)  Name of court: _____

    (b)  Nature of the proceeding: _____

    (c)  Grounds raised: _____

    _____

    _____

    (d)  Status of the proceedings: _____

    _____

18.  Give the name and address, if known, of each attorney who represented you in the following stages of the judgment attacked herein.

    (a)  At preliminary hearing: JOSEPH D. ANTHONY III E.SQ

    _____

    (b)  At arraignment and plea: SAME

    _____

    (c)  At trial: ____ X

    _____

    (d)  At sentencing: _____ SAME

    _____

    (e)  On appeal: U/K

    _____

    (f)  In any postconviction proceeding: __ X

    _____

(g)  On appeal from any adverse ruling in a postconviction proceeding: ___*X*_____

_____

**WHEREFORE**, Movant request that the court grant all relief to which the movant may be entitled in this proceeding, including but not limited to (here list the nature of the relief sought):

1. _____

_____

_____

_____

_____

_____

_____

2.   And such other and further relief as the court deems just and proper.


## OATH

Under penalties of perjury, I declare that I have read the foregoing motion and that the facts stated in it are true.


Date: _____


Walton Correctional Institution
____ World War II Veterans Lane
DeFuniak Springs, Florida 32433


9.

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY, that a true and correct copy of the foregoing instrument: _3.850 motion_____

_____ has been furnished to:

OFFice Of The State Attorney
4010 Lewis Speedway
St. Augustine, Florida 32095

by United States Mail on this _29th_ day of ~~XXXX~~ April___,
200_6_.

_Dinorel Collins_____
Walton Correctional Institution
_691_ World War II Veterans Lane
DeFuniak Springs, Florida 32433

C:\WP51\WP51\LAWFORMS\CIRCUIT

IN THE CIRCUIT COURT OF THE
SEVENTH JUDICIAL CIRCUIT IN
AND FOR ST. JOHNS COUNTY FLORIDA

STATE OF FLORIDA
  PLAINTIFF

V.

QINARD COLLINS, SR.,
  DEFENDANT  /

CASE NO: <u>CF01-1102</u>

# <u>E X H I B I T S</u>

QINARD L. COLLINS
WALTON CORR. INST.
691 W.W II VETERANS LANE
DEFUNIAK SPRINGS FLA. 32433
DC# V18204

# *EXHIBIT*

# *A*

4-4-04

Hi Quinton,

Robert brought the following article to our attention.  He wanted us to send you this information for you to review.  He isn't sure it will help in any way but wanted you to read it.

Norm is working on the picture you sent to him and we will send it back as soon as we can.

Take care and keep in touch.

Peg & Norm

## Did The Baby Die of Shaken Baby Syndrome?
by Harold E. Buttram, MD
(An edited version of a talk given at a February 16, 2002 fund-raiser )
Contributing editor, Peter G. Tocci, BA, MT

### Dr. Harold Buttram:

A man has been incarcerated since he was arrested and jailed in November, 1997 for causing the death of his infant son by what is known as shaken baby syndrome (SBS). In Februray, 1999, he was convicted and imprisoned for life, without parole. Very strong evidence has since arisen that medical misdiagnosis brought the jury conviction, and an appeal has been filed. The story will be profiled here, but first, some pertinent information about immune function.

**A Brief Look at Immunity**
Immune function comprises two major classes: cellular (cell-mediated) immunity and humoral (antibody-mediated) immunity. Cellular immunity utilizes phagocytic activities (ingesting foreign agents) and cytotoxic activities (poisoning foreign agents). Each class is identifiable by a biochemical signature it produces in the form of substances called cytokines.

Major medical journals state that in healthy people, there is a "bias" toward cellular immunity, while people with allergies, asthma, and autoimmune diseases have immune response "skewed" toward the humoral. There is now significant evidence suggesting that vaccines disturb immune balance, thereby contributing profoundly to allergy and other illness, and to their current, alarming increase, especially in infants and children. Dr. H. H. Fudenburg, a world renowned immunologist with hundreds of publications to his credit, made the following comments: "One vaccine decreases cell-mediated immunity by 50%, two vaccines by 70%,    all triple vaccines (such as MMR, DTaP)

markedly impair cell-mediated immunity, which predisposes to recurrent viral infections, especially otitis media, as well as yeast and fungi infections."

**An Ominous Health Trend**
I recall attending summer camp for several seasons during the 1930s. No boy was ever sick, had allergies, or was on medication. It was much the same in the schools I attended. Compare that with today. To my inquiries years ago, school teachers replied emphatically and unanimously that they were seeing more hyperactivity, more learning disabilities/behavioral problems, and more patterns of general sickness among school children.

In 1999, full realization of this adverse health trend hit me with a severe jolt. Were vaccines playing a significant role here? While in this frame of mind, I received my first letter. It seems my thoughts and experiences had "set me up" for his letter, because, on the first reading, a sense of great injustice overwhelmed me. I suspected that studying the baby's medical records would reveal the facts of injustice. That review largely confirmed for me that death occurred in a delayed manner following a combination of vaccines--violence of a different order.

**A Reign of Terror**
I have since come to know the pioneering work of Australian physician Archivedes (Archie) Kalokerinos, MD, who has testified in defense of parents in over 30 SBS cases. Other pioneers in Australia and New Zealand have been working in this field for many years. Of twenty-two cases I have reviewed, all but one show clear evidence, exemplified below, of defendant innocence. In the opinion of those veteran physicians and researchers, and in mine, many cases closely resemble the Yurko scenario: delayed onset, following vaccines, of signs and symptoms conventionally accepted as the definitive criteria for SBS. Most doctors dismiss this correlation as coincidental. Although coincidence might be expected occasionally, at the frequency being observed, such conclusion is unreasonable.

The ominous suggestion follows that if a large portion of SBS accusations and convictions are the result of subsequent misdiagnosis, we are witnessing a rapidly growing reign of terror against home and family. There is no other term for it. An excerpt of a letter written from the prisononer conveys the potential of this terrorism:

". . . our four-year-old daughter was taken by the authorities to 'protect her' from me--the accused who was in a maximum security facility without bond. She was used by the police and authorities to threaten and blackmail my wife to help them fabricate evidence and testify against me. This she adamantly refused to do. She was charged as an accessory to murder, and our daughter was placed in extended custody. Here she was sexually battered and molested when her 'protectors' left her unsupervised with two boys who had a history of deviant behavior. My wife's charges were dismissed after great effort and cost, and our daughter was returned. They both fight every day to bring our family back together and have been fighting since 1997."

**The Birth Experience**
Now to the medical specifics of the baby's case. Importantly, the pregnancy was complicated with constant nausea such that the mother was unable to take vitamins. She lost 10 pounds after conception, and barely regained it before parturition. Additional complications included group B Streptococcal vaginal infection, E coli urinary tract infection, and gestational diabetes.

2

At 35 weeks, on September 16, 1997, labor was chemically induced due to lack of amniotic fluid. Although medical records showed Apgar scores of 8 and 9 (standard of newborn condition--10 being the highest), a video of the birth taken by the father tells a much different story: clear respiratory distress, with marked rib and sternal retractions, and bluish-grey skin color. Hypoxia (oxygen deficiency) was confirmed by arterial blood gasses. The baby was sent immediately to pediatric intensive care, put on a ventilator, and administered Survanta®, a lung surfactant (surface-active) rescue drug. Three daily chest X rays showed bilateral pulmonary infiltrates interpreted as "respiratory distress."

While still presenting the symptoms of respiratory distress, including raspy breathing and grunting, the baby was sent home on his seventh day. Parents and grandparents continued to observe these problems, along with brief periods of apnea (breathing cessation). On November 11, at approximately eight weeks (43 days true post-partum age), the baby was given the DTaP, Hib, OPV, and Hepatitis B vaccines despite the breathing difficulty and length/weight factors in the 3 percentile range. Within 24 hours, low grade fever, irritability, and diarrhea developed, all of which continued for about ten days until the morning of November 24. The father was at home with the baby and his 4-year old sister when the baby's breathing stopped and did not resume. While attempting mouth-to-mouth breathing, the father rushed to a nearby hospital where the baby was only temporarily resuscitated.

**Autopsy and Trial**
Autopsy findings comprised retinal hemorrhages, subdural hematomas (blood-filled swellings on the brain), brain changes interpreted as diffuse axonal injury (axon: nerve impulse conductor), and four rib calluses on the left interpreted as the result of prior fractures. The father was therefore accused, and subsequently convicted by a jury, of murdering his son by physical violence. As mandated by Florida law, a life sentence was imposed. Anyone familiar with the medical/legal procedures in SBS cases is aware that these pathology findings have been deemed exclusively diagnostic of SBS. However, investigation has revealed a significant body of medical literature, much of it by pathologists and specialists in the United States and Great Britain, criticizing this interpretation and showing that these conditions can, and commonly do, arise from a number of other causes.

There were four state witnesses with a total of six appearances before the trial jury, in contrast to one appearance for the single defense witness. This witness was H. Douglas Shanklin, MD, FRSM, Professor of Pathology and of Gynecology and Obstetrics, Division of Neuropathology, University of Tennessee, Memphis. I'm told he is held in the highest professional regard by his peers. Lacking prenatal and birth records at the trial, and having only pathology slides to go on, Dr. Shanklin attributed death to "natural causes" including failure-to-thrive, bilateral pneumonia (confirmed at autopsy), and meningitis.

In a letter summarizing the case, Dr. Shanklin states that either pneumonia or meningitis might or might not have caused death, but together they almost certainly would have. Without prenatal and birth records records, Dr. Shanklin could not corroborate his interpretation of the pathology slides; and the state witnesses went unchallenged with the fact of pregnancy/birth complications, for example. Perhaps the most significant factor working against the defense was the medical complexity of the case, which even doctors have had difficulty grasping. Thus, inequity and confusion led to conviction.

Why were there no prenatal and birth records in court? Unfortunately, no one knows the whole story. Unquestionably, some subterfuge and incompetence were involved. The defense attorneys probably did make a gesture at requesting them, but meeting delay or obstruction, did not persist. The medical examiner was compelled to admit under oath

that he neither sought nor examined these records before or after autopsy. In any case, in my opinion, a lack of pertinent medical records should be, indeed, should have been, grounds for calling a mistrial.

**Evidence of Innocence**
Further complicating the scenario were the rib calluses. In the early stages of review they were quite puzzling. A rational explanation came from a later, voluminous report by Archie Kalokerinos, MD, previously mentioned. In the 1970s, Dr. Kalokerinos made a major contribution to medicine by proving that post-vaccinal death of Aboriginal babies (nearly a 50% rate in some geographical areas), especially if colds or respiratory infections were present, was caused by vaccinal aggravation of a condition he diagnosed as "subclinical scurvy."

Edward Yazbak, MD, a retired pediatrician who has been following the case, informed me that any one of the pregnancy complications would put a baby in a high-risk category. With the multiple complications noted, severe nutritional deficiencies were probable, and Dr. Shanklin reported definite retardation in kidney development. We know that vitamin C is necessary for production and maintenance of connective tissue; that spontaneous fractures and hemorrhages (from bleeding capillaries) characterize classical scurvy; and that the most common site of bleeding in scurvy is subperiosteal (under the fibrous covering of bone). In ribs, as clots from such bleeding develop and calcify, they are indistinguishable on X-ray from healing fractures. Also common in scurvy, slippages of the ribs in locations near the spine may also appear on X-rays as healing fractures. Based upon the medical literature, this is detailed in the Kalokerinos report.

More recently, the father received a report from an Australian hematologist, Michael D. Innis, MBBS, DTM&H, FRCPath, FRCPA, Honorary Consultant Haematologist, Princess Alexandria Hospital, Brisbane, Australia. He cites a highly likely contributory cause of death as intracranial hemorrhage resulting from failure of the liver to synthesize clotting factors in adequate amounts (although the causative connection between insufficient clotting factors and hemorrhage might not be immediately apparent, Dr. Innis has expertise in this area resulting from extensive research). He also emphasizes that bone underlying subperiosteal hemorrhage would become necrotic from loss of it's blood supply, and that a healing necrosis looks identical to a healing fracture at autopsy. Because appropriate post-mortem tests were not done, precise determination of all morbidity factors and their interactions is impossible. But the Innis report alone should be sufficient for the father's vindication.

Finally, the DTaP vaccine in question is known to have come from a from a batch which ranks number one in deaths, number one in non-recoveries, and fourth in total events reported. Such batches are called "Hot Lots." One might wonder why, if batches can be so identified, SBS suspects aren't given some benefit of the doubt. One challenge is that such identification is based upon clinical observation, which courts will not accept. This seems odd, since the Vaccine Adverse Events Reporting System (VAERS) plainly indicates, as does the 1986 Congressional Childhood Vaccine Injury Act, that vaccine injuries are a fact of life. When people try for compensation under this Act, the court disallows VAERS information, asking for objective evidence, such as laboratory tests. Another challenge is, of course, that the requisite tests are nonexistent (see Addendum).

The father could have plea bargained and received a lesser sentence. His refusal spoke to me of a man secure in his innocence. Also remarkable was the immediate and continuing loyalty, under soul-testing circumstances, of his wife, Francine. Following the trial, her diligent efforts secured complete medical records. Based on these records

there are, at this writing, 28 medical professionals willing to testify to the father's innocence (and the number will grow). The disciplines represented at this writing include board-certified specialists in the fields of pathology, bone pathology, toxicology, hematology, ophthalmology, pediatrics, Ob/Gyn, and forensics, with some practitioners having dual specialties including pathology. As noted, an appeal has been filed.

**Extreme Importance of This Case**
Due to the father's tireless effort at hand writing literally thousands of letters, the case has gained significant attention and status internationally. Its critical implications for parents and caretakers falsely accused and imprisoned, and the life-and-death questions it raises concerning medically advised and mandatory vaccine programs, rank it high among the most important legal/health issues. To illustrate further, in my experience it is common in hospital emergency rooms that, once suspicion of shaken baby syndrome arises, all thought of further diagnostic investigation ceases. I know of no other situation in medicine where the usual diagnostic thoroughness one finds in such centers is abandoned.

Finally, public confidence in America's health care system and in the medical profession in particular is already eroding. Sooner or later, it will become publicly obvious that many SBS defendants have been falsely accused and convicted through deplorable misdiagnosis pertaining to pathologies that could one day become regarded as the result of malpractice--the indiscriminate administration of childhood vaccines. Further adverse backlash is sure to ensue in the US and abroad unless this case, as a prime example, is brought to light now with plentiful and reliable support for the defense. Having also witnessed outright viciousness behind the scenes in legal proceedings (such as that, described earlier, used against Francine Yurko), I now feel that the SBS debacle is a potentially fatal malignancy in the integrity of medicine.

This case is eminently winnable. Its particulars make the likelihood of another equally propitious opportunity remote. Based upon what we can only imagine the post vaccinal suffering of that small, fragile life to exemplify, not to mention the misery visited upon his loving family, we--professionals and lay persons alike--must not relent in our insistence upon measures to prevent such tragedy. To this end, this case must be won. No other outcome is thinkable.

**ADDENDUM:**
To this author and many other professionals, the role of medical misdiagnosis in a significant portion, possibly a majority, of SBS accusations and convictions seems to be the result of inadequate investigation in at least three areas, listed below. To avert more tragedy, the following minimal screening is recommended as mandatory before considering charges of child abuse/shaken baby syndrome:
(1) serum ascorbate and histamine to rule out subclinical scurvy;
(2) prothrombin time, partial thromboplastin time, fibrinogen level, platelet count, and D dimer test to rule out bleeding diatheses;
(3) when there is callus or fracture, bone densitometry to rule out the recently described temporary brittle bone disease, as well as tests to rule out classical brittle bone disease and all conditions, such as rickets, that predispose to spontaneous fracture. (See **Minimal Recommended Screening Where Shaken Baby Syndrome is Suspected** for more complete information and references.)

**Caveat:**
The suggested panel is not intended to be comprehensive, but only a starting point for screening purposes where child abuse is suspected. Changes and/or additions are likely

as we learn more about these areas. Such information will be added to the website.

Obviously, the panel does not include tests for vaccine reactions. As noted earlier, no suitable post-licensing diagnostic protocol for vaccine reactions has ever been officially established. There is no basic science in this area worthy of the name, and this seems to be no accident, based upon my experiences at court hearings. There are two important avenues:
1) systematic before-and-after testing for vaccinal effects on the immunological and neurological systems, not to mention their potential effects on genetics;
2) meaningful, long-term epidemiological surveillance of a significant number of vaccine recipients and controls (this implies, of course, that people be informed, and not bullied into vaccinating babies and children, so that there will be controls).
These tests would hold up in court, which is why an iron curtain of official resistance surrounds them. In my opinion also, within a reasonable degree of medical certainty, vaccines and vaccine reactions very frequently trigger subclinical scurvy and its complications, as well as bleeding complications from deficiencies of clotting factors.

**Note:**
This article is endorsed by Roy B. Kupsinel, MD; Susan Kreider, RN; Catherine J. M. Diodati, MA, Vaccination & Biomedical Ethics Researcher and Author; and C.A.B. Clemetson, Professor Emeritus, Tulane University School of Medicine.

As of this writing, a court date has not been set.

6

# *Shaken Baby???*



Media
Conspiracy
Bias
Attitudes
Shaken
Baby??

In recent years some activists have suggested that there is a connection between vaccinations and 'shaken baby syndrome'. This suggestion has brought widespread criticism and ridicule from most in the medical profession.



I was reluctant to do this page due to the inherent emotional nature of the whole notion of shaken baby syndrome. However articles are appearing both online and in the printed media about the possibility of a connection and so with some misgivings I am putting this page online.

**What is Shaken Baby Syndrome?**

Shaken baby syndrome (SBS) is based on findings that include[1]:

- intracranial haemorrhage
- cerebral contusion or other brain tissue injury
- evidence of cerebral trauma e.g. altered consciousness

The 'syndrome' was described by Caffey[2] in the early 1970s and he listed a 'classic' set of symptoms:





- intracranial haemorrhage
- retinal haemorrhage
- metaphyseal fractures

**Search this site**

While none of these signs on their own are a guarantee that an infant has been shaken, together they are considered highly indicative. Attempts have been made over the years to set out guidelines and protocols to follow when investigating a suspected case. The American Academy of Pediatrics has published guidelines[3] and there are articles/policies[4] appearing which call into question the diagnosis of SIDS when proper investigative procedures have not been followed.

**Mistaken Diagnosis**

Are mistakes made when diagnosing SBS? There are reports in the medical and legal literature of mistakes being made. In one example a 10 week old infant girl was admitted to hospital with cerebral bleeding and bruising to the body. She later died. A diagnosis of 'non-accidental injury' was made. The article says that all caregivers considered SBS as the cause of the infant's injuries, particularly as there were bilateral retinal haemorrhages. Fortunately for the parents further blood studies were done and it was shown that the infant had Late Haemorrhagic Disease of Infancy. The infant was born at home and di

not receive the standard vitamin K injection - which is given to (hopefully) prevent this particular disease. This condition is recognised as "one of several bleeding disorders that can mimic the findings of nonaccidental head injury and may lead to a mistaken diagnosis of child abuse"[7].

In an Australian example a father was accused of shaking his infant daughter to death[8]. Medical evidence was presented at the trial which implicated a range of factors, including vaccination. In this case there were no other signs of physical abuse such as fractures or bruising, the injury was restricted to the brain. Vaccination was presented as the 'final straw' for an infant suffering from a multitude of undiagnosed medical problems. The father was found not guilty.

## Media Coverage

An article appeared in the US magazine Redbook[10] in September 2000. The article presented details of cases where fathers had been accused of shaking their children. In two cases the men were acquitted and blame was placed on vaccinations received. In another case the father was found guilty. The article explores the possibility that prosecutors are too quick to blame SBS when there are other possible causes. The National Network for Immunization Information responded to the article with a letter[11] to the magazine and an expanded rebuttal on their website.

Other doctors have also published criticisms[12] of the vaccination defence and of courts who allow the defence to be made. There have also been comments from doctors who caution against over-diagnosis[13].

## The Pro-Choice Response

Articles have also appeared from the pro-choice/'anti-vaccination' movements and some accused parents actively work with vaccination awareness groups in an effort to clear their names. Viera Scheibner PhD has written one such article[14] and she is often called upon in vaccination trials. Her work is much criticised by the medical profession because she is not a medical doctor, her qualifications are in the natural science field. Comments have also been published on the NVIC[15] website and information is available on a site created by British parents[16] who claim they were wrongly accused of SBS.

There is also a case where a convicted man is being assisted by vaccination choice groups. In this case Alan Yurko was sentenced for the shaking death of his son[17]. The Yurko case is different to others using the vaccination defence because his son had evidence of healing rib fractures as well as cerebral bleeding. Supporters of Yurko refer to an article[18] about transient brittle bone disease to help explain the fractures.

## Alternative Diagnosis

situation you cannot say how you will react. The fact that it is your baby in need of attention only makes the situation more stressful.

I was a registered nurse for over 15 years and I saw many emergency situations. I wish I could say that I was always calm but I can't. I saw newly registered doctors shaking uncontrollably during resuscitation attempts, I saw nurses faint and parents hysterical. If trained medical personnel are nervous during their first real emergencies why should we expect parents to react calmly when they find their baby unresponsive and lifeless? Holding an infant by the feet and spanking its bottom sounds outrageous, but it was once standard procedure following birth and is still referred to in movies. When someone says they shook their child to rouse them why do some automatically think of a violent shaking? It could just as well indicate a hand on the shoulder and a gentle shake.

**In Conclusion**

As with so many other legal matters a person's chance of a fair trial will depend heavily on the ability of both his lawyer and his medical 'experts'. Not all cases fit the 'profile' and the fear of many parents is that any injury to their baby will result in a diagnosis of SBS. There is also a growing movement[22, 23] of parents, usually mothers, who say they are being blamed for their child's illness. When the medical profession is unable to determine what is wrong with a child there is the possibility that the mother will be accused of Munchausen Syndrome by Proxy. This psychiatric disorder is when a person deliberately inflicts injury on someone else in order to gain attention[24]. Some mothers claim that they are threatened with the diagnosis if they do not meekly comply with their doctor's wishes.

I don't know what, if any, part vaccines play in SBS. It is apparent that the diagnosis can be made without the so-called triad of events (brain injury, retinal haemorrhage, fractures) and that it is possible for other disease processes to present similiar symptoms. These other conditions are rare, but that does not mean they don't occur. Winning a multimillion dollar lottery is a rare event, but it happens. No-one wants to see a guilty person acquitted for this crime, but everyone deserves a fair trial without hysterical media coverage. To some people the accusation of SBS is sufficient to say someone is guilty. The belief is that by suggesting there may be other factors involved you are condoning child abuse/murder. This is not the case. The conviction of an innocent person is the probable outcome of a false accusation which is not investigated properly. Such an outcome can hardly be seen as justice.

It is not possible to come to an informed opinion on whether or not abuse occurred without access to all the medical and police notes. Most cases you read about on the internet will not provide full details and so what appears straightforward might be very complicated.

(2000) Evaluation of Infants with subdural hematoma who lack external evidence of abuse. Pediatrics, Vol 105, March 2000, pp549-553

Shaken Baby???

Caffey, J. The whiplash shaken infant syndrome. Pediatrics, 1974; 54: 396-403. Quoted in the above (ref 1.) article. (No abstract)

____ AAP policy on SBS

____ AAP policy on SIDS. addendum to policy September 2001.

____ and Krous, HF. Suffocation, shaking or sudden infant death syndrome: Can we tell the difference? Journal of Paediatrics and Child Health, 1999, 35, pp 432-433.


____ Disease of the Newborn - what is it?

____ Fatal intramuscular bleeding misdiagnosed as suspected nonaccidental injury. Pediatrics, Vol. 95(5), May 1995, pp 771-773. (No abstract)

____ Late-form hemorrhagic disease of the newborn: a fatal case report with illustration of investigations that may assist in avoiding the mistaken diagnosis of child abuse. Am J Forensic Med Pathol 1999 Mar;20 (1):48-51


____ decision with explanation of the various medical factors involved in the case of Rikki Lee Walters.

____ Shaken Baby Syndrome or Adverse Vaccine Reaction? Summary of the judge's (ref 8.) decision.


____ article: Was It Murder, Or A Bad Vaccine?

____ from the National Network for Immunization Information.     to Redbook.

____ medical rebuttal from The National Center on Shaken Baby Syndrome.

____ editorial on Shaken Babies, free registration required to read this. Three letters critical of the editorial were published in the September 5, 1998 issue of the journal (not available free online).


____ the vaccination link, Viera Scheibner. See also Maureen Hickman's article at ref 9.

____ Reactions to vaccine match symptoms found in 'shaken baby' cases

____ A group which claims to represent the 5% of SBS cases which do not fit the classic profile.

____ Details of the case against Alan Yurko.


____ Temporary brittle bone disease: association with decreased fetal movement and osteopenia. Calcif Tissue Int 1999 Feb;64 (2):137-43.

____ Osteogenesis imperfecta: the distinction from child abuse and the recognition of a variant form. Am J Med Genet 1993 Jan 15;45(2):187-92


____ Anatomy of the shaken baby syndrome. Anatomical Record (The New Anatomist) 253: pp 13-18, 1998. Woodward trial.

____ Text of a letter published in the journal Pediatrics. Shaken baby syndrome--a forensic pediatric response. Pediatrics. 1998 Feb;10 (2):321-3.

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY, that a true and correct copy of the foregoing instrument: _3.850 motion_ _____ _____ has been furnished to:

Office Of The State Attorney
4010 Lewis Speedway
St. Augustine, Florida 32095

by United States Mail on this _29th_ day of _April_ _____, 200 _6_.

_Linard Collins_ _____
Walton Correctional Institution
_691_ World War II Veterans Lane
DeFuniak Springs, Florida 32433

C:\WP51\WP51\LAWFORMS\CIRCUIT



CIR CT
MINUTE 314 PAGE 417

2006 MAY 25 AM 11:48 FILED

CHERYL STRICKLAND
CLERK OF CIRCUIT COURT
ST. JOHNS COUNTY FL

IN THE CIRCUIT COURT, SEVENTH
JUDICIAL CIRCUIT, IN AND FOR
ST. JOHNS COUNTY, FLORIDA.

CASE NO.: CF01-1102
DIVISION: 56

STATE OF FLORIDA,
        Plaintiff,

vs.

QINARD COLLINS,
        Defendant.

_____/

## ORDER ON MOTION FOR POSTCONVICTION RELIEF

THIS CAUSE came before the Court on the Defendant's Motion for Postconviction Relief, filed pursuant to Florida Rule of Criminal Procedure 3.850. The Court has reviewed and considered the Motion, and being otherwise fully advised in the premises finds as follows:

The Defendant was charged by indictment with aggravated child abuse and first degree murder. The State alleged that the Defendant abused his child by biting, striking, punching, pinching or battering him, and caused the death of his child by hitting, striking, or shaking his child on the head, thereby causing abusive head injury. Pursuant to a negotiated agreement with the State the Defendant plea no contest to second degree murder and was sentenced to 30 years incarceration. He appealed his judgment and sentence to the Fifth District Court of Appeals, which court per curium affirmed this Court's decision.

The Court notes that the Motion is not under oath as required by Rule 3.850(c). While this deficiency alone provides sufficient reason to deny the Motion, the Court considers the Motion on its merits and finds that even if the Motion were under oath it would be denied.

In Ground One of his Motion the Defendant asserts that since he has been incarcerated he has become aware of a research article which indicates that problems associated with vaccinations may cause many of the symptoms associated with Shaken

1

Paper No. 288   Case No. 01001102CF

Baby Syndrome.  He attaches a copy of the article to his Motion.  He asserts that he was unaware of this line of research as a possible defense to the charges.  The Defendant does not assert that his attorney was ineffective for failing to investigate the defense or speak with him about the defense, and he does not indicate that he believes his plea was rendered involuntary as a result of the lack of such knowledge.    Accordingly, the Defendant has not set out a facially sufficient claim for relief.

In Ground Two the Defendant sets out a claim for ineffective assistance of counsel.  To establish a claim of ineffective assistance of counsel, the defendant must show: (i) that his counsel's performance fell below that of reasonable competent counsel; and (ii) that there is a reasonable likelihood that, but for counsel's deficient performance, the outcome of the proceedings would have been different.  See Strickland v. Washington, 466 U.S. 668, 687-88, 694 (1984); Cherry v. State, 659 So. 2d 1069, 1072 (Fla. 1985); Routly v. State, 590 So. 2d 397, 401 (Fla. 1991); see also Duggan v. State, 588 So. 2d 1054 (Fla. 1991) (citing Shaffner v. State, 562 So. 2d 430, 431 (Fla. 1st DCA 1990) (claim is facially insufficient if it does not allege that, absent the misstatement or omission, the defendant would not have entered the plea)).    Such a claim is sufficient to warrant an evidentiary hearing only where the defendant alleges specific facts, not conclusively rebutted by the record, that demonstrate deficient performance by defense counsel and resulting prejudice.  Mendyk v. State, 592 So. 2d 1076, 1079 (Fla. 1992); see also Turner v. State, 570 So. 2d 1114, 1114-15 (Fla. 5th DCA 1990).    General allegations or mere conclusions are insufficient to demonstrate entitlement to relief.  Parker v. State, 904 So.2d 370, 376 (Fla. 2005);  Gutierrez v. State, 860 So.2d 1043 (Fla. 5th DCA 2003).  To carry the burden of alleging and demonstrating prejudice, allegations must be specific, i.e., the defendant must plead and show how the outcome of the case would have been different had counsel not acted deficiently.  Catis v. State, 741 So. 2d 1140 (Fla. 4th DCA 1998).  Is it not enough for the Defendant to show that the alleged errors had some conceivable effect on the outcome of the proceeding, but rather, that there is a reasonable probability that but for the attorney's errors, the result of the proceeding would have been different.  Bowman v. State, 748 So.2d 1082 (Fla. 4th DCA 2000).  Mere possibility and speculation are insufficient to demonstrate prejudice.   Jones v. State, 845 So.2d 55 (Fla. 2003). Moreover, "a court considering a claim of ineffectiveness of counsel need not make a specific ruling on the

performance component of the test when it is clear that the prejudice component is not satisfied." Kennedy v. State, 547 So. 2d 912, 914 (Fla. 1989) (citing Maxwell v. Wainwright, 490 So. 2d 927 (Fla.), cert. denied, 479 U.S. 972 (1986)).

The Defendant asserts that his attorney was ineffective for failing to investigate whether or not adverse vaccine reactions could have caused his child's death. He asserts that his attorney informed him that he had no plausible defenses to the charges. He states that if his attorney had investigated the research and that if his attorney's investigation had yielded positive results, he would have taken the case to trial. In this ground, the Defendant does not even make an unequivocal statement that he would have taken his case to trial had his attorney acted properly. Rather, he makes the conditional statement that he would have gone to trial *if* his attorney's research had turned out favorably. The Defendant does not indicate that such research would in fact have yielded favorable results. Accordingly, even if the attorney acted deficiently, the Defendant has failed to demonstrate that any prejudice resulted. In addition, the line of research cited by the Defendant is applicable to Shaken Baby Syndrome. The deposition of the medical examiner who performed an autopsy on the child reveals that in addition to symptoms of Shaken Baby Syndrome, the child exhibited symptoms of Battered Child Syndrome, specifically: bruising to the face and abrasions, bruises consistent with bite marks, bruising on the gums and lips, scabbed abrasions on the nose and ears, and other areas of abrasions and bruising about the body. See Exhibit 'A.' Even if the research cited by the Defendant provided an avenue of defense as to the Shaken Baby Syndrome, then, it did not explain the symptoms of Battered Baby Syndrome that were present. To the extent that the research would not have aided the Defendant as to the symptoms of Battered Baby Syndrome, no prejudice has been demonstrated and the Defendant's attorney was not deficient for failing to investigate a defense that would not have explained the injuries which the child had received.

In Ground Three the Defendant asserts that the trial court failed to ensure that sufficient facts were placed on the record to support the lesser-included, pled-to charge of second degree murder as opposed to the original charge of first degree murder. Even if this were a cognizable claim, it is one that the Defendant could have and should have raised on direct appeal.

3

CIR CT
MINUTE 314 PAGE 420

Therefore, it is:
**ORDERED AND ADJUDGED** that:

**1.)** The Motion is DENIED.

**2.)** The Defendant shall have 30 days from the date of this Order within which to appeal this Court's decision.

**DONE AND ORDERED** in Chambers, in St. Johns County, St. Augustine, Florida, this 25ᵗʰ day of May, 2006.

J. MICHAEL TRAYNOR
Circuit Court Judge

*Copies To:* 5/25/06 KV

State Attorney

Qinard Collins
Walton Correctional Institution
691 WWII Veterans Lane.
DeFuniak Springs, FL 32433

3

CIR CT
MINUTE 314 PAGE 421

S T I P U L A T I O N

1

2      It was stipulated and agreed by and between

3   counsel for the respective parties, and the witness,

4   TERRENCE STEINER, M.D., CHTD, that the reading and signing

5   of the deposition by said witness be waived

6   and notice of filing be waived.

7           TERRENCE STEINER, M.D., CHTD,

8   having been duly sworn as a witness, testified

9   as follows:

10           DIRECT EXAMINATION

11   BY MR. ANTHONY:

12      Q    State your name for the record, please.

13      A    Dr. Terrence Steiner.

14      Q    And where are you employed, sir?

15      A    I'm self-employed.

16      Q    What kind of work do you do for the county

17   of St. Johns then so far as criminal cases?

18      A    Well, I have a contract, intralocal

19   agreement.  I provide forensic pathology medical

20   examiner services to the three counties of District

21   23, which includes St. Johns County.

22      Q    All right.  Would that be in the capacity

23   of being a medical examiner for them?

EXHIBIT "___A___"

24      A    Yes.

25      Q    If you would just give me a brief overview

                 ST. JOHNS COUNTY COURT REPORTERS

1   of your medical training.

2       A    I can -- she can get the secretary to send

3   you a resume to save you time.  I have been in the

4   practice of forensic pathology in both hospital and

5   forensic settings for 32 years since graduation from

6   medical school and training at Mayo Clinic in

7   Rochester, Minnesota.

8       MR. ANTHONY:  If it's okay with

9   Mr. Larizza, what I will do is we'll just

10  stipulate to submitting this as an exhibit to

11  the deposition.  This is his CV.

12      MR. LARIZZA:  Right.  I don't have any

13  problem with that.

14      MR. ANTHONY:  You have any objection to

15  that?

16      MR. LARIZZA:  No.

17      MR. ANTHONY:  You can show it to Dr.

18  Steiner to see that that's the one that he

19  provided, that is, in fact, the one I got from

20  Dr. Steiner.

21      THE WITNESS:  Or my secretary.  Yeah.

22      MR. ANTHONY:  Or your secretary, yeah.

23  We'll just attach a copy of that, Debby.

24  BY MR. ANTHONY:

25      Q    We're here today specifically on the case

ST. JOHNS COUNTY COURT REPORTERS

1   of State of Florida versus Qinard Collins, Sr.,

2   wherein the alleged victim of that case was Qinard

3   Collins, Jr.  It was alleged that the case occurred

4   back on April 2nd of 2001.  Can you tell me when you

5   did your autopsy of Qinard Collins, Jr., Dr.

6   Steiner?

7       A   I did it on the 3rd of April at 9:30 in

8   the morning.

9       Q   Okay.  What were your findings?

10      A   My findings were those of death due to

11  abusive head injury with evidence of multiple

12  abusive injuries over varied periods in time which

13  made a battered child syndrome as a contributary

14  cause of death.  Externally there was bruising to

15  the face and abrasions, two areas of bruising, one

16  on each jaw consistent with a bite mark pressure.

17  There was bruising on the gums, on the lips.  There

18  was areas of scabbed abrasion where the skin had

19  been rubbed off about the nose, on the ears.  There

20  was a bite type bruising area to the right elbow.

21  There was externally some other scabbed abrasions on

22  the legs and back, and there was a linear area of

23  recent bruising over the right -- or left buttocks,

24  left or right, consistent with some type of blunt

25  trauma.

1       Internally the injuries were those of

2  bruising to the underneath of the scalp in at least

3  eight places, all recent type bruising.  There was

4  massive swelling of the brain, and hemorrhage into

5  the membranes covering the brain and also recent

6  hemorrhage into the subdural space over the

7  posterior -- back of the brain.  There was also

8  external bruising or bleeding into the optic never

9  sheaths, which are the nerves to the eye.

10      Q    The bleeding into the eye is what leads

11 you to -- it would be an indicator of a shaken baby

12 or battered child syndrome?

13      A    Well, the shaken baby and battered child

14 syndrome are different syndromes.  Battered child

15 syndrome is just evidence of trauma separated on

16 more than one occasion.  The bruises -- in this case

17 we have abrasion and bruising both recent, meaning

18 right near the time of death, and older, meaning

19 several days, so that's a battered child.  But the

20 head injury in this case and the eye injury is that

21 that is classic for the shaken baby syndrome, which

22 is an abusive head injury with or without the

23 associated trauma.  And what the injury is is a

24 shearing injury instead of a translational injury

25 that you would get by rapidly violently shaking a

ST. JOHNS COUNTY COURT REPORTERS

baby.  The shear just tears the vessels in the eye,

in the retina, the lining of the eye, the membranes

over the brain and also the dural space where the

veins cross back and forth, those get sheared and

cause this type of injury.  This is opposed to a

blunt trauma where you have a translational injury,

which is a direct force at that area and it's

translated at that point to however far it gets out.

     So these injuries to the brain and to the

eye are those one would expect to see in a shaken

baby syndrome with or without associated trauma, but

in this case we also have evidence of, as I said,

approximately eight areas of recent trauma to the

head by some type of blunt trauma and classically

that could be like knuckles or . . .

    Q   Now, I'm getting from what you're saying,

or if you can explain it to me, that they are both

sharing (sic) and what you would call translational

type injuries?

    A   Well, the bruising is a translational, a

force was applied at that area.  The subdural

leptomeningeal and retinal injuries are

translational, that is that of violent shaking.

    MR. LARIZZA:  Doctor, you just said

    "translational."

        ST. JOHNS COUNTY COURT REPORTERS

1          THE WITNESS:  I mean shearing, yeah.

2      Q     Okay.  So the shaking part you're saying

3   is a sharing versus --

4      A     Shearing.

5      Q     Shearing.  I'm sorry.  I thought you said

6   sharing.

7      A     Shearing, s-h-e-a-r.

8      Q     You're saying shearing versus

9   translational?

10     A     Yes.

11     Q     Did you -- were you aware of any past

12  medical history of Qinard Collins, Jr., prior to

13  your autopsy?

14     A     Not prior to my -- well, I had a history,

15  the baby had the short bowel syndrome, but I didn't

16  have the detailed medical records at that time, but

17  I did obtain them.

18     Q     You have reviewed all the medical records

19  that the police have prior to writing your report?

20     A     No, I did not.  I reviewed the medical

21  records I had prior to.  I don't believe the

22  police -- well, I guess they can get medical records

23  by subpoena, but I got mine by my way of getting

24  them.

25     Q     Okay.

               ST. JOHNS COUNTY COURT REPORTERS

9

CIR CT
MINUTE 314 PAGE 427

A    I reviewed the entire medical records

prior to completion of this report.

Q    Did you -- which hospitals did you have

records from, or do you know?

A    I have records from Flagler Hospital.   I

had records of the emergency medical assistance at

the time the child was reported unresponsive.   I had

records from Shands Hospital where -- from delivery

and then following delivery and the complications in

the neonatal unit, was transferred to Wolfson's

Children's Hospital, I have those records, and I

believe I also have the records when the child was

readmitted in mid March for a week, early March and

a week for some antibiotic therapy and then also

admitted March 15th and 16th or 13th and 14th where

the catheter had to be -- or the antibiotics had to

be repositioned and was discharged at that time, and

it has noted in the medical records available to me

that the child at that time had no abrasions, no

bruising, no evidence of external trauma.

     I have records, too, where the child

failed to keep the follow-up visit with the

gastrointestinal unit, I guess at Wolfson's on the

22nd of March.   And I believe I have records from

the social services, that was the health department

ST. JOHNS COUNTY COURT REPORTERS

*Page 3.*

1   that was, I guess, assisting in getting this child

2   to well baby or whatever type program this baby was

3   in.

4       Q    Were you aware that Qinard Collins, Jr.,

5   was a premature delivery?

6       A    Yes.

7       Q    What effect, if any, would that have on --

8       A    None.

9       Q    -- on your opinion?  Okay.

10          What about drug usage by the mother, would

11   that vary your opinion any as to --

12       A    No.

13       Q    Have you had any specialized training as

14   to bite marks or not, evaluating bite marks?

15       A    No.

16       Q    How many cases would you estimate that you

17   have done involving child victims that suffered

18   either head injury or battered child syndrome or

19   shaken baby syndrome, those type --

20       A    I anticipate two to three deaths per year

21   over 32 years, plus whatever I saw in training, so

22   you know, maybe in consultation, perhaps 2- to 300

23   total.

24       Q    Do you -- have you taught any courses or

25   written any articles yourself specifically in regard

             ST. JOHNS COUNTY COURT REPORTERS

CIR CT
MINUTE 314 PAGE 429

*Page 3.*

1  to those type cases?

2     A    I have used these as examples at courses I

3  have given, but as far as taught medical students or

4  anything, no.

*P)*

5           MR. ANTHONY:  I don't have any further

6     questions.

7           MR. LARIZZA:  I don't have any questions

8     for the doctor.

9           MR. ANTHONY:  Read or waive?

10          THE WITNESS:  Waive.

11  BY MR. ANTHONY:

12     Q    Did you read any articles or newspapers or

13  hear anything on the radio or TV in regard to this

*n.*

14  case specifically?

*West*

15     A    No, I don't get a newspaper.  Don't send

16  me one, please.

*udies*

17  (Witness excused.)

18  (Whereupon, the deposition was concluded.)

*rnal.*

19

*o."*

20

21

*ts in*

22

23

*dical*

24

25

*al*

                ST. JOHNS COUNTY COURT REPORTERS

P

CIR CT
MINUTE 315 PAGE 880

**Provided to Walton CI**
**On** _6-15-06_ **for Mailing**
_____Date_____

**Inmate's Initials** _QC_____

IN THE __SEVENTH__ JUDICIAL
CIRCUIT COURT IN AND FOR
__St Johns__ COUNTY, FLORIDA

L.T. Case No.: _CF-01-1102_
_____(Lower Tribunal Case No.)

Judge: __MICHAEL TRAYNOR__
_____(Judge's Full Name)

__QINARD L COLLINS__,
**Defendant/Appellant,**

v.

__STATE OF FLORIDA__,
**Plaintiff/Appellee,**

**NOTICE OF APPEAL**
*(CRIMINAL PROCEEDING)*

2006 JUN 19 PH 3: 10

CHERYL STRICKLAND
CLERK OF CIRCUIT COURT
ST JOHNS COUNTY FL

FILED

NOTICE IS GIVEN, pursuant to Rule __9.141__ Fla.R.App.P. that
_____(Rule #)

__QINARD L COLLINS__, defendant/appellant, pro se, appeals
(Name of defendant/appellant)

to the District Court of Appeal of Florida, __5th__ District,
_____(Number of District)

the order of this Court rendered on __MAY 25th__, 20__06__.
_____(Month/Day)_____(Year)

The nature of the order is a final order
__DENYING DEFENDANTS MOTION FOR POSTCONVICTION RELIEF__
(State nature of the Order)
__UNDER § 3.850 Fla R CRIM P__

The Judge of the lower tribunal is __MICHAEL TRAYNOR__.
_____(Full Name of Lower Tribunal Judge)

The defendant/appellant is in custody of the Department of

Corrections.  The length of sentence imposed on the

defendant/appellant is __(30)YEARS PRISON__.
_____(Years/Months)

__Qinard Collins__
_____(Signature)

Paper No. _281_ Case No _0100 1102CF_

1

CIR CT
MINUTE 315   PAGE 881

## CERTIFICATE OF SERVICE

**I HEREBY CERTIFY,** that a true and correct copy of the foregoing instrument: _NOTICE OF APPEAL_ _____ has been furnished to:

Office of the Attorney General
PLO1, The Capitol
Tallahassee, Florida 32399-1050

by United States Mail on this 15th day of _June_ , 200 6 .

_Dinard Collins_ V18204

**Walton Correctional Institution**
_691_ **World War II Veterans Lane**
**DeFuniak Springs, Florida 32433**

C:\WPS1\WPS1\LAWFORMS\CIRCUIT



# IN THE DISTRICT COURT OF APPEAL
## FIFTH DISTRICT OF FLORIDA

### QINARD L. COLLINS
Appellant

v.

### THE STATE OF FLORIDA
Appellee

CASE NO: 5D06-2258

LWR Ct NO: 01-1102-CF

---

## APPEAL FROM THE CIRCUIT COURT OF THE SEVENTH JUDICIAL CIRCUIT OF FLORIDA IN AND FOR ST. JOHNS COUNTY

---

## INITIAL BRIEF

---

**Provided to Walton CI
On 7-18-06 for Mailing**
       **Date**

**Inmate's Initials QC**

QINARD COLLINS DC#V18204
WALTON CORRECTIONAL INST.
691 W.WII VETERANS LANE
DEFUNIAK SPRINGS, FL. 32433

L06-1-20844      5D06-2258
**COLLINS, Qinard L.**
v. State of Florida    5th DCA
         Timothy Wilson

WILSON
L06-1-20844 DB
RECEIVED
2006 JUL 11 PM 5:22
ATTORNEY GENERAL'S OFFICE
CRIMINAL APPEALS
TALLAHASSEE

RECEIVED
2006 JUL 18 PM 1:42
OFFICE OF
THE ATTORNEY GENERAL
DAYTONA BEACH, FLORIDA

3

# TABLE OF CONTENTS

PAGE

TABLE OF CONTENTS

TABLE OF CITATIONS . . . . . . . . . . . . . . . . . . . .   ii, iii

PRELIMINARY STATEMENT . . . . . . . . . . . . . . . . . . 1.

STATEMENT OF CASE AND FACTS . . . . . . . . . . . . . . . . 2.

ISSUES

    ONE . . . . . . . . . . . . . . . . . . . . . . . . . 3.

        WHETHER THE TRIAL COURT ERRORED IN SUMMARILY
        DENYING DEFENDANTS CLAIM OF NEWLY DISCOVERED
        EVIDENCE

    TWO . . . . . . . . . . . . . . . . . . . . . . . . . 5.

        WHETHER THE TRIAL COURT ORDER SUMMARILY DENYING
        ISSUE II OF DEFENDANTS RULE 3.850 MOTION IS
        SUPPORTED BY EVIDENCE CONCLUSIVELY SHOWING
        DEFENDANT IS ENTITLED TO NO RELIEF

    THREE . . . . . . . . . . . . . . . . . . . . . . . . 8.

        WHETHER THE TRIAL COURT ERRORED IN DENYING ISSUE (3)
        OF DEFENDANTS RULE 3.850 MOTION AS BEING
        PROCEDURALLY BARRED

CONCLUSION . . . . . . . . . . . . . . . . . . . . . . . . 10

CERTIFICATE OF SERVICE . . . . . . . . . . . . . . . . . . 11

i

## TABLE OF AUTHORITIES

<u>CASE</u>                                                    <u>PAGE</u>

BRADFORD V. STATE                                        4.
869 So 2d 28 (FLa. 2nd D.C.A 2004)


F.B. V. STATE                                            9.
852 So 2d 226 (FLa. 2004)


GROSVENOR V. STATE                                       5.
874 So 2d 1176 (FLa. 2004)


LeDuc V. STATE                                           6.
415 So 2d 721 (FLa. 1982)


MILLER V. STATE                                          3.
814 So 2d 1131 (FLa. 5th D.C.A 2002)


HILL V. LOCKHART                                         5.
474 U.S. 52. 106 S.Ct 366 (1985)


ROBINSON V. STATE                                        6.
909 So 2d 497 (FLa. 5th D.C.A 2005)


ROBINSON V. STATE                                        9.
373 So 2d 898 (FLa. 1979)


SCOTT V. STATE                                           4.
629 So 2d 888 (FLa. 4th D.C.A 1993)


STATE V. BRAVERMAN                                       .3
348 So 2d 1183 (FLa. 3d D.C.A 1977)

## TABLE OF AUTHORITIES

CASE                                                              PAGE

  WILLIE V. STATE                                                   9.
  600 So.2d 479 (Flo 1st D.C.A 1992)


OTHER AUTHORIES

VOL#2. FLORIDA CRIMINAL PRACTICE AND PROCEDURE,                     4.
by RUSSELL E CRAWFORD. 2nd, ed.

IN THE DISTRICT COURT OF APPEAL.
FIFTH DISTRICT OF THE SATE OF FLORIDA

QIWARD COLLINS
         APPELLANT

V.

STATE OF FLORIDA
     | APPELLEE.                    /

CASE NO: 5D06-2258

## PRELIMINARY STATEMENT

APPELLANT WAS THE DEFENDANT AND APPELLEE WAS THE PROSECUTION
IN THE FELONEY DIVISION OF THE CIRCUIT COURT, SEVENTH JUDICIAL
CIRCUIT IN AND FOR St. JOHNS COUNTY FLORIDA. IN THE BRIEF. THE
APPELLEE WILL BE REFERRED TO AS "THE STATE" AND THE APPELLANT WILL
BE REFERRED TO AS DEFENDANT APPELLANT OR BY SURNAME.
     REFERENCES TO THE RECORD ATTACHED TO APPELLANTS BRIEF
WILL BE BY (APPENDIX)

1.

# STATEMENT OF CASE AND FACTS[1]

Appellant Qinard Collins was charged By Indictmen In Case No: 01-1102 with Aggrivated Child Abuse. And First Degree Murder. The victim Qinard Collins Jr was a Prematurly Born Ten Month Old who Suffered From Several Medical Problems. And Required an IV tube which was Connected to His Heart And Demanded Special Care.

The State Alleged that appellant Killed the child By Hitting and/or Shaking the child on or about His Head Causing Abusive Head Injury,

On August 8. 2003, Appellant with the Assistance of Counsel. Entered a Negotiated Plea of No Contest to the Lesser Included Charge of Second Degree Murder. The State Agreed to a Sentence Between 20 to 30 years and Nolle Prosequied Count One Aggravated Child Abuse. The Court Conduct a Plea Colloquy to ascertain The Knowing And Voluntary nature of the Plea.

Sentencing was held on October 10, 2003. The Appellant Argued In Mitigation And Explained That He Never Intended To Harm the victim, But tried to Save Him By Calling 911, and Performing CPR.

---

[1] In Support of the facts Stated Herein. The Appellant Request this Court to take Judicial notice of the Record on Appeal Previously filed In Case No: 5D03-3601

2.

# ARGUMENT
## ISSUE I

### WHETHER THE TRIAL COURT ERRORED IN SUMMARILY DENYING DEFENDANTS CLAIM OF NEWLY DISCOVERED EVIDENCE

IT IS WELL SETTLED THAT A CLAIM OF NEWLY DISCOVERED EVIDENCE IS A SUFFICIENT GROUND ON WHICH TO WITDRAW A CRIMINAL DEFENDANT GUILTY OR NOLO CONTENDRE PLEA. see STATE BRAVERMAN 348 So 2d 1183. 1186 (FLO. 3d D.C.A 1977)

IN ORDER TO PROVE A LEGALLY SUFFICIENT CLAIM OF NEWLY DISCOVERED EVIDENCE AS THE MATTER RELATES TO PLEA NEGOTIATIONS THE FIFTH DISTRICT COURT OF APPEAL RULED THAT A DEFENDANT ALLEGING A CLAIM OF NEWLY DISCOVERED EVIDENCE MUST SHOW THAT WITHDRAWL IS NECESSARY TO CORRECT A MANIFEST INJUSTICE. MILLER V. STATE 814 So 2d 1131 (FLa. 5th D.C.A. 2002)

THE TRIAL COURT DENIED DEFENDANTS CLAIM OF NEWLY DISCOVERED EVIDENCE SPECIFICALLY FINDING THAT DEFENDANT QIUARD COLLINS FAILED TO STATE THAT HIS NOLO CONTENDRE PLEA WAS INVOLUNTARY AS A RESULT OF DEFENDANT LACK OF KNOWLEDGE OF THE NEWLY DISCOVERED EVIDENCE. (Appendix B pg 2)

THE REASONS PROVIDED IN THE TRIAL COURTS ORDER DENYING ISSUE ONE OF DEFENDANT'S RULE 3.850 MOTION IS LEGALLY ERRONEOUS. AND DOES NOT TAKE INTO ACCOUNT THAT AN ALLEGATION OF THE DEFENDANT PLEA IS INVOLUNTARY IS NOT A PREREQUSIT FOR THE DEFENDANT TO OBTAIN RELIEF ON A CLAIM OF NEWLY

Discovered Evidence. Cf, <u>Bradford v. State</u>, 869 So.2d 28 (FLA 2d D.C.A 2004) ( Claim Facially Insufficient Absent Allegation That Withdrawl Is Necessary To Correct A Manifest Injustice )

Thus, From A Thorough Reading of <u>Bradford</u> supra It Is Reasonably Inferrable That The Only Allegation That Oinard Collins Was Obligated To Allege In Asserting His Claim, Was That Withdral Was Necessary To Correct A Manifest Injustice. eg <u>Scott v. State</u> 629 So 2d 888, 890 (Fla. 4th D.C.A 1993 ) Cf, Volume #2 Florida Criminal Practice And Procedure, by Russell E. Crawford, 2nd ed. § 10.18 (a) pg 66 :

> xxxxxx Another Kind Of Collateral Ground Is That Concerning Newly Discovered Evidence. This Ground Is Collateral Because It "Is Not" Related To The Integral Issue Of Whether A Plea Was Voluntary And Intelligently Entered. xxxxx

The Defendant Did State In His Rule 3.850 That Withdrawl Of His Nolo Contendre Plea Was Necessary To Correct A Manifest Injustice. (Appendix A  ) And After Identifying The Precise Nature And Source Of The Evidence Newly Discovered By The Defendant. The Defendant Further Provided An Indept Explaination Of How Defendants Lack Of Knowledge Of The New Evidence Impact The Plea Entered And The Harm Resulting Therefrom. (Appendix A. pg 6 A-B )

Under The Above Scenario, The Trial Court Was Bound By Law To Address The Merits Of The Defendants Claim, Whereas The Claim Of Newly Discovered Evidence As Presented In

4.

DEFENDANT'S RULE 3.850 MOTION DID ALLEGE A LEGALLY SUFFICIENT
CLAIM CONSISTENT WITH CONTROLLING CASE LAW ON THE ISSUE.

### ISSUE II

### WHETHER THE TRIAL COURT ORDER SUMMARILY DENYING ISSUE II OF DEFENDANTS RULE 3.850 MOTION IS SUPPORTED BY EVIDENCE CONCLUSIVELY SHOWING DEFENDANT IS ENTITLED TO NO RELIEF.

WHEN DETERMINING THE ADEQUACY OF DEFENSE COUNSELS
REPRESENTATION WITH REGARD TO PLEA NEGOTIATIONS, THE
FLORIDA SUPREME COURT IN REITERATING THE STANDARD ANNOUNCED
IN HILL V. LOCKHART 474 U.S. 52, 106 S.Ct 366 (1985) HELD THAT
ALTHOUGH THE FIRST PRONG FOR PROVING SUCH CLAIM IS THE SAME
AS STRICKLANDS[1] PERFORMANCE PRONG. THE SECOND OF THE HILL
STANDARD ENTAILS A DEFENDANT SHOWING THAT BUT FOR COUNSELS
ERROR. THE DEFENDANT WOULD NOT HAVE PLEAD GUILTY AND
WOULD HAVE INSIST ON GOING TO TRIAL. see, GROSVENOR V. STATE
874 So 2d 1176, 1179 (Fla. 2004)

THE DEFENDANT QINARD L. COLLINS ALLEGED IN THE TRIAL
COURT THAT HIS ATTORNEY MR. JOSEPH D. ANTHONY WAS INEFFECTIVE
FOR FAILING TO INVESTIGATE WHETHER OR NOT ADVERSE VACCINE
REACTION WAS AND/OR COULD HAVE CAUSED THE VICTIMS DEATH
EXHIBITING SYMPTOMS IDENTICAL TO SHAKEN BABY SYNDROME.

---

[1] 466 U.S. 668, 104 S.Ct 2052 (1984)

In Denying Defendants Claim. The Trial Court Relied Primarily on the Deposition of Dr. Terrence Steiner MD. Dr. Steiner testified teffied that through The Autopsy Performed on The victim. Dr. Steiner Found that Inaddition To Sustaining Internal Injuries That were Consistent With Shaken Baby Syndrom, The Victim Also Had External Injuries That were Consistent With Symptoms of Battered Child Syndrom. (Appendix B Ex A pg 3-7) On The Bases of Said Testimony The Trial Court Found That a Defense of Adverse Vaccine Reaction Even If Possible In The Defendants Case would not Have Explained or Aided Defendant In Explaining The Presence of Battered child Syndrome And Thus. No Prejudice Was Demonstrated By Counsels Failure to Investigate The Viability of a Vaccine Defense.

The Failure To Investigate a Possible Line of Defense Has Been Held To Constitute a Legally Sufficient Claim of Ineffective Assistance of Counsel. ROBINSON V. STATE, 909 So 2d 497, 499 (Fla. 5th D.C.A 2005) Where The Motion. And Records Attached To The Trial Courts order of Denial Do Not Conclusively show that the Defendant Is Entitled To No Relief. An Appeals Court Must Reverse The order Denying Defendants 3.850 Motion. ee. LeDuc V. State 415 So 2d 721. 722 (Fla. 1982)

Dr. Terrence Steiner's Deposition Attached To The Trial Courts order of Denial Does Not Conclusively Refute Defendants Claim That His Attorney Was Ineffective In Failing To Investigate The Possible Defense of Adverse Vaccine Reaction. In Rendering Its order of Denial. The Trial Court erroneously Disregarded Defendants Unequivocal Assertion In His Rule 3.850 Motion

THE REASON WHY THE DEFENDANT PLEAD GUILTY WAS BECAUSE COUNSEL IN FORMED THE DEFENDANT THAT THERE WAS NO DEFENSE TO THE CHARGED CRIME. NOTHING IN THE RECORD REFUTES THIS CLAIM. ADDITIONALLY, THE APPELLANT CONTENDS THAT MERELY BECAUSE THE DEFENSE OF AN ADVERSE VACCINE REACTION WOULD NOT HAVE EXPLAINE THE EXIS TENCE OF THE INJURIES OF BATTERED CHILD SYNDROM AS FOUND BY THE LOWER COURT. THE TRIAL COURT OVERLOOKED THE FACT THAT HAD DEFENSE COUNSEL CONDUCT AN INVESTIGATION INTO THE POSSIBILITIES OF WHETHER AN ADVERSE VACCINATION COULD HAVE CAUSED THE VICTIMS DEATH, AND THE SAME PROVED USEFUL. THE DEFENDANT WOULD HAVE IN FACT HAD VALID DEFENSE CONTRARY TO DEFENSE COUNSELS INITIAL ASSERTION OF THERE BEING NO DEFENSE

WITH THE DEFENDANTS KNOWLEDGE OF WHETER THERE WAS AN ALTERNATIVE CAUSE FOR THE VICTIM DEATH PRIOR TO PLEADING HOLO CONTENDRE. THE DEFENDANT WOULD HAVE HAD A SUBSTANTIAL BASES ON WHICH TO MAKE A FULLY INFORMED AND INTELLIGENT DECISION WHETHER TO PLEA HOLO CONTENDRE OR PROCEED TO TRIAL. WHICH INEVITABLY WAS AN OPTION THE DEFENDANT DID NOT HAVE DUE TO COUNSELS FAILURE TO INVESTIGATE THE FACTS OF THE DEFENDANT CASE THOROUGHLY. ROBINSON Supra

FURTHERMORE, ABSENT THE BENEFIT OF A FULL EVIDENTIARY HEARING TO DEVELOPE ESSENTIAL FACTS CURRENTLY MISSING FROM THE RECORD SUCH AS QUESTIONS AND ANSWERS FROM DR. TERRENCE STEINER AND/OR POST-MORTEM EXAMINATION OF THE VICTIM DETERMINATIVE OF WHETHER VACCINATION ADMINISTERED TO THE VICTIM COULD HAVE PLAYED A PART IN CAUSING HIS DEATH

A PROPER CREDIBILITY DETERMINATION OF THE DEFENDANTS ASSERTION THAT HE WOULD HAVE PROCEDED TO TRIAL AND NOT PLEAD NOLO CONTENDRE WAS NOT AND/OR COULD NOT HAVE BEEN ADEQUATELY MADE BY THE TRIAL COURT UNDER THE GROSVENOR STANDARD Id at 1180-81, BECAUSE THE MERITS OF THE POTENTIAL VACCINE DEFENSE HAS NOT BEEN SUBSTANTIATED AS AN ACTUAL OCCURRENCE AGAINST THE FACTS SURROUNDING THE VICTIMS DEATH IN THE CASE SUBJUDICE.

AGAIN THE ISSUE RAISED BY MR. COLLINS CONTEST COUNSELS FAILURE TO INVESTIGATE A POSSIBLE LINE OF DEFENSE, NOT THE FAILURE TO INFORME THE DEFENDANT OF A READILY AVAILABLE DEFENSE. THEREFORE THE ONLY WAY DEFENDANTS CLAIM COULD HAVE BEEN LEGALLY PROVED OR DISPROVED UNDER THE GROSVENOR STANDARD WAS FOR THE TRIAL COURT TO HAVE FIRST HAD THE MERITS OF THE VACCINE DEFENSE FULLY ESTABLISHED AND TESTED THROUGH A FULL EVIDENTIARY HEARING WHICH WAS NOT DONE AND WAS ERROR.

## ISSUE III

### WHETHER THE TRIAL COURT ERRORED IN DENYING ISSUE(3) OF DEFENDANTS RULE 3.850 MOTION AS BEING PROCEDURALLY BARRED

IN ISSUE(3) OF DEFENDANTS CRIMINAL RULE 3.850 MOTION, QINARD COLLINS ALLEGED A CLAIM OF FUNDAMENTAL ERROR IN THE TRIAL COURT FAILURE TO FIND A FACTUAL BASES FOR THE DEFENDANTS NOLO CONTENDRE PLEA TO THE LESSOR INCLUDED CHARGE OF SECOND DEGREE MURDER, WHERE THE EVIDENCE TENDERED BY THE STATE

Did not Prove the Plead Charge. Cf, F.B. v. State 852 So 2d 226, 230 (Fla. 2003) "citing" Troedel v. State 462 So 2d 392, 399 (Fla. 1984) ( A Conviction Imposed Upon A Crime Totally Unsupported By Evidence Constitutes Fundamental Error. )

The trial Court Found in It's order of Denial that the Claim Raised in Defendants Motion Should Have or Could Have Been Raised on Direct Appeal. (Appendix B pg3 ) Contrary to the Conclusion Setforth in the Courts order of Denial. The Appellant Contends that Controlling Precedent From the Florida Supreme Court Recognizes that the Failure of a Defendant to Raise the validity of a Plea By Direct Appeal is not Fatal to Defendants ability to Seek Collateral Review of Such Plea. Robinson v. State 373 So 2d 898, 903 (Fla. 1979)

Moreover where a Criminal Defendant s Claim is Predicated on Fundamental error, Such claim May Be Raised in A Rule 3.850 Motion Notwithstanding the Failure to Raise the Claim on Direct Appeal. See Nova v. State, 439 So 2d 255. 261 (Fla. 3d D.C.A 1983). Willie v. State, 600 So 2d 479. 482 (Fla. 1st D.C.A 1992)

Thus, For the Reasons Setforth Hereinabove. The trial Courts Bases For Denying issue (3) of Defendants Rule 3.850 Motion is Legally Incorrect and Should Be Reversed with Directions to address the Merits of Defendants claim.

# CONCLUSION

Based on the facts and authorities cited herein. The Appellant states that the trial courts order of denial is in error and should be reversed.

RESPECTFULLY SUBMITTED

/s/ Qinard Collins

Qinard L. Collins DC#V18204
Walton Correctional Institution
691 W.W II Veterans Lane
Defuniak Springs, Fla. 32433

10.

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY, that a true and correct copy of the foregoing instrument: _INITIAL BRIEF_ has been furnished to:

District Court of Appeal
    Fifth District
300 South Beach Street
Daytona Beach, Florida 32114

by United States Mail on this _10th_ day of _July_, 200_6_.

_Dinard Collins_

Walton Correctional Institution
_691_ World War II Veterans Lane
DeFuniak Springs, Florida 32433

C:\WP51\WP51\LAWFORMS\CIRCUIT

IN THE DISTRICT COURT OF APPEAL
FOR THE _____5th_____ DISTRICT
STATE OF FLORIDA

CASE NO.: _5D06-2258_

_Qinard L Collins_ ,
**Appellant,**

v.

THE STATE OF FLORIDA,
Appellee,

---

## APPENDIX TO INITIAL BRIEF

---

RECEIVED 2006 JUL 18 PM 1:42
THE ATTORNEY GENERAL
OFFICE OF
DAYTONA BEACH, FLORIDA

10

# *APPENDIX*

# *A*

IN THE CIRCUIT COURT OF THE
SEVENTH JUDICIAL CIRCUIT
IN AND FOR St. Johns
COUNTY, FLORIDA

STATE OF FLORIDA,
    Plaintiff,

v.

QINARD L. COLLINS
    Defendant,

Criminal Division

Case No.: CF01-1102

(the original case number)

## MOTION FOR POST CONVICTION RELIEF

## INSTRUCTIONS: READ CAREFULLY

(1)  This motion must be legibly handwritten or typewritten, signed by the defendant, and contain either the first or second oath set out at the end of this rule. Any false statement of a material fact may serve as the basis for prosecution and conviction for perjury. All questions must be answered concisely in the proper space on the form.

(2)  Additional pages are not permitted except with respect to the facts that you rely upon to support your grounds for relief. No citation of authorities need be furnished. If briefs or arguments are submitted in support of your legal claims (as opposed to your factual claims), they should be submitted in the form of a separate memorandum of law. This memorandum should have the same caption as this motion.

(3)  No filing fee is required when submitting a motion for Post/Conviction Relief.

(4)  Only the judgment of one case may be challenged in a single motion for postconviction relief. If you seek to challenge

judgments entered in different cases, or different courts, you must file separate motions as to each such case. The single exception to this is if you are challenging the judgments in the different cases that were consolidated for trial. In this event, show each case number involved in the caption.

(5)  Your attention is directed to the fact that you must include all grounds for relief, and all facts that support such grounds, in the motion you file seeking relief from any judgment of conviction.

(6)  When the motion is fully completed, the original must be mailed to the clerk of the court whose address is:

_____

_____

### MOTION

1.   Name and location of the court which entered the judgment of conviction under attack: SEVENTH JUDICIAL CIRCUIT IN AND FOR St JOHNS COUNTY, FLORIDA

2.   Date of judgment of conviction: OCTOBER 10, 2003

3.   Length of sentence: THIRTY (30) YEARS STATE PRISON

4.   Nature of offense(s) involved (all counts): _____

SECOND DEGREE MURDER

_____

_____

5.   What was your plea? (check only one)

    (a) Not Guilty _____
    (b) Guilty _____
    (c) Nolo Contendere  X
    (d) Not guilty by reason of insanity _____

If you entered one plea to one count, and a different plea to another count, give details: N/A

_____

1.

_____

_____

6.   Kind of trial: (check only one)

   (a) Jury _____
   (b) Judge only without jury _____

7.   Did you testify at the trial or at any pre-trial hearing?

   Yes _____ No _____

   If yes, list each such occasion: _____

_____

8.   Did you appeal from the judgment of conviction?

   Yes __X__ No _____

9.   If you did appeal, answer the following:

   (a)  Name of court: FIFTH DISTRICT OF APPEALS, FLORIDA

   (b)  Result: AFFIRMED CASE NO: 5D03-3601

   (c)  Date of result: MAY 14, 2004

   (d)  Citation (if known): UK

10.   Other than a direct appeal from the judgment of

conviction and sentence, have you previously filed any

petitions, applications, motions, etc. with respect to this

judgment in this court? Yes _____ No __X__

11.   If your answer to number 10 was "yes", give the following

information (applies only to proceedings in this court):

   (a)  (1) Nature of the proceeding: _____

_____

_____

        (2) Grounds raised: _____

_____

_____

2.

(3) Did you receive an evidentiary hearing on your petition, application, motion, etc.? Yes _____ No **X**

(4) Result: _____ N/A _____

(5) Date of result: _____ N/A _____

(b) As to any second petition, application, motion, etc., give the same information:

(1) Nature of the proceeding: _____

_____

(2) Grounds raised: _____

_____

(3) Did you receive an evidentiary hearing on your petition, application, motion, etc.?   Yes _____ No **X**

(4) Result: _____

(5) Date of result: _____

12. Other than a direct appeal from the judgment of conviction and sentence, have you previously filed any petitions, applications, motion, etc. with respect to this judgment in any other court? Yes _____ No **X**

13. If your answer to number 12 was "yes", give the following information:

(a) (1) Name of court: _____

(2) Nature of the proceeding: _____

_____

(3) Grounds raised: _____

_____

3.

(4)   Did you receive an evidentiary hearing on your petition, application, motion, etc.?   Yes ____ No _X_

(5)   Result: _____

(6)   Date of result: _____

(b)   As to any second petition, application, motion, etc., give the same information:

(1)   Name of court: _____

(2)   Nature of the proceeding: _____

_____

_____

(3)   Grounds raised: _____

_____

_____

(4)   Did you receive an evidentiary hearing on your petition, application, motion, etc.?   Yes ____ No _X_

(5)   Result: _____

(6)   Date of result: _____

(c)   As to any third petition, application, motion, etc., give the same information:

(1)   Name of court: _____

(2)   Nature of the proceeding: _____

_____

(3)   Grounds raised: _____

_____

_____

4.

(4)   Did you receive an evidentiary hearing on your

petition, application, motion, etc.?     Yes _____ No _X_

(5)   Result: _____

(6)   Date of result: _____

14.  State concisely every ground on which you claim that the

judgment or sentence is unlawful.  Summarize briefly the facts

supporting each ground.  If necessary, you may attach pages

stating additional grounds and the facts supporting them.

For your information, the following is a list of the most

frequently raised grounds for postconviction relief. Each

statement preceded by a letter constitutes a separate ground for

possible relief.  You may raise any grounds that you may have

other than those listed. However, you should raise in this motion

all available grounds (relating to this conviction) on which you

base your allegations that your conviction or sentence is

unlawful.

### DO NOT CHECK ANY OF THESE LISTED GROUNDS

**If you select one or more of these grounds for relief,
you must allege facts. The motion will not be accepted
by the court if you merely check (a) through (i).**

(a)   Conviction obtained by plea of guilty or nolo
contendere that was unlawfully induced or not made voluntarily
with understanding of the nature of the charge and the
consequences of the plea.
(b)   Conviction obtained by the unconstitutional failure of
the prosecution to disclose to the defendant evidence favorable
to the defendant.
(c)   Conviction obtained by a violation of the protection
against double jeopardy.
(d)   Denial of effective assistance of counsel.
(e)   Denial of right of appeal.
(f)   Lack of jurisdiction of the court to enter the judgment
or impose sentence (such as unconstitutional statue).
(g)   Sentence in excess of the maximum authorized by
law.
(h)   Newly discovered evidence.

5.

(i)     Changes in the law that would be retroactive.

A.    Ground 1:  NEWLY DISCOVERED EVIDENCE

Supporting FACTS (tell your story briefly without citing cases or law):

CONTINUED ON PAGE 6-A

B.    Ground 2: INEFFECTIVE ASSISTANCE OF COUNSEL

STRICKLAND V. WASHINGTON 466 U.S 668, 104 S.Ct 2052 (1984)

Supporting FACTS (tell your story briefly without citing cases or law):

CONTINUED ON PAGE 6-C

C.    Ground 3: FUNDAMENTAL ERROR

Supporting FACTS (tell your story briefly without citing cases or law):   CONTINUED ON PAGE 7-A

6.

# GROUND ONE
## -CONTINUED-

ON MAY 1, 2001, THE DEFENDANT QINARD COLLINS SR. WAS CHARGED BY FELONY INDICTMENT WITH ONE COUNT OF FIRST DEGREE FELONY MURDER FOR THE DEATH OF HIS SON QINARD COLLINS JR. IT WAS ALLEGED BY THE STATE OF FLORIDA THAT QINARD SR. KILLED THE VICTIM BY HITTING AND/OR SHAKING AND/OR STRIKING SAID VICTIM ABOUT HIS HEAD CAUSING ABUSIVE HEAD INJURIES.

IN THE DECEMBER 3, 2001 PRETRIAL DEPOSITION GIVEN BY DR. TERRENCE STEINER MEDICAL EXAMINER FOR ST. JOHNS COUNTY FLORIDA. DR. STEINER TESTIFIED THAT THE CAUSE OF THE VICTIMS DEATH WAS DUE TO ABUSIVE HEAD INJURIES AND THAT THE VICTIM SUFFERED INTERNAL BRUSING UNDER THE SCALP IN AT LEAST EIGHT DIFFERENT PLACES, MASSIVE SWELLING OF THE BRAIN AND HEMORRAGE INTO THE MEMBRANES COVERING THE BRAIN. THE VICTIM SUFFERED BLEEDING INTO THE OPTIC NERVE SHEATHS AND THE HEAD AND EYE INJURY SUFFERED WERE DETERMINED BY DR. STEINER TO BE CLASSIC OF SHAKEN BABY SYNDROME[1]

THROUGH PERSONAL CORRESPONDENCE WITH INMATE ROBERT BASSETT, WASHINGTON CORRECTIONAL INSTITUTION, 4455 SAM MITCHELL DRIVE, CHIPLEY, FL. 32428. ON OR ABOUT APRIL 4. 2004 THE DEFENDANT DISCOVERED FACTS THAT WERE UNKNOWN TO THE DEFENDANT WHEN MR. COLLINS PLEAD NOLO CONTENDERE TO THE CHARGE OF SECOND DEGREE MURDER.

UPON READING SEVERAL MEDICAL JOURNALS AND/OR DOCUMETARIES WRITTEN BY DR. HARLD BUTTRAM, et.ol. THE DEFENDANT

---

HEREINAFTER: S.B.S

6.A

HAS LEARNED THAT MEDICAL VACCINATIONS ADMINISTERED TO INFANTS AT BIRTH HAVE BEEN LINKED TO CAUSING INFANT MORTALITY WITH INJURIES OFTEN MISCHARACTERIZED AS RESULTING FROM CHILD ABUSE. (EXHIBIT A)

SOME OF THE SYMPTOMS IDENTIFIED IN DR. BUTTRAM'S MEDICAL REPORT THAT WERE FOUND TO BE CAUSED BY AN ADVERSE VACCINE REACTION WERE INTRACRANIAL AND OCULAR HEMORRHAGE AND SEVERE BRAIN SWELLING. THESE INJURIES WERE OF THE SAME TYPE SUFFERED BY THE VICTIM QINARD COLLINS JR AS FOUND BY DR. TERRANCE STEINER'S AUTOPSY. THE DEFENDANTS SON QINARD JR WAS VACCINATED BY SHANDS MEDICAL CENTER JACKSONVILLE FLORIDA.

WHEN MR. COLLINS ENTERED THE PLEA OF NOLO CONTENDR THE DEFENDANT WAS TOTALLY UNAWARE THAT A POSSIBLE LINE OF DEFENSE IN ADVERSE VACCINE REACTION WAS AVAILABLE TO BE INVESTIGATED AND RAISED TO THE CHARGED OFFENSE.

HAD THE DEFENDANT KNOWN THERE EXIST A POTENTIAL VIABLE DEFENSE OF ADVERSE VACCINE REACTION. THE DEFENDANT WOULD NOT HAVE PLEAD NOLO CONTENDERE TO SECOND DEGREE MURDER. THE DEFENDANT WOULD HAVE FIRST REQUEST DEFENSE COUNSEL TO INVESTIGATE THE VIABILITY OF SAID DEFENSE AGAINST THE FACTS OF THE STATES CASE, AND SUBSEQUENTLY PROCEEDED TO TRIAL BY JURY HAD COUNSELS INVESTIGATION PROVED THE VACCINATION GIVEN THE VICTIM WAS THE CAUSE OF DEATH. THE DEFENDANT IS INNOCENT OF KILLING THE VICTIM, AND BASED ON THE NEWLY DISCOVERED EVIDENCE ALLEGED HEREIN THE WITDRAWL OF DEFENDANTS NOLO CONTENDERE PLEA IS NECESSARY TO CORRECT A MANIFEST INJUSTICE

6-B

# GROUND TWO
## -CONTINUED-

THE DEFENDANTS ATTORNEY MR. JOSEPH ANTHONY RENDERED SUBSTANDARD ASSISTANCE WHEN COUNSEL FAILED TO INVESTIGATE WHETHER AN ADVERSE VACCINE REACTION IN THE VICTIM QINARD COLLINS JR WAS A CONTRIBUTING CAUSE OF THE VICTIMS DEATH.[2]

MEDICAL STUDIES HAVE SHOWN THAT NEONATAL VACCINATIONS ADMINISTERED TO INFANTS HAVE BEEN LINKED TO CAUSING INTERNAL INJURIES THAT ARE COMMONLY RULED TO HAVE OCCURRED FROM PHYSICAL CHILD ABUSE. SEE (EXHIBIT A)

PRIOR TO PLEADING NOLO CONTENDERE TO THE NEGOTIATED PLEA OF SECOND DEGREE MURDER. THE DEFENDANTS ATTORNEY INFORMED MR. COLLINS THERE WAS NO PLAUSIBLE DEFENSE TO THE OFFENSE OF FIRST DEGREE FELONY AS ALLEGED AGAINST THE DEFENDANT. QINARD COLLINS REPEATEDLY MAINTAINED TO DEFENSE COUNSEL THAT HE WAS INNOCENT OF THE CHARGED OFFENSE BUT DISPITE THE DEFENDANTS CONCESSION OF INNOCENCE. DEFENSE COUNSEL TOLD THE DEFENDANT THAT PLEADING NOLO CONTENDERE TO THE CHARGE OF SECOND DEGREE MURDER WOULD BE DEFENDANTS BEST OPTION DUE TO THE ABSENSE OF A VIABLE DEFENSE. THE DEFENDANT TOOK COUNSELS ERRONEOUS ADVISE AND ULTIMATELY PLEAD NOLO CONTENDERE. BASED SOLELY ON DEFENSE COUNSEL ASSERTION THAT DEFENDANT WOULD HAVE NO DEFENSE IN THE EVENT DEFENDANT CASE PROCEED TO TRIAL.

CONTRARY TO THE INFORMATION CONVEYED TO MR. COLLINS BY DEFENSE COUNSEL AND DEFENDANTS STANDING BELIEF OF NO POTENTIAL DEFENSE UPON PLEADING NOLO CONTENDERE.

---

[2.] The Defendant Incorperates Herein Any And All Facts That Are Aired In Ground One Of The Foregoing Motion.

6-C

THE DEFENDANT HAS DISCOVERED SUBSEQUENT TO PLEADING NOLO CONTENDERE THAT THERE WAS A POTENTIALLY VIABLE DEFENSE OF ADVERSE VACCINE REACTION THAT COULD HAVE BEEN USED TO COMBAT THE CHARGE OF FIRST DEGREE FELONY MURDER.

BECAUSE OF DEFENSE COUNSELS FAILURE TO CONDUCT AN INVESTIGATION INTO THE FOREMENTIONED DEFENSE PRIOR TO THE DEFENDANT PLEADING NOLO CONTENDERE. MR. COLLINS MADE AN UNKNOWING DECISION TO PLEA TO SECOND DEGREE MURDER BECAUSE THE DEFENDANT PLEAD WITHOUT THE BENEFIT OF A THOROUGH INVESTIGATION INTO NOR A COMPLETE UNDERSTANDING OF WHETHER THERE WAS ACTUALLY AN ALTERNATIVE CAUSE FOR THE VICTIMS DEATH THAT WOULD INTURN PROVIDE A DEFENSE TO THE STATES CASE. BASED ON THE FACTS ALLEGED IN THE FORE-GOING MOTION. DEFENDANTS NOLO CONTENDERE PLEA WAS NOT A FULLY INFORMED. INTELLIGENT CHOICE TO FORGO THE RIGHT TO TRIAL BY JURY

HAD DEFENSE COUNSEL CONDUCT AN INVESTIGATION INTO THE POSSIBILITIES OF WHETHER AN ADVERSE VACCINE REACTION COULD HAVE CAUSE THE VICTIMS DEATH, AND SUCH INVESTIGATION YIELD FAVORABLE INFORMATION TO SUPPORT A VACCINATION DEFENSE, THE DEFENDANT WOULD NOT HAVE PLEAD NOLO CONTENDERE BUT ALTERNATIVELY PLEAD NOT GUILTY AND INSISTED ON A TRIAL BY JURY.

6-D