D.   Ground 4: _____

_____

_____

Supporting FACTS (tell your story briefly without citing cases or

law): _____

_____

_____

_____

_____

15.  If any of the grounds listed in 14 A, B, C and D were not

previously presented on your direct appeal, state briefly what

grounds were not so presented, and give your reasons why they

were not so presented: _____

_____

_____

_____

_____

7.

## GROUND THREE
### -CONTINUED-

THE DEFENDANT CONTENDS THAT HIS PLEA OF NOLO CONTE-
NDERE ENTERED AUGUST 8, 2003 IS DEFICIENT AND SUBJECT TO
WITHDRAL BECAUSE THE HONORABLE JUDGE ROBERT K. MATHIS
FAILED TO INDICATE ON RECORD IN OPEN COURT WHAT IF ANY
EVIDENCE WAS RECEIVED THAT ESTABLISHED THE CHARGE OF
SECOND DEGREE MURDER. DURING THE PLEA COLLOQUY, A DETAILED
INQUIRY WAS MADE BY THE PRESIDING JUDGE INTO RELEVANT
MATTERS SUCH AS, WHETHER THE DEFENDANT UNDERSTOOD THE
RIGHTS WAIVED BY PLEADING NOLO CONTENDERE, THE APPLICABLE
SENTENCE ON SUCH PLEA, AND DEFENDANTS SATISFACTION WITH
SAID PLEA.

FURTHER ON INTO THE PLEA COLLOQUY. IN AN EFFORT
TO ILLUSTRATE THE FACTS OF THE CASE AGAINST THE DEFENDANT
THE STATE ALLEGED READY TO PROVE, THE STATES ATTORNEY
PROFFERED THE FOLLOWING FACTS TO THE TRIAL COURT:

THE COURT: What's the State Prepared To Prove?

MS. CHRISTINE: Your Honor, The States Prepared
To Prove That On Or About The 2nd Day Of April
2001. WITHIN St. Johns County, Florida. Qinard
Lamar Collins Did Then And There Unlawfully,
While Engaged In The Prepetration Of The Offense
Of Aggrivated Child Abuse, Did Kill And Murder
Qinard Collins. Jr., A Human Being, By Hitting Him
And/or Shaking And/or Striking Said Child On Or
About His Head Causing Abusive Head Injury.

7 · A

NOTHING IN THE SUBSTANCE OF THE ABOVE FACTS TENDERED BY THE STATES ATTORNEY PROVED THAT THE DEFENDANT COMMITTED THE CRIME OF SECOND DEGREE MURDER. IN ORDER TO HAVE PROVED A SUFFICIENT BASES FOR THE CHARGE OF SECOND DEGREE MURDER, THE STATE HAD TO SHOW THAT THERE WAS EVIDENCE THAT WOULD PROVE THE DEFENDANT KILLED THE VICTIM WITH A DEPRAVED MIND REGARDLESS OF HUMAN LIFE.

BECAUSE OF THE TRIAL COURTS FAILURE TO DETERMINE WHETHER A FACTUAL BASES EXIST ON WHICH TO ACCEPT THE DEFENDANTS PLEA OF NOLO CONTENDERE TO SECOND DEGREE MURDER AND FURTHER INDICATE ON THE RECORD THE BASES FOR ACCEPTING SUCH PLEA. THE DEFENDANT HAS PLEAD NOLO CONTENDERE TO AN OFFENSE THAT HAD NO FACTUAL BASES IN THE RECORD TO SUPPORT THE CHARGE.

THE COURT WAS IN ERROR IN FAILING TO INQUIRE INTO THE FACTUAL BASES FOR THE DEFENDANTS PLEA AND BY NOT INDICATING ON RECORD THE SOURCE OF THE FACTUAL BASES USED TO ACCEPT DEFENDANTS PLEA. AND ABSENT A BASES IN THE RECORD TO SUPPORT THE CHARGE OF SECOND DEGREE MURDER, COUPLED WITH THE TRIAL COURTS NONCOMPLIANCE WITH FLORIDA RULE OF CRIMINAL PROCEDURE 3.170(K), 3.172(O) THE WITHDRAWL OF DEFENDANTS PLEA IS NECESSARY TO CORRECT A MANIFEST INJUSTICE.

7-B

16.  Do you have any petition, application, appeal, motion, etc. now pending in any court, either state or federal, as to the judgment under attack? Yes _____ No _X_

17.  If your answer to number 16 was "yes", give the following information:

    (a)  Name of court: _____

    (b)  Nature of the proceeding: _____

    (c)  Grounds raised: _____

_____

_____

    (d)  Status of the proceedings: _____

_____

18.  Give the name and address, if known, of each attorney who represented you in the following stages of the judgment attacked herein.

    (a)  At preliminary hearing: JOSEPH D. ANTHONY III E.S.Q

_____

    (b)  At arraignment and plea: SAME

_____

    (c)  At trial: ___X___

_____

    (d)  At sentencing: _____SAME

_____

    (e)  On appeal: UK

_____

    (f)  In any postconviction proceeding: ___X___

_____

8.

(g)  On appeal from any adverse ruling in a postconviction

proceeding: _____X_____

_____

WHEREFORE, Movant request that the court grant all relief to

which the movant may be entitled in this proceeding, including

but not limited to (here list the nature of the relief sought):

1. _____

_____

_____

_____

_____

_____

_____

2.  And such other and further relief as the court deems

just and proper.

**OATH**

Under penalties of perjury, I declare that I have read the

foregoing motion and that the facts stated in it are true.

Date: _____

_____        _____

                                 Walton Correctional Institution
                                 _____ World War II Veterans Lane
                                 DeFuniak Springs, Florida 32433

9.

In the Circuit Court of the
Seventh Judicial Circuit in
And for St. Johns County Florida

State of Florida
    Plaintiff

v.

Qinard Collins, Sr.,
    Defendant

Case No: CF01-1102

# Exhibits

Qinard L. Collins
Walton Corr. Inst.
691 W.W II Veterans Lane
Defuniak Springs Fla. 32433
DC# V18204

# EXHIBIT

# A

4-4-04

Hi Quinton,

Robert brought the following article to our attention.  He wanted us to send you this information for you to review.  He isn't sure it will help in any way but wanted you to read it.

Norm is working on the picture you sent to him and we will send it back as soon as we can.

Take care and keep in touch.

Peg & Norm

## Did The Baby Die of Shaken Baby Syndrome?
### by Harold E. Buttram, MD
(An edited version of a talk given at a February 16, 2002 fund-raiser )
Contributing editor, Peter G. Tocci, BA, MT

Dr. Harold Buttram:

A man has been incarcerated since he was arrested and jailed in November, 1997 for causing the death of his infant son by what is known as shaken baby syndrome (SBS). In Februray, 1999, he was convicted and imprisoned for life, without parole. Very strong evidence has since arisen that medical misdiagnosis brought the jury conviction, and an appeal has been filed. The story will be profiled here, but first, some pertinent information about immune function.

**A Brief Look at Immunity**
Immune function comprises two major classes: cellular (cell-mediated) immunity and humoral (antibody-mediated) immunity. Cellular immunity utilizes phagocytic activities (ingesting foreign agents) and cytotoxic activities (poisoning foreign agents). Each class is identifiable by a biochemical signature it produces in the form of substances called cytokines.

Major medical journals state that in healthy people, there is a "bias" toward cellular immunity, while people with allergies, asthma, and autoimmune diseases have immune response "skewed" toward the humoral. There is now significant evidence suggesting that vaccines disturb immune balance, thereby contributing profoundly to allergy and other illness, and to their current, alarming increase, especially in infants and children. Dr. H. H. Fudenburg, a world renowned immunologist with hundreds of publications to his credit, made the following comments: "One vaccine decreases cell-mediated immunity by 50%, two vaccines by 70%,    all triple vaccines (such as MMR, DTaP)



markedly impair cell-mediated immunity, which predisposes to recurrent viral infections, especially otitis media, as well as yeast and fungi infections."

**An Ominous Health Trend**
I recall attending summer camp for several seasons during the 1930s. No boy was ever sick, had allergies, or was on medication. It was much the same in the schools I attended. Compare that with today. To my inquiries years ago, school teachers replied emphatically and unanimously that they were seeing more hyperactivity, more learning disabilities/behavioral problems, and more patterns of general sickness among school children.

In 1999, full realization of this adverse health trend hit me with a severe jolt. Were vaccines playing a significant role here? While in this frame of mind, I received my first letter. It seems my thoughts and experiences had "set me up" for his letter, because, on the first reading, a sense of great injustice overwhelmed me. I suspected that studying the baby's medical records would reveal the facts of injustice. That review largely confirmed for me that death occurred in a delayed manner following a combination of vaccines--violence of a different order.

**A Reign of Terror**
I have since come to know the pioneering work of Australian physician Archivedes (Archie) Kalokerinos, MD, who has testified in defense of parents in over 30 SBS cases. Other pioneers in Australia and New Zealand have been working in this field for many years. Of twenty-two cases I have reviewed, all but one show clear evidence, exemplified below, of defendant innocence. In the opinion of those veteran physicians and researchers, and in mine, many cases closely resemble the Yurko scenario: delayed onset, following vaccines, of signs and symptoms conventionally accepted as the definitive criteria for SBS. Most doctors dismiss this correlation as coincidental. Although coincidence might be expected occasionally, at the frequency being observed, such conclusion is unreasonable.

The ominous suggestion follows that if a large portion of SBS accusations and convictions are the result of subsequent misdiagnosis, we are witnessing a rapidly growing reign of terror against home and family. There is no other term for it. An excerpt of a letter written from the prisoner conveys the potential of this terrorism:

". . . our four-year-old daughter was taken by the authorities to 'protect her' from me--the accused who was in a maximum security facility without bond. She was used by the police and authorities to threaten and blackmail my wife to help them fabricate evidence and testify against me. This she adamantly refused to do. She was charged as an accessory to murder, and our daughter was placed in extended custody. Here she was sexually battered and molested when her 'protectors' left her unsupervised with two boys who had a history of deviant behavior. My wife's charges were dismissed after great effort and cost, and our daughter was returned. They both fight every day to bring our family back together and have been fighting since 1997."

**The Birth Experience**
Now to the medical specifics of the baby's case. Importantly, the pregnancy was complicated with constant nausea such that the mother was unable to take vitamins. She lost 10 pounds after conception, and barely regained it before parturition. Additional complications included group B Streptococcal vaginal infection, E coli urinary tract infection, and gestational diabetes.

At 35 weeks, on September 16, 1997, labor was chemically induced due to lack of amniotic fluid. Although medical records showed Apgar scores of 8 and 9 (standard of newborn condition--10 being the highest), a video of the birth taken by the father tells a much different story: clear respiratory distress, with marked rib and sternal retractions, and bluish-grey skin color. Hypoxia (oxygen deficiency) was confirmed by arterial blood gasses. The baby was sent immediately to pediatric intensive care, put on a ventilator, and administered Survanta®, a lung surfactant (surface-active) rescue drug. Three daily chest X rays showed bilateral pulmonary infiltrates interpreted as "respiratory distress."

While still presenting the symptoms of respiratory distress, including raspy breathing and grunting, the baby was sent home on his seventh day. Parents and grandparents continued to observe these problems, along with brief periods of apnea (breathing cessation). On November 11, at approximately eight weeks (43 days true post-partum age), the baby was given the DTaP, Hib, OPV, and Hepatitis B vaccines despite the breathing difficulty and length/weight factors in the 3 percentile range. Within 24 hours, low grade fever, irritability, and diarrhea developed, all of which continued for about ten days until the morning of November 24. The father was at home with the baby and his 4-year old sister when the baby's breathing stopped and did not resume. While attempting mouth-to-mouth breathing, the father rushed to a nearby hospital where the baby was only temporarily resuscitated.

**Autopsy and Trial**
Autopsy findings comprised retinal hemorrhages, subdural hematomas (blood-filled swellings on the brain), brain changes interpreted as diffuse axonal injury (axon: nerve impulse conductor), and four rib calluses on the left interpreted as the result of prior fractures. The father was therefore accused, and subsequently convicted by a jury, of murdering his son by physical violence. As mandated by Florida law, a life sentence was imposed. Anyone familiar with the medical/legal procedures in SBS cases is aware that these pathology findings have been deemed exclusively diagnostic of SBS. However, investigation has revealed a significant body of medical literature, much of it by pathologists and specialists in the United States and Great Britain, criticizing this interpretation and showing that these conditions can, and commonly do, arise from a number of other causes.

There were four state witnesses with a total of six appearances before the trial jury, in contrast to one appearance for the single defense witness. This witness was H. Douglas Shanklin, MD, FRSM, Professor of Pathology and of Gynecology and Obstetrics, Division of Neuropathology, University of Tennessee, Memphis. I'm told he is held in the highest professional regard by his peers. Lacking prenatal and birth records at the trial, and having only pathology slides to go on, Dr. Shanklin attributed death to "natural causes" including failure-to-thrive, bilateral pneumonia (confirmed at autopsy), and meningitis.

In a letter summarizing the case, Dr. Shanklin states that either pneumonia or meningitis might or might not have caused death, but together they almost certainly would have. Without prenatal and birth records records, Dr. Shanklin could not corroborate his interpretation of the pathology slides; and the state witnesses went unchallenged with the fact of pregnancy/birth complications, for example. Perhaps the most significant factor working against the defense was the medical complexity of the case, which even doctors have had difficulty grasping. Thus, inequity and confusion led to conviction.

Why were there no prenatal and birth records in court? Unfortunately, no one knows the whole story. Unquestionably, some subterfuge and incompetence were involved. The defense attorneys probably did make a gesture at requesting them, but meeting delay or obstruction did not persist. The medical examiner was compelled to admit under oath

that he neither sought nor examined these records before or after autopsy. In any case, in my opinion, a lack of pertinent medical records should be, indeed, should have been, grounds for calling a mistrial.

## Evidence of Innocence

Further complicating the scenario were the rib calluses. In the early stages of review they were quite puzzling. A rational explanation came from a later, voluminous report by Archie Kalokerinos, MD, previously mentioned. In the 1970s, Dr. Kalokerinos made a major contribution to medicine by proving that post-vaccinal death of Aboriginal babies (nearly a 50% rate in some geographical areas), especially if colds or respiratory infections were present, was caused by vaccinal aggravation of a condition he diagnosed as "subclinical scurvy."

Edward Yazbak, MD, a retired pediatrician who has been following the case, informed me that any one of the pregnancy complications would put a baby in a high-risk category. With the multiple complications noted, severe nutritional deficiencies were probable, and Dr. Shanklin reported definite retardation in kidney development. We know that vitamin C is necessary for production and maintenance of connective tissue; that spontaneous fractures and hemorrhages (from bleeding capillaries) characterize classical scurvy; and that the most common site of bleeding in scurvy is subperiosteal (under the fibrous covering of bone). In ribs, as clots from such bleeding develop and calcify, they are indistinguishable on X-ray from healing fractures. Also common in scurvy, slippages of the ribs in locations near the spine may also appear on X-rays as healing fractures. Based upon the medical literature, this is detailed in the Kalokerinos report.

More recently, the father received a report from an Australian hematologist, Michael D. Innis, MBBS, DTM&H, FRCPath, FRCPA, Honorary Consultant Haematologist, Princess Alexandria Hospital, Brisbane, Australia. He cites a highly likely contributory cause of death as intracranial hemorrhage resulting from failure of the liver to synthesize clotting factors in adequate amounts (although the causative connection between insufficient clotting factors and hemorrhage might not be immediately apparent, Dr. Innis has expertise in this area resulting from extensive research). He also emphasizes that bone underlying subperiosteal hemorrhage would become necrotic from loss of it's blood supply, and that a healing necrosis looks identical to a healing fracture at autopsy. Because appropriate post-mortem tests were not done, precise determination of all morbidity factors and their interactions is impossible. But the Innis report alone should be sufficient for the father's vindication.

Finally, the DTaP vaccine in question is known to have come from a from a batch which ranks number one in deaths, number one in non-recoveries, and fourth in total events reported. Such batches are called "Hot Lots." One might wonder why, if batches can be so identified, SBS suspects aren't given some benefit of the doubt. One challenge is that such identification is based upon clinical observation, which courts will not accept. This seems odd, since the Vaccine Adverse Events Reporting System (VAERS) plainly indicates, as does the 1986 Congressional Childhood Vaccine Injury Act, that vaccine injuries are a fact of life. When people try for compensation under this Act, the court disallows VAERS information, asking for objective evidence, such as laboratory tests. Another challenge is, of course, that the requisite tests are nonexistent (see Addendum).

The father could have plea bargained and received a lesser sentence. His refusal spoke to me of a man secure in his innocence. Also remarkable was the immediate and continuing loyalty, under soul-testing circumstances, of his wife, Francine. Following the trial, her diligent efforts secured complete medical records. Based on these records

4

there are, at this writing, 28 medical professionals willing to testify to the father's innocence (and the number will grow). The disciplines represented at this writing include board-certified specialists in the fields of pathology, bone pathology, toxicology, hematology, ophthalmology, pediatrics, Ob/Gyn, and forensics, with some practitioners having dual specialties including pathology. As noted, an appeal has been filed.

## Extreme Importance of This Case

Due to the father's tireless effort at hand writing literally thousands of letters, the case has gained significant attention and status internationally. Its critical implications for parents and caretakers falsely accused and imprisoned, and the life-and-death questions it raises concerning medically advised and mandatory vaccine programs, rank it high among the most important legal/health issues. To illustrate further, in my experience it is common in hospital emergency rooms that, once suspicion of shaken baby syndrome arises, all thought of further diagnostic investigation ceases. I know of no other situation in medicine where the usual diagnostic thoroughness one finds in such centers is abandoned.

Finally, public confidence in America's health care system and in the medical profession in particular is already eroding. Sooner or later, it will become publicly obvious that many SBS defendants have been falsely accused and convicted through deplorable misdiagnosis pertaining to pathologies that could one day become regarded as the result of malpractice--the indiscriminate administration of childhood vaccines. Further adverse backlash is sure to ensue in the US and abroad unless this case, as a prime example, is brought to light now with plentiful and reliable support for the defense. Having also witnessed outright viciousness behind the scenes in legal proceedings (such as that, described earlier, used against Francine Yurko), I now feel that the SBS debacle is a potentially fatal malignancy in the integrity of medicine.

This case is eminently winnable. Its particulars make the likelihood of another equally propitious opportunity remote. Based upon what we can only imagine the post vaccinal suffering of that small, fragile life to exemplify, not to mention the misery visited upon his loving family, we--professionals and lay persons alike--must not relent in our insistence upon measures to prevent such tragedy. To this end, this case must be won. No other outcome is thinkable.

## ADDENDUM:

To this author and many other professionals, the role of medical misdiagnosis in a significant portion, possibly a majority, of SBS accusations and convictions seems to be the result of inadequate investigation in at least three areas, listed below. To avert more tragedy, the following minimal screening is recommended as mandatory before considering charges of child abuse/shaken baby syndrome:

(1) serum ascorbate and histamine to rule out subclinical scurvy;

(2) prothrombin time, partial thromboplastin time, fibrinogen level, platelet count, and D dimer test to rule out bleeding diatheses;

(3) when there is callus or fracture, bone densitometry to rule out the recently described temporary brittle bone disease, as well as tests to rule out classical brittle bone disease and all conditions, such as rickets, that predispose to spontaneous fracture. (See Minimal Recommended Screening Where Shaken Baby Syndrome Is Suspected for more complete information and references.)

## Caveat:

The suggested panel is not intended to be comprehensive, but only a starting point for screening purposes where child abuse is suspected. Changes and/or additions are likely

as we learn more about these areas. Such information will be added to the website.

Obviously, the panel does not include tests for vaccine reactions. As noted earlier, no suitable post-licensing diagnostic protocol for vaccine reactions has ever been officially established. There is no basic science in this area worthy of the name, and this seems to be no accident, based upon my experiences at court hearings. There are two important avenues:

1) systematic before-and-after testing for vaccinal effects on the immunological and neurological systems, not to mention their potential effects on genetics;

2) meaningful, long-term epidemiological surveillance of a significant number of vaccine recipients and controls (this implies, of course, that people be informed, and not bullied into vaccinating babies and children, so that there will be controls).

These tests would hold up in court, which is why an iron curtain of official resistance surrounds them. In my opinion also, within a reasonable degree of medical certainty, vaccines and vaccine reactions very frequently trigger subclinical scurvy and its complications, as well as bleeding complications from deficiencies of clotting factors.

**Note:**
This article is endorsed by Roy B. Kupsinel, MD; Susan Kreider, RN; Catherine J. M. Diodati, MA, Vaccination & Biomedical Ethics Researcher and Author; and C.A.B. Clemetson, Professor Emeritus, Tulane University School of Medicine.

As of this writing, a court date has not been set.



# *Shaken Baby???*



Media
Conspiracy
Bias
Attitudes
**Shaken
Baby??**







**Search this site**

powered by FreeFind

In recent years some activists have suggested that there is a connection between vaccinations and 'shaken baby syndrome'. This suggestion has brought widespread criticism and ridicule from most in the medical profession.

I was reluctant to do this page due to the inherent emotional nature of the whole notion of shaken baby syndrome. However articles are appearing both online and in the printed media about the possibility of a connection and so with some misgivings I am putting this page online.

**What is Shaken Baby Syndrome?**

Shaken baby syndrome (SBS) is based on findings that include[1]:

- intracranial haemorrhage
- cerebral contusion or other brain tissue injury
- evidence of cerebral trauma e.g. altered consciousness

The 'syndrome' was described by Caffey[2] in the early 1970s and he listed a 'classic' set of symptoms:

- intracranial haemorrhage
- retinal haemorrhage
- metaphyseal fractures

While none of these signs on their own are a guarantee that an infant has been shaken, together they are considered highly indicative. Attempts have been made over the years to set out guidelines and protocols to follow when investigating a suspected case. The American Academy of Pediatrics has published guidelines[3] and there are articles/policies[4] appearing which call into question the diagnosis of SIDS when proper investigative procedures have not been followed.

**Mistaken Diagnosis**

Are mistakes made when diagnosing SBS? There are reports in the medical and legal literature of mistakes being made. In one example a 10 week old infant girl was admitted to hospital with cerebral bleeding and bruising to the body. She later died. A diagnosis of 'non-accidental injury' was made. The article says that all caregivers considered SBS as the cause of the infant's injuries, particularly as there were bilateral retinal haemorrhages. Fortunately for the parents further blood studies were done and it was shown that the infant had Late Haemorrhagic Disease of Infancy. The infant was born at home and di

not receive the standard vitamin K injection - which is given to (hopefully) prevent this particular disease. This condition is recognised as "one of several bleeding disorders that can mimic the findings of nonaccidental head injury and may lead to a mistaken diagnosis of child abuse"[7].

In an Australian example a father was accused of shaking his infant daughter to death[8]. Medical evidence was presented at the trial which implicated a range of factors, including vaccination. In this case there were no other signs of physical abuse such as fractures or bruising, the injury was restricted to the brain. Vaccination was presented as the 'final straw' for an infant suffering from a multitude of undiagnosed medical problems. The father was found not guilty.

## Media Coverage

An article appeared in the US magazine Redbook[10] in September 2000. The article presented details of cases where fathers had been accused of shaking their children. In two cases the men were acquitted and blame was placed on vaccinations received. In another case the father was found guilty. The article explores the possibility that prosecutors are too quick to blame SBS when there are other possible causes. The National Network for Immunization Information responded to the article with a letter[11] to the magazine and an expanded rebuttal on their website.

Other doctors have also published criticisms[12] of the vaccination defence and of courts who allow the defence to be made. There have also been comments from doctors who caution against over-diagnosis[13].

## The Pro-Choice Response

Articles have also appeared from the pro-choice/'anti-vaccination' movements and some accused parents actively work with vaccination awareness groups in an effort to clear their names. Viera Scheibner PhD has written one such article and she is often called upon in vaccination trials. Her work is much criticised by the medical profession because she is not a medical doctor, her qualifications are in the natural science field. Comments have also been published on the NVIC[14] website and information is available on a site created by British parents[15] who claim they were wrongly accused of SBS.

There is also a case where a convicted man is being assisted by vaccination choice groups. In this case Alan Yurko was sentenced for the shaking death of his son[16]. The Yurko case is different to others using the vaccination defence because his son had evidence of healing rib fractures as well as cerebral bleeding. Supporters of Yurko refer to an article[17] about transient brittle bone disease to help explain the fractures.

## Alternative Diagnosis

Case 3:14-cv-00047-TJC-PDB   Document 10-3   Filed 06/06/14   Page 16 of 82 PageID 481

situation you cannot say how you will react. The fact that it is your baby in need of attention only makes the situation more stressful.

I was a registered nurse for over 15 years and I saw many emergency situations. I wish I could say that I was always calm but I can't. I saw newly registered doctors shaking uncontrollably during resuscitation attempts, I saw nurses faint and parents hysterical. If trained medical personnel are nervous during their first real emergencies why should we expect parents to react calmly when they find their baby unresponsive and lifeless? Holding an infant by the feet and spanking its bottom sounds outrageous, but it was once standard procedure following birth and is still referred to in movies. When someone says they shook their child to rouse them why do some automatically think of a violent shaking? It could just as well indicate a hand on the shoulder and a gentle shake.

## In Conclusion

As with so many other legal matters a person's chance of a fair trial will depend heavily on the ability of both his lawyer and his medical 'experts'. Not all cases fit the 'profile' and the fear of many parents is that any injury to their baby will result in a diagnosis of SBS. There is also a growing movement[22, 23] of parents, usually mothers, who say they are being blamed for their child's illness. When the medical profession is unable to determine what is wrong with a child there is the possibility that the mother will be accused of Munchausen Syndrome by Proxy. This psychiatric disorder is when a person deliberately inflicts injury on someone else in order to gain attention[24]. Some mothers claim that they are threatened with the diagnosis if they do not meekly comply with their doctor's wishes.

I don't know what, if any, part vaccines play in SBS. It is apparent that the diagnosis can be made without the so-called triad of events (brain injury, retinal haemorrhage, fractures) and that it is possible for other disease processes to present similiar symptoms. These other conditions are rare, but that does not mean they don't occur. Winning a multimillion dollar lottery is a rare event, but it happens. No-one wants to see a guilty person acquitted for this crime, but everyone deserves a fair trial without hysterical media coverage. To some people the accusation of SBS is sufficient to say someone is guilty. The belief is that by suggesting there may be other factors involved you are condoning child abuse/murder. This is not the case. The conviction of an innocent person is the probable outcome of a false accusation which is not investigated properly. Such an outcome can hardly be seen as justice.

It is not possible to come to an informed opinion on whether or not abuse occurred without access to all the medical and police notes. Most cases you read about on the internet will not provide full details and so what appears straightforward might be very complicated.

(2000) Evaluation of Infants with subdural hematoma who lack external evidence of abuse. Pediatrics, Vol 105, March 2000, pp549-553



Caffey, J. The whiplash shaken infant syndrome. Pediatrics, 1974; 54: 396-403. Quoted in the above (ref 1.) article. (No abstract)

AAP policy on SBS

AAP policy on SIDS. Addendum to policy September 2001.

Byard, R.W. and Krous, HF. Suffocation, shaking or sudden infant death syndrome: Can we tell the difference? Journal of Paediatrics and Child Health, 1999, 35, pp 432-433.

Disease of the Newborn - what is it?

Fatal intramuscular bleeding misdiagnosed as suspected nonaccidental injury. Pediatrics, Vol. 95(5), May 1995, pp 771-773. (No abstract)

Late-form hemorrhagic disease of the newborn: a fatal case report with illustration of investigations that may assist in avoiding the mistaken diagnosis of child abuse. Am J Forensic Med Pathol 1999 Mar;20 (1):48-51

decision with explanation of the various medical factors involved in the case of Rikki Lee Walters.

Shaken Baby Syndrome or Adverse Vaccine Reaction? Summary of the judge's (ref 8.) decision.

article: Was It Murder, Or A Bad Vaccine?

from the National Network for Immunization Information.       to Redbook.

medical rebuttal from The National Center on Shaken Baby Syndrome.

editorial on Shaken Babies, free registration required to read this. Three letters critical of the editorial were published in the September 5, 1998 issue of the journal (not available free online).

Shaken Baby and the vaccination link, Viera Scheibner. See also Maureen Hickman's article at ref 9.

Reactions to vaccine match symptoms found in 'shaken baby' cases
A group which claims to represent the 5% of SBS cases which do not fit the classic profile.

Details of the case against Alan Yurko.

Temporary brittle bone disease: association with decreased fetal movement and osteopenia. Calcif Tissue Int 1999 Feb;64 (2):137-43.

Osteogenesis imperfecta: the distinction from child abuse and the recognition of a variant form. Am J Med Genet 1993 Jan 15;45(2):187-92

Anatomy of the shaken baby syndrome. Anatomical Record (The New Anatomist) 253: pp 13-18, 1998. Woodward trial.

Text of a letter published in the journal Pediatrics. Shaken baby syndrome--a forensic pediatric response. Pediatrics. 1998 Feb;10 (2):321-3.

IN THE CIRCUIT COURT OF THE
_____Seventh_____ JUDICIAL CIRCUIT
IN AND FOR __St. Johns_____
COUNTY, FLORIDA


STATE OF FLORIDA,
      Plaintiff,

v.                                        Case No.: _CF-01-1102_____

__Qinard L. Collins__,
      Defendant,


## MOTION FOR AN EVIDENTIARY HEARING

NOW COMES the defendant __Qinard L. Collins_____, and respectfully moves this Court for and Evidentiary Hearing on the submitted, __Motion For Postconviction Relief_____, pursuant to: **Fla.R.Crim.P.** Rule _3.850_____, in the instant cause of action.


**AS GROUNDS** the defendant states:

1. That the __Motion For Postconviction Relief_____, now pending before this Court, contains numerous allegations of an evidentiary nature that requires the presentation of testimony and other related evidence to properly substantiate and corroborate the

allegations set forth, and the issues raised therein, and for the Court to be able to make a fair evaluation.

2. That the Defendant further submits, that for the court to be able to fairly and intelligently evaluate and rule upon the foregoing motion, it is essential for the petitioner to be given the opportunity to present case law and arguments.

WHEREFORE, the Defendant QINARD L. COLLINS,

moves this Court to accordingly grant the Defendant and evidentiary hearing for the reasons stated above.

Respectfully Submitted,

*Qinard Collins*

Walton Correctional Institution
691 World War II Veterans Lane
Defuniak Springs, Florida 32433

2

# APPENDIX
# B

IN THE CIRCUIT COURT, SEVENTH
JUDICIAL CIRCUIT, IN AND FOR
ST. JOHNS COUNTY, FLORIDA.

CASE NO.: CF01-1102
DIVISION: 56

STATE OF FLORIDA,
      Plaintiff,

vs.

QINARD COLLINS,
      Defendant.
_____/

## ORDER ON MOTION FOR POSTCONVICTION RELIEF

THIS CAUSE came before the Court on the Defendant's Motion for Postconviction Relief, filed pursuant to Florida Rule of Criminal Procedure 3.850. The Court has reviewed and considered the Motion, and being otherwise fully advised in the premises finds as follows:

The Defendant was charged by indictment with aggravated child abuse and first degree murder. The State alleged that the Defendant abused his child by biting, striking, punching, pinching or battering him, and caused the death of his child by hitting, striking, or shaking his child on the head, thereby causing abusive head injury. Pursuant to a negotiated agreement with the State the Defendant plea no contest to second degree murder and was sentenced to 30 years incarceration. He appealed his judgment and sentence to the Fifth District Court of Appeals, which court per curium affirmed this Court's decision.

The Court notes that the Motion is not under oath as required by Rule 3.850(c). While this deficiency alone provides sufficient reason to deny the Motion, the Court considers the Motion on its merits and finds that even if the Motion were under oath it would be denied.

In Ground One of his Motion the Defendant asserts that since he has been incarcerated he has become aware of a research article which indicates that problems associated with vaccinations may cause many of the symptoms associated with Shaken

1

Baby Syndrome.  He attaches a copy of the article to his Motion.  He asserts that he was unaware of this line of research as a possible defense to the charges.  The Defendant does not assert that his attorney was ineffective for failing to investigate the defense or speak with him about the defense, and he does not indicate that he believes his plea was rendered involuntary as a result of the lack of such knowledge.  Accordingly, the Defendant has not set out a facially sufficient claim for relief.

In Ground Two the Defendant sets out a claim for ineffective assistance of counsel.  To establish a claim of ineffective assistance of counsel, the defendant must show: (i) that his counsel's performance fell below that of reasonable competent counsel; and (ii) that there is a reasonable likelihood that, but for counsel's deficient performance, the outcome of the proceedings would have been different.  See Strickland v. Washington, 466 U.S. 668, 687-88, 694 (1984); Cherry v. State, 659 So.2d 1069, 1072 (Fla. 1985); Routly v. State, 590 So.2d 397, 401 (Fla. 1991); see also Duggan v. State, 588 So.2d 1054 (Fla. 1991) (citing Shaffner v. State, 562 So.2d 430, 431 (Fla. 1st DCA 1990) (claim is facially insufficient if it does not allege that, absent the misstatement or omission, the defendant would not have entered the plea)).  Such a claim is sufficient to warrant an evidentiary hearing only where the defendant alleges specific facts, not conclusively rebutted by the record, that demonstrate deficient performance by defense counsel and resulting prejudice.  Mendyk v. State, 592 So.2d 1076, 1079 (Fla. 1992); see also Turner v. State, 570 So. 2d 1114, 1114-15 (Fla. 5th DCA 1990).  General allegations or mere conclusions are insufficient to demonstrate entitlement to relief.  Parker v. State, 904 So.2d 370, 376 (Fla. 2005); Gutierrez v. State, 860 So.2d 1043 (Fla. 5th DCA 2003).  To carry the burden of alleging and demonstrating prejudice, allegations must be specific, i.e., the defendant must plead and show how the outcome of the case would have been different had counsel not acted deficiently.  Catis v. State, 741 So.2d 1140 (Fla. 4th DCA 1998).  Is it not enough for the Defendant to show that the alleged errors had some conceivable effect on the outcome of the proceeding, but rather, that there is a reasonable probability that but for the attorney's errors, the result of the proceeding would have been different.  Bowman v. State, 748 So.2d 1082 (Fla. 4th DCA 2000).  Mere possibility and speculation are insufficient to demonstrate prejudice.  Jones v. State, 845 So.2d 55 (Fla. 2003). Moreover, "a court considering a claim of ineffectiveness of counsel need not make a specific ruling on the

2

performance component of the test when it is clear that the prejudice component is not satisfied." Kennedy v. State, 547 So. 2d 912, 914 (Fla. 1989) (citing Maxwell v. Wainwright, 490 So. 2d 927 (Fla.), cert. denied, 479 U.S. 972 (1986)).

The Defendant asserts that his attorney was ineffective for failing to investigate whether or not adverse vaccine reactions could have caused his child's death. He asserts that his attorney informed him that he had no plausible defenses to the charges. He states that if his attorney had investigated the research and that if his attorney's investigation had yielded positive results, he would have taken the case to trial. In this ground, the Defendant does not even make an unequivocal statement that he would have taken his case to trial had his attorney acted properly. Rather, he makes the conditional statement that he would have gone to trial if his attorney's research had turned out favorably. The Defendant does not indicate that such research would in fact have yielded favorable results. Accordingly, even if the attorney acted deficiently, the Defendant has failed to demonstrate that any prejudice resulted. In addition, the line of research cited by the Defendant is applicable to Shaken Baby Syndrome. The deposition of the medical examiner who performed an autopsy on the child reveals that in addition to symptoms of Shaken Baby Syndrome, the child exhibited symptoms of Battered Child Syndrome, specifically: bruising to the face and abrasions, bruises consistent with bite marks, bruising on the gums and lips, scabbed abrasions on the nose and ears, and other areas of abrasions and bruising about the body. See Exhibit 'A.' Even if the research cited by the Defendant provided an avenue of defense as to the Shaken Baby Syndrome, then, it did not explain the symptoms of Battered Baby Syndrome that were present. To the extent that the research would not have aided the Defendant as to the symptoms of Battered Baby Syndrome, no prejudice has been demonstrated and the Defendant's attorney was not deficient for failing to investigate a defense that would not have explained the injuries which the child had received.

In Ground Three the Defendant asserts that the trial court failed to ensure that sufficient facts were placed on the record to support the lesser-included, pled-to charge of second degree murder as opposed to the original charge of first degree murder. Even if this were a cognizable claim, it is one that the Defendant could have and should have raised on direct appeal.

**Therefore**, it is:

**ORDERED AND ADJUDGED** that:

**1.)** The Motion is DENIED.

**2.)** The Defendant shall have 30 days from the date of this Order within which to appeal this Court's decision.

**DONE AND ORDERED** in Chambers, in St. Johns County, St. Augustine, Florida, this 25 day of May, 2006.

/s/ J. MICHAEL TRAYNOR

**J. MICHAEL TRAYNOR**
Circuit Court Judge

*Copies To:*

State Attorney

Qinard Collins
Walton Correctional Institution
691 WWII Veterans Lane.
DeFuniak Springs, FL 32433

4

3

1          S T I P U L A T I O N

2          It was stipulated and agreed by and between

3    counsel for the respective parties, and the witness,

4    TERRENCE STEINER, M.D., CHTD, that the reading and signing

5    of the deposition by said witness be waived

6    and notice of filing be waived.

7               TERRENCE STEINER, M.D., CHTD,

8    having been duly sworn as a witness, testified

9    as follows:

10               DIRECT EXAMINATION

11   BY MR. ANTHONY:

12        Q    State your name for the record, please.

13        A    Dr. Terrence Steiner.

14        Q    And where are you employed, sir?

15        A    I'm self-employed.

16        Q    What kind of work do you do for the county

17   of St. Johns then so far as criminal cases?

18        A    Well, I have a contract, intralocal

19   agreement.  I provide forensic pathology medical

20   examiner services to the three counties of District

21   23, which includes St. Johns County.

22        Q    All right.  Would that be in the capacity

23   of being a medical examiner for them?        **EXHIBIT** " A "

24        A    Yes.

25        Q    If you would just give me a brief overview

              ST. JOHNS COUNTY COURT REPORTERS

1  of your medical training.

2       A   I can -- she can get the secretary to send

3  you a resume to save you time.  I have been in the

4  practice of forensic pathology in both hospital and

5  forensic settings for 32 years since graduation from

6  medical school and training at Mayo Clinic in

7  Rochester, Minnesota.

8            MR. ANTHONY:  If it's okay with

9       Mr. Larizza, what I will do is we'll just

10      stipulate to submitting this as an exhibit to

11      the deposition.  This is his CV.

12           MR. LARIZZA:  Right.  I don't have any

13      problem with that.

14           MR. ANTHONY:  You have any objection to

15      that?

16           MR. LARIZZA:  No.

17           MR. ANTHONY:  You can show it to Dr.

18      Steiner to see that that's the one that he

19      provided, that is, in fact, the one I got from

20      Dr. Steiner.

21           THE WITNESS:  Or my secretary.  Yeah.

22           MR. ANTHONY:  Or your secretary, yeah.

23      We'll just attach a copy of that, Debby.

24  BY MR. ANTHONY:

25       Q   We're here today specifically on the case

            ST. JOHNS COUNTY COURT REPORTERS

1  of State of Florida versus Qinard Collins, Sr.,

2  wherein the alleged victim of that case was Qinard

3  Collins, Jr.  It was alleged that the case occurred

4  back on April 2nd of 2001.  Can you tell me when you

5  did your autopsy of Qinard Collins, Jr., Dr.

6  Steiner?

7       A    I did it on the 3rd of April at 9:30 in

8  the morning.

9       Q    Okay.  What were your findings?

10      A    My findings were those of death due to

11 abusive head injury with evidence of multiple

12 abusive injuries over varied periods in time which

13 made a battered child syndrome as a contributary

14 cause of death.  Externally there was bruising to

15 the face and abrasions, two areas of bruising, one

16 on each jaw consistent with a bite mark pressure.

17 There was bruising on the gums, on the lips.  There

18 was areas of scabbed abrasion where the skin had

19 been rubbed off about the nose, on the ears.  There

20 was a bite type bruising area to the right elbow.

21 There was externally some other scabbed abrasions on

22 the legs and back, and there was a linear area of

23 recent bruising over the right -- or left buttocks,

24 left or right, consistent with some type of blunt

25 trauma.

6

1        Internally the injuries were those of

2   bruising to the underneath of the scalp in at least

3   eight places, all recent type bruising.  There was

4   massive swelling of the brain, and hemorrhage into

5   the membranes covering the brain and also recent

6   hemorrhage into the subdural space over the

7   posterior -- back of the brain.  There was also

8   external bruising or bleeding into the optic never

9   sheaths, which are the nerves to the eye.

10      Q    The bleeding into the eye is what leads

11  you to -- it would be an indicator of a shaken baby

12  or battered child syndrome?

13      A    Well, the shaken baby and battered child

14  syndrome are different syndromes.  Battered child

15  syndrome is just evidence of trauma separated on

16  more than one occasion.  The bruises -- in this case

17  we have abrasion and bruising both recent, meaning

18  right near the time of death, and older, meaning

19  several days, so that's a battered child.  But the

20  head injury in this case and the eye injury is that

21  that is classic for the shaken baby syndrome, which

22  is an abusive head injury with or without the

23  associated trauma.  And what the injury is is a

24  shearing injury instead of a translational injury

25  that you would get by rapidly violently shaking a

1    baby.  The shear just tears the vessels in the eye,

2    in the retina, the lining of the eye, the membranes

3    over the brain and also the dural space where the

4    veins cross back and forth, those get sheared and

5    cause this type of injury.  This is opposed to a

6    blunt trauma where you have a translational injury,

7    which is a direct force at that area and it's

8    translated at that point to however far it gets out.

9              So these injuries to the brain and to the

10   eye are those one would expect to see in a shaken

11   baby syndrome with or without associated trauma, but

12   in this case we also have evidence of, as I said,

13   approximately eight areas of recent trauma to the

14   head by some type of blunt trauma and classically

15   that could be like knuckles or . . .

16        Q    Now, I'm getting from what you're saying,

17   or if you can explain it to me, that they are both

18   sharing (sic) and what you would call translational

19   type injuries?

20        A    Well, the bruising is a translational, a

21   force was applied at that area.  The subdural

22   leptomeningeal and retinal injuries are

23   translational, that is that of violent shaking.

24             MR. LARIZZA:  Doctor, you just said

25        "translational."

                 ST. JOHNS COUNTY COURT REPORTERS

1         THE WITNESS:  I mean shearing, yeah.

2    Q    Okay.  So the shaking part you're saying

3    is a sharing versus --

4    A    Shearing.

5    Q    Shearing.  I'm sorry.  I thought you said

6    sharing.

7    A    Shearing, s-h-e-a-r.

8    Q    You're saying shearing versus

9    translational?

10   A    Yes.

11   Q    Did you -- were you aware of any past

12   medical history of Qinard Collins, Jr., prior to

13   your autopsy?

14   A    Not prior to my -- well, I had a history,

15   the baby had the short bowel syndrome, but I didn't

16   have the detailed medical records at that time, but

17   I did obtain them.

18   Q    You have reviewed all the medical records

19   that the police have prior to writing your report?

20   A    No, I did not.  I reviewed the medical

21   records I had prior to.  I don't believe the

22   police -- well, I guess they can get medical records

23   by subpoena, but I got mine by my way of getting

24   them.

25   Q    Okay.

                ST. JOHNS COUNTY COURT REPORTERS

A    I reviewed the entire medical records
prior to completion of this report.

Q    Did you -- which hospitals did you have
records from, or do you know?

A    I have records from Flagler Hospital.  I
had records of the emergency medical assistance at
the time the child was reported unresponsive.  I had
records from Shands Hospital where -- from delivery
and then following delivery and the complications in
the neonatal unit, was transferred to Wolfson's
Children's Hospital, I have those records, and I
believe I also have the records when the child was
readmitted in mid March for a week, early March and
a week for some antibiotic therapy and then also
admitted March 15th and 16th or 13th and 14th where
the catheter had to be -- or the antibiotics had to
be repositioned and was discharged at that time, and
it has noted in the medical records available to me
that the child at that time had no abrasions, no
bruising, no evidence of external trauma.

I have records, too, where the child
failed to keep the follow-up visit with the
gastrointestinal unit, I guess at Wolfson's on the
22nd of March.  And I believe I have records from
the social services, that was the health department

ST. JOHNS COUNTY COURT REPORTERS

1    that was, I guess, assisting in getting this child

2    to well baby or whatever type program this baby was

3    in.

4         Q     Were you aware that Qinard Collins, Jr.,

5    was a premature delivery?

6         A     Yes.

7         Q     What effect, if any, would that have on --

8         A     None.

9         Q     -- on your opinion?  Okay.

10            What about drug usage by the mother, would

11   that vary your opinion any as to --

12        A     No.

13        Q     Have you had any specialized training as

14   to bite marks or not, evaluating bite marks?

15        A     No.

16        Q     How many cases would you estimate that you

17   have done involving child victims that suffered

18   either head injury or battered child syndrome or

19   shaken baby syndrome, those type --

20        A     I anticipate two to three deaths per year

21   over 32 years, plus whatever I saw in training, so

22   you know, maybe in consultation, perhaps 2- to 300

23   total.

24        Q     Do you -- have you taught any courses or

25   written any articles yourself specifically in regard

1   to those type cases?

2       A    I have used these as examples at courses I

3   have given, but as far as taught medical students or

4   anything, no.

5           MR. ANTHONY:  I don't have any further

6       questions.

7           MR. LARIZZA:  I don't have any questions

8       for the doctor.

9           MR. ANTHONY:  Read or waive?

10          THE WITNESS:  Waive.

11  BY MR. ANTHONY:

12      Q    Did you read any articles or newspapers or

13  hear anything on the radio or TV in regard to this

14  case specifically?

15      A    No, I don't get a newspaper.  Don't send

16  me one, please.

17  (Witness excused.)

18  (Whereupon, the deposition was concluded.)

19

20

21

22

23

24

25

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY, that a true and correct copy of the foregoing instrument: _Appendix To Initial Brief_ _____ _____ has been furnished to:

Disrtict Court of Appeal
  Fifth District
300 South Beach Street
Daytona Beach, Florida 32114

by United States Mail on this 10th day of July _____, 200 6.

_Dinard Collins_

Walton Correctional Institution
 691 World War II Veterans Lane
DeFuniak Springs, Florida 32433

C:\WP51\WP51\LAWFORMS\CIRCUIT

Inmate Name _Girard Collins_ DC # _V18204_

Walton Correctional Institution
691 World War II Veterans Lane
DeFuniak Springs, Florida 32433

Housing _A1121L_

RECEIVED

2[...] JUL 10 [...] 1:52

[...]

LEGAL MAIL
MAILED FROM A
CORRECTIONAL INSTITUTION

Office Of The Attorney General
PL01, The Capitol
Tallahassee, Florida 32399-1050



MAILED FROM A
STATE CORRECTIONAL
INSTITUTION

Provided to Walton CI
On  7-10-06  for Mailing
Date

Inmate's Initials  QC

LEGAL MAIL
MAILED FROM A
CORRECTIONAL INSTITUTION

LEGAL MAIL
MAILED FROM A
CORRECTIONAL INSTITUTION

R

*RF 06-1-20844*
*WILSON*
*7-31-06*
*mg*

IN THE DISTRICT COURT OF APPEAL OF THE STATE OF FLORIDA

FIFTH DISTRICT

QINARD L. COLLINS,

      Appellant,

v.

                    Case No. 5D06-2258

STATE OF FLORIDA,

      Appellee.

_____

## RESPONSE TO APPELLANT'S BRIEF FILED ON APPEAL FROM SUMMARY DENIAL OF COLLATERAL MOTION

Appellee, the State of Florida, pursuant to Florida Rule of Appellate Procedure 9.141(b), files this response to Appellant's initial brief and states:

Appellant appeals from the summary denial of a Florida Rule of Criminal Procedure 3.800(a) or 3.850 motion.  The State declines to file an answer brief in this cause, unless this Court so requests.  See Ketion v. State, 548 So. 2d 778 (Fla. 1st DCA 1989);  Toler v. State, 493 So. 2d 489 (Fla. 1st DCA 1986).

Respectfully Submitted,

CHARLES J. CRIST, JR.
ATTORNEY GENERAL

TIMOTHY D. WILSON
Assistant Attorney General
Fla. Bar #33383
444 Seabreeze Blvd.
Fifth Floor
Daytona Beach, FL 32118
(386) 238-4990 (Telephone)
(386) 238-4997 (Fax)

COUNSEL FOR APPELLEE

*7-31-06*
*mg*

<u>CERTIFICATE OF SERVICE</u>

I HEREBY CERTIFY that a true and correct copy of the above and foregoing Response has been furnished by U.S. Mail to Quinard Collins, DC# V18204, Walton Correctional Institution, 691 W.W. II Veterans Lane, DeFuniak Springs, Florida 32433 , this day of July, 2006.

TIMOTHY D. WILSON
COUNSEL FOR APPELLEE



206-1-20844

# IN THE DISTRICT COURT OF APPEAL OF THE STATE OF FLORIDA
## FIFTH DISTRICT
JULY TERM 2006

NOT FINAL UNTIL THE TIME EXPIRES
TO FILE REHEARING MOTION, AND,
IF FILED, DISPOSED OF.

QINARD L. COLLINS,

    Appellant,

v.

STATE OF FLORIDA,

    Appellee.

_____/

Case No. 5D06-2258

CF01-1102

Decision filed   September 5, 2006

3.850 Appeal from the Circuit
Court for St. Johns County,
J. Michael Traynor, Judge.

Qinard L. Collins, Defuniak Springs, pro
se.

Charles J. Crist, Jr., Attorney General,
Tallahassee, and Timothy D. Wilson,
Assistant Attorney General, Daytona
Beach, for Appellee.

PER CURIAM.

  AFFIRMED.

PLEUS, C.J., SAWAYA and MONACO, JJ., concur.

T

**IN THE DISTRICT COURT OF APPEAL**
**FOR THE ___FIFTH___ DISTRICT**
**STATE OF FLORIDA**

Qinard L. Collins ,
        **Appellant,**

v.

State of Florida ,
        **Appellee,**

Case No.: 5D06-2258

**Provided to Walton CI**
On __9/12/06__ for Mailing
       **Date**

Inmate's Initials __QC__

L06-1-20844

**MOTION FOR RE-HEARING**

NOW COMES, the Appellant Qinard L. Collins , pro se,
pursuant to **Fla.R.App.P.** 9.330(a) and submits this Motion for Re-
Hearing in the above styled cause.

In support the appellant states the following:

THE FIFTH DISTRICT COURT OF APPEALS DECISION ENTERED
SEPTEMBER 5, 2006 UPHOLDING THE TRIAL COURTS DENIAL OF
DEFENDANTS MOTION FOR POSTCONVICTION RELIEF SEVERLY
OVERLOOKS CONTROLLING POINTS OF LAW AND DECISIVE FACTS
REGARDING THE ISSUES RAISED ON APPEAL AS ILLUSTRATED
HEREIN.

1

## <u>ISSUE I</u>

IN RENDING ITS ORDER/DENYING ISSUE II OF THE
DEFENDANT'S RULE 3.850 MOTION THE TRIAL COURT REACHED
THE FOLLOWING CONCLUSION ON THE DEPOSITION OF DR. TERRENCE
STEINER M.D.,CHTD:

> Even if the research cited by the Defendant
> Proved an avenue of defense as to The Shaken
> Baby Syndrome. then it did not explain the
> Symptoms of Battered Baby Syndrome that
> were present. To the extent that the research
> would not have aided the Defendant as to the
> Symptoms of Battered Baby Syndrome, no prej-
> -udice has been demonstrated and Defendants
> Attorney was not deficient for failing to inves-
> Tigate a defense that would not have explained
> the injuries which the child received. (R#419)

IN AFFIRMING THE TRIAL COURTS REASONING ON APPEAL,
THE 5th DISTRICT COURT OF APPEAL HAS SEVERLY OVERLOOKED
THAT WHEN DECIDING THE LEGAL SUFFICIENCY OF AN INEFFECTIVE
ASSISTANCE OF COUNSEL CLAIM REGARDING COUNSELS FAILURE
TO INVESTIGATE A POTENTIAL LINE OF DEFENSE AS THE MATTER
RELATES TO PLEA NEGOTIATIONS.

THE FLORIDA SUPREME COURT IN <u>GROSVENOR V. STATE</u>
874 So.2d 1176 (Fla. 2004) ACKNOWLEDGED:

2.

xxxxx It is not necessary for the Defendant to show that he actually would have prevailed at Trial, although the strength of the governments case against the Defendant should be considered in evaluating whether the Defendant really would have gone to trial if he had received adequate advice from his counsel. GROSVENOR, at. pg 1181

UNDER THE ABOVE HOLDING, IT REASONABLY APPEARS THAT ISSUES RELEVANT TO THE DEFENSE OF ADVERSE VACCINE REACTION NOT EXPLAING THE TRANSLATIONAL INJURIES SUFFERED BY THE VICTIM THAT WERE DETERMINED TO BE SYMPTOMS OF BATTERED BABY SYNDROME COULD NOT HAVE BEEN CONCLUSIVE OF WHETHER DEFENDANT ALLEGED A LEGALLY SUFFICIENT CLAIME OF INEFFECTIVE ASSISTANCE OF COUNSEL REGARDING COUNSELS FAILURE TO INVESTIGATE SAID DEFENSE.

THIS COURT OVERLOOKS THAT HAD COUNSEL INVESTIGATED THE ADVERSE VACCINATION DEFENSE AND SUCH DEFENSE PROVED VIABLE, THERE WOULD HAVE BEEN AN EQUALLY COMPETING BASES FROM WHICH A JURY COULD CONCLUDE THAT THERE EXIST AN ALTERNATIVE BASES FOR THE VICTIMS DEATH.

THERE IS CURRENTLY NO EVIDENCE IN THE RECORD BEFORE THIS COURT ON APPEAL THAT THIS COURT COULD FAITHFULLY USE TO SAY THE STATE WOULD BE ABLE TO ACTUALLY PROVE AT A TRIAL THAT THE DEFENDANT CAUSED THE INJURIES SUFFERED BY THE VICTIM. MOREOVER THERE IS NO EVIDENCE IN THE RECORD ON APPEAL BEFORE

3.

THIS COURT ILLUSTRATING THE STRENGTH OF THE STATES CASE AGAINST THE DEFENDANT ABSENT THE DEFENDANTS NO CONTEST PLEA AND THERE WAS NO EVIDENTIARY HELD IN THE TRIAL COURT TO DEVELOPE WHETHER AN ADVERSE VACCINE REACTION COULD HAVE ACTUALLY CAUSED OR WAS A CONTRIBUTING FACTOR IN THE VICTIMS DEATH

GIVEN THE LACK OF THE FOREMENTIONED FACTS IN THE RECORD ON APPEAL. THIS COURTS DETERMINATION INTO THE MERITS OF APPELLANTS CLAIM WAS NOT MADE CONSISTENT WITH THE STANDARD ANNOUNCED IN GROSVENOR supra BECAUSE THE TOTALITY OF THE CIRCUMSTANCES AND FACTS SURROUNDING THE CASE Sub iudice WAS NOT COMPLETELY BEFORE THIS COURT ON APPEAL. AND FACTS NECESSARY FOR A LEGAL EVALUATION OF THE DEFENDANTS CLAIM UNDER GROSVENOR COULD NOT HAVE BEEN ACHIEVED BY THIS COURT FROM THE FACE OF THE TRIAL COURTS CURSORY SUMMARY DENIAL ORDER.

## ISSUE II

THE FIFTH DISTRICT COURT OF APPEALS AFFIRMED THE THE TRIAL COURT'S ORDER DENYING DEFENDANTS CLAIM OF FUNDAMENTAL ERROR RAISED IN ISSUE III OF DEFENDANTS RULE 3.850 MOTION FOR POSTCONVICTION RELIEF ON THE BASES THAT SAID CLAIM SHOULD HAVE AND COULD RAISED ON DIRECT APPEAL. (R*420)

IN AFFIRMING THE LOWER COURTS ORDER OF DENIAL THE 5th DISTRICT CLEARLY OVERLOOKED THE WELL SETTLED RULE

4.

THAT FUNDAMENTAL ERROR MAY BE RAISED FOR THE FIRST TIME
"AT ANY POINT" INCLUDING IN A POSTCONVICTION PROCEEDING
SEE. WILLIE. V. STATE 600 So 2d 479, 482 (FLO. 1st D.C.A 1992)

   ERROR IN THE TRIAL COURTS FAILURE TO FIND A FACTUAL
BASES FOR A PLEA ENTERED TO AN OFFENSE WHICH ELEMENTS ARE
NOT SHOWN TO BE ESTABLISHED BY THE EVIDENCE PROFFERED
IN THE RECORD BY THE STATE HAS BEEN HELD TO CONSTITUTE
FUNDAMENTAL ERROR. SEE, ALLEN V. STATE 876 So 2d 737. 740
(FLO. 1st D.C.A 2004) ON THE BASES OF THE ABOVE AUTHORITY
THE APPELLATE IS ENTITLED TO HAVE THE DENIAL OF ISSUE III
OF THE DEFENDANTS RULE 3.850 MOTION REVERSED. WITH SAID
ISSUE ADDRESSED ON THE MERITS.

## CONCLUSION

   WHEREFORE, THIS HONORABLE COURT SHOULD REVERSE THE DENIAL
OF DEFENDANTS RULE 3.850 MOTION.


                    RESPECTFULLY SUBMITTED
                    /S/ Dinard Collins
                     QINARD L. COLLINS DC#V18204
                     WALTON CORRECTIONAL INST.
                     691 W.W II VETERANS LANE
                     DEFUNIAK SPRINGS, FL. 32433


                              5.

## CERTIFICATE OF SERVICE

   I HEREBY CERTIFY, that a true and correct copy of the
foregoing instrument: Motion for Re-Hearing has been furnished to:
Fifth District Court Of Appeal
300 South Beach Street
Daytona Beach, FL 32114

by United States Mail on this 17th day of September , 20 06 .

*Dinard Collins*

Walton Correctional Institution
691 World War II Veterans Lane
DeFuniak Springs, Florida 32433

3

Qinard Collins V18204
Walton Correctional Institution
691 WWII Veterans Lane
DeFuniak Springs, Florida 32433
Housing H 3103L

RECEIVED
2006 SEP 20  AM 11: 14
OFFICE OF
THE ATTORNEY GENERAL
DAYTONA BEACH, FL

Office Of The Attorney General
4444 Sea breeze Boulevard, 5th Floor
Daytona Beach, Florida, 32118

MAILED FROM A
STATE CORRECTIONAL
INSTITUTION



DE FUNIAK SPRINGS
SEP 18 2006
FL

U.S. POSTAGE
00.63
H METER 403436

Provided to ⟨illegible⟩ on ⟨illegible⟩
On __9/17/06__ for Mailing
Date

Inmate's initials __QC⟨illegible⟩__



*WILSON*
*206-1-20844*

## IN THE DISTRICT COURT OF APPEAL OF THE STATE OF FLORIDA
### FIFTH DISTRICT

QINARD L. COLLINS,

      Appellant,

v.                             CASE NO.  5D06-2258

STATE OF FLORIDA,

      Appellee.
_____/

DATE:  October 13, 2006

## BY ORDER OF THE COURT:

      ORDERED that Appellant's Motion for Re-Hearing, filed September 20,

2006, is denied.

*I hereby certify that the foregoing is
(a true copy of the original Court order.*

              WRIGHT         ERK

RECEIVED
2006 OCT 16  AM 8:42
OFFICE OF
THE ATTORNEY GENERAL
DAYTONA BEACH, FLORIDA

cc:      Office of the Attorney General, Daytona Beach
          Qinard L. Collins

*10-17-06*

*1*



LINARD L. COLLIN

v.

STATE OF FLORIDA

5D06-2258

RECEIVED

2006 NOV -2   AM 8: 35

OFFICE OF
THE ATTORNEY GENERAL
DAYTONA BEACH, FLORIDA

ST. JOHNS
CF-01-1102

Mandate was forwarded to trial court today.

Clerk, Fifth District Court of Appeal,

Daytona Beach

NOV 1 0 2006

BR

Wilson

206-1-20844

8

DISTRICT COURT OF APPEAL
FIFTH DISTRICT
300 SOUTH BEACH STREET
DAYTONA BEACH, FLORIDA 32114-5097



PROVIDED TO
HOLMES CI ON
JAN 0 5 2011
FOR MAILING

PROVIDED TO
HOLMES CI ON
JAN 0 4 2011
FOR MAILING

IN THE CIRCUIT COURT OF THE
SEVENTH JUCICIAL CIRCUIT
IN AND FOR ST. JOHNS COUNTY, FLORIDA

STATE OF FLORIDA

v.

QINARD COLLINS

CRIMINAL DIVISION
CASE NU8MBER: CF01-1102

MOTION FOR POST CONVICTION RELIEF

1. Name and location of the court which entered the judgment of conviction under
   attack: <u>Seventh Judicial Circuit, St Johns County, Florida.</u>

2. Date of judgment of conviction: <u>10-10-03.</u>

3. Length of sentence: <u>30 years.</u>

4. Nature of offense involved (all counts): <u>2nd degree murder</u>

5. What was your plea? <u>Nolo Contender</u>

If you entered one plea to one count, and a different plea to another count give
details: <u>N/A</u>

6. Kind of trial? <u>Judge only without jury.</u>

7. Did you testify at the trial or at any pretrial hearing? <u>No</u>

8. Did you appeal from the judgment of conviction? <u>Yes</u>

9. If you did appeal, (a) name of court: <u>Fifth district f appeals, Florida</u>
   (b) Result: <u>Affirmed</u>
   (c) Date of result: 05-14-04
   (d) Citation (if known): No. 5003-3601 unpublished

FILED
2011 JAN -7 P 2: 28
CHERYL STRICKLAND
CLERK OF CIRCUIT COURT
ST JOHNS COUNTY

RECEIVED
2012 AUG 13  AM 11: 36
OFFICE OF
THE ATTORNEY GENERAL
DAYTONA BEACH, FLORIDA

1

IN THE CIRCUIT COURT OF THE
Seventh JUDICIAL CIRCUIT
IN AND FOR St. Johns COUNTY, FLORIDA

STATE OF FLORIDA )

v.

Qinard L. Collins
[your name]

) CRIMINAL DIVISION
) CASE NUMBER: CF01-1102
) [the original case number]

MOTION FOR POST CONVICTION RELIEF
Instructions Read Carefully

(1) This motion must be legibly handwritten or typewritten, signed by the defendant, and contain either the first or second oath set out at the end of this rule. Any false statement of a material fact may serve as the basis for prosecution and conviction for perjury. All questions must be answered concisely in the proper space on the form.

(2) Additional pages are not permitted except with respect to the facts which you rely upon to support your grounds for relief. No citation of authorities need be furnished. If briefs or arguments are submitted in support of your legal claims (as opposed to your factual claims), they should be submitted in the form of a separate Memorandum of Law. This memorandum should have the same caption as this Motion.

(3) No filing fee is required when submitting a Motion for Postconviction Relief.

(4) Only the judgment of one case may be challenged in a single Motion for Postconviction Relief. If you seek to challenge judgments entered in different cases, or different courts, you must file separate motions as to each such case. The single exception to this is if you are challenging the judgments in the different cases which were consolidated for trial. In this event, show each case number involved in the caption.

(5) Your attention is directed to the fact that you must include all grounds for relief, and all facts that support such grounds, in the motion you file seeking relief from any judgment of conviction.

(6) When the motion is fully completed, the original must be mailed to the Clerk of the Court where your conviction was obtained.

## MOTION

1. Name and location of the court which entered the judgment of conviction under attack:

Seventh Judicial Circuit, St. Johns County, Florida .

2. Date of judgment of conviction: 10-10-03 .

3. Length of sentence: 30 yrs.

4. Nature of offense(s) involved (all counts): 2nd degree murder

_____ .

5. What was your plea? (check only one)

(a) _____ Not Guilty

(b) _____ Guilty

(c) __X__ Nolo Contender

(d) _____ Not Guilty by reason of insanity

If you entered one plea to one count, and a different plea to another count, give details:

_____ N/A _____ .

6. Kind of trial: (check only one)

(a) _____ Jury

(b) __X__ Judge only without jury

7. Did you testify at the trial or at any pretrial hearing?

Yes _____ No _X_

If yes, list each such occasion: _____ .

2

8. Did you appeal from the judgment of conviction?

Yes  X   No _____

9. If you did appeal, answer the following:

(a) Name of court:  Fifth Dist. of Appeals, Florida                      .

(b) Result:  Affirmed                                                    .

(c) Date of result:  5-14-04                                            .

(d) Citation (if known):  No. 5D03-3601 unpublished                     .

10. Other than a direct appeal from the judgment of conviction and sentence, have you previously filed any petitions, applications, motions, etc. with respect to this judgment in this court?

Yes  X   No _____

11. If your answer to number 10 was "yes", give the following information (applies only to proceedings in this court):

(a)     (1) Nature of the proceeding:  Rule 3.850 motion                      .
        (2) Grounds raised:  IAC for failing to investigate vaccine article and new evid.
        (3) Did you receive an evidentiary hearing on your petition, application, motion, etc.?
        Yes _____ No  X
        (4) Result:  Denied due legal insufficiency                              .
        (5) Date of result:  5-25-06                                             .

(b) As to any second petition, application, motion, etc., give the same information:  N/A
        (1) Nature of the proceeding: _____
        (2) Grounds raised: _____
        (3) Did you receive an evidentiary hearing on your petition, application, motion, etc.?
        Yes _____ No _____
        (4) Result: _____.
        (5) Date of result: _____.

3

12. Other than a direct appeal from the judgment of conviction and sentence, have you previously filed any petitions, applications, motions, etc. with respect to this judgment in any other court?

Yes _____ No __X__

13. If your answer to number 12 was "yes", give the following information:  N/A

(a)     (1) Name of court: _____.

        (2) Nature of the proceeding: _____.

        (3) Grounds raised: _____.

        (4) Did you receive an evidentiary hearing on your petition, application, motions, etc.?

        Yes _____ No _____

        (5) Result: _____.

        (6) Date of result: _____.

(b) As to any second petition, application, motion, etc., give the same information:

        (1) Name of Court: _____.

        (2) Nature of the proceeding: _____.

        (3) Grounds raised: _____.

        (4) Did you receive an evidentiary hearing on your petition, application, motion, etc.?

        Yes _____ No _____

        (5) Result: _____.

        (6) Date of result: _____.

(c) As to any third petition, application, motion, etc., give the same information:

        (1) Name of Court: _____.

        (2) Nature of the proceeding: _____.

        (3) Grounds raised: _____.

        (4) Did you receive an evidentiary hearing on your petition, application, motion, etc.?

        Yes _____ No _____

        (5) Result: _____.

        (6) Date of result: _____.

4

14. State concisely every ground on which you claim that the judgment or sentence is unlawful. Summarize briefly the facts supporting each ground. If necessary, you may attach pages stating additional grounds and the facts supporting them.

For your information, the following is a list of the most frequently raised grounds for postconviction relief. Each statement preceded by a letter constitutes a separate ground for possible relief. You may raise any grounds which you may have other than those listed. However, you should raise in this motion all available grounds (relating to this conviction) on which you base your allegations that your conviction or sentence is unlawful.

## DO NOT CHECK ANY OF THESE LISTED GROUNDS.

If you select one or more of these grounds for relief, you must allege facts. The motion will not be accepted by the Court if you merely check (a) through (i).

(a) Conviction obtained by plea of guilty or nolo contender which was unlawfully induced or not made voluntarily with understanding of the nature of the charge and the consequences of the plea, in violation of Due Process rights, 14ᵗʰ Amend., U.S. Const.

(b) Conviction obtained by the unconstitutional failure of the prosecution to disclose to the defendant evidence favorable to the defendant.

(c) Conviction obtained by a violation of the protection against double jeopardy.

(d) Denial of effective assistance of counsel.

(e) Denial of right to appeal.

(f) Lack of jurisdiction of the court to enter the judgment or impose sentence (such as an unconstitutional statute).

(g) Sentence in excess of the maximum authorized by law.

(h) Newly discovered evidence.

(i) Changes in the law that would be retroactive.

(j) U.S. Const. Substantive-innocence right, 8ᵗʰ/14ᵗʰ Amend.

5

A. Ground One: Violation of Due Process rights Secured by Boykin v. Alabama, 395 U.S. 238 (1969) (intelligent and voluntary plea), Medina v. Calif, 505 U.S. 437 (1992) (recognized principles of fundamental fairness), Napue v. Illinois, 360 U.S. 264 (1959) (founding verdict on Known false evid), Jackson v. Virginia, 443 U.S 307 (1979) (insufficient evid). As shown by newly discovered evidence

Supporting FACTS (tell your story briefly without citing cases or law): _____

Qinard alleges that newly discovered evidence now exists that proves a plethora of his State/Federal Due Process rights were violated and that he would have zealously exercised his right to go to trial had he known of this pre-plea and post-plea evidence.

SEE: Accompanying "Memorandum of Supporting Facts to Motion For PCR", "Memorandum of Law in Support of Motion For PCR." And Master Exhibit Index, Appendix A, Appendix B, of Supporting Exhibits.

6

B. Ground Two: Violation of Sixth Amend., U.S. CONST. right to Counsel, Secured by Hill v. Lockhart, 474 U.S. 52 (1995), Wiggins v. Smith, 539 U.S. 510 (2003), for failing to investigate State's evidence and render competent advice; pursuant to newly discovered evidence.

Supporting FACTS (tell your story briefly without citing cases or law): _____

Qinard asserts that his right to Assistance of Counsel were violated, when counsel failed to investigate the medical and biomechanical aspects of the state's injury-causation-hypothesis, failed to consult with medical/biomechanical experts, failed to request exonerating medical tests, and failed to render legal advice in accordance with this investigation. Had counsel advised Qinard of the pre-2003 exculpatory evidence and the defenses which would have flowed from this evidence, then Qinard would have insisted on going to trial.

SEE: Accompanying Memorandum of Supporting Facts, Memorandum of Law, Master Exhibit Index, And Appendix A, Appendix B, of supporting Exhibits.

7

C. Ground Three: Violation of U.S. Const., Freestanding / Substantive Actual Innocence right secured by In re: Troy Anthony Davis, 2009 WL 2486475 (8-17-09), — U.S. — (2009), House v. Bell, 126 S.Ct. 2064, 2082, 2086 (2006), pursuant to newly discovered evidence.

Supporting FACTS (tell your story briefly without citing cases or law): _____

Qinard asserts that his "Freestanding" actual innocence rights were violated in light of the new exonerating evidence.

SEE: Accompanying "Memorandum of Supporting Facts to Motion For PCR," "Memorandum of Law in support of Motion For PCR," And Master Exhibit Index, Appendix A, Appendix B, of supporting exhibits.

8

D. Ground Four:____N/A_____

_____

_____

_____

_____

_____

Supporting FACTS (tell your story briefly without citing cases or law): _____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

15. If any of the grounds listed in 14 A, B, C, and D were not previously presented on your direct

appeal, state briefly what grounds were not so presented, and give your reasons why they were

9

not so presented: _All Grounds required expanded record, (e.g. Ground one)_ _to be cognizable and legally sufficient. Newly discovered evidence made cognizable._

16. Do you have any petition, application, appeal, motion, etc. now pending in any court, either state or federal, as to the judgment under attack?

Yes _____ No _X_

17. If your answer to number 16 was "yes," give the following information: N/A

    (a) Name of Court: _____.

    (b) Nature of the proceeding: _____.

    (c) Grounds raised: _____.

    (d) Status of the proceedings: _____.

18. Give the name and address, if known, of each attorney who represented you in the following stages of the judgment attacked in this matter.

    (a) At preliminary hearing: _Joseph D. Anthony III, Esq._
_____

    (b) At arraignment and plea: _Same_
_____

    (c) At trial: _N/A_
_____

    (d) At sentencing: _Same_
_____

    (e) On appeal: _Unk._
_____

    (f) In any postconviction proceeding: _Pro per_
_____

    (g) On appeal from any adverse ruling in a postconviction proceeding: _pro per_
_____

WHEREFORE, Movant prays that the Court grant all relief to which he or she may be entitled in this proceeding, including but not limited to (here list the nature of the relief sought):

1. Appoint Counsel, grant Expert witness Fees for Drs. Innis, Buttram, Mendelscha, Stephens, Set evidentiary hearing, vacate no contest plea and dismiss Fictitious charges with prejudice.

_____

_____

2. Such other and further relief as the Court deems just and proper.

**Unnotarized oath**.

Under penalties of perjury, I declare that I have read the foregoing motion and that the facts stated in it are true.

*Qinard Collins*
[Defendant's signature]

Print Name, Address Below

Qinard Collins   V18204

Holmes C.I.

3142 Thomas Drive

Bonifay, Florida 32425

Housing H3101L



Qinard Collins Sr. #18204
Holmes Correctional Institute E2-21385
3142 Thomas Drive
Bonifay, Florida 32425
In Propria Persona

FILED

2011 JAN -7 P 2: 28

CHERYL STRICKLAND
CLERK OF CIRCUIT COURT
ST JOHNS COUNTY

IN THE CIRCUIT COURT, SEVENTH
JUDICIAL CIRCUIT IN AND FOR
ST. JOHNS COUNTY, FLORIDA

STATE OF FLORIDA
    Plaintiff

Crim. No. CF01-1102

**MEMORANDUM OF SUPPORTING
FACTS TO MOTION FOR PCR**

-VS-

QINARD L COLLINS
    Defendant

(Honorable Judge Traynor)(Div 56)

COMES NOW, Qinard Collins Sr., Defendant in Propria Persona to the above

entitled action pursuant to Rule 3.850 (b)(1)(c), FLA.R. Crim. P., and hereby respectfully

submits his memoranda of supporting facts to his PCR motion filed this same day.

This factual memorandum is supported by the accompanying memorandum of

laws, accompanying Appendix A and B (that consists of newly discovered Expert Op.

evidence and literature). Master Exhibit index, and motion for Court Appointed Counsel,

all of which provide Federal grounds to vacate Mr. Collins' plea.

Dated this _____5th_____ day of ___January___, 2011.

    By _Qinard Collins_

    Qinard Collins Sr., Def. in Pro Pe

1

**TABLE OF CONTENTS**

I.   CASE OVERVIEW AND CLAIMS

    A. RELEVANT HISTORY

    B. NEWLY DISCOVERED EVIDENCE SUPPORTS
       FEDERAL CLAIMS PROVING MANIFEST INJUSTICE

1. Ground One: Due Process Violations of _Boykin_, _Medina_, _Napue_, _Jackson_
2. Ground two: Ineffective assistance violation of _Hill_ v. _Lockhart_
3. Ground three: Actual Innocence violation of _Schlup_, _Troy_, _House_

II.  INDEPENDENT PANEL OF EXPERTS RULES "NATURAL" CAUSED
DEATH MISDIAGNOSED BY THE M.E., DEBUNKS SBS, FINDS NO
EVIDENCE OF SIS/BCS AND EXONERATES QINARD.

    A. Exposure of Governing Science and Med. Standards
    B. Scientific Community Rejects SBS En Banc
    C. Scientific Debunking Causes Paradigm Shift in TBI Cases
    D. Medical Review Panel Rejects SBS/SIS/BCS Diagnoses and
       Rules Death Due to Natural Causes

III. NEW EVUDENCE SIGNIFICANTLY ALTERS THE
RISK-BENEFIT ANALYSIS, WARRANTS WITHDRAWAL
AND TRIAL TO PREVENT MANIFEST INJUSTICE

    A. Qinard is not notified of raging 2001-2003 controversy over SBS and SIS
       before being advised to take plea.
    B. New science proves plea was founded upon knowingly false and unreliable
       Evidence resulting in manifest injustice.

IV.  CONCLUSION AND REQUESTED RELIEF.

# I. CASE OVERVIEW AND CLAIMS

## A. Relevant History

On 4-2-01 Qinard Collins Sr., (hereafter Qinard) called 911 to report that he found his 10 month old son, Qinard Collins Jr. face down between the mattress and the crib gasping for air. Qinard promptly began CPR until paramedics and police arrived and took over the scene.

Upon arrival the paramedics found the child was not breathing and had no pulse. CPR was continued, an I.V. was started, and the child was transported to Flagler Hospital. Shortly thereafter the child was pronounced dead. During their treatments the paramedics observed facial, chest, neck, and arm bruising. However, while Qinard explained the facial bruises had come from accidental father-son play, the chest, neck, and arm bruises had not become visible until the paramedics arrived, after CPR had already been instituted by the father.

Police verified that poor Qinard Jr. had been a very sick child who spent most of his short life in the hospital (for 277 of his 305 days of life). Even after his final discharge home, where his death took place, he had been continued on **intravenous antibiotics**. His final diagnoses included extreme prematurity, necrotizing enterocolitis, recurrent intestinal perforations requiring repeated bowel resections, which in turn resulted in the "short bowel syndrome," recurrent E coli and enterococcal septicemia. vitamin deficiencies, developmental delays, and cholestatic jaundice. It was because of Qinard Jr's recurrent series of critical events, mainly his recurrent series of bowel

3

perforations, that he required prolonged in-hospital care and intravenous antibiotics, which were continued at home for a short period before culminating in his death.

M.E. Dr. Steiner performed the **partial** autopsy on 4-3-01 and told Detect. Gober III that "the victim was shaken, became unconscious, and never regained consciousness." (Exh A12) The shaken-baby-syndrome (SBS) diagnosis was later renamed abusive head trauma which was cited in the autopsy as the official cause of death, with the battered child syndrome (BCS) listed as the contributory cause (although no old injuries were found).

Despite Qinard Jr's grave and prolonged medical history, both Dr. Steiner and Flagler Hospital physicians followed the rigid medical pattern currently prevalent in hospital emergency rooms of attributing brain hemorrhages and bruises in the absence of known accidental causes as diagnostic of inflicted child abuse, irrespective of the fact that there are many nontraumatic medical causes of bruises and brain hemorrhages.

On 5-1-01 Qinard was indicted for two felony counts. In count two he was accused of "hitting and/or shaking and/or striking said child on or about his head". (Exh. A7), thereby causing his death on or about 4-2-01. (id). In count one he was accused of "biting, striking, punching, pinching or battering" the child between 3-17-01 and 4-1-01, to "willfully torture and/or maliciously punish" the child, (id), (AKA BCS). The Battered Child Syndrome charge was later dismissed.

Advised by his attorney that there existed no credible defense against these charges  (Exh. A10), Qinard accepted a **no contest** plea for 2nd degree murder, and the state dismissed their BCS charges. Florida provided the factual basis for this plea (since Qinard would not admit to factual guilt, insisting he was innocent), and claimed they

could prove the infant was shaken, struck, or hit on the head by Qinard, thereby causing the fatal brain injuries. (R.T., 8-8-03, 8-9). This evidence and plea was accepted by the court which sentenced Qinard to 30 years in prison on 10-10-03.

While his <u>Anders</u> brief presented no claims for relief, his First Rule 3.850 motion did submit three claims for relief that are different from today's claims. Ground one of the former motion alleged newly discovered evidence in the form of an adverse vaccine reaction article by Dr. Buttram but failed to legally state a claim for relief and was accordingly denied on legal deficiency grounds. In the second claim it was asserted plea-counsel should have investigated adverse vaccine reactions as a **possible** defense to the SBS charges, but did not claim that any prejudice flowed from this hypothetical error. This legally deficient claim was denied. In the third claim it was asserted that the factual basis was legally inadequate to support 2nd degree murder charges. This claim was denied on procedural default grounds for failing to raise it on direct appeal.

### B.  Newly Discovered Evidence Supports Federal Claims Proving Manifest Injustice.

On 5-29-09 Qinard's former appeal-counsel sent him the medical records (Exh. A11) that are relevant to this case, including a deposition to Dr, Steiner, the 2001 pathologist for this case. This was the first time Qinard had seen and possessed these records, which Qinard promptly sent out for a medicolegal review. This group's final pathological report was issued on 9-27-10, and this motion timely raises the following Constitutional claims for relief:

<u>Under Ground One:</u> Qinard alleges that newly discovered evidence now exists that proves a plethora of his State/Federal Due Process rights were violated and that he would have zealously exercised his right to go to trial had he known of this pre-plea and post-

plea evidence. The 14th Amendment Due Process doctrines which were violated and that are presented to the court pursuant to Rule 3.850(a)(1)(5)(6)(b)(1), Fla. R. Crim. P., are as follows:

(a) The right to an intelligent and voluntary plea process pursuant to the Boykin v. Alabama, 395, U.S. 238 (1969),Bousley v. U.S., 523 U.S. 614, 618-620 (1998), and Robinson v.State, 373 So. 2d 898 (Fla. 1979), line of authority.

(b) The right to a plea process that is applied in a "fair manner," Mathews v. Eldridge, 474 U.S. 319 (1976), that does not violate "Fundamental Fairness" Medina v. Calif., 5O5 U.S. 437(1992), by founding the verdict upon evidence that now known to be false, Napue v. Illinois. 360 U.S. 264 (1959), Mooney v. Holohan, 294 U.S. 103 (1933), and/or unreliable.

(c) The right to have his conviction founded upon constitutionally sufficient evidence under the Jackson v. Virginia, 443 U.S. 307 (1979), Smith v. Mitchell,437 F3d 884, 890 (9th Cir 2006), (Expert lacked sufficient evidence to support Op.), U.S. v. Martin,147 F.3d 529, 533(7th Cir 1998)(Plea did not waive right to contest whether facts admitted were sufficient), line of authority.

**Under Ground Two:** Qinard asserts his rights under Hill v. Lockhart 474 U.S. 52. 106  S. Ct. 366 (1995) and Wiggins v. Smith, 539 U.S. 510,123 S. Ct. 2527 (2003) were violated when counsel failed to investigate the medical and biomechanical aspects of the state's injury-causation-hypothesis, failed to consult with medical/biomechanical experts, failed to request exonerating medical tests, and failed to render legal advice in accordance with this investigation. Had counsel advised Qinard of the pre-2003 exculpatory evidence contained in this brief and the defenses which would have flowed from this evidence, then Qinard would have insisted on going to trial.

**Under Ground Three:** Qinard asserts that his "Freestanding" actual innocence rights, under In Re Troy Anthony Davis, 2009 WL 2486475 (8-17-09), House v. Bell, 126 S Ct 2064, 2082, 2086 (2006), and Herrera v. Collins, 506 U.S. 390, 113 S. Ct. 853,  (1993), were violated in light of the new exonerating evidence, and moves the court to further consider **Grounds 1-2,** Supra, under the Schulp v. Delo, 115 S. Ct. 851 (1995),

6

"gateway," actual innocence procedure/test if necessary to reach the merits of the claims.

## II.   INDEPENDENT PANEL OF EXPERTS RULES "NATURAL" CAUSED DEATH MISDIAGNOSED BY 2001 M.E., DEBUNKS SBS, FINDS NO EVIDENCE OF SBS/BCS, EXONERATING QINARD. \

Once Qinard had the relevant medical records he asked Dr. Buttram, a retired M.D. and K.E. Holcomb, a pediatric head trauma defense-expert and paralegal, to review his case and provide pro bono assistance. Both agreed. Dr. Buttram then contacted Dr.Michael Innis, a senior hematologist and forensic pathologist from Australia who agreed to assist, while K.R. Holcomb contacted injury-causation-expert Dr. Robert Mendelsohn, a retired neurosurgeon and Dr. Peter Stephens, a senior forensic pathologist (former Iowa M.E.), both of whom agreed to help pro bono.

Dr. Innis is recognized internationally as a leading senior hematologist and forensic pathologist. After conducting his medical review of this case, he determined that the cause and manner of death was misdiagnosed by the 2001 M.E. and that the child actually died from natural causes. His C.V. is appended to the back of his exonerating written report. SEE: (Exhibit A1).

Dr. Harold Buttram is a retired physician who has published internationally and extensively on the SBS/SIS subject and reviewed over 100 such cases . After conducting his medical review of the records in this case Dr. Buttram concluded the child died from natural causes (Exh. A2), that the bruising was caused by a hemorrhagic disorder, not by abuse, and there was no evidence to support abusive head trauma (AHT)/ battered child syndrome (BCS) injury mechanisms (Exh. A3). His CV is appended to the back of his preliminary report (Exh. A2)

Dr. Mendelsohn is internationally recognized for his expertise and work in the injury causation field. After reviewing the medical records and the reports from both Dr. Innis and Dr. Buttram, Dr. Mendelsohn concurred in full with both reports, found the child had died from natural causes, and concluded that there was insufficient evidence to support an AHT or BCS diagnosis (Exh. A3).

Dr. Stephens is a senior forensic pathologist who has international recognition and specializes in pediatric head trauma cases. After reviewing the medical records and the reports from the 2009 experts, Dr. Stephens concurred in full with Dr.s Innis, Buttram, Mendelsohn, (Exh. A1, A2, A3, A4)  and concluded that the child died from natural causes. He further concluded that there was insufficient evi9dence to support either AHT or BCS (Exh. A5), and that the 2001 M.E. did not finish te autopsy in this case.

Each of these medical experts has reviewed all the new (post 2001) scientific literature which conclusively debunked the old SBS/SIS (AKA abusive head trauma) hypotheses used by the 2001 M.E. and which are no longer recognized by the M.E. community; they have also reviewed new scientific advances which govern the evaluation of body contusions. These scientific advances, which did not exist in 2001, are discussed in this motion and incorporated into the new expert reports.

KR Holcomb is a consultant to defense lawyers who represent pediatric head trauma clients and is recognized as an expert in this medicolegal field due to his international publications due to his international publications on this subject matter. However, he is a paralegal and not a lawyer. After preparing these documents for Mr. Collins his participation in this case and his legal authority to assist Mr. Collins come to an end (Exh. A5).

By definition abusive head trauma (AHT) postulates that a death was caused by shaking (SBS), by griping a child around the thorax or torso and hitting his head against a hard surface (SIS), or by hitting his head with an object (NAI, BCS, intentional blunt force trauma).

Since the three different hypotheses involve three different injury mechanism models, they will be discussed individually to avoid the overly vague AHT phrase and provide better injury mechanism clarity for the court.

In the subsections which follow, the court will be fully briefed on the overwhelming scientific research which conclusively debunked SBS, on the paradigm shift in the evaluation of pediatric head injury and contusion causation cases which is sweeping through the country, and on the evidence that proves a "natural" causes death.

## A. Exposure of Governing Science and Medical Standards:

Presently a tsunami is sweeping the medicolegal communities as 30 years of medicolegal misunderstandings are brought to light regarding the branch of science which governs SBS and their enormous amount of scientific research on the topic. Previously it was assumed that medical doctors were the governing experts of the SBS hypothesis and the ones with the expertise to validate or reject the hypothetical injury mechanism. However, medical doctors have **no** formal training in the scientific field of injury biomechanics. (**SEE**: Reference Manual on  Scientific Evidence 2nd Edition, Federal Judicial Center, pages 447-448 (2000), (listing Med Training).

SBS/SIS/AHT/BCS are all postulated injury mechanisms rather than disease-caused injury mechanisms. As such they are governed by the mechanics and not the medical branch of science. Moreover, "biomechanicians" are biomechanical specialists with the

9

formal (Ph.D.) training and expertise to test and then validate or reject postulated mechanical injury mechanisms; e.g. Lehmeier v. Hammer, 214 Ariz. 57, 148 P.3d. 191(app. 2006) (Discussing biomechanicians' expertise in biomechanical-injury-mechanisms). The distinction between the two different areas of expertise are best explained by Forensic Pathologist John Plunkett, M.D. and Biomechanicians Drs. Goldsmith and F.A.Bandak as follows:

> "Biomechanics is the subset of the scientific discipline of mechanics that deals with the forces, motions, deformation, ruptures, fractures, breaks, etc of living tissue. The science of biomechanics applies at the microscopic…and the macroscopic (tissue, organ, full body, etc.) scales. 'Injury biomechanics' is the application of biomechanics to the understanding of the causation and mechanisms of injury". (Dr. F.A. Bandak, Exh. B9, at 79).

> **"Because their training is so vastly different**, they evaluate and assess trauma in very different ways: Biomechanicians and physicians evaluate trauma in fundamentally different ways. A biomechanician constructs or accepts a particular system, obtains its physical and geometric characteristics, applies a specified and quantifiable input (load), and then determines the output using experimental, analytical, and numerical techniques. A physician, in contrast, sees the end product of signs and symptoms and relies primarily if not exclusively on experience and observational case material to diagnose and treat. A biomechanician traces a continuous path from cause to effect using the laws of nature, tries to determine the specific mechanism of injury, and attempts to either establish or eliminate an ultimate mechanical cause." (Dr. Plunkett/Dr.

Goldsmith, (Exh. B6, at 89).

Accordingly, while a biomechanician is not qualified to contradict, for example, a pediatrician's autism diagnosis and treatment plan, neither can a medical doctor contradict a biomechanician's professional opinion or finding on the validity or rejection of a potential mechanical injury mechanism that his discipline has tested and studied. As in both instances the expert is bespeaking to his specific area of expertise for which the disputing person has no training.

Moreover, medical doctors are routinely bathed in an ocean of literature that ranges from "opinion" papers such as a retrospective case study, ranging up to scientific papers with control groups or a controlled experiment that tests any given hypothesis postulated in an "opinion" (id) paper.  To sort through this literature and assign evidentiary weight grades, the medical community relies upon the American Medical Association (AMA) evidence-based medicine (EBM) standards. (**SEE:**  Exhibit B1) or the Scientific Community's Quality of Evidence Ratings (QER),( Exh. B4)

While these and other similar literature-review-standards employ evidentiary weight tiers that assign different grades to different types of studies and scientific methodology, it is axiomatic under these standards that a scientific paper that tests a published hypothesis will always be given more controlling weight than a retrospective case study opinion paper. In short, "science" papers always trump "opinion" papers.

Thus, if a case study concluded that SBS was a valid diagnosis and this paper was published, a physician could be guided by this paper for his diagnosis. However, if a scientific paper was published that tested the SBS hypothesis, and if the data from this

11

controlled experiment invalidated (or falsified) the previous paper, current professional standards would require the treating physician to reject the previous opinion paper and to base his diagnosis upon the science paper, for the hypothesis had been falsified.

> "Scientific methodology is based on generating hypotheses and testing them to see if they can be falsified: Indeed, this methodology is what distinguishes science from other fields of study." (Daubert v. Merrel Dow Pharm., 509 U.S. 570, 592-593 (1993).

In summary, medical doctors are required under the AMA's Evidentiary Based Medicine Standards to always rely upon the "highest quality" literature (Exh B1) that is available, and a well done scientific paper will always trump a retrospective case study opinion paper.

### B.. Scientific Community Rejects SBS En Banc

Qinard's medical review panel researched the scientific history behind the ill-conceived birth of the SBS hypothesis over 30 years ago. They have further reviewed all of the scientific literature which tested or studied this hypothetical TBI mechanism. After this careful EBM review of the governing literature, the panel has concluded that SBS does not exist and is not a scientifically sound hypothetical brain injury mechanism. Accordingly, the panel has rejected the "shaking" diagnosis and this portion of the indictment for the proffered reasons that follow. (SEE: SBSreferences.com., Exh. 14A-C)

Back in 1966 biomechanician Dr Ommaya was investigating whiplash injuries in association with the U.S. Highway Department. In furtherance of this research he conducted a series of mechanical sled tests with adult monkeys in which the monkeys were secured to chairs facing forward, while a piston mimicking a 30 m.p.h. car struck the back to mimic a rear-end auto collision. Among the 19 monkeys that were tested, 11 suffered fatal neck-spinal cord injuries and subdural hemorrhages. After publishing his

results, Dr. Ommaya was contacted by Dr. Caffey who was a radiologist. Dr. Caffey

wanted to know if Dr. Ommaya's data and the biomechanical sciences would support a

then new SBS hypothesis. Since Dr. Caffey had no formal training in the injury-

biomechanical discipline, this consultation was appropriate. However, during this

telephone consult, Dr. Ommaya rejected the SBS hypothesis and explained that human-

shakers could not generate the force levels generated by a 30 m.p.h. mechanical piston,

nor was there any experimental data in existence then that could support such a

hypothetical.

Ignoring or misunderstanding Dr. Ommaya's expert advice (Exh. B3), Dr. Caffey

published his 1972/1974 papers that incorrectly claimed Dr. Ommaya's monkey

experiment supported his new SBS hypothesis. **SEE** (Exh. B6, p. 92) This miscited 1966

experimental data is the only experimental data relied upon by all published "opinion"

papers that have advocated SBS.

Prior to 1987 no biomechanical scientists had yet tested the SBS hypothesis which

was initially rejected on lack of supporting evidence within their discipline grounds.

However, in 1987 a multidisciplinary team of medical doctors and biomechanicians set

out to validate or falsify the hypothesis through controlled experimental testing. Using

specially designed infant models (dummies) with accelerometers and adult "shakers,." a

long series of pure shaking tests (69) and shaking impact tests were conducted. The

results of these tests proved that a human-shaker could only produce about 1/10th (9.29

g's) of the  85-125 Gs force needed for lethal brain injuries (SDH/DAI)

force levels (9.29 Gs) needed for lethal brain injuries (SDH/DAI) , although impacting

the head against a hard surface could generate up to 428 Gs of force which clearly could

13