be lethal. Thus, this controlled experiment completely invalidated the SBS hypothesis as humans (as opposed to mechanical pistons) could only generate 7-10 percent of the force needed for the SBS hypothesis to be valid.  Under any of the recognized literature review standards, this 1987 published paper (**SEE**: Exhibit B2) should have been given controlling diagnostic weight and ended all debates.

In 2002 Dr. Ommaya teamed up with fellow biomechanicians Dr. K.L. Thibault and Dr. W. Goldsmith to conduct a careful biomechanical reanalysis of his original monkey-data (which the medical community had misunderstood), the 1987 data generated by Duhaime (Exh. B2), other relevant biomechanical data, and recognized brain injury threshold levels. (SEE: Ommaya AK, Goldsmith W, and Thibault KL Biomechanics and neuropathology of adult and pediatric head injury, *British Journal of Neurosurgery,* 2002; 16: 220-242),  to determine if any experimental data or biomechanical principles supported the SBS hypothetical.  Since Ommaya was also a trained neurosurgeon, their results were published in a medical journal. This team concluded that human shaking produced acceleration and force levels "well below thresholds for cerebral concussion, subdural hematoma, subarachnoid haemorrhage, deep brain haemorrages, or cortical contusions" (id), and that Dr. Caffey and other M.D.s had misunderstood the 1968 experiment  In sum, they found 1987 Duhaime had correctly falsified SBS, that SBS was not supported by the 1968 experimental data, and that there existed no other data to support the SBS hypothetical. The year 2003 saw the publication of three scientific papers that also falsified SBS through more scientific scrutiny. These papers came out a few months before Qinard entered his plea.

In 2003 an article by Donohoe (Exh B4) provided a scientific review of all the

1966-1998 SBS opinion papers that advocated SBS. These papers were assessed under the international scientific communities Q.E.R (quality control standards), and it was concluded that "there was inadequate scientific evidence to come to a firm conclusion as to the validity of SBS." (id 241)

In reaching this scientific conclusion, Dr. Donohoe made the following observation: "In this article, the quality of evidence…is being assessed. The issue of the evidence for SBS appears analogous to an inverted pyramid, with a small database (most of it poor-quality, original research retrospective in nature and without appropriate control groups) spreading to a broad body of somewhat divergent opinions. One may need reminding that repeated opinions based on poor-quality data cannot improve the quality of evidence." (Exh B4 at 241)

2003 Prange (Exh B5) was another biomechanical test and review, that is considered the leading paper on shaking impacts against various surfaces. Relevant to Qinard, these biomechanicians utilized a far more sophisticated infant model than the one used by Duhaime and replicated the 1987 Duhaime "shaking" test with improved methodology. Their results validated the Duhaime results as none of their adult human "shakers" could generate more than about $1/10^{th}$ of the force levels needed to cause SBS. They also tested the hypothesis that manually impacting the infant head against a cushioned surface could cause fatal TBI. Their results proved this hypothesis false as cushioned surfaces generated non-lethal (-10 g) force levels similar to shaking.

2003 Cory was yet another biomechanical experiment that **zealously** attempted to generate data that would support the SBS hypothesis, all to no avail. In these two experiments, 1987 Duhaime was replicated yet again, and a new infant whip-injury

mechanism was tested. Altering the Duhaime-infant-model within acceptable ranges, Cory created a worse case scenario model (i.e. higher center of gravity, hinge neck) and replicated the Duhaime-shaking-test. Even with this model, Cory's test again generated only 1/10th of the force needed to validate SBS. Next he tried raising the infant model over the shaker's shoulders and swinging the model below waist-level with a snapping (whip) motion. Even this extreme action could not generate lethal force to validate the debunked SBS hypothesis or cause SDH/DAI injuries. (Cory C.Z. and Jones M.D., Can \ shaking alone cause fatal brain injury? *Medicine, Science, and the Law,* 2003; 43(4):317-333).

2004 Plunkett/Goldsmith teamed a leading forensic pathologist with a leading biomechanician to once again conduct a biomechanical analysis of all the science to see if any support could be found for the debunked SBS hypothesis. In this paper (Exh. B6) the authors concluded that SBS was formulated as a hypothesis only because Dr Caffey misunderstood Ommaya's 1966 experimental data, and if not for this misinterpretation, the hypothesis would not have been published. (id., 92) They concluded that SBS was not a valid hypothesis and that any infant who was violently shaken with 7-10 gs of force under the postulated SBS-model would suffer lethal neck injuries, none of which had been reported in the literature.

2004 Plunkett/Geddes was another joint paper that combined Dr. Plunkett's Forensic pathologist expertise with the expertise of Dr. Geddes, one of the world's leading neurologists. In this paper (Exh B7), SBS was assessed under EBM protocols and found to be lacking. Accordingly, the prestigious authors called upon the international medical community (Dr Geddes was based in England) to re-examine their SBS

diagnosis. Their paper was endorsed by 41 experts who published their approval. This paper caused the English Judicial System to Sua Sponte review numerous SBS convictions and grant relief where warranted.

2005 saw the publication of three more scientific papers, all of which yet again debunked SBS.

2005 Bandak (Exh. B9) was perhaps the most significant publication to date. Dr. Faris Bandak, Ph.D. is arguably the nation's most qualified injury-biomechanician and was the director of the United States National Highway Traffic Safety Administration's Accident Reconstruction Division. He is also the Professor of Engineering and Applied Sciences for the George Washington University. Dr. Bandak followed up on the Dr. Goldsmith 2004 finding that all cases of hypothetical SBS would necessarily have lethal neck/brain stem injuries. Conducting an in-depth biomechanical analysis of SBS with special emphasis on the injury thresholds of the infant neck. Dr. Bandak concluded that human shaking could not cause lethal brain injuries in an infant, but that violent shaking would cause structural and lethal neck failure, something that had been unreported in the literature. Put another way, you **could not** violently shake an infant without causing these injures due to the inherent weakness of the infant neck. No such injuries exist in this case.

2005 Leestma (Exh. B8) was another scientific methodology review of all the SBS opinion papers from 1969-2001, and once again, Dr. Leestma found the literature was not scientifically sound and could not be used to support a SBS diagnosis. He concluded that: "until there is sufficient scientifically rigorous support for a causal hypothesis, and until all attempts at falsification of it have failed, the hypothesis must be regarded as unproven." (Exh. B8) For these reasons he rejected SBS.

2005 Wolfson was yet another biomechanical test of the SBS hypothesis that validated the 1987 Duhaime results. Replicating Duhaime, Wolfson and his shakers obtained similar results and could only generate about 1/10th of the force needed for brain injuries. "As with previous research….unable to show that shaking alone can cause the head accelerations necessary to cause brain injuries associated with SBS." (Wolfson *et al*, Ridged body modeling of shaken baby syndrome, *Proc Inst Mech Engineering*, 2005; 219(1):63-70, at page 68.)

As a side note, Wolfson validated an earlier finding by 2003 Cory, supra. In both 2003/2005 tests the human shakers could not violently shake the infant model beyond an average of ten (10) seconds, which greatly disturbed Dr. Cory since the "opinion literature" postulated a 60-180 second shaking episode, which was shown to be beyond human capabilities.

In 2006 Dr Uscinski, a neurosurgeon with the profound Potomac Institute (Medical policy think tank), published his paper and its EBM review of the science papers that debunked SBS (Exh. B10). Dr. Uscinski concluded that SBS was no longer a valid diagnosis.

2007 Prange (Exh B11) was a govt. funded crash dummy test that generated data which invalidated a 2003 Cory suggestion. Cory had postulated that perhaps when a child was shaken the chin impacted against the chest, and that this protected the neck from injury. However, the data from 2007 Prange proved that structural neck damage took place during the arcing motion of the head <u>before</u> chin-chest impact took place. Thus, this new 2003 hypothesis was rejected after being tested and falsified.

### C.. Scientific Debunking Causes Paradigm Shift in TBI Cases

In 2006 the National Association of Medical Examiners (N.A.M.E.) sent shock waves throughout the medicolegal communities by rescinding and declining to renew their endorsement of SBS. The members of this association have the legal duty for deciding cause of death issues, and when their official forensic pathologist association no longer endorsed SBS, this act had a tremendous ripple effect. **SEE:** (Exh. 5, B 13)

For example, in 2008 the M.E. for Ontario, Canada was in court on another matter dealing with the malpractice of one of his pathologists when he Sua Sponte asked the court for resources so that all of his office's former 220 SBS rulings could be re-examined. To support this request the M.E. explained that recent scientific advances had debunked and invalidated the old hypothesis. On 10/1/08 this government request was granted, for which the M.E. should be applauded.
**SEE:** (goudgeinquiry.cm/report/index)(Exh. A8)

Moreover, this scientific tsunami that debunked SBS has begun to sweep through our judicial system as 30 years of medical-legal misunderstandings are corrected.
In 2007 Texas halted their execution in a SBS case and remanded for an Evd. Hrg due to affidavits from Dr. Plunkett and Biomehanician Chris Van Ee, Ph.D., that alleged SBS did not exist, Ex Parte Henderson. 246 S.W. 3d 690 (Tex. App. 2007).

In 2007 Missouri banned SBS from their court rooms under Frye, due to the new science that Dr. Plunkett brought into the courtroom with his testimony. Missouri v. Hyatt, 06 M7-CR00016-2 (Cic. CT. Shelby City, MO.)(11-6-07 order)..

In 2008, this was followed by Wisconsin that reversed an old SBS conviction after a newly discovered evidence Evd. Hrg. That articulated some of the new science, State v. Edmonds, 308 Wisc 2d 374. 746 NW2d 590 (2008).

Even the BBC has become involved and has conducted their own investigation into the SBS myth. Working with biomechanician Chris Van Ee, Ph.D., the reporter shook an infant doll as violently as possible and could only generate a 7G force level or about 7% of the force level needed for brain injury. This was compared to the 110G force level from a standing couch fall and a 10G rocket launch. **SEE:** (Exh. A9).

It is against this background of recent changes and the paradigm shift in pediatric head trauma evaluations that Qinard's pro bono medical review panel assess this case.

### D. Medical Review Panel Rejects SBS Myth, Finds No Evidence to Support SIS/BCS/NAI and Concludes Death Was Due to Natural Causes

Qinard was convicted of second degree murder based on the state's claim they would prove that on 4-2-01 Qinard (1) hit, (2) shook, or (3) struck the child's head causing death. By whatever name, be that AHT, SBS, SIS, NAI, blunt force trauma, or BCS, Florida had to prove shaking, hitting, or striking of the head.

Based on the extensive scientific scrutiny that "shaking" has been subjected to, Qinard's experts have concluded that this hypothetical brain injury mechanism is a scientific impossibility.

The experts then examined the hypothesis that Qinard Jr. was gripped by Qinard and had his head impacted against a hard or soft surface. Biomechanicians recently falsified and debunked the soft-cushion version of this hypothesis (Exh. B5) so the panel focused on the hard-surface version which remains a valid theory. When biomechanicians tested and debunked SBS between 1987-2005, (Supra), they at the same time tested and validated the intentional impact theory.

However, for this theory to be valid it requires two elements or two pieces of

diagnostic evidence. First, the child must have a significant soft tissue head injury as an impact site to support the allegation that the head impacted a hard surface, such as prominent bruising and/or subgaleal (scalp) hemorrhages. The former would be apparent by visual inspection. The latter would be readily apparent on the head CT scan, which was not the case. While the child did have minor scalp; bruises, none of these soft tissue injuries were significant enough to support a 100G lethal head impact.

Next, the theory requires diagnostic evidence to support the "gripped" element. For the diagnosing expert to allege the child was grabbed and head impacted onto a hard surface, there must be matching bruising imprints and patterns to provide the evidence that this diagnosis requires. In this case, Qinard's experts concluded that none of the contusions were the correct size, location, or pattern to match up with human grip" marks. Lacking evidence to support either the "significant-head-impact" or "grip marks" elements of this theory, Qinard's panel rejected this wild 2001 diagnosis on insufficient evidence grounds. Accordingly, the State allegation that Qinard was guilty of "striking" the child's head against a hard surface has no scientific support.

There remains the final State allegation that Qinard hit the infant in the head with an object such as his knuckles. Like the SIS claim (id), Qinard's panel found this nonsensical charge had insufficient evidence to be valid. Again, from a scientific viewpoint, the theory that an infant could be killed by sufficient blunt force trauma force levels is of course valid when the proper evidence is present. However, like the foregoing SIS theory, this theory likewise requires evidence of a significant blow to the head. Killing blows to the head are not insignificant and will leave behind significant evidence. Typically one would expect to see large swollen goose-bumps, large fist-sized areas of

bruising and significant scalp hemorrhages which are very apparent on head CT scans or

MRIs when they are present. Moreover, the mad-speculation of supposed knuckle marks

postulated by the 2001 pathologist has no valid evidentiary support. These bruises are not

significant enough to be diagnostic of death blows, and there are no indications proving

they are the correct pattern to match Qinard's knuckles. Indeed, these minor scalp

artifacts were not even measured by the 2001 M.E. who could not therefore claim that the

artifacts were the correct shape, size, spacing, and pattern to match Qinard's knuckles.

Nor is there any evidence to suggest these artifacts match any object Qinard could have

used.with patterns to provide the evidence. An example of such a "grip mark" pattern

which would be sufficient to support a diagnosis of being abusively grabbed can be seen

in photograph #5.22 from the Forensic Pathologist's Textbook,.(Exh.  B19, photographs

#5.19, 5.20, 5.21). Like ballistic evidence, bruise-causation allegations or evidence must

be "matched" to the injury causation-object to be scientifically valid, as noted by a 2005

study, accord:

> "With the exception of a bruise that carries the clear imprint of the implement
> used or multiple bruises of uniform shape, there are few bruising patterns that
> reach diagnostic significance…In the court setting, opinion must be solidly based
> on the evidence available." (Marguire, Mann, *et ,* Are there patterns of bruising in
> childhood which are diagnostic or suggestive of abuse? *Arch Dis Child,* 2005;
> 90:182-186.)

Accordingly, for these reasons and other reasons articulated in their individual

reports, Qinard's panel rejects the wild diagnosis that this child was hit and died, as this

allegation has no diagnostic evidence or science to support it. (**SEE**  Appendix. A)

Furthermore, while the BCS charges were dismissed along with the Misc. bruises

which allegedly supported the diagnosi, those charges likewise suffered from a lack of

evidence defect, as the Misc. bruises had no "imprints" or "patterns" necessary to support

an abuse diagnosis.

Having determined with a reasonable degree of scientific and medical certainty that the child did not die from shaking, being struck against a hard surface, or hit in the head by knuckles or other objects, the panel looked to other causes that were supported by the medical records and a horrific medical history.

Expert defense witnesses who have recently reviewed this case have attributed the primary cause of brain hemorrhage and extensive terminal bruising to *Late-Form hemorrhagic disease of the newborn (Late-form HDN), which is caused by vitamin K deficiency, in which the incidences of brain hemorrhage and bruising are virtually 100%.* (Rutty, G.N, Smith C.M., *et al,* Late-form hemorrhagic disease of the newborn, *American Journal of Forensic Med. and Pathology,* 1999; 20(1):48-51). Risk factors for Late-form HDN include:

- Antibiotic therapy (antibiotics kill out essential intestinal flora that produce vitamin K.),
- Premature birth.
- Nutritional deficiencies during pregnancy including green leafy vegetables, the primary source of vitamin K.
- Compromised liver function (one of the major listed complications in the baby was cholestatic jaundice.

Amazingly, the routine screening tests for hemorrhagic disorders (prothrombin and partial thromboplastin times) were not ordered or performed following Qinard Jr's terminal hospital admission to Flagler Hospital on April 2, 2001, nor was the PIVKA test (proteins in the absence of vitamin K), which is specifically diagnostic for Late-form HDN. The prothrombin and partial thromboplastin times tests are normally considered standard practice in the emergency room care of infants with brain hemorrhages.

23

This vitamin K deficiency, HDN diagnosis, was reached by all of Qinard's pro bono medical experts, (Exh. A1, p. 5, n.3), (Exh. A2, p. 10-12)(Exh. A3, p.3), Exh A4, p.2), (Exh. A6, p.2), and was a subject matter which Dr. Innis had published on. Dr. Stephens determined that the 2001 misdiagnoses was specifically caused by the M.E.'s failure to complete the autopsy: "The autopsy report is sketchy and inadequate…no…full body X-rays…no…photographs…no…histologic (microscopic) examination…would have been challenged had the case gone to trial…a definitive test for vitamin K…was not done," (Exh A6, p.2-3)…"and that this partial 2001 autopsy caused "a tragic miscarriage of justice." (id., p.4, par #5).

Dr. Buttram best explained how this child became vitamin K deficient and how this caused all the contusions and death. When this poor child was intravenously given heavy antibiotics for 277 days of his short 305-day life, these antiotics killed the body's vitamin K-producing (friendly) bacteria and caused the deficiency. Without adequate vitamin K, the body cannot produce its needed clotting agents. Without clotting agents, the hemorrhagic disease quickly manifested causing spontaneous hemorrhaging in the brain and throughout the body (Exh. A2, p. 10-12).

This hemorrhagic disease has been widely recognized by the medical community for decades, e.g. (Exh. B16-B17), and standard medical practice requires consideration of this disease before jumping to AHT/BCS diagnoses. Qinnard's experts all found this diagnosis obvious in light of the child's tragic 304 day history.

## III  NEW EVIDENCE SIGNIFICANTLY ALTERS THE RISK-BENEFIT ANALYSIS, WARRANTS WITHDRAWAL AND TRIAL TO PREVENT MANIFEST INJUSTICE.

For the factual reasons that follow, Qinard asserts that his new evidence supports

his three new grounds for relief.

### A. Qinard Is Not Notified of the Raging 2001-2003 Controversy Over SBS and SIS Before Being Advised to Take Plea

Qinard entered his no-contest plea based on the legal advice of his court appointed lawyer, Joseph Anthony III. Counsel advised that there was no credible defense against the SBS and SIS charges contained in the indictment, and that if Qinard exercised his right to trial, it would be his innocence-word against the inculpatory testimony of the state pathologist and several other medical doctors, all of whom would claim the child could only have died from SBS/SIS, and in addition was a victim of BCS. Qinard realized that pursuant to this advice, if he went to trial his conviction on both counts was guaranteed, as counsel had no disputing defense experts, (Exh A10), and no defense against these charges. For these reasons he pled to "no contest," in which he did not waive his right to claim his innocence.

However, after obtaining all of his records in 2009, Qinard learned that after over three years of representation, counsel had done nothing to investigate the State's medical and biomechanical case against him, nor was the M.E. ever requested to complete the autopsy. While counsel did consult with Dr. Seibel, M.D., who was a pediatrician that worked with the child protection services and testified for the State in other cases, Dr. Seibel had no formal training or education in the forensic sciences, in death investigation, in injury-causation-mechanics, or in biomechanics. He was not qualified to determine if the M.E. did or did not conduct a proper autopsy process, nor was he qualified to determine how a specific injury was caused. In sum, his expertise was in pediatric development and treatment – not in injury causation. SEE: Caro v. Calderon, 165 F.3d

1223, 1226 (9M Cir. 1999)(holding that counsel has a duty to conduct an investigation which allows a determination of what type of experts to consult and then to present those experts with information relevant to their opinion).  Nor did counsel conduct any kind of biomechanical or medical literature search to investigate the validity of the indictments SBS/SIS and BCS charges.

Yet, even a token literature search or investigation of any medical data base would have uncovered the 1987 Duhaime test (Exh.B2), the 2001 N.A.M.E. paper, (Exh. B13), the 2002 Uscinski paper (Exh. B3), the 2002 Barnes paper, (Exh B14), the 2003 Prange paper (Exh B5), the 2002 Ommaya paper, Supra, the 2003 Cory paper, Supra, and the 2003 Donohoe paper (Exh B4).

On the front page of the N.A.M.E. paper, the "Editor's Note" explained that while the paper had been submitted as an official "Position Paper" on SBS, it had been rejected as such by the medical journal's peer review panel due to the "controversy" over SBS. Thus, while accepted for publication as an "opinion" paper it was rejected as an unbiased "position paper" on SBS. This would have alerted counsel to the existence of a"controversy." (Exh. B13).  The 2002 Uscinski paper (Exh B3) would have informed Counsel that SBS was born out of a medical misunderstanding (i.d. p. 218) over 1968 biomechanical experimental data generated by Dr. Ommaya who's 2002 paper, Supra, enforced this point. The 2001 Plunkett paper and 2002 Barnes paper, Supra, both found minor falls and hemorrhagic diseases that could mimic the signs of SBS/SIS/BCS (Exh B12, B14). While the 1987 Duhaime, 2003 Prange, Cory, and Donohoe papers all debunked SBS (B2, B4-5).

Had Counsel conducted a token internet search rather than a medical database

search, he could not have neglected to locate <SBStruth.com> and <SBSdefense.com,> both of which have extensive literature summary lists and advice for defense lawyers. Both of these sites as well as other similar sites listed the Duhaime, Plunkett, Barnes, Ommaya, Donohoe papers and included references to the hemorrhagic diseases bespoken of by 2002 Barnes (B14), which could mimic SBS/SIS/BCS and that needed to be ruled out by the prothrombin time (PT) and partial thromboplastin time (PTT), PIVKA, and other tests.

This token research would have compelled counsel to consult with any of these authors. After consultation, counsel would have learned that microscopic tissue examinations and .PTT/PT tests were both considered mandatory by the forensic pathologist community in this type of a case as part of the differential diagnosis process which has been a basic medical practice and tradition for over 100 years. (Exh. B6)

Had counsel sought out defense experts, he would have located the readily available experts which accompany this filing or a host of other experts who authored papers cited in this motion, any of whom would have rendered exculpatory reports in 2003.

Had Qinard known that numerous experts believed this natural causes death was misdiagnosed by the pathologist due in part to his incomplete autopsy, he would have insisted on a trial.

In summary, had counsel conducted even the most token investigation into the state's circumstantial evidence medical-opinion-only case, he would have learned that the cause of death and injuries had been misdiagnosed by the pathologist, due in part to his incomplete autopsy. Had counsel advised Quinard of this defense, he would have insisted

on going to trial with his experts (App. A) with the 1987-2003 scientific literature, and

with the long-standing hemorrhagic disease literature that explains his son's death. (Exh.

B 16-17)

### B. New Science Proves Plea Was Founded upon Knowingly
### False and Unreliable Evidence Resulting in Manifest Injustice.

The expert opinions and scientific literature that accompany this motion prove

by clear and convincing evidence that Qinard did not kill his son by "shaking, striking, or

hitting" his head.

In 2002 it was universally accepted by the governing branch of biomechanical

science that fatal brain injuries could not be caused by human shaking. In sum, this was

proven to be a scientific impossibility. While Qinard does not accuse the prosecutor of

personally knowing this fact in Oct., 2003, he does assert that the prosecutor had a "duty

to know" by and through her M. E. that the evidence was false. Nevertheless, whether the

prosecutor did or did not know, this does not change the fact that this evidence was false,

and the new 2004-2007 science conclusively proves this fact.

While killing a child by "striking or hitting" the head can be a valid lethal injury-

mechanism, it requires head bruises with "imprints" or "patterns" that "match" the object

alleged to have caused the impact, or matching grip marks.  As shown by the photographs

in the medical literature that accompanies this motion, (B 15) a child can obtain horrific

bruising from medical intervention causes (id) or hemorrhagic disorders. Without a

visible pattern or imprint it is a medical and scientific impossibility to divine the cause of

any given artifact, and when medical doctors seek to cloak their wild guesses in the guise

of medical certainty, this results in false convictions. (Exh B16)

Presenting such flawed evidence to Qinard, disguised as provable evidence,

indicates that his plea decision was based upon false and misleading information. Had he known that the evidence was flawed, he would have insisted upon a trial.

Moreover, in the context of a plea, the new evidence also proves his freestanding Innocence. Lacking inculpatory "shaking" evidence, and lacking sufficient evidence to support a valid "striking or hitting" theory, the State no longer has a provable factual case. At trial, the same result would prevail as the State no longer has a valid murder theory or a valid BCS theory. While the State could argue that Qinard abusively caused the oval cheek bruises, Qinard's experts would point out that normal Father-Son cheek nibbling play of this type would leave an oval-bruising due to the son's hemorrhagic disorder in which spontaneous bruising is prevalent. Qinard's extensive bruising could have resulted from any normal-routine handling of the infant. Moreover, CPR (SEE Exh. B15 photographs) and the routine bruising from this act, (id) would be greatly aggravated due to the hemorrhagic disorder.

## IV.   CONCLUSION AND REQUESTED RELIEF

For the foregoing reasons and those reasons articulated in the accompanying memorandum of law, Qinard moves the court to set an evidentiary hearing whereat his plea-counsel and the Medical-Review Panel Experts can testify consistent with their written reports (Appendix A), the supporting literature in accompanying Appendix B, and the facts contained in thie brief.

Since the 2001 autopsy took place in this case, there has been a paradigm shift in the way these types of cases are evaluated, and Dr. Steiner's National Association of Medical Examiners no longer endorses SBS. .

Without this former SBS default diagnosis, a wide range of other causes,

29

including natural causes such as hemorrhagic disorders, (Exh B 16-17) metabolic causes and minor falls that were previously overlooked, are now re-evaluated by the medical community and given far more consideration.  Qinard is entitled to have his day in court and moves the court for justice and a chance to put forth his exculpatory evidence, which will prove his innocence..

## UNNOTARIZED OATH

UNDER THE PENALTIES OF PERJURY, I declare that I have read the foregoing motion and that the facts stated in it are true.

/s/ *Qinard Collins*

Qinard L. Collins  V18204

Holmes Correctional Institution

3142 Thomas Drive

Bonifay, Florida 32425

Housing H3101L



Qinard Collins Sr., #18204
Holmes Correctional Institute, E2-21385
3142 Thomas Drive
Bonifay, Florida 32425
In Propria Persona

IN THE CIRCUIT COURT, SEVENTH
JUDICIAL CIRCUIT IN AND FOR
ST. JOHNS COUNTY, FLORIDA

QINARD L COLLINS
<u>Defendant</u>

Crim. No. CF01-1102

Memorandum of Law in
Support of Motion for PCR

-vs-

STATE OF FLORIDA
<u>Plaintiff</u>

  Comes now Qinard Collins Sr., Defendant in Propria to the above entitled

action, pursuant to Rule 3.850, Fla. R. crim. P. and hereby respectfully submits his

memorandum of law in support of his motion for PCR filed this same day with the

honored Court.

By: _Qinard Collins_
     Qinard L. Collins Sr.
     Def. in Pro. per.

1

## MEMORANDUM OF LAW

For the legal reasons that follow, Qinard asserts that his claims are not procedurally barred and that they should be granted on the on the merits before or after an evidentiary hearing.

## I. <u>COMPLIANCE WITH SUCCESSIVE MOTION REQUIREMENTS:</u>

Pursuant to Rule 3.850(b)(1), Fla.R.Crim. P., Qinard's motion must be filed within 2 years of his judgment and sentence, unless it relies upon newly discovered evidence as that phrase is defined by subsection (1), id., and the <u>Robinson</u> v. <u>State,</u> 770 So. 2d 1167 (Fla 2000), <u>Jones</u> v. <u>State</u> 709 2d 512, 521(Fla 1998), or <u>Schulp</u> v <u>Delo,</u> 513 U.S. 298, 329 (1995) line of authority.

Under subsection (b)(1), this evidence must have been unknown to Qinard at the time of his plea and undiscoverable through due diligence, though persuasive enough to prove Qinard would have insisted on trial had he known of its existence, (<u>Hill</u>, infra) or that it would have undermined the integrity of the plea's factual basis (<u>Napue</u>, infra, <u>Medina</u>, infra, <u>Jackson</u>, infra), and that it probably would have resulted in an acquittal Had Qinard proceeded to trial.

Under Federal habeas corpus successive filing jurisprudence,the new evidence must show that it is more likely than not "that no reasonable juror would have convicted him in light of the new evidence," <u>Schulp</u>, at 329 Supra.

Moreover, Qinard must present "new or different grounds," Rule 3.850(F), Fla. R. Crim. P., from those claims that were decided upon the merits in his last motion, and the new grounds must not violate the abusive writ doctrine under State law.

However, it should be noted for the sake of Federal and State comity that Federal habeas

jurisprudence allows successive or abusive claims that were procedurally defaulted in

State court, to be decided upon the merits in Federal Court, if the claims can meet the

Schulp, id, actual innocence test.

   In this case Qinard did not get the relevant medical records until May, 2009. Once in

possession of the records he promptly sent them to Dr. Buttram, which began the chain of

events that led to the pro bono medical case review by all the experts, SEE: (Appendix A

Rpts.) and the extensive scientific literature which supports said opinions. (Appendix B)

   As an indigent represented by Counsel, Qinard could not be expected to know of this

evidence in 2001-2004, as he relied upon counsel for this function. Post 2004, Qinard

was an indigent prisoner who once again could not be expected to know of these experts

and the scientific literature that supports their opinions. Accordingly it should be

axiomatic that this evidence is newly discovered under Subsection (b)(1), supra, and this

motion is timely, since the final pathologist's report was not issued until 9-27=10.

   While Qinard's last motion to set aside his plea did wield a newly discovered

evidence claim, that claim failed to comply with the legal requirements for such claims,

was denied for failing to state a claim upon which relief could be granted, and did not

rely upon the evidence that supports this motion. Accordingly, today's ground one-three

are not re-urging claims and evidence that were previously decided upon the merits.

   Moreover, while the last motion did urge an ineffective assistance of counsel claim

for failing to investigate vaccine reactions, today's claim relies upon newly discovered

evidence not previously seen by Qinard or the Court. Moreover, it accuses counsel of

failing to consult with potential defense experts and failing to investigate the State's

3

murder and injury "opinion" evidence, grounds that have not been decided by this court previously.

## II.   LEGAL REASONS TO GRANT RELIEF:

While Qinard does not have access to Florida case law on the topic, he notes at the onset that in accepting a plea there is no material difference between an <u>Alford</u> (Infra) Plea with its protestation of innocence and a no contest plea with its refusal to admit guilt. <u>North Carolina</u> v. <u>Alford.</u>, 400 U.S. 25, 37, 91 S.Ct. 160, 167(1970). (There is no material difference between a plea that refuses to admit commission of the criminal act and a plea containing a protestation of innocence.)

For in neither instance does the defendant admit guilt,  and in both instances the defendant's decision to accept the plea rests on his risk/benefit calculation. Other states therefore adopted a more lenient withdrawal standard prior to sentencing for no contest pleas, e.g. <u>Washington</u> v. <u>Superior</u> Court, 180 Ariz. 91,  93-94,  881 P.2d 1196(Ariz. App.1994)(Public lacks assurance of guilt if objective basis for reevaluation exists, withdrawal should be permitted).

Accordingly, when deciding Qinard's  three new grounds for relief, the honored Court is moved to adopt a slightly more liberal interpretation of the relevant legal doctrines and to bear in mind that this case contains no admissions of guilt.

### A. Ineffective Assistance

Florida has adopted The <u>Hill</u> v. <u>Lockhart</u>, 474 U.S. 52,56,59(1985),<u>Strickland</u> v.<u>Washington</u>, 466 U.S. 668(1985), and <u>Wiggins</u> v. <u>Smith, 539 U.S.</u> 510, 123 S. CT. 2527 (2003), line of authority which holds that plea counsel has a duty to conduct a reasonable investigation into the state's prosecution theories. When counsel fails to do

4

this and it results in a failure to render competent legal advice that informs his client of a "viable," infra, defense to the charges, Florida and Federal Courts have found this to be constitutionally ineffective assistance. SEE: e.g. Diaz v,. State, App. 3 Dist., 534 So.2d 817(1988)(To set aside no contest plea, defendant must prove counsel failed to advise of "viable" defense.), Freeman v. State, App. 2 Dist., 616 So. 2d 181(1993)(Failing to investigate State's defective evidence was ineffective assistance entitling plea to be set aside), Ivy v. Caspari, 173 F.3d 1136, 1143(8th Cir. (1999)(Failing to advise client and Court of viable defense,

was ineffective assistance entitling plea to be vacated).

Ex parte Brandy Del Briggs, 187 S.W. 3rd 458 (Tex. App.)(2005), while a Texas case, is nevertheless both instructive and persuasive when deciding this case.

In Briggs, the defendant entered a guilty plea to SBS charges based on the advice of her attorney in 2000, regarding the 1999 death of her infant son. She then filed her state habeas petition that was accompanied by four written reports from medical doctors who claimed the 1999 death was due to natural causes that mimic SBS and that the death had been misdiagnosed in 1999. This evidence was then used to support an actual innocence claim and ineffective assistance of counsel claim under Hill, supra, Wiggins, supra for failing to investigate the State's medical evidence and consult with a defense retained medical expert.

Unlike this case, the defendant admitted her guilt in her plea, admitted to shaking the child, and did not allege that SBS was not a valid injury mechanism. For these reasons her actual innocence claim was denied. Briggs, 187 S.W. 3d, at 465-466, as her

5

evidence put forth an alternative cause of death, but did not prove the State's theory could **not** be true, only that it **may not** be true.

However, the Court found Counsel's failure to investigate the medical evidence in violation of Wiggins, Supra, Strickland, Supra, and that if not for this failure, the defendant would have gone to trial, Hill, Supra. As in this case, the infant in Briggs was a very sick child with serious and prolonged medical conditions which were never investigated by counsel and that proved a natural cause of death. This court should find Briggs persuasive and likewise reverse.

As documented in the factual memorandum, if Qinard confines his new evidence to that which existed prior to Oct. 2003, there was an overwhelming amount of exculpatory evidence that would support a "Viable" defense to all of the charges. Had counsel conducted even a token investigation into the biomechanical hypotheses wielded by the State, counsel would have learned that each hypothesis (Shake, Strike, Hit, BCS) was fundamentally flawed with no basis in science or evidence. Moreover, each of Qinard's experts (Appendix A) that come before the Court today with their exonerating written reports were readily available to counsel in 2003 and would have rendered similar reports then.

Caro v. Calderon, 165 F.3d 1223, 1226(Ca9 1999)(Counsel has duty to determine type of expert needed and then consult). Holsomback v. White, 133, F.3d 1382 1387 (CAll 1998)(holding counsel's failure to investigate state's lack of medical evidence ineffective), Sparman v. Edwards. 26 F. Supp. 2d 450 (E.D.N.Y. 1997)(holding counsel ineffective for failing to investigate and introduce medical evidence that contradicted the state's medical testimony); "A lawyer who fails to adequately investigate and to

introduce into evidence [information] that demonstrates his client's factual innocence, or

that raises substantial doubt as to the question to undermine confidence in the verdict,

renders deficient performance." Lord v. Wood, 184 F. 3d 1083, 1093(Ca 9 1999).

Had counsel conducted his most basic investigative duty and advised Qinard of

this viable defense (Appendix A-B), he would not have accepted any plea, would have

moved to dismiss the indictment and insisted on going to trial on any remaining

charges.Hill, supra, Wiggins, supra, Diaz, supra.

**B.   Due Process Violation**

A plea of no contest waives several constitutional rights, including the Sixth

Amendment right to insist upon a jury trial, and must therefore be entered intelligently

and voluntarily to comport with constitutional due process requirements. Boykin v.

Alabama, 395 U.S. 238 (1969).

Moreover, the plea process itself must be applied in a fair manner which does

not violate "any recognized principle of fundamental fairness," Medina v. Calif, 505

U.S. 437, 112 S. Ct. 2572, 2578 (1992).

"Recognized principles" can include but are  not limited to: Perjurous testimony

by a key witness that is spawned by the State or that should have been known and halted

by the State, Mooney v. Holohan, 294 U.S. 103 (1935), erroneous State Court evidentiary

rulings that infect the criminal process, Crane v. Kentucky, 476 U.S. 685 (1996),

suppressed material evidence by the prosecutor, Kyles v. Whitley, 115 S. Ct. 1555(1995),

or "by any others acting on the government's behalf in the case," Kyles, 115 S. Ct., at

1567, such as police (id) or a pathologist. Founding the penalty (or verdict) upon

unreliable and questionable evidence, also violates a recognized principle, Johnson  v.

Mississippi, 486 U.S. 578(1978), as does founding a verdict upon evidence that is constitutionally insufficient, Jackson v. Virginia, 443 U.S. 307, 99 S. Ct. 2781, 2792(1979). If a case suffers from a Jackson id., defect, the case cannot be "rescued" by an expert opinion that is also suffering from underlying insufficient evidence defect, Smith v. Mitchell, 437 F. 3d 884, 890 (9th Cir.)(2006).

In this case Qinard's due process rights under Boykin were clearly violated. While there remain some faith-based zealots or apologists who still wish to believe that "shaking" is a valid traumatic brain injury mechanism, the entire scientificcommunity that is responsible for validating the mechanism has rejected it *en banc.* SEE: SBS References.com. Exh. 14A-C (Biomechanicians declarations advising courts they have been misled by medical community.) Moreover, since the evidence to support these claims comes from the new expanded record, these issues are proper PCR issues.

Today it would be error for any court to accept this injury mechanism as a portion or element of factual basis. Moreover, both the head "striking" and "hitting" injury mechanisms require "matching" soft tissue injury patterns or imprints to be valid, none of which existed in this case; i.e. significant impact and/or grip marks.

When Qinard made his decision to accept the plea, he was unaware that the alleged factural basis and inculpatory evidence was permeated with flaws and relied in part upon non-existent, **faith-based** injury mechanisms. He was further unaware that his son suffered from hemorrhagic disorders that the incomplete autopsy and M.E. had misdiagnosed. Under these egregious circumstances, Qinard asserts his Boykin rights

8

were violated and that he never would have entered the plea had he known of the
information contained in his accompanying appendices (A/B).

For these same reasons, Qinard asserts that the plea was founded upon evidence
that is now known to be false and unreliable, in violation of the <u>Mooney,</u> supra, and
<u>Johnson,</u> supra, line of authority. Qinard further asserts that the factual basis relied upon
the wild opinion of the M.E. and that this opinion suffered from a constitutional
insufficiency of evidence defect in violation of the <u>Jackson, Smith,</u> line of authority,
supra. Moreover, since the evidence to support these claims comes from the new
expanded record, these issues are proper per-motion issues.

Wherefore, for all of the above reasons and those reasons contained in his factual
memorandum, Qinard asserts that his plea process was fundamentally unfair, <u>Medina,</u>
supra, and should be vacated.

### C.  Actual Innocence Claims:

Under federal habeas corpus jurisprudence, a defaulted claim can be decided if
newly discovered evidence shows that due to a constitutional error an innocent person
has been convicted . To be credible the new evidence must be reliable, such as
"exculpatory scientific evidence," trustworthy eye witness, or critical physical evidence –
that was not presented at the trial." <u>Schulp</u> v. <u>Delo</u> 513 U.S. 298, 115 S. Ct. 851,
865(1995). Under this innocence analysis, the Court considers all evidence to include
illegally admitted or excluded evidence and new evidence not previously seen by the jury
or Court <u>Schulp</u> 115 S Ct. at 867. If the court finds that this evidence shows that " a
Constitutional violation has probably resulted in a conviction of one who is actually
innocent," <u>Schulp</u> at 867 then the judgment must be reversed. In making this

determination, the Court does not use its own independent judgment but "rather the standard requires the district court to make a probabilities determination about what reasonable … jurors would do." (at 868), and "whether" it is more likely than not that a reasonable juror would have convicted him in light of the new evidence" (at 867).

While the Schulp test is merely a "gateway" procedure to have a defaulted Constitutional claim heard on the merits and is not a claim in and of itself, freestanding or substantive actual innocence claims, by comparison, are recognized and cognizable under the holdings in Herrera v. Collins, 506 U.S. 390, 113 S. Ct. 853, 869(1993)(Assuming claim cognizable),  House v. Bell, 126 S. Ct. 2064, 2082 (2006)(Assuming claim cognizable), and in Re: Davis, 2009 WL2486475___S. Ct. ___(8-17-09)(Remaining for Evd. Hrg. on freestanding innocence claim).

While no rigid or formalistic test yet exists for deciding freestanding innocence claims, the Herrera, supra court found that a "truly persuasive demonstration of  actual innocence," 115 S. Ct., 869, would meet the test, and the 11th circuit has required the petitioner to show by "clear and convincing evidence that a jury would not have found him guilty." In Re Davis, 565 F.3d 810, 826 (11th Cir. 2009)(denying Evd. Hrg.), In Re Davis, WL 2486475 (8-17-09)(Accepting original jurisdiction filing of habeas petition and remanding for freestanding innocence Evd. Hrg.).

If this court for any reason finds that it cannot decide the merits of Qinard's three grounds for relief, then it is moved to decide the claims under the Schulp "gateway," test. Supra.

Regarding Qinard's freestanding innocence claim under Davis, id, the Court

should note that the expert reports and scientific literature in this case have far more evidentiary weight than the lay witness affidavits in Davis. (id) Moreover, both Qinard and Davis present new evidence, which if true, completely undermines the State's only inculpatory evidence. In Davis, the only inculpatory evidence came in the form of eye-witness testimony, and in Qinard the only inculpatory evidence came in the form of medical opinion potential testimony. In Davis, the new evidence showed the previous testimony was likely incorrect (recanting affidavits), and in Qinard's case the new expert evidence shows the original medical opinion was incorrect and relied on injury mechanisms now known to be impossible. The only real difference in principle between the two cases concerns the evidentiary weight. Expert opinions supported by new scientific literature, would always carry more weight than a recanting eye witness.

Wherefore, these reasons and in addition those reasons articulated in the accompanying factual memorandum, Qinard moves the honored Court to grant his requested relief before or after any court-ordered evidentiary hearings.

### III.   CONCLUSIONS

For these reasons Qinard asserts that the State's theory **cannot** be true, that manifest injustice has taken place, that the Court should appoint counsel, grant an evidentiary hearing, and thereafter vacate his plea. There has been a paradigm shift in the evaluation of pediatric deaths, as the National Association of Medical Examiners no longer endorses the debunked SBS diagnosis, which in turn has fundamentally altered the entire differential diagnosis process. This new evidence should not be ignored, and the Court should grant relief.

11

## UNNOTARIZED OATH

UNDER THE PENALTIES OF PERJURY, I declare that I have read the foregoing motion and that the facts stated in it are true.

/s/ _Qinard Collins_

_Qinard L. Collins_ V18204

Holmes Correctional Institution

3142 Thomas Drive

Bonifay, Florida 32425

Housing H3101L

**Z**

Qinard Collins Sr. #18204
Holmes Correctional Institute
3142 Thomas Drive
Bonifay, FL 32425

In Propia Persona

IN THE CIRCUIT COURT, SEVENTH
JUDIUCIAL CIRCUIT, IN AND FOR
ST. JOHNS COUNTY, FLORIDA

QINARD COLLINS,                    Crim. No. CF0-1102
      Defendant

**MASTER EXHIBIT A INDEX
TO MOTION FOR PCR**

-VS-

STATE OF FLORIDA,
      Plaintiff

      Comes Now Qinard Collins Sr, defendant In Propria Persona to the above entitled

action pursuant to Rule 3.850(b)(1)(c),FlA. R. Crim. P. and hereby respectfully submits

his Master Exhibit  Index for accompanying appendix A in support of his

motion for post-conviction relief filed this same day.

Dated this ___5 th___ of ___January___ 2010

By: _Qinard Collins_
                Qinard Collins Sr
                Def. in pro. Per.

## MASTER EXHIBIT A INDEX

A1_____Hematologist Dr. Innis, 8-15-09 Rpt.

A2_____Experienced in SBS/SIS, Dr. Buttram, 8-27-09 Rpt.

A3_____Experienced in SBS/SIS, Dr. Buttram, 8-30-09 Rpt.

A4_____Neurosurgeon Dr. Mendelsohn, 12-7-09 Rpt.

A5_____K.R. Holcomb, 10-10-10 declaration.

A6_____Pathologist Dr. Stephens, 9-27-10 Rpt.

A7_____2001 indictment

A8_____2008 Ontario News Article.

A9 _____2009 BBC News Article.

A10 _____2010 Qinard Collins Affidavit.

A11_____5-29-09 Med Rec. Transmittal from Counsel.

A12_____10-9-01, Det. Gober Deposition (p.21-22 excerpt)

14-SEP-2009 08:33      MICHAEL INNIS          +61 0754932826          P.02

*A1*

Dr Michael D Innis MBBS;DTM&H;FRCPA;FRCPath
1 White Dove  Court
Wurtulla, Qld 4575
Phone/Fax 07 54032816

### EXPERT CERTIFICATE
### Section 177, Evidence Act 1995 No 25

1.  This statement made by me accurately sets out the evidence which I would be prepared, if necessary, to give in court as a witness. The statement is true to the best of my knowledge and belief and I make it knowing that, if it is tendered in evidence, I shall be liable to prosecution if I have wilfully stated anything which I know to be false or do not believe to be true.

2.  My date of birth is 8/7/1919

3.  I hereby certify that:
      My full name is Michael Derrick Innis
      My contact address is as above.
      I have retired from Full Time employment as Senior Pathologist in the Repatriation Hospital and as Haematologist  Princess Alexandra Hospital Brisbane.
      I am now engaged in Consultation work in Private Practice.

My qualifications and resume are as follows.
    1. MBBS (Bachelor of Medicine and Bachelor of Surgery)  University of Madras 1942
    2. DTM&H (Diploma of Tropical Medicine & Hygeine)University of Liverpool 1958
    3. FRCPA (Fellow of the Royal College of Pathologists Australasia ) 1960 Australia
    4. FRCPath(Fellow of the Royal College of Pathologists)  United Kingdom 1970
Previous appointments in Pathology/ Haematology
    1. Registrar in Pathology Doncaster Royal Infirmary 1956 - 1959
    2. Assistant Pathologist Adelaide Children's Hospital 1959 - 1960
    3. Consultant Haematologist Princess Alexandra Hospital  1960 - 79
    4. Private Pathology Practice 1979 -1985
    5. Senior Visiting Pathologist and Part time Lecturer in
        Medicine Repatriation Hospital Greenslopes1985 - 1995
    6. Since 1995 I have been engaged in Medico-legal investigations of
        alleged child abuse in the United Kingdom, Australia,
        Ireland, and the United States of America. I have given
expert testimony in Courts in Australia, England and the USA.
    7. I have indicated the biochemical tests necessary to screen for
        Temporary Brittle Bone Disease [1] and any case in which
        "fractures" have been observed.

8. I have had some of my work published in a USA Medical peer reviewed journal. http://www.jpands.org/vol11no1/innis.pdf

9. I have published a paper 'Vitamin K Deficiency Disease' in the peer reviewed Journal of Orthomolecular Medicine March 2008 which provides a "natural" explanation of bruises, fractures and subdural haemorrhages hitherto attributed to Child Abuse or more specifically to Shaken Baby Syndrome/ Shaken Impact Syndrome.

While at the Doncaster Royal Infirmary I was one of three Pathologists conducting post-mortem examinations on all unexplained and unexpected deaths, in which there were no suspicious circumstances, in the West Riding Yorkshire.

My main expertise is in Haematology. I was in charge of the Haematological Investigations of all patients attending the Princess Alexandra Hospital during the period 1960 - 1979. I was also responsible for the training in Haematology of some candidates for the Fellowship of the Royal College of Pathologists of Australasia. My experience in Private Laboratories and in the Repatriation Hospital was along similar lines.

I am the author of about 30 papers dealing with various aspects of diseases of children and adults. My most recent papers are listed below.

I have also devised and hold the patent for a Computer Program called Medisets. It is designed to assist Medical Practitioners in Clinical Diagnosis and the correct use of Laboratory investigations in arriving at Diagnoses[2]. The program analyses Clinical and Laboratory findings in many hundreds of cases gathered from leading journals as well as from my own experience over the last 25 years.

For further information about me please consult:
1. Outstanding People of the 20th Century
2. Who's Who in the World
3. Who's Who in Science and Engineering
4. Who's Who in Medicine

Most recent publications
1. Innis MD. http://bmj.com/cgi/eletters/328/7433/183#48653.29 Jan 2004
2. Innis MD. *Clinical problem solving – the role of expert laboratory systems* Med. Inform. (1997 ) vol 22 p 251-252
3. Innis MD Vaccines, Apparent Life Threatening Events, Barlow's Disease, and Questions about Shaken Baby Syndrome. Vol 11 2006:17-19 http://www.jpands.org/vol11no1/innis.pdf
4. Innis MD Vitamin K Deficiency Disease Journal of Orthomolecular Medicine, volume 23, number 1: 2008, pages 15 - 20.

SIGNED _____ WITNESS _____

15-AUG-2009 10:34      MICHAEL INNIS            +61 0754932826        P.01      8/0

## Michael Innis

**From:** <hbuttram1304@comcast.net>
**To:** "Michael Innis" <micinnis@bigpond.com>
**Sent:** Friday, 14 August 2009 9:15 PM
**Subject:** Re:

Wonderful! My office fax number is 215-529-9034.
We are very grateful.

Harold Buttram, MD

----- Original Message -----
From: "Michael Innis" <micinnis@bigpond.com>
To: hbuttram1304@comcast.net
Sent: Friday, August 14, 2009 12:37:43 AM GMT -05:00 US/Canada Eastern
Subject: Re:


Dear Haold
   I'll have the report ready in 24 hours - I can fax it to you if I have your fax number.
Best wishes
Michael

----- Original Message -----
From: hbuttram1304@comcast.net
To: micinnis@bigpond.com
Sent: Wednesday, August 12, 2009 11:57 PM

To Dr. Innis: Dr. Yazbak forwarded your message. Any help you can provide in the Qintan
Collins case will be greatly appreciated.

Harold Buttram, MD

Harold,
     Give pages attached. Please
let me know if there is any
clarification required.

                    Michael.

This report is very clear

          H EB

15/08/2009

15-AUG-2009 10:34      MICHAEL INNIS          +61 0754932826      P.01    8/09

## Michael Innis

| | |
|---|---|
| **From:** | <hbuttram1304@comcast.net> |
| **To:** | "Michael Innis" <micinnis@bigpond.com> |
| **Sent:** | Friday, 14 August 2009 9:15 PM |
| **Subject:** | Re: |

Wonderful! My office fax number is 215-529-9034.
We are very grateful.

Harold Buttram, MD

----- Original Message -----
From: "Michael Innis" <micinnis@bigpond.com>
To: hbuttram1304@comcast.net
Sent: Friday, August 14, 2009 12:37:43 AM GMT -05:00 US/Canada Eastern
Subject: Re:

Dear Harold
   I'll have the report ready in 24 hours - I can fax it to you if I have your fax number.
Best wishes
Michael

   ----- Original Message -----
   **From:** hbuttram1304@comcast.net
   **To:** micinnis@bigpond.com
   **Sent:** Wednesday, August 12, 2009 11:57 PM

   To Dr. Innis: Dr. Yazbak forwarded your message. Any help you can provide in the Qintan
   Collins case will be greatly appreciated.

   Harold Buttram, MD

Harold,
Give paper attached. Please
let me know if there is any
clarification required.

Michael.

15/08/2009

# Report on Quinard L Collins Jr
### Date of Birth 3rd June 2000 Deceased 2nd April 2001.

This report is based on the information sent to me by Dr Harold E Buttram MD authorized by Quinard L Collins.

## Prenatal History

The progress notes indicate that the mother was anemic and was a cigarette smoker who was medicated with iron and multivitamin tablets and folic acid. Because she was overweight she was referred to a weight control clinic.

*Comment*

*Cigarette smoking during pregnancy is known to have a number of adverse effects mainly as a result of the reduced levels of Vitamin C it induces in the mother(1). Among these adverse effects is premature rupture of the membranes and all the consequences of prematurity which include low birth weight and dysfunction of the Lungs and Liver.*

## Birth Records and Admission to Neonatal Intensive Care Unit.

Spontaneous rupture of the membranes occurred at 26 weeks and 3 days of gestation. The infant weighed 1109 gms, had Apgar scores of 4 at 1 minute and 8 at 5 minutes and was transferred to the Neonatal Intensive care Unit (NICU). Prematurity, Reparatory Distress and Presumptive Sepsis were the Admission Diagnoses.

*Comment*

*As expected the consequences of cigarette smoking by the mother were prematurity, respiratory distress and low birth weight. Liver dysfunction was not evident on admission to the NICU but developed later in the form of abnormal Liver Function Tests.*

## Subsequent Progress

The Shands Hospital Records indicate that there were Eleven "Problems" associated with the stay of the child in that Hospital from June 3rd 2000 to February 6th 2001. He developed Necrotizing Enterocolitis on the 18th day of life and subsequently underwent three abdominal operations. Other problems included Cholestatic Jaundice, Hypotension, Thrombocytopenia and Anemia, Enterococcal Bacteremia and Short Bowel Syndrome.

1

**His Discharge Diagnoses read:**
1. Ex-28 week premie. NICU graduate
2. Short-bowel syndrome
3. Iron deficiency anemia.
4. Strabismus (esotropia right eye)
5. Gram-positive bacteremia, resolved.

## Comment

*Oyuinard suffered several problems among which were Cholestatic Jaundice, suggesting Liver dysfunction, and the Short Bowel Syndrome. Patients with Short Bowel Syndrome may have complications caused by malabsorption of vitamins and minerals, such as deficiencies in vitamins A, D, E, K, and B12, calcium, magnesium, iron, folic acid, and zinc. These may appear as anemia, hyperkeratosis (scaling of the skin), easy bruising, muscle spasms, poor blood clotting, and bone pain.[2]*

*The consequences of the malabsorption of Vitamin K have been recorded by several authors. They have been summarized and reported by me as "Vitamin K Deficiency Disease" [3]*

*Vitamin K Deficiency Disease has all the features of the condition variously called Shaken Baby Syndrome/ Shaken Impact Syndrome/ Battered Child Syndrome, Inflicted Brain Injury and Abusive Head Injury- the Autopsy diagnosis.*

## Fluger Hospital Emergency Department April 2nd 2001

The father found the child unresponsive in his crib and called the Emergency Service. The child was seen to be in Cardiac and Respiratory arrest. CPR was attempted and he was later intubated and admitted to Hospital.

On examination the patient was found to have multiple purple-colored bruises, the anterior fontanelle was full and swollen, pupils fixed and dilated and tympanic membranes clear.

Portable abdominal X-Ray showed no gross abnormality.
Significant Laboratory Investigations showed:
1. Hemoglobin reduced
2. Neutrophils elevated
3. Albumin, Globulin, Creatinine and Total Proteins reduced
4. AST and Alkaline Phosphatse elevated.

2

**Comment**

*It is noted that although the child was seen to have multiple bruises no investigations for a Coagulation Disorder were carried out. If these tests were done they have not been made available to the Defense and this could result in a miscarriage of Justice as these tests provide further evidence to refute false accusations of Child Abuse as has been brought to the attention of the Medical Prfession by Rutty et al; [4].*

*With regard to the level of Hemoglobin and Neutrophils it is clear the child was anemic and had an infection. The child's protein levels were low and confirm the child was suffering from Malabsorption as was to be expected with the Short Bowel Syndrome.*

*Elevation of the AST and Alkaline Phosphatse, when considered in connection with his clinical state, is evidence of Liver dysfunction.*

*The Liver is the site of formation of Prothrombin, necessary for the clotting of blood. This is controlled by Vitamin K and evidence of Liver dysfunction supports the view that that this child had a Coagulation defect which would account for all the bruises found on him.*

---

**Autopsy Report (Performed on April 3rd 2001)**

1. Unexpected infant death with
   - A Bruising scalp recent
   - B Cerebral edema with leptomeningeal and subdural hemorrhage,acute
   - C. Hemorrhage optic nerve sheaths acute.
   - D Bruising/abrasions-face, recent
   - E. Bruising buccal mucosa, recent
   - F. Multiple Areas of bruising and abrasions-trunk, buttocks and extremities, recent.
2. Premature delivery with
   - A Short bowel syndrome.

3

## COMMENT AND CONCLUSION

*DEATH WAS DUE TO THE SHORT BOWEL SYNDROME CAUSING MALABSORPTION OF ESSENTIAL NUTRIENTS ESPECIALLY VITAMINS C AND K.*

*As I have stated earlier this child had clear evidence of the Malabsorption due to the Short Bowel Syndrome – of this there can be no doubt. Prematurity and Liver dysfunction were contributing factors to his demise.*

*As a result of the malabsorpton of essential nutrients, which included both Vitamin C and K, there was a failure of the normal coagulation system which resulted in all the bruises and bleeding found on he child. Death was clearly the result of Vitamin K Deficiency Disease with the added complication of Vitamin C deficiency and Liver dysfunction..[3,4,5]*

]

------------------------------------------------------------

**Reference:**

1. Casanueva E, Ripoll C, Tolentino M, Morales RM, **Vitamin C supplementation to prevent premature rupture of the chorioamniotic membranes**: a randomized trial. www.ncbi.nlm.nih.gov/pubmed/15817864

2. en.wikipedia.org/wiki/**Short_bowel_syndrome** –

3. Innis MD. Vitamin K Deficiency Disease *Jour Orthomol Med* 2008;23:15-20

4. Rutty GN, Smith M, Malia RG. Late Form Hemorrhagic Disease of the Newborn. A Fatal Case Report with Illustrations of Investigations Which May Assist Avoiding the Mistaken Diagnosis of Child Abuse. *Am J Forensic Med Path* 1999;20(1):48-51

5. Clemetson CAB Vitamin C Vol I, II and III. CRC Press Roca Raton 1989.

------------------------------------------------------------

Report of Arthur S Burns DDS May 28 2001
   "Forensic dental comparison was made between an injury pattern having the class characteristics of a human bite mark on the right cheek of a deceased infant and dental records of two persons, with respect to which set of teeth might be the origin of the marks."

Conclusion.   The teeth of Carie-Lenn Canova can be ruled out as having been the origin of the bite mark.
The teeth of Quinard Collins Sr. are the possible origin of the bite mark,

*Comment*
   *It is well known to those with experience of Vitamin C deficiency that superficial skin lesions are part and parcel of the disease. Having worked in the Tropics I have seen many cases of Scurvy. I can only conclude that Arthur S Burns has misdiagnosed the lesion he saw on the cheek of the child. History tells us James Lind (of 'limey' fame) observed skin lesions in his sailors as long ago as 1795.*

I declare I have not made any statement that I know to be untrue.

*[signature: Michael Innis]*

Michael Innis  MBBS; DTM&H; FRCPA; FRCPath.

5

8-27  ﾟ /1 3

Medical Report on Qinard L. Collins, Jr, DOB 06-03-00, Date of Death 04-02-01

**Available for Review**

- Hand-written prenatal progress notes, Canova, Carrie Lenn
- Mother's hospital delivery summary sheet, 06-03-00, Shands Hospital, Jacksonville, Florida.
- In the hospital records there was a document entitled, "Chorioamnionitis Causes Perinal Illness Blamed on Smoking."
- Shands Hospital admission records (under the name of "Canova Boy,"), June 3, 2000 to February 6, 2001.
- Hospital records, Baptist/Wolfson's Children's Hospital, Jacksonville, Florida, admissions of February 6 to 28 in 2001, March 17 to 14 in 2001, and March 15 to 16 in 2001.
- Flagler Hospital Emergency Dept records, April 2, 2001.
- Autopsy report, April 3, 2001.
- Report of Arthur S. Burns, D.D.S., Orthodontics, Forensic Dentistry. Report of May 28, 2001, accompanied by Curriculum Vitae.

**Clinical History**

<u>Prenatal Progress Notes (Location of visits was not identified in the notes - Most dates were incompletely copied):</u>

Carrie Lenn Canova's first prenatal visit date was on January 5, 2000. Her LMP was on 11-11-99, with EDC by menses 08-29-00. She was placed on 400 mcgs of folic acid iron tablets, and multivitamins. Her prepregnancy weight was 175 lbs. Her Hct was 30%. Progress notes of of 01-06-00 recorded anemia, inadequate diet, and "smokes." (Stop smoking was stressed). She was referred to a weight control clinic. A later note recorded total weight gain of 15 lbs, although the date could not be determined.

Qinard L. Collins, Jr. was the product of a mixed marriage with a black father and white mother.

*Comments: Cigarette smoking during pregnancy is known to have a number of adverse effects including reduced levels of Vitamin C (essential for connective tissue and blood vessel wall integrity. Smoking is a major risk factor for premature rupture of the membranes(1) and all of the consequences of prematurity including which include low birth weight and dysfunction of lungs and liver. <u>Respiratory distress</u> was prominent at birth, requiring transfer to the hospital neonatal intensive care unit. <u>Liver dysfunction</u> was not evident at birth but developed later with abnormal liver function tests on admission to Baptist/Wolfson Children's Hospital March 7th and to Flagler Hospital April 2nd. (See below).*

*The liver is the site of formation of Prothrombin, necessary for the clotting of blood. This is controlled by Vitamin K, and evidence of liver dysfunction supports the view that this child had a coagulation defect which would account for all the bruises found on him.*

1

<u>Shands Hospital Newborn Records, June 3, 2000 to February 6, 2001:</u>

The mother had been transferred from Flagler Hospital to Shanks Hospital and was admitted in active labor following spontaneous rupture of membranes. Her medications included pitocin drip and 2 grams of intravenous ampicillin. APGARS were 4 at 1 minute and 8 at 5 minutes, with reduced respiratory efforts initially and with reduced muscle tone and reflexes, poor color. Birth weight was "very low weight" at 1109 grams. The placenta was sent to pathology. The baby was preterm with estimated gestational age of 26 weeks and 3 days.

The mother was 19-years-old and prima gravida, her blood type A positive. Maternal tests were negative for Herpes simplex virus and RPR; HIV was unknown, rubella non-immune, GC/Chladmydia negative, and group B Strep unknown. *She had previously received (immunosuppressive) betamethasone times two as a tocolytic agent (in attempt to avert preterm labor) and Ampicillin times three prior to delivery.* She had spontaneous rupture of membranes four minutes prior to delivery with clear fluid noted. The infant was transferred to neonatal intensive care unit.

The baby's weight was 1109 grams, length 40 cm, head circumference 25.5 cm. The baby demonstrated respiratory distress following birth, but the remainder of the physical exam was unremarkable.

ADMISSION DIAGNOSES:

1. Prematurity
2. Respiratory distress
3. Presumptive sepsis

HOSPITAL Course:

PROBLEM NUMBER ONE: FLUIDS, ELECTROLYTES AND NUTRITION: The infant was started on intravenous fluids. He was switched to total parenterl nutrition on day of life number one, with initiation of enteral feeds on day of life number four. Mom provided breast milk initially. The infant tolerated formula and had episodes of hypoglycemia within the first month of life. The electrolytes were stabilized. The baby underwent intestinal surgery three different times during this hospitalization:

<u>June 27, 2000:</u>  Resection of right colon and 36 cm of ileum for necrotizing enterocolitis and possible perforation.
<u>September 27:</u> Resection of stoma and ileocolostomy for perforated necrotizing enterocolitis, status-post ileostomy and resection.
<u>November 30:</u> Re-exploration, resection of 12 cm of colon, ileocolostomy, gastrostomy, ventral hernia repair.

Total parenteral nutrition was resumed following these operations, after which he was again weaned to oral feedings. However, he had failure to thrive attributed to "short bowel syndrome" from the repeated bowel surgeries with multiple episodes of dehydration and with electrolyte abnormalities. At time of discharge the infant was taking

2

oral Alimentum feeds with rice cereal for five feeds a day. He also was receiving parenteral intralipids.

PROBLEM NUMBER TWO: RESPIRATORY: On admission, the baby was intubated and received Survanta times two. He was extubated on the 6th and remained on nasal cannula at 21%, with episodes of apnea and bradycardia which was treated with Theophylline until day of life number eighteen when he developed respiratory distress secondary to necrotizing enterocolitis. He was reintubated and placed on a high frequency ventilator. He was extubated on day of life number 36 and started on conventional ventilator with nasal cannula, which in turn was later discontinued.

PROBLEM NUMBER THREE: INFECTIOUS DISEASE: The infant received intravenous Ampicillin and Gentamycin for three days following his birth. On day of life number 18 he developed abdominal distention and feeding intolerance. He had pneumotosis intestinalis/necrotizing enterocolitis and was treated medically until the 27th September when he was taken to surgery. A wound culture at surgery was positive for Citrobacter Klebsiella, Bacteroides, and Enterobacter. He developed Enterococcus bacteremia sepsis on October 20th and on October 30 had positive C difficile colitis and again on November 11th, 2000. He had numerous Rotavirus infections with dehydration. He was positive for Rotavirus for a total of seven times, with five negative Rotazymes. On February 3rd, 2001 the Rotazyme was negative. The baby was febrile on Jan. 30, 2001 and had positive blood cultures for E coli and Enterococcus species. A later blood culture showed no growth. (NOTE: *Following onset of necrotizing enterocolitis on his 18th day of* life (June 21, 2000), *which was accompanied by bouts of bacteremia, the patient was continuously maintained on intravenous Vancomycin and Gentamycin until discharge on February 6, 2001. Also, as indicated in the hospital discharge orders, the antibiotics were to be continued after transfer to Baptist/Wolfson's Children's Hospital*).

PROBLEM NUMBER FOUR: HEMATOLOGY: During June, 2000, when diagnosed with necrotizing enterocolitis, the infant had thrombocytopenia and anemia. He was transfused several times. At time of discharge his hematocrit was 28.1% and reticulocyte count 1.3.

PROBLEM NUMBER FIVE: CENTRAL NERVOUS SYSTEM: The infant received indocin times three. He had a total of five head ultrasounds, the last three were negative (July 3, July 10, and August 5, 2000).

PROBLEM NUMBER SIX: CARDIOVASCULAR: The infant had hypotension secondary to necrotizing enterocolitis. He was started on Dopamine on day of life number twenty-nine which was discontinued on day of life number 39. There were no further heart issues.

PROBLEM NUMBER SEVEN: GASTROINTESTINAL: The infant was diagnosed with necrotizing enterocolitis on day of life number eighteen secondary to feeding intolerances. He was treated medically until he perforated. He was taken to surgery June 27th.

3

The surgical operative note of June 27, 2000 revealed that he underwent an exploratory laparotomy and had a resection of his ascending colon and 33 cm of terminal ileum, which was noted to be necrotic with perforations in different regions. There was 2 cm of ileum that appeared to be viable and was left intact. Distal to this, approximately 6 cm of terminal ileum and all of the ascending and transverse colon were also necrotic. Some portions were obviously gangrenous. There was another perforation in the mid-transverse colon. All of this was resected in bloc. The mid transverse colon was then anastomosed to the 2 cm of the terminal ileum which was previously left intact. This was brought out as a mucus fistula and an ileostomy

The infant was again taken to surgery on September 27, 2000, at which time the initial ileostomy was closed.

On November 16th, the infant underwent an upper and lower gastrointestinal series which showed a transverse colon stricture. He underwent surgery again on November 30, 2000. The surgical operative note revealed multiple adhesions with small bowel stuck to the anterior abdominal wall. The remaining transverse colon was resected approximately 12 cm. In addition the small bowel was also attached to the duodenum with adhesions, which were removed. An ileocolostomy was also performed along with placement of gastrostomy tube and ventral hernia repair. The gastrostomy tube was later replaced.

Other gastrointestinal issues included cholestatic jaundice. Other digestive problems included short bowel syndrome with dehydration, failure to thrive, and transverse colon spasms, all of which were resolving at time of discharge on 02-06-01.

PROBLEM NUMBER EIGHT: DEVELOPMENT: The patient was being followed by Child and Life Services for developmental delay.

PROBLEM NUMBER TEN: EYES: The infant had mature retina and strabismus, with left eye being dominant. This was treated with an eye patch four times per day.

PROBLEM NUMBER ELEVEN: IMMUNIZATIONS: The baby received his Hepatitis B vaccine on August 10 and again December 10, 2000. He received his DTaP on August 11 and on December 10, 2000. He received his IPV on August 11 and on December 10, 2000.. He received his HIB on August 10 and December 10, 2000.  He received his Prevnar on August 10 and December 10, 2000.

DISCHARGE PHYSICAL EXAMINATION: Weight 5,325 grams. HEENT normocephalic. Atrial fibrillation open and flat. Remainder of exam noncontributory.

DISCHARGE DIAGNOSES:

1. Extreme prematurity.
2. Necrotizing enterocolitis.
3. Short bowel syndrome.

4

4. Cholestatic jaundice.
5. E. coli and Enterococcal bacteremia.
6. Strabismus.
7. Developmental delay.

**Comment:** *Patients with Short Bowel Syndrome may have complications caused by malabsorption of vitamins and minerals, such as deficiencies in vitamins A, C, D, E, K, and B1; calcium, magnesium, iron, folic acid, and zinc. These may appear as anemia, hyperkeratosis (scaling of the skin), easy bruising, muscle spasms, poor blood clotting, and bone pain.(2)*

*The consequences of malabsorption of Vitamin K have been recorded by several authors. They have been summarized and reported by Dr. Michael Innis as "Vitamin K Deficiency Disease." (3)*

**Vitamin K deficiency disease has all the features of the condition variously called Shaken Baby Syndrome/Shaken Impact Syndrome/Battered Child Syndrome/Inflicted Brain Injury, and Abusive Head Injury – the Autopsy diagnosis. Child abuse has been brought to the attention of the Medical Profession by Rutty et al. (4)**

DISPOSITION:

1. Feeds……………………………...
2. Current medications: Multivitamins with iron, 3 mgs/kg per day – divided t.i.d.; *Gentamycin 30 mgs I.V. every 8 hours, Vancomycin, 100 mgs I.V. every 8 hours*; Mylicon 20 mgs four times a day.
3. The infant will be transferred to the gastroenterology service at Wolfson's Children Hospital.

Baptist/Wolfson's Children's Hospital Admission, Feb. 6 – 18, 2001:

The patient was admitted for management of "short bowel syndrome." The patient had been receiving parenteral TPN and intralipids since first developing necrotizing enterocolitis,, all previous attempts to advance to full oral feedings having failed because of dumping syndrome. He had previously had a gastric tube placed on 11-10-30 as well. The patient had also had a previous problem with cholestatic jaundice, but this had not recurred for over 4 months.

Active problems for Qinard Jr. were listed as follows:

1. Short bowel syndrome.
2. Gram positive bacteremia 02-02-2001, on vancomycin; gastroenteritis since then. He had a PICC in place.
3. Strabismus, right eye esotropia getting patched 4 times daily, to be followed by ophthalmologist.
4. Iron deficiency anemia/malnutrition, currently on iron and multivitamins.

5

5. Developmental delay, likely mutifactorial. Will consult with PT, OT, and speech therapy to evaluate and manage.
6. Qinard Jr. is 8 months old and needs immunizations. Qinard's parents live in St. Augustine and visit when they can. ......Mom works 2 jobs. She does not seem actively involved in his care when available.

Pertinent findings on admission physical exam included right eye esotropia, but able to fix with both eyes; PICC line in place – also gastric tube. In addition there was slight decrease in subcutaneous fat.

Hospital Course: The patient was started on Alimentum 4 times a day and continued on his Total Parental Nutrition (TPNL and intralipids. The patient had a Brovian insertion in the left subclavian on 02-12-2001. His oral feedings were gradually advanced, as were his gastric tube feedings, while TPN and intralipids were gradually decreased though still administered at time of discharge. Stool pH and reducing substances were monitored daily to evaluate for signs and symptoms of dumping syndrome, but these remained stable and within normal limits during course of hospitalization. Nutrition and speech therapy departments were both consulted during hospitalization.

The patient's hemodynamic and respiratory status remained stable throughout hospitalization. The patient had normocytic normochromic anemia thought to be secondary to iron deficiency, and hemoglobin electrophoresis on 01-10-2001 showed hemoglobin A 96.9%, Hgb A2 3.1%. Iron, transferrin, TIBC and vitamin B12 levels on 02-10-2001 were all within normal limits. Unsaturated iron binding capacity was 255, iron percent saturation was 25, and folate level was more than 24. Triglycerides on 02-06-2001 were 113.  He remained afebrile during hospitalization. Repeat blood and urine cultures were negative. *He completed a total of 17 days on Vancomycin and Gentamycin during hospitalization*. Surgery was scheduled for patient's esotropia. Social service was consulted – it was noted that the parents were more involved during this admission than previously.

DISCHARGE DIAGNOSES:
1. Ex-28-week-premie, NICU graduate.
2. Short-bowel syndrome.
3. Iron-deficiency anemia.
4. Strabisums (esotropia right eye)
5. Gram-positive bacteremia, resolved.

He was scheduled for ophthalmology visit in 6 weeks, for Dr. Lane, Health Dept, St John's County in 2 weeks (apparently for updating vaccines).

Baptist/Wolfson's Chilren's Hospital Admission, March 7th to 14th, 2001:

According the readmission notes, the patient was found to have a fever of 103.0 degrees that day during earlier routine visit to the Gastrointestinal Clinic. The mother reported

6

that he had been cranky and not his usual self since the previous day and had been coughing since previous hospital discharge on 08-28-2001.

<u>Admitting physical exam</u> reported Temp. of 100.8, pulse 160, height 63-3/4ths cm, less than third percentile, weight 5.44 Kgs, less than third percentile, right eye notable for inward gaze, , anterior fontanelle open and soft. Left tympanic membrane was red with some retraction. The right TM was red with normal mobility. The remainder of exam was unremarkable.

<u>Labs:</u> Chemistries were normal except for a low potassium of 3.3. Liver function tests were elevated with AST of 76, AT of 110, GGT of 253. White blood cont was 15,000, Hgb and hematocrit 10.3 and 31.3 respectively, platelets 382,000, 63% neutrophils, 19 % lymphs, 8 monos, 9 bands, one metamyelocyte.

The patient was admitted with diagnosis of presumed bacteremia/sepsis and initially **started on intravenous Vancomycin and Gentamycin after obtaining blood cultures, (which were continued for an additional three days following discharge for a total course of 10 days).** Intravenous TPN was continued along with gastric tube and oral feedings. Urine culture grew Klebsiella, blood cultures grew Klebsiella and E-coli. Given a previously normal urinalysis, it was assumed that his bacteremia was most likely from fecal contamination of his indwelling bladder catheter. His fever rapidly cleared with this therapy. He was discharged with continuation of antibiotics, to be seen in gastrointestinal clinic one week following discharge.

<u>Baptist/Wolfson's Children's Hospital Admission, March 15-16, 2001:</u>

Approximately 18 hours following previous hospital discharge the parents noted that patient's left subclavian central venous catheter had come out. On this admission general surgery was consulted and a right subclavian central venous catheter was placed without incident.

**(Comment: Within the baby's total life span of 305 days, he was administered intravenous Vancomycin and Gentamycin for a total of 277 days.)**

<u>Flagler Hospital Emergency Department, April 2, 2001:</u>

*As per E.M.S., the father found the baby wedged between the rails and mattress of his crib, removed him and called for help.*

*According to hand-written emergency department records, the Emergency Medical Service was called to the residence for cardiac and respiratory arrest of the patient. On arrival they found the infant in the arms of a deputy policeman, who was providing rescue breathing. The patient was intubated in the rescue vehicle, an I.V. was placed, and fluids and oxygen started along with CPR. However, when the patient was placed on a heart monitor after arrival in the emergency department, there was virtual asystole.*

7

On examination the patient was found to have multiple purple-colored bruises, at least 16 of which were described.  The anterior fontanelle was full and swollen, pupils fixed and dilated, tympanic membranes clear.

Portable abdominal X-ray: No gross abnormality

Laboratory reports: Red blood cells 2.2 million/mm3, Hgb 5.7, Hct 17.6%, White Blood Count 30,700 with 63% neut., 29% lymphs, 1 % monos, 1% eos, albumen 2.2 (3.5-5.2), globulins 2.0 (2.4-3.8), A/G 1.1 (1.0-1.7), total bilirubin 0,6; Liver tests: AST 36 (11-27), ALT 25 (5-39), alkaline phosphatase 285 (32-112), LDH 272 (98-172), glucose 250 (<114), BUN 15, creatinine low at 0.4, sodium 132, potassium high at 7.0 (3.4-4.5), $CO_2$ 17, uric acid 2.8, Ca 9.2 Phos high at 8.1 (2.5-4.3), cholesterol 65, triglycerides 151, total protein low at 4.2 (6.3-7.9).

Arthur S. Burns, D.D.S., Forensic Dentistry Report of May 28, 2001:

"A forensic dental comparison was made between an injury pattern having the class characteristics of a human bite mark on the right cheek of a deceased infant and dental records of two persons, with respect to which set of teeth might might be the origin of the bite marks."

"For this purpose facial and dental photographs were taken of Qinard Collins Sr and the mother, Carrie-Lenn Canova. Also two sets of upper and lower alginate impressions were taken, immediately poured up in dental stone to produce models of their teeth. "Both persons were very cooperative."

"Conclusion: The teeth of Carrie-Lenn Canova can be ruled out as having been the origin of the bite mark.
The teeth of Qinard Collins Sr. are the possible origin of the bite mark, and cannot be excluded."

Autopsy Report (Autopsy performed on April 3, 2001)

FINAL ANATOMIC DIAGNOSES

FINDINGS:

1.   Unexpected infant death with
     A.  Bruising, scalp, recent.\
     B.  Cerebral edema with leptomeningeal and subdural hemorrhage, acute.
     C.  Hemorrhage, optic nerve sheaths, acute.
     D.  Bruising/abrasions-face, recent
     E.  Bruising, buccal mucosa, recent.
     F.  Multiple areas of bruising and abrasion-trunk, buttocks and extremities, recent.

2.   Premature delivery with
     A.   Short bowel syndrome.

CAUSE OF DEATH: Abusive head injury.

CONTRIBUTORY CAUSES: Battered child syndrome.

MANNER OF DEATH:   Homicide.

SPECIAL STUDIES:   Full body X-rays, liver, blood saved for file. Postmortem ophthalmic pathology examination. complete drug screen, blood-none detected.

CASE SUMMARY: This 9 month old black male was alleged to have been found unresponsive in his crib by his father on the afternoon of 2 April 01. Rescue was summoned to the scene at 1326 hours. Upon their arrival, the baby was in the arms of first-responding-deputy undergoing mouth-to-mouth resuscitation. He was in full arrest. Cardiopulmonary resuscitation was instituted and he was transported to Flagler Hospital………"

EXTERNAL EXAMINATION: Pertinent findings included  weight of 14 lbs, length 24," head circumference 16," The scalp appeared free of traumatic injuries.

The following bruises and/or abrasions were described: A triangular dark red-brown bruising superior to left  eyebrow, 5/8" in maximal dimension; a punctuate scabbed abrasion over the right bridge of the nose, 1/8" in size; a linear abrasion over the dorsum of the nose, ½" in size; a punctate abrasion over the left ala, 1/16" in size; an ovoid area of fading dark red-orange bruising over the left lateral mandibular ramus suggestive of a bite mark, 1 ½ " in maximal dimensions, left to right and 1 ½", head to toe; a similar area of orange-black bruising over the right mandibular ramus, 1 ½" head to toe and 1 1/4th, left to right; immediately medial to the above is a non-patterned area of fading orange bruising, ½" X 1/8" in size. In a similar manner other bruises or scabbed abrasions were described  the lower lip, left lateral chest up to 1/8th" in size, (also two abdominal surgical scars); abrasion 1/8th inch in size over the right mid thigh; fading orange bruising 3/8" in size below the right patella; abrasion over left inferior buttock; 10 areas of punctuate abrasions over the left inferior lateral scapular throughout an area approximating 1" in maximal dimensions. Incisions of the skin revealed subcutaneous bleeding in other areas. There were also multiple small areas of irregular hemorrhage over the buccal mucosa of the mid upper lip and adjacent central incisors.

INCISIONS AND BODY CAVITIES: Visual exams of ribs and sternum, mediastinum, lungs, heart, stomach, liver, and gall bladder were unremarkable. The liver weighed 420 grams, the spleen 50 grams, the kidneys 20 grams each.

INTESTINES: Previous surgical resection of distal small intestine (ileum), cecum and ascending colon were noted. An anastomotic site was not identified. Small numbers of fibrous adhesions were present over the serosa. Mucosa appeared normal. Moderate numbers of small tan nodal structures were present at the base of the mesentery.

Q

HEAD: Upon reflection of the scalp, there was red-black scalpular hemorrhage beneath the area previously described abrasion above the left brow – also over the midforehead region – two areas of ovoid dark red bruising involving the left superior forehead, as well as other areas of bruising. Upon removal of the calvarium there was approximately 6 ccs of loosely clotted and liquid dark red <u>subdural</u> <u>blood</u> over the right parietal occipital region and between the adjacent left hemisphere. The cerebral hemispheres were moderately edematous. There were also two areas of <u>leptomeningeal hemorrhage</u> over the right superior parietal region and superior occipital region near the hemispheric fissure, each approaching ¾". Brain weight was 710 grams. Both globes were exposed by removal of the orbital plate. Each showed recent bright red <u>hemorrhage in the optic nerve sheaths</u>.

**THERE WERE NO MICROSCOPIC TISSUE REPORTS PROVIDED IN THE AUTOPSY REPORT.**

**Clinical Discussion**

<u>Preface:</u>

My personal background and experiences with the shaken baby syndrome cases has special relevance to the present case, and for this reason will be briefly reviewed here. My first Shaken Baby Syndrome/Shaken Impact Syndrome (SBS/SIS) case-encounter occurred in February, 1999. Since that time I have reviewed and written medico-legal reports on over 100 cases and have testified in court in defense of accused parents or caretakers over 30 times in states throughout the USA. A large majority of these cases have involved brain and/or retinal hemorrhages. Many have also involved bruises, a few presenting with superficial vasculitis, often mistaken for bruises.

With the possible exception of a few early cases, I do not recall a single case presenting with brain hemorrhages in which treating physicians did not include at least the usual screening bleeding studies in a diagnostic workup, namely the prothrombin time (PT) and partial thromboplastin time (PTT), to rule out bleeding disorders as a source of the hemorrhages. It is true that the presence of subdural brain hemorrhages were not known to emergency room doctors of Flagler Hospital when the baby was brought in by E.M.S. personnel, but because of the extensive bruising, the possibility of a hemorrhagic disorder should have been entertained with appropriate testing.

It is clearly the duty of treating physicians, as well as medical examiners at autopsy, to establish a differential diagnosis of the findings (in this case brain hemorrhages and extensive bruising) and for emergency room personnel to perform appropriate testing for the different possibilities before drawing diagnostic conclusions. This was not done in the present case, leaving the Terminal Flagler Hospital and autopsy diagnoses highly questionable.

<u>Differential Diagnosis of Infant Hemorrhagic Diseases and their  Laboratory Evaluations:</u>

A proper differential diagnosis of hemorrhagic disorders would at least include thrombocytopenia (platelet deficiencies), disseminated intravascular coagulation (consumption of clotting factors, usually related to massive trauma), hereditary clotting factor deficiencies (hemophila, von Willebrand's disease, etc), hemorrhagic disease of the newborn, and a variant of the latter referred to as "late form hemorrhagic disease of the newborn." Finally, scurvy (clinical vitamin C deficiency) should also be included in this list, as will be elaborated on below.

Prothrombin time (PT), partial thromboplastin time (PTT), fibrinogen, bleeding time, blood coagulatioan time, and platelet counts will rule out most of these conditions, but when one or more of these is abnormal, then further testing is indicated. These would include the liver-derived clotting factors, among which factors VIII and IX are the most common in the hereditary (hemophila) bleeding disorders. Von Willebrand disease would also come under this category. Finally, for our purposes here, there are the conditions known as hemorrhagic disease of the newborn and *late-form hemorrhagic disease of the newborn, both related to vitamin K deficiency, the latter being my presumptive diagnosis in the present case*.

In explanation, there are four liver-derived factors that are dependent of vitamin K for activation, namely prothombin (factor II) and factors VII, IX, and X. There is a specific blood test for diagnosis of vitamin K deficiency referred to as the PIVKA test (protein induced in vitamin K absence, which should always be performed in infants with a prolonged prothrombin time, since this is an easily treatable disease.

**Primary Diagnosis:** Late-Form Hemorrhagic Disease of the Newborn:

To review the basic history in the present case, the mother was given two grams of Ampicillin prior to delivery, which would have eradicated her source of the highly protective Lactobacillus bifidis, which she would have introduced into the baby's gastrointestinal tract even with her limited initial breast feeding. However, as Lactobacillus is unduly susceptible to antibiotics, the L. bifidis was eradicated in the infant.

In addition, the *frequently prolonged administration of antibiotics to the infant, though unquestionably indicated under the circumstances, would have favored the overgrowth of potentially pathogenic yeast and bacteria, which became a vicious cycle of recurrent infections and eventual bowel necrosis.*

Late-form hemorrhagic of the newborn (Late-onset HDN) is thoroughly reviewed in a classic report by G.N. Rutty et al.(6) In the article it was pointed out that the classical form of hemorrhagic disease of the newborn (HDN) is usually a self-limiting, acquired hemorrhagic disorder that takes place as a result of vitamin K deficiency, taking place with 24 to 72 hours following birth. Late-onset HDN is defined as cases occurring after the first week of life with most presenting between 4 to 6 weeks after birth. Intracranial bleeding may occur in up to 100 % of cases; other common cites of bleeding also include the skin and the oronasal (mucous membranes), gastrointestinal, and urogenital tracts. Mortality from intracranial bleeding may reach 19% with 67% of survivors reported to

potentially have long-term neurologic deficits. *Risk factors include prematurity, being small for gestational age (Qintan Jr was cited as 1/3rd in percentiles both length and weight during one of his routine pediatric visits), and finally antibiotics, which tend to kill out intestinal bacteria necessary for production of vitamin K.* It is true that Qintan's late-onset HDN occurred unusually delayed at 9 months, but this becomes acceptable and rational when one considers that he was on almost constant intravenous antibiotics following his 18th day of life, with intravenous administration of Vancomycin and Gentamycin for 277 days in a life span of 305 days.

As additional risk factors in favor of late-onset HDN, the patient's liver function tests were abnormal both with the Baptist/Wolfson Hospital admission of March 7th to 14th and again with terminal Flagler Hospital admission on April 2. This, together with the short bowel syndrome, would have severely compromised the baby's nutritional status and liver function in spite of continued mineral and vitamin supplements.

## Probable Contributory Factor: Vitamin C deficiency (Scurvy)

In the 1960s and 1970s, A Kalokerinos, while working as a health officer among the Australian aborigines, became appalled by a nearly 50 percent infant mortality rate. Observing signs of scurvy in some infants, and noting that the infants commonly died following immunizations, especially if ill with common viral infections, Kalokerinos began administering regular vitamin C supplements, giving injectable vitamin C during crises, and avoiding vaccines when a child was ill, even if just a runny nose. Thereafter pediatric death rates dropped nearly to zero in his health district.(7) Since that time, Kalokerinos' observations have been supported academically by Clemetson. (8) Unfortunately, the importance of these observations has not yet been recognized, and meaningful scientific investigation into a possible connection between vitamin C deficiency and vaccine reactions remains largely unexplored.

While the recommended 30 mgs of vitamin C per day is generally adequate for a healthy infant, it may be rapidly consumed and totally inadequate when the infant is stressed or ill, as with a viral infection. The common cold, for instance, has been shown to reduce vitamin C levels in the blood by 50 percent.(9) Vaccines contain numerous toxins and free-radical generators, including formaldehyde, mercury (still present in traces), aluminum, phenols, alcohols, mineral oil, antibiotics, bacterial endotoxins, and viral DNA. All of these are proinflammatory and pro-oxidants which tend to drain the body's supply of vitamin C.(10)

## Elevated Blood Histamine as Cause of Capillary Fragility and Bleeding from Scurvy

Far from being uncommon, vitamin C deficiency does still occur in the Western World. When people attending a Health Maintenance Organization (HMO) clinic in Tempe, Arizona were tested for plasma vitamin C, it was found to be depleted (between 0.2 and 0.5 in 30 percent of subjects, and to be deficient (below 0.2 mgs/100 ml) in 6 percent.(11)

As reviewed by Clemetson, when the human plasma ascorbic acid level falls below 0.2 mg/ml, the whole blood histamine level is doubled or quadrupled.(12) Blood

12

histamine is also increased by vaccines or toxoids, by stresses such as heat or cold, and by various drugs in guinea pigs.(13) Vitamin C has been shown to inactivate tetanus toxin (14) and diphtheria toxin.(15) It has been shown that *bleeding from scurvy results from increased blood histamine, or histaminemia, which causes separation of endothelial cells from one another in capillaries and small venules.*(16) Both subperiosteal hemorrhages (resulting in callus-like swellings now misinterpreted as fractures) and subdural hemorrhages were included in early descriptions of classical scurvy.(17-18)

As author of this report, it is notable that in reviewing the medical records nearly 100 SBS cases in their various forms in the last ten years, I have seen only one case in which vitamin C blood level was tested, and even here the test was done long after the acute respiratory collapse and therefore was irrelevant.

Vitamin C Essential for Connective Tissue Formation and Integrity:

**One of the lesser known functions of vitamin C is its essential role in incorporating the amino acid, praline, into collagen, which forms the basis for all connective tissue of the body. In the present case this would explain the multiple skin macerations, described as "abrasions" in the autopsy report, also a likely consequence of clinical scurvy. With fragile cutaneous and subcutaneous tissues, these macerations most likely took place during CPR administered in the ambulance on the way to Flagler Hospital.**

Hazards of Free Iron in and around the Brain:

Tauscher et al reported an association between histologic chorioamnionitis (inflammation of the placenta) and brain hemorrhage in preterm infants.(19) Intracerebral hemorrhage occurs in up to 50 percent of very low-birth-weight infants and is thought to represent a substantial cause of morbidity and mortality in these infants.(20)

Small subdural hemorrhages are not uncommon in uncomplicated births and asymptomatic term newborns. Based on magnetic resonance imaging (MRI), Whitby et al. reported subdurals in 9 of 111 infants in 2004.(21) Similar findings were reported by Chamnanvanakij and coworkers,(22) but the Whitby study repeated the positive MRIs in four weeks and found that the "haematomas had completely resolved."

Consequently, small hemorrhages are not uncommon even in uncomplicated childbirths, but little consideration has been given to the residual iron. As the red blood cells begin to lyse (break up) and release their iron. The iron is scavenged by white blood cells and taken up by nearby tissues in the form of hemosiderin.

Free-iron in and around the brain may also result when there are critical drops in levels of vitamin C following vaccines, followed by a precipitous rise in serum histamine, this in turn resulting in capillary fragility and leakage of blood into and around the brain.

It is known that iron overload in the liver, pancreas, and kidneys can be very destructive, a condition known has hemochromatosis. The concern here is that residual iron in and around the brain may be the igniting factor for a firestorm of lipid peroxidation in the brain following vaccines.(23)

13

**Also Possibly Contribuptory:** <u>Cutaneous Vasculitis and Other Reported Skin Conditions following Hepatitis B Vaccinations:</u>

Reported dermatologic reactions to hepatitis B vaccine include cutaneous vasculitis,(24-27) urticaria,(28) and cutaneous lupus erythematosus,(29) These few examples were chosen as being  representative of the probable large-scale incidence of skin reactions to vaccines, though usually remaining unrecognized as to their true nature. Diagnoses of these conditions would require a skin biopsy.

## Summary and Conclusions

In my opinion, it is a near certainty that the differences in the case of Qinard L. Collins leading to a fatal outcome rested in the following factors:

1. He was born premature at 26 weeks and 3 days with very low birth weight of 1109 grams.
2. The mother was administered two courses of betamethasone (known to be immunosuppressive) and three courses of Ampicillin before delivery.
3. A 3-day course of Ampicillin and Gentamycin were administered to the infant following birth.
4. Following onset of necrotizing enterocolitis on 18th day of life (June 21, 2000), the baby was maintained on intravenous Vancomycin and Gentamycin until hospital discharge on February 6, 2001. These were then continued an additional 17 days following transfer to Baptist/Wolfson's Children's Hospital (February 6 to 28), and again administered for a 10 day course following readmission to Baptist/Wolfson's Children's Hospital with signs of sepsis (March 7 to 14th, 2001), for a total of 277 days intravenous antibiotics in a life span of 305 days.
5. Prolonged antibiotic therapy, though unquestionably indicated, resulted in intestinal flora dysbiosis, eliminating the beneficial and protective Lactobacillus species and fostering pathogenic bacteria and (almost certainly) yeast microorganisms.
6. The prolonged administration of antibiotics would also have largely eliminated the beneficial intestinal bacteria required for manufacturing of Vitamin K. Consequently, *late-form hemorrhagic disease of the newborn* can be assumed to the source of the brain and multiple cutaneous hemorrhages – also the primary cause of death. Almost certainly, clinical *scurvy from vitamin C deficiency* also played a role.
7. A terminal bout of septicemia may also have been a contributory factor in the patient's death.
8. The skin "abrasions and bruises" attributed to the "battered child syndrome" in the autopsy report were more likely another manifestation of clinical scurvy.
9. In summary, prematurity and liver dysfunction were contributing factors to this baby's demise. "Short bowel syndrome" was diagnosed fairly early in this in his short life. As a result of malabsorption of essential nutrients,

14

which included both vitamin C and K, there was a failure of the normal coagulation system resulting in all the bruises and bleeding found on the child. Death was clearly the result of Vitamin K Deficiency Disease with the added complication of Vitamin C deficiency and liver dysfunction. [3,4,5]

*Harold Buttram*

Harold E. Buttram, M.D.
August 27, 2009

## References

1. Casanueva E, Ripoil C, Tolentino M, Morales RM. Vitamin C supplementation to prevent premature rupture of the chorioamniotic membranes: a randomized trial, www.ncbi.nih.gov/pubmed/15817864
2. en.wikipedia.org/wiki/**Short_bowel_syndrome**
3. Innis, MD, Vitamin K Deficiency Disease. *Journal Orthomolecular Medicine,* 2008; 23:15-20.
4. Rutty GN, Smith M, Malia RG. Late Form Hemorrhagic Disease of the Newborn. A fatal case report with illustrations of investigations which may assist avoiding the mistaken diagnosis of child abuse. *American Journal of Forensic Medicine and Pathology,* 1999; 20(1):48-51.
5. Clemetson CAB, Vitamin C, Vol. I, II, and III, CRC Press, Boca Raton, 1989.
6. Rutty, GN, Smith, CM and RG Malia. Late-form hemorrhagic disease of the newborn, *American Journal of Forensic Medicine and Pathology.* 1999; 20(1):48-51.
7. Kalokerinos A, *Medical Pioneer of the 20th Century, an Autobiography.* Melbourne, Australia, Biology Therapies Publishing, 2000:11-61.
8. Clemetson CAB. *Vitamin C,* Volumes I, II, & III. CRC Press, Boca Raton, 1989.
9. Hume R, Weyers E. Changes in the leucocyte ascorbic acid concentration during the common cold. *Scot Med J,* 1973; 18:3.
10. Clemetson CAB. Barlow's Disease, *Medical Hypothesis.* 2002; 59(1):52-56.
11. Johnston DS, Thompson MS. Vitamin C status of an out-patient population. *American J Clinical Nutrition,* 1998; 17:366-370.
12. Clemetson, CAB. Histamine and ascorbic acid in human blood. *Journal of Nutrition,* 1980; 110:662-668.
13. Chaterjee JB, Majunder AK, nandi BK, et al. Synthesis and some major functions of vitamin C in animals, *Annals New york Academy of Science,* 1975; 258:24-47.
14. Dey, PK. Efficacy of vitamin C in counteracting tetanus toxin toxicity, *Naturwissenschaften,* 1966; 53:319.
15. Jungblut CW, Zweemer RL. Inactivation of diphtheria toxin in vivo and in vitro by crystalline vitamin C (ascorbic acid), *Proceedings of the Society of Experimental Biology & Medicine,* 1935; 32:1229-1234.
16. Gore I, Tanaka Y, Fujinami T et al. Endothelial changes produced by ascorbic acid deficiency in guinea pigs. *Arch Pathology,* 1965; 80:371-376.

15

17. Barlow T. On cases described as 'acute rickets,' which are probably a combination of scurvy and rickets; the scurvy being an essential and rickets being a variable element. *Med Chir Trans*, 1883; 66:159.

18. Hart C, Lessing O. *Der Scorbut der Kleinen Kinder (Moller-barlowsche Krankheit)*. Stuttgart: Verlag von Ferdinand Enke, 1913.

19. Tauscher MK, Berg D, Brockmann, et al. Association of histologic chorioamnionitis:Increased levels of cord blood cytokines, and intracerebral hemorrhage in preterm neonates. *Bio Neonate*, 2003; 83:166-170.

20. *Maternal-Fetal Medicine, Principles and Practice*. Creasy RK, Reznik R Editors, Philadelphia: W.B. Saunders, 1994:1169.

21. Whitby EH, Griffiths PD, Rutter S et al. Frequency and natural history of subdural haemorrhages in babies and relation to obstetric factors. *Lancet*, 2004; 8:363:846-851.

22. Chamnanvanakif S, Rollins N, Perlman JM, Subdural hematoma in term infants, *Pediatric Neurology*, 2002;

23. Rensburg, SJ van, Zyl J van, Hon D et al. Biochemical Model for Inflammation of the Brain: the effect of iron and transferrin on moncytes and lipid peroxidation. *Metabolic Brain Disease*, 2004; 19(1/2):97-112.

24. Allen, M.B., Cockwell, P, and Page, R.L., Pulmonary and cutaneous vasculitis following hepatitis B vaccination. *Thorax*, 1993; 48:580-581.

25. Cockwell, P., Allen, M.B., and Page, R. Vasculitis related to hepatitis B vaccine, *British Medical Journal*, 1990; 301 (6763), 1281.

26. Drucker, Y., Prayson, R.A., Bagg, A, and Calabresc, L.H. Lymphocytic vasculitis presenting as diffuse subcutaneous edema after hepatitis B vaccine. *Journal of Clinical Rheumatology*, 1997; 3(3):158-161.

27. Kerleau, J.M., Levesque, H., Lair, G. Lecomte, F. Carrara, O, and Courtois, H. Is hepatitis vaccination a new cause of necrotizing vasculitis? (letter), Rev. Med. Interne. 1997; 18(6):491-492.

28. Lohiya, G. Asthma and urticaria after hepatitis B vaccination, *Western Journal of Medicine*, 1987; 147: 341.

29. Grezard, P., Chefai, M., Philoppot, V., Perrot, H. and Faisant, M. Cutaneous lupus erythematosus and buccal apthtosis following hepatitis B vaccination in a six year-old boy. *Annals of Dermatology and Venereology*, 1996; 123(10):657-659.

Harold E. Buttram, MD, F A A E M

Updated: December 10, 2008

Updated October 5, 2009

# Curriculum Vitae

## Name

HAROLD E. BUTTRAM, M.D., F.A.A.E.M.

## Current Position – Retired Since January 1, 2008

1974-January 1, 2008   Family Physician, Private Practice
5724 Clymer Rd, Quakertown, PA 18951
(215) 536-1890   Fax: (215) 529-9034
Email: hbuttram@woodmed.com

## Personal

| | |
|---|---|
| Date of Birth: | 26 Nov 1925 |
| Place of Birth: | Oklahoma City, OK |
| SSN: | 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 |
| Marital Status: | Married (Virginia) |
| Home Residence: | Blooming Glen, PA |

## Specialty

Family Practice
Environmental Medicine

## Certification

05/31/1989- present   Diplomate, International Board of Environmental Medicine
ID# 30

Oct, 03 – Dec, 04   Diplomate (Grandfathered), American Board of Clinical Metal
Toxicology – now inactive

## State Licenses

09/26/1969-
12/31/2006   Commonwealth of Pennsylvania State Board of Medicine
#MD 011389-E

## Hospital Affiliations

1970-1974   Grandview Hospital, Active Staff
General Medical and Obstetrical Privileges
Voluntary resignation (no longer doing obstetrics, the only
active participation in staff membership)

| | |
|---|---|
| 1998-January 1, 2008 | Lehigh Valley Hospital<br>Department of Family Practice, Affiliate Staff |

## Education and Training

| | |
|---|---|
| 1946-1950 | Undergraduate Education:<br>Texas Western College, Texas<br>*Bachelor of Arts Degree in Psychology* |
| 1954-1958 | Professional Education:<br>University of Oklahoma School of Medicine<br>Oklahoma, OK<br>*Doctor of Medicine* |

## Internship and Residency

| | |
|---|---|
| 07/1/58-6/30/59 | Rotating Internship<br>Parkland Memorial Hospital/ Dallas County Hospital |
| 07/1/59-6/30/60 | Internal Medicine Residency, PGY1<br>Parkland Memorial Hospital/ Dallas County Hospital |
| 07/01/60-06/30/61 | Internal Medicine/Nephrology Fellowship, PGY2<br>University of Texas Southwestern Medical Center, Dallas |
| 07/1/61/6/30/62 | Internal Medicine Residency, PGY3<br>Baylor University Medical Center |

## Continuing Medical Education Summary

| | |
|---|---|
| 1994 | 29 Hours of Category I ACCME Approved |
| 1995 | 20 Hours Non designated |
| 1996 | 57 Hours of Category I ACCME Approved |
| 1997 | 112.5 Hours of Category I ACCME Approved |
| 1998 | 77 Hours of Category I ACCME Approved |
| 1999 | 72 Hours of Category I ACCME Approved |
| 2000 | 72 Hours of Category I ACCME Approved |
| 2001 | 121 Hours of Category I ACCME Approved |
| 2002 | 63.5 Hours of Category I ACCME Approved |
| 2003 | 72 Hours of Category I ACCME Approved |
| 2004 | 72 Hours of Category I ACCME Approved |
| 2004 | 3 Hours CME in patient Safety/Risk Management |
| 2005 | 8.5 hours CME in patient Safety/Risk |
| 2005 | Management<br>77 hours of Category I ACCME Approved |
| 2006 | 16 hours CME in patient Safety/Risk Management |
| 2006 | 5 hour CME in Legal Medicine |
| 2006 | 67.5 hours CME Category I ACCME Approved |

## Military Assignments

| | |
|---|---|
| 12/50-12/52 | Corpsman<br>U.S. Army Medical Corp |

2

## Previous Positions

| | |
|---|---|
| 1962-1966 | Private Practice, Internal Medicine<br>Richardson, TX |
| 1966-1970 | Private Practice, General Internal Medicine and Obstetrics<br>Portales, New Mexico |
| 1970-present | Private Practice, Family Practice and Environmental Medicine<br>Quakertown, Pennsylvania |

## Appointments and Positions

| | |
|---|---|
| 11/96 -present | Humanitarian Society, Quakertown, PA |

## Membership in Professional Organizations

| | |
|---|---|
| 1985-present | Fellow, American Academy of Environmental Medicine<br>(AAEM) |

## Community Service

| | |
|---|---|
| March, 2003-present | Estimated 500 hours of pro bono medical-legal work in defense of parents or caretakers whom I believed to have been falsely accused of Shaken Baby Syndrome/non-accidental trauma |

**Pennsylvania Medical Society Plaque:** Awarded at a Bucks County Medical Society meeting in early 2008 following my retirement which stated:

"Fifty Years of Medical Service, faithfully performed in the traditional ideals of the medical profession."

## Publications and Presentations

| | |
|---|---|
| 1980 | *Freedom of Choice in the Healing Arts,*<br>Humanitarian Publishing Co. |
| 1982 | *Today's Health Movement and the Future of America*<br>Humanitarian Publishing Co. |
| 1983 | *Vaccinations and Immune Malfunction*<br>Humanitarian Publishing Co. |
| 1987 | *Vaccinations and Immune Malfunction*<br>Section IV, Chpt VaccIM, in *A Textbook of Natural Medicine*<br>Joseph Pizzorno ND & Michael Murray, ND, Editors<br>*John Bastyr College Publications, 1987* |
| 1990 | *For Tomorrow's Children, A Manual for Future Parents*<br>Preconception Care, Inc |
| 1996 | Contributing author to *It's Only Natural*<br>Humanitarian Publishing Co |
| 1996 | *Our Toxic World, Who Is Looking After Our Kids?* |

3

2001        Foresight America Foundation for Preconception Care.
            *"Vaccine Scene 2001 Update and Overview"*
            *Townsend Letter for Doctors and Patients, June, 2001*
            *"Shaken Baby Syndrome or Vaccine Induced Encephalitis"*
            *Medical Sentinel, Fall, 2001*
            *"Shaken Baby Syndrome or Vaccine Induced Encephalitis?   The Story of Baby Allen"*

2002        *The Journal of Degenerative Diseases, July 1, 2001*
            *"An Appeal for Clean Air in the Workplace"*

2002        *Townsend Letter, August/September, 2002*
            *"Are Vaccines Sowing Seeds of Genetic Change?"*

2003        *Philosophical Publishing Co.*
            *"Shaken Baby Syndrome or Vaccine-induced Encephalitis?"*

2003        *Townsend Letter, October, 2003*
            *"Vaccines, Vitamin C Depletion, and Shaken Baby Syndrome",*
            *Redflagsdaily.com, Nicholas Regush Editor*

2003        *"Rules of Evidence in the Courts," Redflagsdaily.com*
            *Nicholas Regush Editor*

2004        *"Childhood Immunizations and Abrupt-Onset Apnea,"*
            *Redflagsdaily.com*

2004        *"Vaccine Scene, 2004 Update: Still MMR Vaccination, Mercury, and Aluminum," Medical Veritas,* April, 2004; 1(1):130-135

2004        *"Superficial and Misleading Critique." British Medical Journal, Letter-to-Editor,*        *October*        *5,*        *2004.*
            http://bmj.bmjjournals.com/cgi/eletters/325/7373/1134/a#7653

2004        *Presentation on Environmental Medicine,   Holistic Moms Network,   Natural Living Conference,* November 6, 2004, Fairfield, New Jersey

2004        *Presentation on Shaken Baby Syndrome, Missouri State Public Defender Workshop,* December 3, 2004, Lodge of Four Seasons on Lake of the Ozarks

2004        *"Vaccine Safety Tests: What Are They? Why Are They Needed? Why Are They Not Being Done?" Red Flags Daily.com*

2005        *"Vaccine Safety Tests: What Are They? Why Do We Need Them? Why Are They Not Being Done?" Vaccine Risk Awareness Network Inc (VRAN),* Spring/Summer 2005

2005        *Food Processing and Commercial Chemicals: Their Potential Effects on the Brain, Nervous system, and Psyche during Childhood,* zzzzzzzzzzzzzzzzzzzzzzlstitufrdLatitudes ONLINE, http://www.latitudes.org/membership/1/vol07/chemicals001.html, Dec. 27, 2005; Vol. 7, No. 1

4