Downloaded from bmj.com on 23 October 2008

Saturday 27 March 2004

# BMJ

---

# The evidence base for shaken baby syndrome

*We need to question the diagnostic criteria*

Editorial p 720
Clinical review p 754
Letters p 766
Personal view p 775

The phrase "shaken baby syndrome" evokes a powerful image of abuse, in which a carer shakes a child sufficiently hard to produce whiplash forces that result in subdural and retinal bleeding. The theory of shaken baby syndrome rests on core assumptions: shaking is always intentional and violent; the injury an infant receives from shaking is invariably severe; and subdural and retinal bleeding is the result of criminal abuse, unless proved otherwise.[1] These beliefs are reinforced by an interpretation of the literature by medical experts, which may on occasion be instrumental in a carer being convicted or children being removed from their parents. But what is the evidence for the theory of shaken baby syndrome?

Retinal haemorrhage is one of the criteria used, and many doctors consider retinal haemorrhage with specific characteristics pathognomonic of shaking. However, in this issue Patrick Lantz et al examine that premise (p 754) and conclude that it "cannot be supported by objective scientific evidence."[2] Their study comes hard on the heels of a recently published review of the literature on shaken baby syndrome from 1966 to 1998, in which Mark Donohoe found the scientific evidence to support a diagnosis of shaken baby syndrome to be much less reliable than generally thought.[3]

Shaken baby syndrome is usually diagnosed on the basis of subdural and retinal haemorrhages in an infant or young child,[1] although the diagnostic criteria are not uniform, and it is not unusual for the diagnosis to be based on subdural or retinal haemorrhages alone."[1] The website of the American Academy of Ophthalmology states that if the retinal haemorrhages have specific characteristics "shaking injury can be diagnosed with confidence regardless of other circumstances."[4] Having reviewed the evidence base for the belief that perimacular folds with retinal haemorrhages are diagnostic of shaking, Lantz et al were able to find only two flawed case-control studies, much of the published work displaying "an absence of ... precise and reproducible case definition, and interpretations or conclusions that overstep the data."[2] Their conclusions are remarkably similar to those of Donohoe, who found that "the evidence for shaken baby syndrome appears analogous to an inverted pyramid, with a very small database (most of it poor quality original research, retrospective in nature, and without appropriate control groups) spreading to a broad body of somewhat divergent opinions."[3] His work entailed searching the literature, using the term "shaken baby syndrome" and then assessing the

methods of the articles retrieved, using the tools of evidence based inquiry. Reviewing the studies achieving the highest quality of evidence rating scores, Donohoe found that "there was inadequate scientific evidence to come to a firm conclusion on most aspects of causation, diagnosis, treatment, or any other matters," and identified "serious data gaps, flaws of logic, inconsistency of case definition."[3]

The conclusions of Lantz et al and of Donohoe make disturbing reading, because they reveal major shortcomings in the literature relating to a field in which the opportunity for scientific experimentation and controlled trials does not exist, but in which much may rest on interpretation of the medical evidence.[5]

If the concept of shaken baby syndrome is scientifically uncertain, we have a duty to re-examine the validity of other beliefs in the field of infant injury. The recent literature contains a number of publications that disprove traditional expert opinion in the field. A study of independently witnessed low level falls showed that such falls may prove fatal, causing both subdural and retinal bleeding.[6 w2] A biomechanical analysis validates that serious injury or death from a low level fall is possible and casts doubt on the idea that shaking can directly cause retinal or subdural haemorrhages.[7 w3] An important lucid interval may be present in an ultimately fatal head injury in an infant.[8] Neuropathological studies have shown that abused infants do not generally have severe traumatic brain injury and that the structural damage associated with death may be morphologically mild.[9 10] What is the relevance of the craniocervical injuries to corticospinal tracts, dorsal nerve roots, and so on that have been described?[10 11] We do not know. What is the force necessary to injure an infant's brain? Again, we do not know.

While most abused children indisputably show the signs of violence, not all do. No one would be surprised to learn that a fall from a two storey building or involvement in a high speed road traffic crash can cause retinal and subdural bleeding, but what is the minimum force required? "It is one thing clearly to state that a certain quantum of force is necessary to produce a subdural hematoma; it is quite another to use examples of obviously extreme force ... and then suggest that they constitute the minimum force necessary."[11]

Research in the area of injury to infants is difficult. Quality evidence may need to be based on finite element

---

 Additional references w1-w3 are on bmj.com

BMJ 2004;328:719-20

719

Downloaded from bmj.com on 23 October 2008

## Editorials

modelling from data on infants' skulls, brains, and neck structures, rather than living animals. Any studies on immature animal models, if performed, will need to be validated against the known mechanical properties of the human infant. Pending completion of such studies, the reviews by Lantz and Donohoe are a valuable contribution and provide a salutary check for anyone wishing to cite the literature in support of an opinion. Their criticisms of lack of case definition or proper controls can be levelled at the whole literature on child abuse. If the issues are much less certain than we have been taught to believe, then to admit uncertainty sometimes would be appropriate for experts. Doing so may make prosecution more difficult, but a natural desire to protect children should not lead anyone to proffer opinions unsupported by good quality science. We need to reconsider the diagnostic criteria, if not the existence, of shaken baby syndrome.

J F Geddes *retired (formerly reader in clinical neuropathology, Queen Mary, University of London)*

London (j.f.geddes@doctors.org.uk)

J Plunkett *forensic pathologist*

Regina Medical Center, 1175 Nininger Road, Hastings, MN 55033, USA

Competing interests: JFG and JP have given evidence in criminal cases at the request of both the prosecution and the defence.

1  American Academy of Pediatrics Committee on Child Abuse and Neglect. Shaken baby syndrome: rotational cranial injuries—technical report. *Pediatrics* 2001;108:206-10.
2  Lantz P, Sinai S, Stanton C, Weaver R. Perimacular retinal folds from childhood head trauma: Case report with critical appraisal of current literature. *BMJ* 2004;328:754-6.
3  Donohoe M. Evidence-based medicine and shaken baby syndrome. Part I: literature review, 1966-1998. *Am J Forensic Med Pathol* 2003;24:239-42.
4  American Academy of Ophthalmology. Shaken baby syndrome resources. www.aao.org/aao/education/library/shaken_baby.cfm (accessed 25 Feb 2004).
5  Milroy CM. Medical experts and the criminal courts. *BMJ* 2003;326:294-5.
6  Plunkett J. Fatal pediatric head injuries caused by short-distance falls. *Am J Forensic Med Pathol* 2001;22:1-12.
7  Ommaya AK, Goldsmith W, Thibault L. Biomechanics and neuropathology of adult and paediatric head injury. *Br J Neurosurg* 2002;16:220-42.
8  Denton S, Mileusnic D. Delayed sudden death in an infant following an accidental fall. *Am J Forensic Med Pathol* 2003;24:371-6.
9  Geddes JF, Hackshaw AK, Vowles GH, Nickols CD, Whitwell HL. Neuropathology of inflicted head injury in children. I. Patterns of brain damage. *Brain* 2001;124:1290-8.
10  Geddes JF, Vowles GH, Hackshaw AK, Nickols CD, Scott IS, Whitwell HL. Neuropathology of inflicted head injury in children. II. Microscopic brain injury in infants. *Brain* 2001;124:1299-306.
11  Shannon P, Smith CR, Deck J, Ang LC, Ho M, Becker L. Axonal injury and the neuropathology of shaken baby syndrome. *Acta Neuropathol* 1998;95:625-31.
12  People v Martinez, 51 P3d 1046 (2001) (R'hrg den. 2002) (cert. granted, 2002).

---

# Shaken baby syndrome

*Pathological diagnosis rests on the combined triad, not on individual injuries*

Shaken baby syndrome is a form of physical non-accidental injury to infants, characterised by acute encephalopathy with subdural and retinal haemorrhages, occurring in a context of inappropriate or inconsistent history and commonly accompanied by other apparently inflicted injuries.[1] [2] Injuries to the neck and spinal cord may also be present. Controversy surrounds the precise causation of the brain injury, the retinal and subdural haemorrhages, as well as the degree of force required and whether impact in addition to whiplash forces is needed.[1] [3] [4] Although most discussion has concerned fatal injuries of this nature, not all are lethal, but they may be associated with subsequent neurological disability of varying severity.

Expert medical evidence about inflicted injury must have scientific validity, but applying the evidence based criteria appropriate to clinical practice entails some difficulties.[5] In clinical practice medical management of defined clinical problems can be compared and best practice distinguished by clinical outcomes. Conversely, in inflicted paediatric injuries, one is presented with the outcome, investigation follows rather than precedes that outcome, and the history may be incomplete or deliberately misleading. A need exists for an impartial and intelligent assessment, but how may this be achieved in practice?

Because of the serious implications of diagnosing inflicted injury such as shaken baby syndrome, every case must be evaluated in detail, taking account of all the circumstances surrounding the injury and considering the pathological features in full, rather than attempting to evaluate the significance of each component.

In shaken baby syndrome, it is the combined triad of subdural and retinal haemorrhage with brain damage, as well as the characteristics of each of these components that allow a reconstruction of the mechanism of injury, and assessment of the degree of force employed. The application of rotational acceleration and deceleration forces to the infant's head causes the brain to rotate in the skull. Abrupt deceleration allows continuing brain rotation until bridging veins are stretched and ruptured, causing a thin layer of subdural haemorrhage on the surface of the brain. This is not a space occupying lesion; its importance is in indicating the mechanism of injury. The retinal haemorrhages, which are characteristically extensive, occupy much of the circumference of the globe and extend through all the layers of the retina and similarly result from rotational acceleration and deceleration forces.

The mechanism of brain damage is problematic. Traditional wisdom has suggested shearing forces operating within the brain substance with consequent axonal damage.[6] Geddes et al, in a careful neuropathological study of head injuries in children using β amyloid precursor protein immunostaining, observed that the predominant changes in infants with evidence of shaking were hypoxic-ischaemic rather than the diffuse axonal injury seen in older children and adults with fatal head trauma.[7] [9] These authors thought that acceleration and deceleration forces might damage the neuraxis to cause apnoea, with consequent ischaemic insult causing diffuse cerebral oedema.

Unfortunately, this logical idea was followed in a second paper by the statement, "Although mechanisms of

Editorial p 719
Clinical review p 754
Letters p 766
Personal view p 775

*BMJ* 2004;328:720-1

ORIGINAL ARTICLE

*B 8*

# Case Analysis of Brain-Injured Admittedly Shaken Infants
## 54 Cases, 1969–2001

*Jan E. Leestma, MD, MM*

**Abstract:** The English-language medical case literature was searched for cases of apparent or alleged child abuse between the years 1969 and 2001. Three-hundred and twenty-four cases that contained detailed individual case information were analyzed yielding 54 cases in which someone was recorded as having admitted, in some fashion, to have shaken the injured baby. Individual case findings were tabulated and analyzed with respect to shaking as being the cause for the injuries reported. For all 54 admittedly-shaken-infant cases, the provided details regarding the shaking incidents and other events are reported. Data in the case reports varied widely with respect to important details. Only 11 cases of admittedly shaken babies showed no sign of cranial impact (apparently free-shaken). This small number of cases does not permit valid statistical analysis or support for many of the commonly stated aspects of the so-called shaken baby syndrome.

**Key Words:** shaken baby syndrome, child abuse, inflicted brain injury, retinal hemorrhage, pediatric head injury

(*Am J Forensic Med Pathol* 2005;26: 199–212)

In recent years, the term *battered baby* has given way to the term *shaken baby* as a label for infants or young children who have apparently suffered inflicted injuries at the hands of parents, caregivers, or others. The assertion is broadly held by many physicians that the physical act of shaking an infant may, by itself, cause serious or fatal injuries[1–4] but may be accompanied by impacts, referred to by some as the "shaken-impact" syndrome.[5] Some have maintained[3,6] that shaking and impact have essentially the same effect and produce "rotational" cranial injury by virtue of their individual or combined mechanical forces. The clinical findings in children younger than 2 years of age of subdural hematoma, cerebral edema and/or ischemia, retinal hemorrhages, retinal folds,

with or without subarachnoid hemorrhages, with or without evidence of cranial trauma are said to characterize the "shaken" baby. This constellation of findings is said not to occur with short falls, seizures, accidents, or other innocent events, rather are regarded by many as virtually diagnostic of the "shaken baby syndrome."[1–3,6] Currently, there are wide differences of opinion regarding the supposed syndrome within the medical and legal communities.

As a general principle, to discover possible causal mechanism(s)[3,6] behind any disease process it is common to select cases that unequivocally have the disease or condition in question and then study them in a variety of ways to discover common features and historical facts that might lead to a possible cause or causes for the condition. As is often the case, this undertaking initially involves a retrospective analysis, the analytical perils of which are well documented.[7] It is rarely sufficient for rigorous scientifically acceptable proof of causality to rely only upon retrospective case studies, which are very often little more than anecdotal reports; nevertheless, as a *starting point* this method has merit. Eventually, more rigorous methods must be employed to meet the standards of veracity for causality demanded by modern science. Experimental studies with appropriate controls and experimental design can provide support for, or invalidate, a causal theory. Other nonexperimental validation methods may fall under the rubric of "evidence-based medicine,"[7,8] which demands elimination of various forms of bias and error, the use of control groups, multiple independent studies, careful attention to data collection and analysis, and other often difficult, time-consuming, and expensive methods. Until there is sufficient scientifically rigorous support for a causal hypothesis and until all attempts at falsification of it have failed, the hypothesis must be regarded as unproven.[9] The so-called shaken baby syndrome is no exception to these requirements.

The goal of this study was to collect and analyze as many published alleged child-abuse cases in the English-language medical literature in which shaking may have been involved and to determine how many case reports recounted a confession or admission by a caregiver of having shaken the injured baby in some fashion. This fundamental selection criterion (shaking) was critical to evaluating conclusions

Manuscript received December 13, 2004; accepted January 10, 2005.

From the Department of Pathology, Children's Memorial Hospital, Chicago, Illinois.

Reprints: Jan E. Leestma, MD, MM, 1440 North Kingsbury Street, Suite 210, Chicago IL, 60622. E-mail: Jleestma@aol.com.

Copyright © 2005 by Lippincott Williams & Wilkins

ISSN: 0195-7910/05/2603-0199

DOI: 10.1097/01.paf.0000164228.79784.5a

Copyright © Lippincott Williams & Wilkins. Unauthorized reproduction of this article is prohibited.

*Leestma*                    *The American Journal of Forensic Medicine and Pathology • Volume 26, Number 3, September 2005*

regarding this alleged mode of injury and the features of the syndrome that are popularly accepted. Given an admission by someone of shaking in a case, the author then sought to determine what this population of children looked like in terms of the recounted shaking episode, clinical history, clinical findings, pathology, and outcome. The author sought to determine, if the case base supported or could support any of the conclusions widely held about the so-called shaken baby syndrome. Key among these were shaking causes intracranial brain injuries, subdural hemorrhages, retinal hemorrhages, retinal folds, and brain swelling; when a child is shaken vigorously, it becomes unconscious immediately, and the seriousness of its condition is obvious. If these assertions were true, it should be borne out in the statistical analysis of published cases, though there would still be concerns of validity because of the nature of the case study methods in the original publications.

## MATERIALS AND METHODS

The author reviewed the English-language peer-reviewed medical literature from 1969–2001, in which the title of the article or its implied subject matter dealt with the so-called shaken baby syndrome, "whiplash" shaking, inflicted cranial injury, etc. Articles were identified using a "branching" approach: searching cited articles in the most recent publications and working backward. MEDLINE and other computerized databases were also searched for citations possibly not quoted by known articles. A hard copy of every cited article identified was collected, reviewed, and analyzed by the author.

While there were hundreds of articles over the past 30-plus years that fitted the basic selection criteria, only those that included sufficient individual case data with respect to age, sex, and basic historical information, including clinical and pathologic findings, were selected for analysis. Regrettably, many articles relating to the "shaken baby syndrome" described cases in lumped table formats or statistical formats that did not permit individual case assessment or critical examination of the data and were therefore not incorporated into this analysis. A key element that was searched for was whether anyone was on record as having *admitted* to shaking the baby victim in any fashion, since this is the presumed independent variable of possible causality. Most commonly, articles listed their criteria for the label of "shaken baby" syndrome as having been based upon inference or presumptive evidence such as judgment of an individual or panel of child abuse experts, pathologists, social workers, ophthalmologists, emergency room physicians, radiologists, etc[10–15] but did not report what the perpetrator *actually did or confessed to.*

Case reports and series that did have sufficient individual case information were excerpted for a series of vital data that were reduced to tabular format for specific case categories. Case data were recorded and analyzed with the aid of the Statistical

**TABLE 1.** Tabular Listing of Clinical and Pathological Variables for the Entire 54 Admittedly Shaken Babies, the Cases of Hadley et al,[16] 41/54 Cases (Excepting the Hadley et al Cases), the 12 Admittedly Shaken Babies With Evidence of Cranial Impact, and the 11 Admittedly Shaken Babies Without Evidence of Impact to the Cranium

| Variable | Admittedly Shaken, No Impact, n = 11 | | Admittedly Shaken, With Impact, n = 12 | | Admittedly Shaken, Ex-Hadley et al Cases, n = 41 | | Apparently Shaken, Hadley et al, n = 13 | | The Admittedly "Shaken" Cases, n = 54 | |
|---|---|---|---|---|---|---|---|---|---|---|
| | Valid Cases, No./% | Incid, No./% | Valid Cases, No./% | Incid, No./% | Valid Cases, No./% | Incid, No./% | Valid Cases, No./% | Incid, No./% | Valid Cases, No./% | Incid, No./% |
| Age in months, mean | 10 (90.9) | 5.1 mo | 12 (100) | 9.3 mo | 40 (97.6) | 7.3 mo | 13 (100) | 5.7 mo | 53 (98.1) | 6.9 mo |
| Sex, M/F | 11 (100) | 3/8 | 12 (100) | 8/4 | 41 (100) | 21/20 | 13 (100) | 7/6 | 54 (100) | 28/26 |
| Consciousness | 11 (100) | | 11 (91.7) | | 34 (82.9) | | 13 (100) | | 47 (87) | |
| Normal | | 2 (18.2) | | 3 (27.3) | | 5 (14.7) | | 0 | | 5 (10.6) |
| Obtunded | | 4 (36.4) | | 1 (9.1) | | 6 (17.6) | | 7 (53.9) | | 13 (27.7) |
| Coma | | 5 (43.5) | | 7 (63.6) | | 23 (67.6) | | 6 (46.2) | | 29 (61.7) |
| Respiration | 8 (72.7) | | 6 (50) | | 22 (53.87) | | 0 | | 22 (40.7) | |
| Normal | | 4 (50) | | | | 4 (18.2) | | | | 4 (18.2) |
| Distress | | 2 (25) | | 2 (33.3) | | 10 (45.5) | | | | 10 (45.5) |
| Apnea | | 2 (25) | | 4 (66.7) | | 8 (36.4) | | | | 8 (36.4) |
| | | | | | | | | | | *(continued)* |

*© 2005 Lippincott Williams & Wilkins*

Copyright © Lippincott Williams & Wilkins. Unauthorized reproduction of this article is prohibited.

Case 3:14-cv-00047-TJC-PDB   Document 10-7   Filed 06/06/14   Page 5 of 40 PageID 702

TABLE 1. (continued) Tabular Listing of Clinical and Pathological Variables for the Entire 54 Admittedly Shaken Babies, the Cases of Hadley et al,[16] 41/54 Cases (Excepting the Hadley et al Cases), the 12 Admittedly Shaken Babies With Evidence of Cranial Impact, and the 11 Admittedly Shaken Babies Without Evidence of Impact to the Cranium

| Variable | Admittedly Shaken, No Impact n = 11 | | Admittedly Shaken, With Impact n = 12 | | Admittedly Shaken, Ex-Hadley et al Cases n = 41 | | Apparently Shaken, Hadley et al n = 13 | | The Admittedly "Shaken" Cases n = 54 | |
|---|---|---|---|---|---|---|---|---|---|---|
| | Valid Cases, No./% | Incid., No./% | Valid Cases, No./% | Incid., No./% | Valid Cases, No./% | Incid., No./% | Valid Cases, No./% | Incid., No./% | Valid Cases, No./% | Incid., No./% |
| Vomiting | 7 (63.6) | 2 (28.6) | 2 (16.7) | 0 | 11 (26.8) | 4 (36.4) | 0 | | 11 (20.4) | 4 (36.4) |
| Seizures | 8 (72.7) | 5 (62.5) | 5 (41.7) | 5 (100) | 21 (51.2) | 17 (81) | 13 (100) | 13 (100) | 34 (63) | 30 (88.2) |
| Symptoms | 4 (36.4) | | 4 (33.3) | | 12 (29.3) | | 0 | | 12 (22.2) | |
| Immediate | | 0 | | 2 (50) | | 2 (16.7) | | | | 2 (16.7) |
| Hour/hours | | 1 (25) | | 1 (25) | | 3 (25) | | | | 3 (25) |
| Day | | 2 (50) | | | | 3 (25) | | | | 3 (25) |
| Days | | 1 (25) | | 1 (25) | | 3 (25) | | | | 3 (25) |
| Month | | | | | | 1 (8.3) | | | | 1 (8.3) |
| Retinal hemorr. | 9 (81.8) | 9 (100) | 9 (75) | 9 (100) | 33 (80.5) | 33 (100) | 13 (100) | 13 (100) | 46 (85.2) | 46 (100) |
| Vitreous hemorr. | 3 (27.3) | 3 (100) | 4 (33.3) | 4 | 10 (24.4) | 10 (100) | 0 | | 10 (18.5) | 10 |
| Retinal fold | 1 (9.1) | 1 | 2 (16.7) | 1 | 2 (4.9) | 2 | 0 | | 2 (3.7) | 2 |
| Retinal detachment | | | 1 (8.3) | | 3 (7.3) | 1 | 0 | | 3 (5.6) | 3 |
| Papilledema | 1 (9.1) | | | | 1 (2.4) | 1 | 0 | | 1 (1.9) | 1 |
| Acute SDH | 10 (90.9) | 6 (60) | 10 (83.3) | 8 (80) | 34 (82.9) | 26 (76.5) | 13 (100) | 13 (100) | 47 (87) | 39 (83) |
| Chronic SDH | 4 (36.4) | | 2 (16.7) | | 12 (29.3) | 4 (33.3) | 0 | | 6 (11.1) | 4 |
| Spinal EDH/SDH | 0 | | | | 0 | | 13 (100) | 12 (92.3) | 6 (11.1) | 5 |
| Spinal cord injury | | | 3 (25) | 3 | 0 | | 0 | 4 (66.7) | 6 (11.1) | 4 |
| Cerebral edema | 5 (45.5) | 3 (60) | 5 (41.7) | 4 | 15 (36.6) | 13 (86.7) | 13 (100) | 13 (100) | 15 (27.8) | 13 (86.7) |
| Subarach. hemorr. | 8 (72.7) | 6 (75) | 4 (33.3) | 3 (75) | 21 (51.2) | 18 (85.7) | 13 (100) | 13 (100) | 34 (63) | 28 (82.4) |
| Cerebral hemorr. | 7 (63.6) | 2 (28.6) | 1 (8.3) | 1 | 21 (51.2) | 12 (60) | 0 | | 33 (61.1) | 21 (63.6) |
| Cerebral vein/sinus thrombosis | 0 | | | | 2 (4.9) | 2 | 6 (46.2) | 0 | 2 (3.7) | 2 |
| Skull fracture | 11 (100) | 0 | 8 (66.7) | 6 (75) | 24 (58.5) | 6 (25) | 0 | | 30 (55.6) | 6 (20) |
| Scalp injury | 11 (100) | 0 | 8 (66.7) | 6 (75) | 21 (51.2) | 6 (28.6) | 0 | | 21 (38.9) | 6 (28.6) |
| Facial injury | 11 (100) | 0 | 10 (83.3) | 7 (70) | 23 (56.1) | 7 (30.4) | 0 | | 23 (42.6) | 7 (30.4) |
| Acute rib fracture(s) | 10 (90.9) | 1 (12.5) | 4 (33.3) | 2 | 16 (39) | 2 (12.5) | 0 | | 16 (29.6) | 2 (12.5) |
| Old rib fracture(s) | 8 (72.7) | 3 (27.3) | 4 (33.3) | | 14 (34.1) | 3 (21.4) | 0 | | 14 (25.9) | 3 (21.4) |
| Body injury | 11 (100) | 2 (20) | 7 (58.3) | 6 (85.7) | 25 (61) | 14 (56) | 0 | | 25 (46.3) | 14 (56) |
| Extremity injury | 10 (90.9) | | 5 (41.7) | 4 (80) | 20 (48.8) | 9 (45) | 6 (46.2) | | 20 (37) | 9 (45) |
| Head impact* | 11 (100) | 0 | 12 (100) | 12 | 30 (73.2) | 12 (40) | 0 | | 36 (66.7) | 12 (33.3) |
| History of abuse | 4 (36.4) | | 4 (33.3) | | 13 (31.7) | | 0 | | 13 (24.1) | |
| Prior | | 2 | | 4 | | 9 (69.3) | | | | 9 (69.2) |
| Subsequent | | 2 | | 0 | | 4 (30.8) | | 6 | | 4 (30.8) |
| History of sibling abuse | 1 (9.1) | 1 | 2 (16.7) | 2 | 7 (17.4) | 7 | 0 | | 7 (13) | 6 |
| Outcome | 11 (100) | | 12 (100) | | 41 (100) | | 13 (100) | | 54 (100) | |
| Alive | | 4 (36.4) | | 1 (8.3) | | 9 (22) | | 5 (38.5) | | 9 (16.7) |
| Alive/deficits | | 4 (36.4) | | 5 (41.6) | | 14 (34.2) | | 0 | | 19 (35.2) |
| Dead | | 3 (27.3) | | 6 (50) | | 18 (43.9) | | 8 (61.5) | | 26 (48.1) |

Valid cases are those in which pro or con information was provided in the case reports for that variable and which can be used for computations. When a value for a variable was not provided, the case was considered "missing" for that variable and was not included for computations. Incidence percentages were not computed when the number of cases was considered too small since the result might be misleading.
*Head impact: a computed variable (if scalp or facial injury or skull fracture was present, head impact was assumed).

© 2005 Lippincott Williams & Wilkins

Copyright © Lippincott Williams & Wilkins. Unauthorized reproduction of this article is prohibited.

*Leestma*          *The American Journal of Forensic Medicine and Pathology* • Volume 26, Number 3, September 2005

**TABLE 2.** Tabular Listing of 41/54 Cases (Excepting the Hadley et al[16] Cases) of Admittedly Shaken Babies Showing Individual Clinical and Pathological Findings

| Case Reference | Age in Months | Sex | Consciousness | Respiration | Vomiting | Seizure | Retinal Hemorrhage | Vitreous Hemorrhage | Retinal Fold | Retinal Detachment | Papilledema | Acute Subdural Hematoma |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Gutkelch[18] | 6.0 | M | O | D | 0 | + | ? | ? | ? | ? | ? | + |
| Gutkelch[18] | 6.0 | M | ? | ? | + | + | + | ? | ? | ? | ? | + |
| Mushin[20] | 3.5 | M | O | ? | ? | + | + | + | ? | ? | ? | + |
| Caffey[4] | 0.4 | F | ? | D | ? | ? | + | + | ? | ? | ? | + |
| Caffey | 2.8 | F | O | D | ? | ? | ? | ? | ? | ? | ? | + |
| Oliver[25] | 3.0 | F | C | N | ? | + | + | ? | ? | ? | ? | + |
| Oliver[25] | 3.5 | M | C | ? | ? | + | + | ? | ? | ? | ? | ? |
| Ellison[27] | 2.5 | M | O | D | ? | ? | ? | ? | ? | ? | ? | ? |
| Bennett[28] | 15 | F | C | ? | ? | ? | + | ? | ? | ? | ? | 0 |
| Carter[32] | 4.0 | M | N | N | + | + | + | + | ? | ? | ? | + |
| Carter[32] | 4.0 | M | C | A | 0 | 0 | ? | ? | ? | ? | ? | ? |
| Carter[32] | 4.0 | F | C | ? | ? | + | + | + | ? | + | ? | + |
| Bensted[33] | 2.0 | F | C | ? | ? | + | + | + | ? | ? | ? | + |
| Bensted[33] | 5.0 | F | C | ? | ? | + | + | ? | ? | ? | ? | + |
| Bensted[33] | 9.0 | M | C | N | ? | + | + | ? | ? | ? | ? | 0 |
| Frank[34] | 3.0 | F | C | N | 0 | + | + | + | ? | ? | ? | 0 |
| Frank[34] | 1.3 | F | O | N | 0 | 0 | ? | ? | ? | ? | ? | 0 |
| Frank[34] | 4.0 | F | C | N | 0 | 0 | ? | ? | ? | ? | ? | 0 |
| Eagan[35] | 11.0 | F | C | A | 0 | 0 | + | + | ? | ? | ? | + |
| Eagan[35] | 10 | M | N | D | ? | 0 | ? | ? | ? | ? | ? | + |
| Greenwald[37] | 2.0 | M | N | A | ? | ? | + | + | ? | ? | + | + |
| Greenwald[37] | 8.0 | M | C | ? | ? | ? | + | + | ? | ? | + | ? |
| Lambert[38] | 13 | F | C | ? | + | + | + | + | ? | + | + | + |
| Duhaime[41] | 3.0 | M | C | ? | ? | ? | ? | ? | ? | ? | ? | + |
| Duhaime[41] | 24 | M | C | ? | ? | ? | ? | + | ? | ? | ? | + |
| Duhaime[41] | 19 | F | C | ? | ? | + | + | ? | ? | ? | ? | ? |
| Spaide[49] | 1.5 | F | ? | ? | ? | ? | + | + | + | ? | ? | ? |
| Massicotte[52] | 9.0 | F | C | A | ? | ? | + | + | + | + | ? | ? |
| Zepp[33] | 3.5 | F | C | D | ? | ? | + | ? | ? | ? | ? | 0 |
| Zepp[33] | 4.0 | M | C | D | ? | ? | + | + | ? | ? | ? | + |
| Haseler[60] | 5.6 | F | C | A | ? | ? | + | ? | ? | ? | ? | + |
| Becker[62] | 3.0 | M | C | ? | ? | ? | ? | + | ? | ? | ? | + |
| Becker[62] | 3.0 | M | O | D | + | ? | ? | + | ? | ? | ? | + |
| Becker[62] | ? | F | O | ? | ? | ? | ? | ? | ? | ? | ? | ? |
| Kivlin[67] | 29 | F | C | ? | ? | ? | + | + | + | + | ? | + |
| Kleinman[48] | 4.0 | M | C | A | ? | ? | + | ? | + | ? | ? | + |
| Kleinman[48] | 5.0 | M | C | A | ? | ? | + | + | ? | ? | ? | ? |

*(continued)*

F indicates female; M, male. Variables (+, present; 0, absent; ?, unknown or missing): consciousness (C, coma; N, normal; O, obtunded/lethargic); respiration (A, apnea; N, normal; D, distress; N, normal); outcome (A, alive and well; AI, alive but neurologically impaired; D, dead).

© 2005 Lippincott Williams & Wilkins

Copyright © Lippincott Williams & Wilkins. Unauthorized reproduction of this article is prohibited.

The American Journal of Forensic Medicine and Pathology • Volume 26, Number 3, September 2005 Brain-Injured Shaken Infants

TABLE 2. (continued) Tabular Listing of 41/54 Cases (Excepting the Hadley et al[16] Cases) of Admittedly Shaken Babies Showing Individual Clinical and Pathological Findings

| Case Reference | Chronic Subdural Hematoma | Cerebral Edema | Subarachnoid Hemorrhage | Cerebral Hemorrhage | Skull Fracture | Scalp Injury | Facial Injury | Recent Rib Fracture(s) | Body Injuries | Extremity Injuries | Outcome |
|---|---|---|---|---|---|---|---|---|---|---|---|
| Gutkelch[18] | ? | ? | ? | + | 0 | 0 | 0 | 0 | 0 | 0 | D |
| Gutkelch[18] | ? | ? | ? | ? | 0 | ? | 0 | ? | 0 | ? | D |
| Mushin[20] | ? | ? | + | + | 0 | 0 | 0 | ? | + | ? | D |
| Caffey[4] | ? | ? | + | ? | 0 | 0 | 0 | ? | + | ? | D |
| Caffey | ? | ? | + | 0 | 0 | 0 | 0 | ? | 0 | + | D |
| Oliver[25] | ? | ? | ? | ? | + | 0 | ? | ? | ? | ? | AI |
| Oliver[25] | ? | ? | + | ? | 0 | 0 | ? | ? | ? | + | AI |
| Ellison[27] | ? | + | ? | + | 0 | ? | + | + | + | ? | AW |
| Bennett[28] | 0 | + | 0 | ? | 0 | ? | 0 | ? | 0 | ? | AW |
| Carter[32] | ? | + | 0 | ? | 0 | 0 | 0 | 0 | 0 | 0 | AW |
| Carter[32] | ? | ? | ? | 0 | 0 | 0 | 0 | 0 | 0 | 0 | AI |
| Carter[32] | ? | ? | + | + | 0 | ? | ? | ? | ? | ? | AI |
| Bensted[33] | ? | ? | ? | ? | 0 | ? | ? | ? | 0 | 0 | D |
| Bensted[33] | ? | ? | + | + | 0 | ? | 0 | ? | + | ? | D |
| Bensted[33] | 0 | ? | ? | 0 | 0 | ? | ? | ? | + | + | D |
| Frank[34] | 0 | ? | + | + | 0 | 0 | 0 | 0 | 0 | 0 | AI |
| Frank[34] | 0 | ? | 0 | ? | 0 | 0 | 0 | 0 | 0 | 0 | AI |
| Frank[34] | + | ? | ? | 0 | 0 | 0 | 0 | 0 | 0 | ? | AI |
| Eagan[35] | ? | ? | + | ? | 0 | ? | ? | ? | ? | 0 | AW |
| Eagan[35] | ? | + | ? | + | 0 | ? | 0 | ? | 0 | ? | D |
| Greenwald[37] | ? | ? | ? | ? | 0 | ? | ? | ? | 0 | 0 | AW |
| Greenwald[37] | 0 | ? | ? | + | 0 | ? | ? | ? | 0 | + | AI |
| Lambert[18] | ? | + | + | + | ? | + | 0 | 0 | + | ? | D |
| Duhaime[41] | ? | + | ? | + | ? | ? | ? | ? | ? | ? | D |
| Duhaime[41] | ? | + | 0 | ? | ? | + | ? | ? | ? | ? | D |
| Duhaime[41] | ? | ? | + | + | + | + | ? | ? | + | ? | AI |
| Spaide[49] | + | + | ? | + | + | + | + | + | + | + | D |
| Massicotte[52] | ? | + | ? | ? | ? | ? | ? | ? | ? | ? | AI |
| Zepp[53] | ? | + | + | ? | ? | ? | ? | 0 | ? | ? | AI |
| Zepp[53] | 0 | + | ? | + | ? | + | ? | 0 | 0 | + | AI |
| Haseler[60] | ? | + | ? | ? | ? | ? | 0 | ? | 0 | + | AW |
| Becker[62] | ? | + | ? | ? | ? | 0 | ? | ? | ? | 0 | D |
| Becker[62] | ? | + | ? | ? | 0 | + | 0 | 0 | 0 | 0 | D |
| Becker[62] | ? | ? | ? | + | ? | ? | + | ? | + | + | AW |
| Kivlin[67] | ? | + | + | ? | ? | ? | ? | ? | ? | ? | D |
| Kleinman[48] | ? | + | ? | ? | ? | ? | ? | 0 | 0 | ? | D |
| Kleinman[48] | ? | ? | ? | ? | 0 | 0 | ? | 0 | ? | + | D |

© 2005 Lippincott Williams & Wilkins

203

Copyright © Lippincott Williams & Wilkins. Unauthorized reproduction of this article is prohibited.

*Leestma*   *The American Journal of Forensic Medicine and Pathology* • Volume 26, Number 3, September 2005

Package for the Social Sciences (SPSS-PC) data analysis and statistical program package. The Pearson bivariate correlation methodology for rank-ordered variables was used within the SPSS-PC program. The data recorded included and analyzed, in addition to basic demographic data, details on what the presenting symptoms and signs were, time course of processes, a listing of injuries both internal and external of the nervous system, eyes, and other organs, and outcome.

The cases were subdivided into categories: (1) those cases where someone was reported to have admitted shaking the baby, regardless of circumstance and where there was no evidence of cranial impact (no skull fracture, no scalp or facial injuries recorded); (2) those cases where shaking was admitted and there was evidence of head impact reported; (3) the cases of Hadley et al,[16] in which shaking may or may not have occurred but in which spinal injury was thought to have occurred. All these data are reported in condensed table form (Table 1). A short, often verbatim, synopsis of each case of the injury circumstances in each of the 54 admitted shakings is presented, along with the other facts of the case, in Table 2. A correlation matrix for all variables that had significant bivariate correlations to at least the 0.05 level is presented in Table 3.

## RESULTS

Of the 324 cases extracted from 57 published papers between the years 1969 and 2001, 54 of the cases reported contained specific information that someone had shaken the victim in some manner, regardless of what else might or was admitted to have happened.[4,14,16–70] The cases with no admission of shaking (270 cases) were analyzed also but will be compared with the 54 cases and reported with correlations and conclusions in a separate publication. It should be stated that the majority of alleged "shaken baby" cases do not contain an actual admission on the part of a caregiver of having shaken the victim, rather that shaking was imputed, suspected, or "determined" in some manner.

With respect to the 54 admittedly shaken cases, there were 13 cases reported by Hadley et al,[16] which were analyzed separately and together with the remaining 41 cases. Of the 41 cases (ex, Hadley et al[16]) 11 cases apparently did not have evidence of cranial impact (no scalp or facial bruising by inspection (if the child survived) or by autopsy and no evidence of skull fracture). Twelve of the 41 did have evidence of cranial impact injury. Eighteen of the 41 cases did not have information provided in the case reports referable to the issue of cranial impact (invalid cases for this variable). The 13 cases of Hadley et al[16] were analyzed separately from the 41 cases because it could not be determined from the reports if, in fact, the child had actually been admittedly shaken. The manner of these case presentations and discussion was confusing and contradictory; thus, this author could not determine the veracity of the basic selection

criterion of shaking yet felt compelled to include these cases, if for no other reason than shaking was said to have been the cause of spinal injuries in this group of children. Comparisons between the groups and the entire 54 cases (including Hadley et al[16]) are presented in Table 1.

## Case Details for the 54 Admittedly Shaken Babies

### The Cases of Guthkelch (1971)[18]

In case 1, the mother said that the baby had had several "fits" and she feared he was going to choke, so she shook him several times to try to clear his throat, whereupon he went into convulsions. The mother admitted the possibility of innocent, though thoughtless, actions on the baby.

In case 2, the mother denied striking or beating the child but admitted she and her husband "might have" shaken the baby after he cried at night. Oval bruises matching finger pads were found on forearms of the baby.

### The Case of Mushin and Morgan (1971)[20]

In this case, the father admitted to strangling the baby with a blanket and then spent the remainder of the night shaking the baby in an attempt to revive him. Pharyngeal bruising and hemorrhages were noted at autopsy and "extensive" bruising, sites not specified, was noted as well.

### The Cases of Caffey (1974)[4]

In the case of baby "H," the information about the case strongly implies that the baby's nurse, who confessed to shaking most of the babies in her care, as well as performing other physical actions, such as pounding on the back, shook this baby. Autopsy was reported to show a liver laceration with hemorrhage, as well as intracranial injuries, as shown in Table 2. Apparently, no sign of external injury was noted. In the case of baby "K," specifics of the shaking were provided by the same nurse involved with baby "H." In this case, the nurse shook the baby until her head "bobbed" and she became faint because she did not drink her bottle. In this case, there was no sign of external trauma but intracranial injuries were present, as noted in Table 2.

### The Cases of Oliver (1975)[25]

In case 1, the mother admitted to shaking the baby, throwing it, and possibly swinging it against an object. There was a "long" delay between infliction of the injuries and when hospitalization occurred. The child had been having "fits" and had been refusing to eat. Skull fractures and other injuries were noted along with other details provided in Table 2. In case 2, the baby victim had been battered by the mother with blows of the fist and by shaking. There were bruises to arm and cheek, as well as scratches to chest and abdomen. Old rib fractures were also noted.

204

© *2005 Lippincott Williams & Wilkins*

Copyright © Lippincott Williams & Wilkins. Unauthorized reproduction of this article is prohibited.

*The American Journal of Forensic Medicine and Pathology* • Volume 26, Number 3, September 2005 *Brain-Injured Shaken Infants*

### The Case of Ellison et al (1978)[27]

In case 3, the father admitted that while shaking the baby, his head struck a hard surface. Generalized bruising was found with ecchymoses on buttocks, both forearms and frontal scalp. A coagulation profile was normal. There were skull fractures, multiple rib fractures, and evidence of recent and older long-bone injuries (Table 2).

### The Case of Bennett and French (1980)[28]

The child was admitted flaccid and in coma, with injuries noted in Table 2. During the hospital stay, nurses observed the father to violently shake the baby by her arms because she had not finished her lunch. The father admitted to shaking in this fashion on many prior occasions. Skull films showed widened sutures but no fracture, and other radiographs showed old fractures of long bones and clavicle.

### The Cases of Carter and McCormick (1983)[32]

In case 2, the mother of the baby admitted shaking the child to quiet its crying. There were multiple old rib fractures and other injuries as noted. In case 3, the child was said to have fallen off a bed 3 days prior to admission to hospital. The child at that time was limp but eventually recovered. Three days later, the child began having seizures. Examination revealed a bruise on the back and a scrape on the forehead but little else externally. There was a skull fracture and evidence of older long-bone injury, subdural hematoma, and retinal hemorrhages. Both parents admitted to having shaken the baby. In case 4, the father admitted to having violently shaken the baby during an apneic spell in an attempt to revive her. The child did not have fractures but had many bruises of the neck and abdomen, a minimal subdural hematoma, and retinal hemorrhages. The child was returned to the family. At 6 months of age, the child was readmitted to hospital with a hyphema of the right eye, fracture of the left radius, and bruising to the face. More details are found in Table 2.

### The Cases of Benstead (1983)[33]

In case 1, the child was admitted semiconscious with seizures and died. Four years after the child's death, a sibling was treated for a broken leg. At that time, the father was questioned again about the dead child and admitted to "viciously" shaking the child at the time. In case 2, the child had been irritable for the day prior to admission and had been crying inconsolably. There was a "scuff" mark across the right chest but no other external injury. Internally, there were hemorrhages in both psoas muscles and other retroperitoneal tissues. The father admitted to shaking the child during one of her "fits" to quiet him. In case 3, the child was admitted to hospital posturing and uncon-

scious. He had apparently been normal 2 hours before. The baby had a tiny bruise above the left eye and a bruise on the right upper arm. There was a sagittal sinus thrombosis found at autopsy. The mother admitted losing her temper and throwing the child across the room to a sofa and also admitted violently shaking the child. More details are found in Table 2.

### The Cases of Frank et al (1985)[34]

In case 1, the mother of the baby admitted to having violently shaken her. Papilledema may have been noted ("disc margins obscured by edema"). The injuries of the child are listed in Table 2. Studies indicated probable sagittal sinus/venous thrombosis. In case 2, the child was said to have fallen off a kitchen table, but later parents admitted to having shaken the baby because she cried. The child had apparently not lost consciousness after the shaking but by the next day was feeding poorly and developed focal seizures. No evidence of external trauma was found on admission. The child survived with brain atrophy and neurologic deficits. In case 4, the father admitted to shaking the baby because she annoyed him. The child was hospitalized with seizures. There were bilateral retinal hemorrhages; dilated retinal veins; scattered red, round, and raised papilla-like bleed foci in the retina, with scattered flame-shaped retinal hemorrhages with foci of pallor. CT scan showed subdural effusions. Apparently, the child was returned to the family but was readmitted at 10 months of age with a fractured femur. A sibling was also treated for abuse.

### The Cases of Eagan et al (1985)[35]

In case 1, the baby was admitted comatose and not breathing. The baby was said to have fallen from a couch to the floor and become unconscious. The child had been admitted several times in the past for traumatic incidents allegedly including several falls. The stepfather admitted he had shaken the child to waken her from a nap and then had slapped her. Two months later, the child was readmitted unresponsive. The stepfather admitted to spanking the child and "spinning her around," after which she became unconscious. In case 3, the father reported that the child was placed in an armless chair while he took a nap. The child may have fallen from the chair and had become lodged between 2 other pieces of furniture. On questioning, the father admitted to have shaken the child back and forth to calm him. The child had healing fractures of the left arm. Siblings showed evidence of abusive injuries. Table 2 contains more details.

### The Cases of Greenwald et al (1986)[37]

In case 2, the foster mother of the child admitted to shaking the baby in an attempt to stop seizures he was having. He had had seizures since age 4 months and may have been abused in his original home. After other injuries to the child,

Copyright © Lippincott Williams & Wilkins. Unauthorized reproduction of this article is prohibited.

Leestma                The American Journal of Forensic Medicine and Pathology • Volume 26, Number 3, September 2005

**TABLE 3.** Tabular Correlation Matrix Derived From Pearson Bivariate Correlation Computation for Variables That Had Statistically Significant Correlations to at Least the 0.05 Level Using SPSS-PC Statistical Program

| Variables | Age | Consciousness | Respiration | Seizure | Symptom Delay | Acute SDH | Chronic SDH | Spine Injury | Cord Injury | Cerebral Edema | SAH |
|---|---|---|---|---|---|---|---|---|---|---|---|
| Age | X | * | | | | | | | | | |
| Consciousness | * | X | | | | | | | | | |
| Respiration | | | X | | | | | | | | |
| Seizure | | | | X | | | | | | | |
| Symptom delay | | | | * | X | | # | | | | |
| Acute SDH | | | * | | | X | | | | * | |
| Chronic SDH | | | | | | | X | | | * | |
| Spine injury | | | | | | | | X | | | |
| Cord injury | | | | | | | | * | X | | |
| Cerebral edema | | | | * | * | | | | | X | |
| SAH | | | | | | * | | * | # | X | X |
| Brain hem. | | | | | | | | | | | |
| Skull fx | | | * | | | | | | | | |
| Acute rib fx | | | | | | | | | | | |
| Old rib fx | | | | | | | | | | | |
| Other fx | | | | | | | | | | | |
| Scalp injury | * | | | | | | | | | | |
| Face injury | | * | | | | | | | | | |
| Body injury | | | | | | | | | | | |
| Extremity injury | | | | | | | | | | | |
| Internal injury | | | | | | | | | | | |
| Head impact | | | | | | | | | | | |
| Outcome | | | | | | * | | | | | |

(continued)

*Indicates correlation significance to the 0.05 (2-tailed) level, and # indicates correlation significance to the 0.01 or better (2-tailed) level.
Fx indicates fracture; SAH, subarachnoid hemorrhage; SDH, subdural hematoma.
Definitions: Consciousness, level of consciousness at admission; respiration, respiratory status on admission; seizure, presence or absence of seizures on admission; symptom delay, time elapsed between incident and appearance of symptoms or hospitalization; head impact, computed variable positive if case had scalp hemorrhage, and/or facial bruising, and/or skull fracture; outcome, alive or dead.

© 2005 Lippincott Williams & Wilkins

Copyright © Lippincott Williams & Wilkins. Unauthorized reproduction of this article is prohibited.

*The American Journal of Forensic Medicine and Pathology* • Volume 26, Number 3, September 2005 *Brain-Injured Shaken Infants*

**TABLE 3.** (*continued*) Tabular Correlation Matrix Derived From Pearson Bivariate Correlation Computation for Variables That Had Statistically Significant Correlations to at Least the 0.05 Level Using SPSS-PC Statistical Program

| Variables | Brain Hem. | Skull Fx | Acute Rib Fx | Old Rib Fx | Other Fx | Scalp Injury | Face Injury | Body Injury | Extremity Injury | Internal Injury | Head Impact | Outcome |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Age | | | | | | | | | | | | |
| Consciousness | | | | | | | | | | | | |
| Respiration | | * | | | | | | | | | | # |
| Seizure | | | | | | | | * | | | | |
| Symptom delay | | | | | | # | | | | | | # |
| Acute SDH | | | | | | | | | | | | |
| Chronic SDH | | | | | | | | | | | | |
| Spine injury | | | | | | | | | | | | |
| Cord injury | | | | | | | | | | | | |
| Cerebral edema | | | | | | | | | | | | |
| SAH | X | | | | | | | | | # | | * |
| Brain hem. | X | X | | | | | | | | # | | |
| Skull fx | # | # | # | | # | # | # | | | | # | |
| Acute rib fx | | X | X | * | * | # | # | | | | # | |
| Old rib fx | | | * | X | X | | | | | | | |
| Other fx | | # | # | # | X | # | | | # | | # | |
| Scalp injury | * | | # | | | X | X | # | * | | # | * |
| Face injury | | | * | | # | # | X | X | # | | # | * |
| Body injury | | | | | | * | * | X | X | | * | |
| Extremity injury | | | | | | * | # | X | | * | | |
| Internal injury | # | # | | | | * | # | # | * | X | X | |
| Head impact | * | | | | | * | | * | | * | X | * |
| Outcome | * | # | | | | * | * | * | | | X | X |

© 2005 Lippincott Williams & Wilkins

Copyright © Lippincott Williams & Wilkins. Unauthorized reproduction of this article is prohibited.

*Leestma*          *The American Journal of Forensic Medicine and Pathology* • Volume 26, Number 3, September 2005

he was removed from the foster home and placed in another home. In case 5, the child was admitted apneic. CPR had been attempted by the father, and he had also shaken him in an attempt to revive him over a 10-minute period. The child had had prior apneic episodes. Subdural hematomas required repeated aspirations and shunts. The child was not examined by an ophthalmologist until 7 months of age. Table 2 contains more details.

### The Case of Lambert et al (1986)[38]

The baby had apparently been vomiting for 4 days prior to admission. The child's babysitter admitted shaking the child vigorously 4 days before admission. Examination showed ecchymoses over the sternum and other injuries as noted in Table 2. At autopsy papilledema was noted in one eye. The sternal injury was said to be consistent with 3–5 days' duration, as was the age of the subdural hematoma the child had.

### The Case of Alexander et al (1986)[39]

This 3 1/2-month-old boy had been irritable and "stiff," with shallow breathing. The father admitted "patting him, shaking him, and giving mouth-to-mouth resuscitation." The child had facial bruises, retinal hemorrhages, and bilateral subarachnoid and subdural hemorrhages but no fractures. Other details are found in Table 2.

### The Cases of Duhaime et al (1987)[41]

In case 3, the child apparently had a history of a fall or having been hit and admittedly shaken by someone (not specified). No apparent cranial impact was noted and no skull fracture seen. Apparently, no retinal hemorrhages were noted. Case 11 had a history of an apparent fall or having been hit and shaken by someone (not specified). Injuries are listed in Table 2. In case 13, the history was similar to both cases with an apparent fall and/or having been hit or shaken by someone (not specified). There were skull fractures, and other injuries were noted.

### The Case of Spaide et al (1990)[49]

This child may have fallen 6 weeks prior to admission from her crib to the floor. Subdural effusions were found on admission. The mother admitted that she shook the baby after she cried all day long and after, finally having fallen asleep, she was awakened by noises made by siblings and a church bell ringing. The mother lost her temper and was enraged and grabbed the baby and shook her. Other details are found in Table 2.

### The Case of Massicotte et al (1992)[52]

In case 2, the babysitter of the child said she had rolled off the couch and landed on her milk bottle or may have slipped while in the bathtub, hitting her head. The 12-year-old sitter later admitted to shaking the infant and throwing her to the floor. There were skull fractures and multiple injuries listed in Table 2. There were optic nerve sheath hemorrhages; both eyes had perimacular folds and hemorrhages to the ora serrata in the eyes.

### The Cases of Zepp et al (1992)[53]

In case 1, the child had apparently been healthy until the day before admission, when she appeared sleepy and refused food; the next morning, the child could not be aroused. Ultrasound imaging indicated intracranial bleeding and a possible lesion in the medulla. Other lesions are listed in Table 2. The parents admitted that he had vigorously shaken the baby. In case 2, the parents admitted to repetitively having shaken the baby because of crying. There were chest injuries. No apparent subdural hematoma was noted, though the brain was edematous and there was increased intracranial pressure and bilateral retinal and vitreous hemorrhages.

### The Case of Haseler et al (1997)[60]

In case 1, the child was said to have suffered a seizure after a 3-foot fall from a table, but one parent was reported to have witnessed the other parent severely shaking the infant. The child apparently was initially conscious but then went on to arrest. An MRI showed extradural and subdural collections, both of which eventually resolved without treatment. Table 2 contains further details.

### The Cases of Becker et al (1998)[62]

In case 1, the child was reported to have been crying inconsolably all day, with frantic sucking actions. In the evening, the father found the baby not breathing and slapped him on the back and tried mouth-to mouth resuscitation. He later admitted that he had "shaken the baby too much" during the incessant crying of the baby. No external signs of trauma were noted. Extensive intra- and preretinal bleeding was noted in both eyes. In case 2, the baby had several episodes of vomiting and making "strange noises." The mother admitted to shaking the child because she thought he was suffocating. She said she held the baby by the chest and shook him. The child became cyanotic but responded to mouth-to-mouth resuscitation but then had respiratory failure again. Apparently both parents had shaken the child. There were no external signs of trauma. The child had a leg fracture and other injuries. In case 4, the parents of the baby were worried because the child did not awaken. The mother then shook the baby several times. The child then awakened but then lost consciousness and had a seizure. The mother said that she could not imagine that her shaking was that violent and denied intent to harm the child. Table 2 contains further details.

### The Case of Kivlin (1999)[67]

This 29-month-old female was admitted in coma, with extensive bruising of the head, face, limbs, and trunk. The

© 2005 Lippincott Williams & Wilkins

Copyright © Lippincott Williams & Wilkins. Unauthorized reproduction of this article is prohibited.

*The American Journal of Forensic Medicine and Pathology* • Volume 26, Number 3, September 2005 Brain-Injured Shaken Infants

chest showed "loop-shaped" marks that were said to be pathognomonic for abuse. The wrists showed evidence of restraint injuries and many old burn marks. The baby's grandmother admitted to shaking the baby after being enraged at her resistance to toilet training and for swearing at her. The child apparently appeared dazed after the shaking and then fell down some stairs. The brain allegedly showed laceration of the corpus callosum. Little other information was provided (see Table 2). The eyes at autopsy showed evidence of retinal scarring and hemosiderin.

### The Cases of Hadley et al (1989)[16]

No specific incident data regarding shaking were provided, and there is doubt if shaking occurred (see Discussion below). The case data provided are summarized in Table 1. Of the 13 cases presented, only 6 had an autopsy performed. Very little data from the autopsies were provided, but it is said that none of the babies suffered a cranial impact. All of the infants had retinal hemorrhages, subdural hematomas, and presumed evidence of spinal injury.

### The Cases of Benzel and Hadden (1989)[47]

In case 5, a 9-month-old male allegedly fell from a bed. From the manner in which the information was provided in the paper, it appears that the baby's mother admitted shaking the baby in an attempt to revive it, possibly after the baby aspirated. This child apparently had no external injury but did have bilateral chronic subdural hematomas with an acute component on one side. It is not noted if the child had retinal hemorrhages. The child recovered with good neurologic status. In case 12, the baby was a 3-year-old female who experienced a seizure while eating and was shaken by a parent apparently after the child aspirated. The child had bilateral chronic subdural hematomas and apparently intraparenchymal brain hemorrhage. No mention is made of retinal hemorrhages. The child had multiple periosteal elevations in several long bones and burn on the flank. The child survived in a vegetative state. In case 19, the baby was a 6-month-old male who apparently choked while eating and was shaken by a parent in an attempt to revive it after aspiration. The child had a subarachnoid hemorrhage and facial bruises. No mention was made of retinal hemorrhages. The child survived but with poor neurologic status. Table 2 contains further details.

### The Cases of Kleinman et al[48]

In case 1, a 4-month-old male was admitted to the hospital in respiratory arrest with cerebral edema, probable subdural hematoma, retinal hemorrhages, and a healing tibial fracture. The baby died after 13 hours. There had been a previous admission with facial bruising. The father of the baby admitted that he held the baby in front of him and shook and squeezed him for 1 to 2 minutes. In case 2, a 5-month-old male was admitted in coma to the hospital after apparently suddenly stopping breathing. The father admitted shaking the baby in an attempt to revive him. The baby had retinal hemorrhages, interhemispheric subdural hematoma, intraventricular hemorrhage, and several healing skeletal fractures. More details are found in Table 2.

### Clinical and Pathologic Findings in the 54 Cases

The characteristics of all 54 cases, as well as the various subcategories (the "Hadley" cases, those with and without apparent impact to the head) are tabulated in Table 1. The youngest case was about 2 weeks of age, and the oldest was 3 years of age. The average age of the 54 infants was 6.9 months, with the nonimpacted babies appearing to be younger than those with evidence of cranial impact. The male/female ratio was nearly equal. About 10% of shaken babies were apparently conscious at the time of admission and/or were never unconscious. The majority of shaken babies had respiratory difficulty or apnea on admission, but 18% did not. Seizures before, at, or after admission were very common (88%). For the 12 having actual pro or con (valid cases) information about the time course of development of symptoms, about 17% of babies apparently became ill proximate to the event, but delays of symptom appearance were very common (over 80% of cases). For the 46 cases in which some information was reported concerning retinal hemorrhages, all of these had some degree of retinal hemorrhaging in 1 eye or both eyes. There were 10 valid cases of vitreous hemorrhage, and all had this lesion; in the remainder no information was provided. There were only 2 cases reported with retinal folds and 3 cases with retinal detachments. Only 1 case was reported to have papilledema, but no data on this point were provided for the other 53 cases.

Information about acute subdural hemorrhage, unilateral or in multiple sites, was reported for 47 of 54 cases, and 83% of the cases valid for this variable had a subdural hemorrhage. Chronic subdural hematoma information was provided for 12 cases, but only 4 of these had this lesion. Comparatively little information was provided in the 54 cases concerning spinal skeletal or soft tissue or spinal cord injury (only 6, essentially the "Hadley" cases) in which 2 of 3 had some form of spinal trauma. Data about cerebral edema was provided for only 15 of 54 cases, but 87% of these cases had it in some form. Subarachnoid hemorrhage was reported in >80% of the 34 cases where information existed. Hemorrhage said to have been present in the brain tissue (so-called contusions) occurred in about the same percentage of valid cases. Cerebral venous/sagittal sinus thrombosis was rarely reported (only 2 cases). Skull fracture occurred in 6 of 30 valid cases for this variable. Similar occurrences of facial and scalp bruising were observed. Some form of head impact was found in 12 of the 36 valid cases for this "computed" variable. Recent rib fractures were present in 2 of 16 valid

Copyright © Lippincott Williams & Wilkins. Unauthorized reproduction of this article is prohibited.

*Leestma*          *The American Journal of Forensic Medicine and Pathology* • Volume 26, Number 3, September 2005

cases, and older rib fractures were present in 3 of 14 valid cases for this variable. Injury to the trunk was present in 14 of the 25 valid cases for this variable, and fracture or soft-tissue injury to an extremity or extremities was present in 9 of 20 valid cases. Chronic abuse was noted in all the 13 valid cases for this variable, and sibling abuse was noted in 6 of the 7 cases where information was provided. Twenty-six infants died (48% mortality rate), 9 infants were alive and apparently well, but 19 (35%) were alive but had neurologic deficits of varying severity.

The corresponding data on the other groupings of cases are found in Table 1. An overview of the "shaken without apparent impact" (11 cases) and the "shaken with head impact" cases (12 cases) reveals that the nonimpact group appeared to be younger than the impacted group. They also presented with fewer and less serious clinical symptoms than the impacted group. The distribution of retinal pathology in impact versus nonimpact shaken babies is not very different. It should be noted that no retinal folds were found in the nonimpact babies and that the only cases with this pathology had evidence of head impact, but there were only 2 valid cases listed. Acute subdural hematomas were probably more common in the impacted babies than in the nonimpacted babies. The mortality rate for nonimpacted shaken babies was 27% as compared with 50% for impacted babies. Apparently, no observation of spinal injury or cord injury was noted in any of the non–"Hadley" cases. The individual clinical and pathologic findings for all 54 cases can be found in Table 2.

### Statistical Correlations

The age of the baby correlated significantly to the 0.05 level with the state of consciousness at admission, meaning that lower levels of consciousness were more likely the older the baby was. Furthermore, a lower level of consciousness correlated with the presence of trunk trauma, as did the presence of rib fractures (old and new), evidence of scalp, face, and internal injuries, and a poor outcome. Scalp injury was most likely to be observed visually or at autopsy in the older rather than in the younger babies ($<0.01$). Respiratory difficulty on admission correlated (0.05 level) with the presence of an acute subdural hematoma and a skull fracture. In addition, acute subdural hematoma correlated with the likelihood of hemorrhage in the brain substance and a poorer outcome. Other correlations with brain tissue hemorrhage were scalp hematoma, poor outcome, and evidence of internal visceral injuries ($<0.01$ level). Seizures correlated with the presence of cerebral edema but not with any other variable. Cerebral edema correlated with delay in the appearance of symptoms (0.05 level) and with the appearance of seizures, as did the presence of a chronic subdural hematoma ($<0.01$ level). Subarachnoid hemorrhage was correlated with spine injury (0.05 level) and with spinal cord injury ($<0.01$ level). Since the "computed" variable, head impact, was computed

out of evidence for any 1 or more of facial bruising, scalp bruising, skull fracture, each component variable correlated highly with the "computed" variable. Poor outcome appeared to be most dependent on the level of consciousness at admission and the presence of an acute subdural hematoma ($<0.01$ level), and the presence of hemorrhage in the brain, scalp, trunk, and with internal injuries (0.05 level). No statistical correlations with any variable could be obtained for any category of ocular or orbital pathology. These data are found in Table 3.

## DISCUSSION

The number of reported apparently or supposedly shaken babies in the literature until about the year 2001 is not precisely known, but the 324 cases forming this series are in keeping with the estimated number indexed by other authors.[8,70] The fundamental question addressed by this study involved whether case literature on the broad subject of abusively head-injured babies supports or can support the widely held views that shaking of an infant causes a constellation of injuries that when identified are probative for shaking having occurred and that to some, retinal hemorrhages and certain other intraocular pathologies are by themselves diagnostic, or virtually so, of the infant having been shaken and that once shaking has occurred, the infant becomes ill almost immediately; thus, the adult who is present when a child decompensates and has certain clinical findings (elaborated above) is regarded as having inflicted the injuries upon the baby in his/her care.[71]

It should be evident from the foregoing data described in the text and in tables, that case-based information on allegedly "shaken" infants is often scanty or missing, highly variable in the manner reported, and not systematic in details provided. The case selection methodology employed in most articles is inconsistent, often arbitrary, and, individually or collectively of insufficient numbers to permit robust statistical analysis, much less declarative supportable statements of how certain injuries are supposed to have occurred. It is well recognized that in most child-abuse cases, little, if any, information is ever provided by the alleged abuser as to what he/she did, inherently making any case study on allegedly "shaken" babies very difficult to perform at the outset. These deficiencies have been pointed out before by Donohoe.[8] Even when there is an admission on the part of a caregiver, however complete or truthful the admission is can rarely be known with certainty.[72] Usually, very little information regarding the specifics of an abusive episode are ever elicited and almost never reported in detail in the literature. Thus, it is painfully apparent that the crucial selection criterion, that the baby was shaken, is rarely obtained and is usually lacking in details of what else might have occurred. It should also be obvious how difficult it would be to assemble a significant

© 2005 Lippincott Williams & Wilkins

Copyright © Lippincott Williams & Wilkins. Unauthorized reproduction of this article is prohibited.

Case 3:14-cv-00047-TJC-PDB   Document 10-7   Filed 06/06/14   Page 15 of 40 PageID 712

body of case reports upon which to show highly specific causal relationships to the trauma or injuries observed.

It appears that there may only be 11 cases in over 30 years of published case reports that may actually meet the criterion of "shaken-only" injured infants. Eight of these babies survived and 3 died; thus, it may never be known what the full extent of injuries, including possible cranial impact and neck injuries, existed in these 8 for lack of an autopsy. It may be worth noting that this group of infants was younger than those with known cranial impacts. It may be that the younger infants had more malleable skulls than the older babies and thus were less likely to display scalp bruising, even if they suffered a head impact, than those infants with more ossified skulls. It also appears that none of these 11 babies had neck injuries and that, whatever happened to these infants, it was less serious than in those infants who suffered known cranial impacts. Neck injuries were reported only in the cases of Hadley et al[16] and not in any of the others. This raises the issue of possible missed spinal injury in allegedly shaken infants, as well as the inability at clinical examination to identify possible cord injury in a comatose, nonbreathing infant. With respect to retinal pathology, the number of valid cases is simply too small to permit conclusions to be made regarding any form of retinal pathology and the phenomenon of shaking forces. Furthermore, if the 11 cases of "shaking only" are valid, it is obvious that delays in appearance of symptoms do occur and are more likely than the immediate appearance of symptoms following the shaking incident(s).

Owing to a paucity of collateral information in the cases examined, it cannot be conclusively known which injuries occurred because of inflicted or accidental physical forces or by underlying or secondary disease processes, an issue that is rarely addressed in the "shaken baby" literature. Furthermore, because many potentially causal variables for pathologies and clinical findings observed exist in alleged abuse cases, given the nature of the case report literature it is impossible to determine with scientific rigor what role shaking might play in abusive head injury in the face of obvious impact injuries. It is also not possible from this case analysis to infer that any particular form of intracranial or intraocular pathology is causally related to shaking; rather, it appears that most of the pathologies in allegedly shaken babies are due to impact injuries to the head and body, regardless of what came before.

## REFERENCES

1. Kairys SW, Alexander RC, Block RW, Everett VD, Hymel KP, Jenny C, for the American Academy of Pediatrics Committee on Child Abuse and Neglect. Shaken baby syndrome: rotational cranial injuries: technical report (T0039). *Pediatrics*. 2001;108:206–210.
2. Alexander R, Crabbe L, Sato Y, et al. Incidence of impact trauma with cranial injuries ascribed to shaking. *Am J Dis Child*. 1990;144:724–726.
3. Case ME, Graham MA, Handy TC, et al. Position paper on fatal abusive head injuries in infants and young children. *Am J Forensic Med Pathol*. 2001;22:112–122.
4. Caffey J. The whiplash shaken infant syndrome: manual shaking by the extremities with whiplash-induced intracranial and intraocular bleedings, linked with residual permanent brain damage and mental retardation. *Pediatrics*. 1974;54:396–403.
5. Bruce DA, Zimmerman RA. Shaken impact syndrome. *Pediatr Ann*. 1989;18:482–491.
6. Spivack BS. Biomechanics of abusive head trauma. In: Lazoritz S, Palusci VJ, eds. *The Shaken Baby Syndrome: A Multidisciplinary Approach*. Binghamton, NY: The Haworth Maltreatment & Trauma Press; 2001:55–78.
7. Greenhalgh T. *How to Read a Paper: The Basics of Evidence Based Medicine*. London: BMJ Publishing Group; 1997.
8. Donohoe M. Evidence-based medicine and shaken baby syndrome, part I: literature review 1966–1998. *Am J Forensic Med Pathol*. 2003;29: 239–242.
9. Foster KR, Huber PW. *Judging Science: Scientific Knowledge and the Federal Courts*. Cambridge, MA: MIT Press; 1997.
10. Reece RM. Controversies in shaken baby/shaken impact syndrome. In: Lazoritz S, Palusci VJ, eds. *The Shaken Baby Syndrome: A Multidisciplinary Approach*. Binghamton, NY: The Haworth Maltreatment & Trauma Press; 2001:367–388.
11. Alexander R, Crabbe L, Sato Y, et al. Serial abuse in children who are shaken. *Am J Dis Child*. 1990;144:58–60.
12. Chadwick DL. Preparation for court testimony in child abuse cases. *Ped Clin N Am*. 1990;37:955–971.
13. DiScala C, Sege R, Guohua Li, et al. Child abuse and unintentional injuries: a 10 year retrospective. *Arch Pediatr Adolesc Med*. 2000;154: 16–22.
14. D'Lugoff MI, Baker DJ. Case study: shaken baby syndrome: one disorder with two victims. *Public Health Nurs*. 1984;15:243–249.
15. Eagan BA, Whelan-Williams S, Brooks WG Jr. The abuse of infants by manual shaking: medical, social and legal issues. *Florida MA*. 1985;72: 503–507.
16. Hadley MN, Sonntag VKH, Rekate HL, et al. The infant whiplash-shake injury syndrome: a clinical and pathological study. *Neurosurgery*. 1989; 24:536–540.
17. Swischuk LE. Spine and spinal cord trauma in the battered child syndrome. *Radiology*. 1969;92:733–738.
18. Guthkelch AN. Infantile subdural haematoma and its relationship to whiplash injuries. *BMJ*. 1971;2:430–431.
19. Mushin AS. Ocular damage in the battered-baby syndrome. *BMJ*. 1971;14:402–404.
20. Mushin A, Morgan G. Ocular injury in the battered baby syndrome: report of two cases. *Br J Ophthalmol*. 1971;55:343–347.
21. Harcourt B, Hopkins D. Ophthalmic manifestations of the battered-baby syndrome. *BMJ*. 1971;3:398–401.
22. Friendly DS. Ocular manifestations of physical child abuse. *Trans Am Acad Ophthalmol Otol*. 1971;75:318–332.
23. Jensen AD, Smith RE, Olson MI. Ocular clues to child abuse. *J Pediatr*. 1971;8:270–272.
24. Guarnaschelli J, Lee J, Pitts FW. "Fallen fontanelle" (Caida de Mollera): a variant of the battered child syndrome. *JAMA*. 1972;222:1545–1546.
25. Oliver JE. Microcephaly following baby battering and shaking. *BMJ*. 1975;2:262–264.
26. Weidenthal DT, Levin DB. Retinal detachment in a battered infant. *Am J Ophthalmol*. 1976;81:725–727.
27. Ellison PH, Tsai FY, Largent JA. Computed tomography in child abuse and cerebral contusion. *Pediatrics*. 1978;62:151–154.
28. Bennett HS, French JH. Elevated intracranial pressure in whiplash-shaken infant syndrome detected with normal computerized tomography. *Clin Pediatr*. 1980;19:633–634.
29. Ober RR. Hemorrhagic retinopathy in infancy: a clinicopathologic report. *J Pediatr Ophthalmol Strabismus*. 1980;17:17–20.
30. San Martin R, Steinkuller PG, Nisbet MR. Retinopathy in the sexually abuse battered child. *Ann Ophthalmol*. 1981;13:89–91.
31. Ment LR, Duncan CC, Rowe DS. Central nervous system manifestations of child abuse. *Conn J Med*. 1982;46:315–318.
32. Carter JE, McCormick AQ. Whiplash shaking syndrome: retinal hemorrhages and computerized axial tomography of the brain. *Child Abuse Negl*. 1983;7:279–286.

© 2005 Lippincott Williams & Wilkins

Copyright © Lippincott Williams & Wilkins. Unauthorized reproduction of this article is prohibited.

Case 3:14-cv-00047-TJC-PDB   Document 10-7   Filed 06/06/14   Page 16 of 40 PageID 713

33. Benstead JG. Shaking as a culpable cause of subdural haemorrhage in infants. *Med Sci Law.* 1983;23:242–244.
34. Frank Y, Zimmerman R, Leeds NMD. Neurological manifestation in abused children who have been shaken. *Dev Med Child Neurol.* 1985; 27:312–316.
35. Eagan BA, Whelan-Williams S, Brooks SG Jr. The abuse of infants by manual shaking: medical, social and legal issues. *J Florida Med Assoc.* 1985;72:503–5-7.
36. Giangiacomo J, Barkett KJ. Opthalmoscopic findings in occult child abuse. *J Pediatr Ophthalmol Strabimus.* 1985;22:234–237.
37. Greenwald MJ, Weiss A. Oestlerle CS, et al. Traumatic retinoschisis in battered babies. *Ophthalmology.* 1986;93:618–625.
38. Lambert SR, Johnson TE, Hoyt CS. Optic nerve sheath and retinal hemorrhages associated with the shaken baby syndrome. *Arch Ophthalmol.* 1986;104:1509–1512.
39. Alexander RC, Schor DP, Smith WL. Magnetic resonance imaging of intracranial injuries from child abuse. *J Pediatr.* 1986;109:975–979.
40. Spaide RF. Shaken baby syndrome: ocular and computed tomographic findings. *J Clin Neuroophthalmol.* 1987;7:108–111.
41. Duhaime A-C, Gennarelli TA, Thibault LE, et al. The shaken baby syndrome: a clinical, pathological, and biomechanical study. *J Neurosurg.* 1987;66:409–415.
42. Sinal SH, Ball MA. Head trauma due to child abuse: serial computerized tomography in diagnosis and management. *South Med J.* 1987;80:1505–1512.
43. Giangiacomo J, Khan JA, Levine C, et al. Sequential cranial computed tomography in infants with retinal hemorrhages. *Ophthalmology.* 1988; 95:295–299.
44. Ganyon MW, Koh K, Marmor MF, et al. Retinal folds in the shaken baby syndrome. *Am J Ophthalmol.* 1988;106:423–425.
45. Rao N, Smith RE, Choi JH, et al. Autopsy findings in the eyes of fourteen fatally abused children. *Forensic Sci Int.* 1988;39:293–299.
46. Levin AV, Magnusson MR, Rafto SE, et al. Shaken baby syndrome diagnosed by magnetic resonance imaging. *Pediatr Emerg Care.* 1989; 5:181–186.
47. Benzel EC, Hadden TA. Neurologic manifestations of child abuse. *South Med J.* 1989;82:1347–1351.
48. Kleinman PK, Blackbourne BD, Marks SC, et al. Radiologic contributions to the investigation and prosecution of cases of fatal infant abuse. *N Engl J Med.* 1989;320:507–511.
49. Spaide RF, Swengel RM, Scharre DW, et al. Shaken baby syndrome. *Am Fam Physician.* 1990;41:1145–1153.
50. Elner SG, Elner VM, Arnall M, et al. Ocular and associated systemic findings in suspected child abuse: a necropsy study. *Arch Ophthalmol.* 1990;108:1094–1101.
51. Mehl AL. Shaken impact syndrome. *Child Abuse Negl.* 1990;14:603–605.
52. Massicotte SJ, Folberg R, Torczynski E, et al. Vitreoretinal traction and perimacular folds in the eyes of deliberately traumatized children. *Ophthalmology.* 1991;98:1124–1127.
53. Zepp F, Brühl K, Zimmer B, et al. Battered child syndrome: cerebral ultrasound and CT findings after vigorous shaking. *Neuropediatrics.* 1991;23:188–191.
54. Buys YM, Levin AV, Enzenauer RW, et al. Retinal findings after head trauma in infants and young children. *Ophthalmology.* 1992;99:1718–1723.
55. Spear RM, Chadwick D, Peterson BM. Fatalities associated with misinterpretation of blood cerebrospinal fluid in the "shaken baby syndrome." *Am J Dis Child.* 1992;146:1415–1417.
56. Hicks RA, Gaughan DC. Understanding fatal child abuse. *Child Abuse Negl.* 1995;17:855–863.
57. Sargent S, Kennedy JG, Kaplan JA. "Hyperacute" subdural hematoma: CT mimic of recurrent episodes of bleeding in the setting of child abuse. *J Forensic Sci.* 1996;41:314–316.
58. Lam CH, Montes J, Farmer J-P, et al. Traumatic aneurysm from shaken baby syndrome: case report. *Neurosurgery.* 1996;39:1252–1255.
59. Haviland J, Ross Russell RI. Outcome after severe non-accidental head injury. *Arch Dis Child.* 1997;77:504–507.
60. Haseler LJ, Arcinue E, Danielsen ER, et al. Evidence from proton magnetic resonance spectroscopy for a metabolic cascade of neuronal damage in shaken baby syndrome. *Pediatrics.* 1997;99:4–14.
61. Kapoor S, Schiffman J, Tang R, et al. The significance of white-centered retinal hemorrhages in the shaken baby syndrome. *Pediatr Emerg Care.* 1997;13:183–185.
62. Becker JC, Liersch R, Tautz C, et al. Shaken baby syndrome: report on four pairs of twins. *Child Abuse Negl.* 1998;22:931–937.
63. Hansen KK. Folk remedies and child abuse: a review with emphasis on *caida de mollera* and its relationship to shaken baby syndrome. *Child Abuse Negl.* 1998;22:117–127.
64. Fishman CD, Dahser WB III, Lambert SR. Electroretinographic findings in infants with the shaken baby syndrome. *Pediatr Ophthalmol Strabismus.* 1998;35:22–26.
65. Shannon P, Smith CR, Deck J, et al. Axonal injury and the neuropathology of shaken baby syndrome. *Acta Neuropathol.* 1998;95: 625–631.
66. Chabrol B, Decarie J-C, Fortin G. The role of cranial MRI in identifying patients suffering from child abuse and presenting with unexplained neurological findings. *Child Abuse Negl.* 1999;23:217–228.
67. Kivlin JD. A 12-year ophthalmologic experience with the shaken baby syndrome at a regional children's hospital. *Trans Am Ophthalmol Soc.* 1999;97:545–582.
68. Brown SM, Shami M. Optic disk neovascularization following severe retinoschisis due to shaken baby syndrome. *Arch Ophthalmol.* 1999;117: 838–839.
69. Gleckman AM, Evans RJ, Bell MD, et al. Optic nerve damage in shaken baby syndrome: detection by β-amyloid precursor protein immunohistochemistry. *Arch Pathol Lab Med.* 2000;124:251–256.
70. Taff ML, Boglioli LR, DeFelice JF. Commentary on: Controversies in shaken baby syndrome and on Gilliland MGF, Folberg R. Shaken babies: some have no impact injuries. *J Forensic Sci.* 1996;41:114–116. *J Forensic Sci.* 1996;41:729–730.
71. Nashelsky MB, Dix JD. The time interval between lethal infant shaking and onset of symptoms: a review of the shaken baby syndrome literature. *Am J Forensic Med Pathol.* 1995;16:154–157.
72. Conti RP. The psychology of false confessions. *J Credibility Assessment Witness Psychol.* 1999;2:14–36.

© 2005 Lippincott Williams & Wilkins

Copyright © Lippincott Williams & Wilkins. Unauthorized reproduction of this article is prohibited.





ELSEVIER

Available online at www.sciencedirect.com

SCIENCE @ DIRECT®

Forensic Science International 151 (2005) 71–79



Forensic
Science
International

www.elsevier.com/locate/forsciint

# Shaken baby syndrome: A biomechanics analysis of injury mechanisms

## Faris A. Bandak *

*Department of Neurology, A1036 F. Edward Hébert School of Medicine, Uniformed Services,
University of the Health Sciences, 4301 Jones Bridge Road, Bethesda, MD 20814, USA*

Received 2 November 2004; received in revised form 2 February 2005; accepted 8 February 2005

## Abstract

Traumatic infant shaking has been associated with the shaken baby syndrome (SBS) diagnosis without verification of the operative mechanisms of injury. Intensities for SBS have been expressed only in qualitative, unsubstantiated terms usually referring to acceleration/deceleration rotational injury and relating to falls from great heights onto hard surfaces or from severe motor vehicle crashes. We conducted an injury biomechanics analysis of the reported SBS levels of rotational velocity and acceleration of the head for their injury effects on the infant head–neck. Resulting forces were compared with experimental data on the structural failure limits of the cervical spine in several animal models as well as human neonate cadaver models. We have determined that an infant head subjected to the levels of rotational velocity and acceleration called for in the SBS literature, would experience forces on the infant neck far exceeding the limits for structural failure of the cervical spine. Furthermore, shaking cervical spine injury can occur at much lower levels of head velocity and acceleration than those reported for the SBS. These findings are consistent with the physical laws of injury biomechanics as well as our collective understanding of the fragile infant cervical spine from (1) clinical obstetric experience, (2) automotive medicine and crash safety experience, and (3) common parental experience. The findings are not, however, consistent with the current clinical SBS experience and are in stark contradiction with the reported rarity of cervical spine injury in children diagnosed with SBS. In light of the implications of these findings on child protection and their social and medico-legal significance, a re-evaluation of the current diagnostic criteria for the SBS and its application is suggested.
© 2005 Elsevier Ireland Ltd. All rights reserved.

*Keywords:* Injury; Infant; Shaken; Baby; Rotational; Acceleration/Deceleration; Syndrome; Neck

## 1. Introduction

Shaking an infant to the point of severe brain injury is usually associated in the literature with the diagnosis referred to as the shaken baby syndrome (SBS). Infant shaking is in fact a potentially very injurious mechanical event. Consequently, its analysis and assessment requires knowledge and training in *Injury Biomechanics*. This scien-

tific discipline deals with the mechanical damage processes and causations of injury. Therefore, Injury Biomechanics is central to the study of the mechanisms of injury in the SBS.

The current description of the SBS in the literature evolved over a period of nearly a half a century with some reports attributing its genesis to Caffey [1–3] a pediatric radiologist, who had the notion that an association between chronic subdural hematoma and long bone fracture in children should be a red flag for child abuse. Caffey's notion remained less known for about 10 years until he encountered the case of Virginia Jaspers, a nurse caretaker who confessed

* Tel.: +1 301 299 7357.
   *E-mail address:* fbandak@usuhs.mil.

0379-0738/$ – see front matter © 2005 Elsevier Ireland Ltd. All rights reserved.
doi:10.1016/j.forsciint.2005.02.033

*F.A. Bandak / Forensic Science International 151 (2005) 71–79*

Table 1
Head injuries in the infant vs. the adult

| Infant | Adult | Both |
|---|---|---|
| Deformation based | | |
| Tears in subcortical white matter | Epidural hematoma | Lesions in the corpus callosum and brain stem |
| Separation of a suture | Basilar skull fractures | Traumatic axonal injury |
| Suture-to-suture linear fractures | Diffuse axonal injury | Linear skull fractures |
| Ping pong fractures | | |
| Bilateral skull fractures | | |
| Pressure based | | |
| Coup hemorrhages | Coup and contre-coup hemorrhages | |
| Coup contusions | Coup and contre-coup contusions | |
| Coup acute subdural hematoma | | |
| Relative motion based | | |
| | | Acute subdural hematoma[a] |
| | | Localized intracranial hemorrhages[a] |

[a] Represents different biomechanisms for the infant and adult.

to shaking a 2-week-old infant who died. Jasper's confession is a legalistic characterization and thus did not provide scientific support for Caffey's notion but did help start the use of the SBS label in the literature. It is unclear from the literature that Caffey envisioned this label to evolve into the SBS diagnosis as seen and applied today.

Kempe [4] contributed to the current description of SBS by introducing the "Battered Child Syndrome" and the concept that inconsistency between clinical observations and reported event history should signal abuse. However, a fundamental element of the meaning behind accurate "history" has to do with the biomechanical causes of injury. Clearly, the assessment of the mechanical causation of injury requires training and experience in Injury Biomechanics, a distinct discipline not taught in medical school. Lack of education and experience in Injury Biomechanics, amongst other factors, has led in practice to the proliferation and propagation of inaccurate and sometimes erroneous information on SBS injury mechanisms in the literature.

Another factor was added by Guthkelch [5] who synthesized the accumulating SBS medical literature to conclude that it is possible to infer shaking without impact as a cause of injury when an infant presents with subdural hematoma and retinal hemorrhages. He did not conclude that only shaking could cause such injuries. At this point in its evolution, the SBS began to develop in the literature into the *injury causation signature* that is widely described and used today. More specifically, an infant presenting with, at a minimum, acute subdural hematoma (ASDH) and retinal hemorrhages with "inconsistent" or "un-explained" biomechanical history is commonly diagnosed with SBS. Such diagnosis puts the physician in the difficult position of evaluating injury causation to determine if the reported history is biomechanically "consistent" or "explainable" without the benefit or even availability of an Injury Biomechanics assessment.

In this study, we will present a biomechanics analysis of infant shaking and its consequences on the head-neck to determine if it is possible for the fragile infant neck to withstand SBS-defined levels of head accelerations without injury.

## 2. Biomechanical classification of head injury

The SBS diagnosis has been primarily linked to injuries of the head. Table 1 shows the types of head injuries occurring in infants and adults. Generally, head injuries can be classified in groups with similar biomechanical genesis (Fig. 1). Biomechanical forces acting on the head can be dynamic or static (Fig. 1) and since shaking is a dynamic event, static forces (Fig. 1) will not be discussed here. Dynamic head loadings are categorized as either contact or non-contact meaning direct loading to the head and head loading through the neck respectively. The mechanical features leading to a particular head injury or set of injuries distinguishing primary and secondary are shown in Fig. 1. Primary injuries are those caused directly by the mechanical insult and secondary injuries result as that part of the pathophysiological progression following primary injury. *The boundary between primary and secondary injury in SBS has not been clearly defined.*

Fig. 1 shows injuries that have been related in the literature to local intracranial brain motion, gross intracranial brain motion, or both. For instance, a direct impact to the head resulting from a fall on a flat surface produces a local indentation of the skull impinging on the brain and producing local brain deformations and pressures. Another consequence of the contact is the stopping of the moving head. The stopping force is communicated to the brain through a local path starting first with the area of contact on the scalp over the skull through the subarachnoidal cerebro-spinal fluid (CSF) layer surrounding the brain and eventually reaching the brain. The higher the fall, the faster, to a practical limit, the head impact velocity, and so the

F.A. Bandak / Forensic Science International 151 (2005) 71–79



Fig. 1. Biomechanical classification of head injuries.

greater and faster the stopping force transmission to the brain. Whole-brain movement is eventually stopped against higher intracranial coup pressure and lower contre-coup pressure. The extent of gross intracranial brain movement also depends on how much rotational energy is involved in the impact [6]. Forces on the head through the non-contact mechanism pass through the neck and therefore inherently have a rotational component though, practically, much lower peak accelerations and much longer durations are achievable through this type of loading. Theoretically, injuries associated with rotational head accelerations are common to both the contact and the non-contact categories (Fig. 1) if sufficient magnitudes and rates are reached. Head injuries from non-contact loading are producible through contact loading but the converse is generally not true.

The non-contact form of head loading has been the cornerstone of the Shaking Baby Syndrome definition. In its purest form the SBS, as described in the medical literature [7], represents rotational head accelerations from a sequence of mechanical events paraphrased as follows:

*An infant is gripped by the chest or shoulders and forcefully shaken back and forth whipping the head in the antero-posterior direction. The nearly non-existent muscle strength of the infant neck makes the head highly susceptible to high head-whipping rotational acceleration so severe that the brain moves relative to the interior surface of the skull resulting in torn bridging veins and so acute subdural hematoma.*

While SBS has taken on other labels in the literature adding or substituting terms like "whiplash" and "impact," it still maintains the shaking component as the central causation substratum of this diagnosis.

## 3. Biomechanical aspects of the infant anatomy

Discussion of infant shaking calls for a brief overview of the infant anatomy deemed relevant to the biomechanics of shaking. The head of the infant, weighing up to one third of the total body weight, is effectively a nearly unsupported mass. As a practical matter of common safety, caution is required of a caretaker when picking up or generally moving an infant. Caretakers must provide head support to compensate for the fragility, laxity, and the lack of infant neck muscle strength since it provides minimal resistance to any externally induced relative motion between the head and the thorax.

The massive-head and weak-neck attributes of the infant create the potential for severe neck injury under certain dynamic conditions. The flat, shallow, articular surfaces, cartilaginous nature, and incomplete ossification of the cervical vertebrae increases the potential for relative displacement between vertebrae and puts more burden on the weak infant cervical spine ligaments and on the infantile spinal cord. The neck as a whole, with the characteristics described above can stretch significantly beyond subluxation limits without ligamentous rupture. In addition, it can be stretched more than the spinal cord is able to accommodate [8] thus potentially injuring the spinal cord under distraction forces. Atlanto-axial and atlanto-occipital dislocation, dens fractures, and cord transections can occur from excessive stretch of the neck as has been reported for circumstances of breech extraction deliveries [9]. The infantile ligaments control the articulation and govern the mobility and range of motion of the cervical spine. These ligaments are vital to the stability of the atlanto-occipital joints governing the articulation at the cranio-vertebral junction. The cranio-vertebral junction houses the cervico-medullary portion of the spinal cord and thus presents a vulnerability to commonly fatal craniospinal injuries under serious traumatic excursions into the spinal canal. This canal is large in C1 compared to the segments below. It is occupied equally by the dens and the cord both taking up two thirds of the space with the remaining one third free space. Consequently, there is some room for the cord to move under atlanto-occipital displacement. However, displacements exceeding the available free space can injure the cord.

The chest of the infant is defined in the SBS literature as a possible grip area for the shaker. The infant's thin thoracic wall and the cartilaginous elastic nature of the ribs make the chest more vulnerable to large deformations and chest indentations which can cause injury and affect internal organs. The chest circumference is generally smaller (0.5 in. or so) than the head circumference at birth with its value reaching that of the head circumference at about 1 year of age. The neonatal chest is nearly circular and slowly becomes elliptical with age making it wider in the coronal plane at about 6 months of age. The location of the heart in an infant is of course different from that of the older child. It is located at the midpoint between the head and the buttocks and after the fourth year, the heart descends downward as the chest grows. The chest prepares biomechanically for this descent by becoming very bony with ossified ribs forming the protective rib cage, which also descends downward providing similar protection for the kidneys, the spleen, and other organs.

Integrated into the chest structure is the thoracic part of the vertebral column. The infant spinal column has a single curve composed of the thoracic, the cervical, and the lumbar portions of the column [10]. This important feature is relevant to the infant's biomechanical response to shaking versus that of the older child. The lower portion of the spinal column, referred to as the sacral region, forms another but smaller curve. The vertebral column eventually assumes the familiar S-shape as the skeletal structure develops and the pelvis tilts forward creating the thoraco-lumbar inflection point in the familiar S-shape.

## 4. Injury biomechanics analysis of infantile SBS

In order to evaluate the operative injury mechanisms in the brain of an infant under SBS-defined head acceleration,



Fig. 2. Several time-history snap shots of the head-neck during chest shaking.

F.A. Bandak / Forensic Science International 151 (2005) 71–79

75

we must obtain the loadings that actually reach the brain along the path starting at the grip points of the shaker's hands, through the thorax, spinal column, neck, and eventually the head. Fig. 2 shows, schematically, the back and forth head motion resulting from shaking. The grip forces act on the thorax and load the ribs. They are transmitted through the posterior joints connecting the ribs to the thoracic spinal column and so shake the column imposing that back-and-forth on the base of the cervical spine portion of the spinal column. The resulting forces enter the neck at C7. We did not address possible injury to any part of the body below C7 in this study. This conservative position was taken even though the required chest-shaking intensity of SBS can cause injuries in the infant below C7.

## 5. SBS head loading

We have necessarily described SBS in terms of head loading because the head has been central to the definition of the SBS injuries. Chest shaking forces reach the head through the neck starting at C7 and moving back and forth in wave fashion (Fig. 2) eventually reaching the cranio-vertebral junction. Along this path, the force acts on soft, flat, incompletely ossified vertebrae, and soft ligaments. The forces reach the cranio-vertebral junction and induce the infant skull to move back and forth with little resistance to pivot about the atlanto-occipital joint. The overall head motion is governed by the neck which significantly influences

the head trajectory and the center of rotation. In fact, the neck must completely bear the load that keeps the head and thorax from separating. For the infant, this type of chest-shaking head motion can be thought of as a kind of "dragging" motion where the neck, acting as a tether, pulls the unsuspecting head in response to the induced motion of the chest. This has not been described as the mechanism for SBS.

To understand what has been described in the literature for SBS accelerations, consider an illustrated example of a sphere with mass $m$ connected to a rod with length $r$ as shown in Fig. 3. If point $B$ starts to move in a straight line in the horizontal direction, a force from the rod will act on it to cause it to also move inwards in the radial direction resulting in the composite, familiar motion along a circular arc ultimately setting mass $m$ in rotation about point $A$. At any point along the arc, one can evaluate the acceleration of mass $m$. This acceleration has two main components, a tangential component (along the arc), $a_t$, and a normal (in the radial direction) component, $a_n$, as shown in Fig. 3. The figure shows that the mass is tending to escape the circular arc and go free but is constrained by the rod to move along the arc. Naturally then, the mass $m$ is exerting a force with components $F_n = ma_n$ and $F_t = ma_t$ on the rod. If for instance, the outward acceleration $a_n$ has a magnitude of 50 G and the value for mass is 1.36 kg, then the force acting on the rod is equal to 665 N (150 lbf). Clearly, the rod will give way if it is not strong enough to bear such a force. Under similar circumstances the neck experiences forces as the massive head is accelerated.



$a_n = v^2/r$      Normal acceleration (velocity squared over the radius)

$a_t = r \, (d^2\theta/dt^2)$      Tangential acceleration (radius times the angular acceleration)

$F = ma$      Newton's Second Law (mass times acceleration)

$F_n = ma_n$      Normal Force (distraction force)

$F_t = ma_t$      Tangential Force (shear force)

Fig. 3. Force diagram on (a) sphere and (b) head-neck schematically indicating rotational head motion about point A.

76                          *F.A. Bandak / Forensic Science International 151 (2005) 71–79*

The reported SBS back-and-forth head motion of this type along an arc produces an exchange between $a_n$ and $a_t$ in a periodic fashion reaching peaks at alternating times along the arc. Relating these to forces acting on the rod, we see that the rod has to resist forces tending to both stretch and bend it. While more complicated biomechanically, the actual shaking response of the infant head also imposes shear and tensile forces as well as compressive forces on the infant neck.

To evaluate the neck forces produced by SBS-type head accelerations, we considered the range of rotational head acceleration and velocity levels cited in the literature. Jenny and co-authors [11] attempting to show that higher accelerations can be achieved by human manual shaking reported that peak rotational accelerations of 6000–13,252 rad/s$^2$ and rotational velocities of 120–153 rad/s are possible through the manual human shaking of a dummy surrogate representing a Japanese infant. Spivack used the work of Duhaime et al. [12] relating rotational velocities of 50–120 rad/s and approximately 30,000-rad/s$^2$ rotational acceleration to SBS. SBS is cited in the literature as having forces that are as great as those of falls from great heights, by some accounts more than 9 m (30 ft), onto hard surfaces or from high-speed motor vehicle crashes [13]. These contentions of SBS load levels have not been substantiated biomechanically with some reports refuting their validity at all [12,14].

To illuminate and compare simplified head motion energies of familiar events such as car crashes, biking, walking, etc., with shaking, we calculated the free head velocity associated with each event as shown in Table 2. The table reflects conservative but realistic estimates of maximum free head velocity for each of the events. Ironically, the values show that shaking head velocity is less than the maximum free-fall velocity from height of 1 m (3(1/4) ft). This comparability of energies raises further questions concerning the forces reported for SBS and might account in part for the misconceptions and controversial views on the head injury severity of "short falls." The energy from velocity is called kinetic energy and we refer to it here as *unrealized* damage energy meaning it can be converted to potentially damaging energy through a rapid change in magnitude and/or direction. For the case of the infant head, this velocity change can come from the action of the neck on the head during chest shaking as we explained earlier or it can come from an impact action applying force directly on the head such as that from a fall. Table 2 shows the energies as multiples of units of failure energy where the failure energy was taken to be equal to the skull fracture energy in the infant. Skull fracture energy was chosen since skull fracture has been used as a conservative indicator of impact intracranial injury in infants [15,16].

A range of angular accelerations and velocities was taken to be between 5000 and 15,000 rad/s$^2$ for rotational acceleration and between 50 and 150 rad/s for rotational velocity. This range was chosen because it is conservatively representative of the *lower* values cited in the literature for SBS and reported to be below thresholds postulated in the SBS literature for subdural hemorrhages. The SBS forces were obtained and compared with the current biomechanical data related to infant injury thresholds.

## 6. Results and discussion

The shaken baby syndrome, as a diagnosis, has become virtually synonymous with inflicted cerebral trauma. The injury mechanisms of the SBS have historically not been linked to cervical spine injury even though its early evolution was bolstered by Caffey's [3] interpretation of Ommaya's whiplash work [17,18]. Caffey interpreted this work as a demonstration that brain injury could occur from head whipping by chest shaking without contact head impact. Caffey translated Ommaya's results without considering Injury Biomechanics, into an explanation for a confession of shaking.

The Ommaya whiplash animal model primarily addressed the primate head as an adequate surrogate for the adult human brain under the types of loading tested. While an argument can be made for this model substitution for the case of adult human head, the neck is another matter. Astonishingly, Caffey did not give consideration to the head-neck features of the primate model used to study whiplash. In fact, the animal model used had quite opposite whiplash-related features compared to the infant when the head-neck is concerned. Specifically, the rhesus monkey has a small,

Table 2
Head velocities and normalized failure energy associated with familiar dynamic events compared with shaking and falls

|  | Height (m) | Velocity (m/s) | Normalized impact energy (Nm/N) | 1.3 N head weight ($E_{SF}$)[a] | 2.3 N head weight ($E_{SF}$) |
|---|---|---|---|---|---|
| Free fall (30 ft) | 9.10 | 13.36 | 9.10 | 13.00 | 23.00 |
| Powered vehicles 48 km/h (30 mph) |  | 13.36 | 9.10 | 13.00 | 22.99 |
| Adult biking 32 km/h (20 mph) |  | 8.90 | 4.04 | 5.77 | 10.20 |
| Adult running 24 km/h (15 mph) |  | 6.70 | 2.29 | 3.27 | 5.78 |
| Toddler biking 16 km/h (10 mph) |  | 4.40 | 0.99 | 1.41 | 2.49 |
| Toddler running 9.7 km/h (6 mph) |  | 2.70 | 0.37 | 0.53 | 0.94 |
| Free fall (3 ft) | 0.91 | 4.09 | 0.85 | 1.22 | 2.15 |
| Shaking 11–15.5 km/h (6.8–9.5 mph; 10–14 ft/s) |  | 4.31 | 0.95 | 1.35 | 2.39 |

[a] $E_{SF}$ is the energy associated with skull fracture and so the column is in units of $E_{SF}$.

*F.A. Bandak / Forensic Science International 151 (2005) 71–79*

Table 3
Neck distraction forces vs. head weight and center of rotation

| Neck distraction force (N) | | | | | | |
|---|---|---|---|---|---|---|
| Head weight (kg) | 0.68 | | 1.34 | | 1.59 | |
| Neck length (cm) | 3.81 | 6.35 | 3.81 | 6.35 | 3.81 | 6.35 |
| Low end of reported SBS rotational acceleration range | 1027 | 1711 | 1711 | 2852 | 2395 | 3992 |
| High end of reported SBS rotational acceleration range | 9240 | 15399 | 15399 | 25665 | 21559 | 35931 |

relatively less massive, head on quite a strong neck while the infant on the other hand has a relatively more massive head on a floppy, weak, neck. Consequently, the infant neck is far more susceptible to whiplash injury than that of the rhesus monkey under the similar chest-shaking head accelerations. Nearly half of the concussed animals in Ommaya's [17]

whiplash experiments experienced cervical spine or brain stem injuries even with the disproportionately strong neck relative to the human infant.

Ommaya's experiments [17] as well as follow-up primate experiments by Ommaya's previous co-workers, Gennarelli and Thibault [19] supported a rotational acceleration



Fig. 4. SBS neck distraction force vs. (a) Structural failure of the cervical spine and (b) normalized to human neonate distraction failure data.

78                          *F.A. Bandak / Forensic Science International 151 (2005) 71–79*

mechanism for the generation of cranial subdural hematomas. This is the much-heralded differential rotational skull–brain motion mechanism that causes parasagittal bridging veins to rupture and thus hemorrhage below the dura. This mechanism was postulated for the adult head with a fully ossified, stiff, skull which plays a major role in its activation. It is important to note that the Gennarelli-Thibault experiments were conducted in a way that protected the neck from head whipping forces. In those experiments, the head of the primate was potted in a metal cylinder which was constrained to accelerate and then decelerate along a prescribed arc in a prescribed time frame. In this way, the neck was not subjected to the forces of the accelerated free head as it would be if the loadings were applied at the chest. This is precisely and erroneously the presumed SBS head motion where equivalent rotational accelerations of the infant human head were calculated by scaling this type of data. The important question when using the results of these experiments to interpret infant shaking injury is whether it is naturally possible for a free human head to reach such head accelerations through chest shaking without neck injury. This question was not addressed by those primate experiments nor has it been addressed quantitatively in the literature. It was addressed in this study for the case of infant shaking.

Our results for SBS head accelerations imposed for different head masses and centers of rotation (Table 3) representative of infants show that the resulting forces produce both distraction and localized hyper-flexion and hyper-extension forces on the infant neck and that these forces increase with increasing head mass. Therefore, it can be concluded that for the same acceleration and same neck size, a heavier head is more likely to produce a shaking neck injury.

Using a range of values for head mass and center of rotation for infants, and peak acceleration and peak velocity for SBS, we obtained neck distraction forces ranging from a lower bound of 1027 N to an upper bound of 35,910 N (Table 3). These values were compared with experiments on several animal species and on neonate cadavers as shown in Fig. 4. The experimental results show that the cervical spine becomes susceptible to severe injury at values as low as 209 N for the baboon at 3 years equivalent human age [20,21]. Fig. 4 shows failure values of 249 N for the infant goat neck [22] and 445 N for the human neonate neck [9]. It is important to note that these experimental values approximate force levels that would cause major structural failure of the cervical spine for each species. Serious cord injury or even transection can be expected to occur at even lower force levels [8]. The important observation here is the order of magnitude differences between what is reported in the SBS literature as necessary levels to cause injury and the actual magnitudes of the operative forces.

These force levels conservatively indicate that severe cervical spinal cord or brain stem injury in the infant can occur at significantly lower levels than invoked by the

current SBS literature as a cause of subdural hematomas. These results are quite consistent with the laxity and fragility of the infantile cervical spine and the lack of muscle strength of the neck. They are also consistent with the established experience that neck injury does not usually occur as a result of direct loading to the neck. The more common causes of neck injury are by action that involves the head. Whether by direct head impact induced accelerations, or head accelerations from indirect chest shaking, it is generally the forces on the head that transmit to neck injury forces. This is the essence of the term "whiplash" that is quite familiar to neck injury victims of rear-end motor vehicle crashes. Ironically, whiplash has been intrinsically embraced in the definition of the Shaken Baby Syndrome without reference at all to cervical spine injury.

## 7. Conclusions

This study resulted in the following findings:

1. Head acceleration and velocity levels commonly reported for SBS generate forces that are far too great for the infant neck to withstand without injury.
2. Head velocity from human manual shaking is of the same order as free fall head velocity from a height of about 1 m (approximately 3-ft).
3. Shaking head accelerations can potentially cause severe, if not lethal, cervical spinal cord or brain stem injury in the infant at levels *well below* those reported for the Shaking Baby Syndrome.
4. Given that cervical spine injury is reported to be a rare clinical finding in SBS cases, the results of this study indicate an SBS diagnosis in an infant with intracerebral but without cervical spine or brain stem injury is questionable and other causes of the intracerebral injury must be considered.
5. Re-consideration and clarification of the relative significance of each of the terms "shaking" and "impact" as used in the SBS diagnosis of cerebral trauma in an infant is warranted.
6. Cervical spine and/or brain stem injury should be included amongst the factors considered in the determination of consistency of reported history in cases where infant shaking is suspected. It should be kept in mind that such injury is not exclusive to shaking as the sole mechanical cause. Traumatic shaking is just one of the causes.
7. The rotational head acceleration mechanism for the intracerebral injuries of the SBS is inconsistent with the findings of this study. A non-impact, shaking-only, mechanism of primary intracerebral injury in an infant has not yet been described and requires further research. We have shown that infant shaking can cause primary brain stem or cervical spinal cord disruption which is known to lead to secondary intracerebral injury manifest-

ing as the familiar apneic presentation which is followed by hypoxic-ischemic response and cerebral edema.

In light of the findings of this study, re-evaluation of the present diagnostic criteria for the SBS merits serious attention for its implications on child protection and for the social and medicolegal significance of its application.

## References

[1] J. Caffey, Multiple fractures in the long bones of infants suffering from subdural hematoma, Am. J. Roentgen. 56 (1946) 163.

[2] J. Caffey, On the theory and practice of shaking infants: its potential residual effects of permanent brain damage and mental retardation, Am. J. Dis. Child. 124 (1972) 161.

[3] J. Caffey, The whiplash shaken infant syndrome: manual shaking by the extremities with whiplash- induced intracranial and intraocular bleedings, linked with residual permanent brain damage and mental retardation, Pediatrics 54 (1974) 396–403.

[4] C.H. Kempe, F.N. Silverman, R.F. Steele, W. Droegemueller, H.K. Silver, The battered child syndrome, JAMA 181 (1962) 17–24.

[5] A.N. Guthkelch, Infantile subdural hematoma and its relationship to whiplash injuries, Br. Med. J. 2 (1971) 430–431.

[6] F.A. Bandak, On the mechanics of impact neurotrauma: critical review and synthesis, In: Bandak et al., (Ed.), Traumatic Brain Injury: Bioscience and Mechanics, Mary Ann Liebert, 1996, pp. 139–153.

[7] American Academy of Pediatrics, Committee on child abuse and neglect, Shaken baby syndrome: Rotational cranial injuries – technical report, Pediatrics, 2001 108, 1, 206–210.

[8] W.E. Stern, R.W. Rand, Birth injuries to the spinal cord: report of two cases and review of the literature, Am. J. Obstet. Gynecol. 78 (1959) 498.

[9] M. Duncan, Laboratory note: on the tensile strength: a critical of the fresh adult fetus, Br. Med. J. 2 (1874) 763–764.

[10] W.H. Johnson, J.A. Kennedy, Radiographic Anatomy of the Human Skeleton, Williams and Wilkins, Baltimore, 1961.

[11] C. Jenny, T. Shams, N, Rangarajan, T. Fukuda, Injury Biomechanics Research, 30th International Workshop, Ponte Vedra Beach, Florida, 2002, pp. 129–143.

[12] A.-C. Duhaime, T.A. Gennarelli, L.E. Thibault, D.A. Bruce, S.S. Margulies, R. Wiser, The shaken baby syndrome: a clinical, pathological, and biomechanical study, J. Neurosurg. 66 (1987) 409–415.

[13] A.C. Duhaime, J. Alario, et al. Pediatrics 90 (1992) 179–185.

[14] M.T. Prange, B. Coats, A.C. Duhaime, S.S. Margulies, Anthropomorphic simulations of falls, shakes, and inflicted impacts in infants, J. Neurosurg. 99 (2003) 143–150.

[15] S.A. Schutzman, P. Barnes, A.-C. Duhaime, D. Greenes, C. Homer, D. Jaffe, R. Lewis, Evaluation and management of children younger than 2-years-old with apparently minor head trauma: proposed guidelines, Pediatrics 107 (5) (2001) 983–993.

[16] K. Quayle, D. Jaffe, N. Kupperman, B. Kaufman, B. Lee, T. Park, W. McAlister, Diagnostic testing of acute head injury in children: When are head computed tomography and skull radiographs indicated? Pediatrics 99 (5) (1997).

[17] A.K. Ommaya, F. Faas, P. Yarnell, Whiplash injury brain damage, JAMA 204 (1968) 285–289.

[18] A.K. Ommaya, P. Yarnell, Subdural hematoma after whiplash injury, Lancet (1969) 237.

[19] T.A. Gennarelli, L.E. Thibault, Biomechanics of acute subdural hematoma, J. Traum. 22 (1982) 680–686.

[20] D. Nuckley, M. Eck, S. Hersted, R. Mizra, R. Ching, Tensile mechanics of the developing baboon cervical spine, in: F.A. Bandak (Ed.), Injury Science Research Proceedings of the 28th International Workshop on Human Subject Biomechanics, Atlanta, Georgia, 2000, pp. 85–89.

[21] R. Ching, J. Nuckley, S. Hersted, M. Eck, P. Mann, Tensile mechanics of the developing cervical spine, Stapp. Car Crash. J. 45 (2001) 329–336.

[22] R. Mayer, P. Pintar, N. Yoganadan, Pediatric neck tensile strength characteristics using a caprine model, in: F.A. Bandak (Ed.), Injury Biomechanics Research, Proceedings of the 27th International Workshop on Human Subject Biomechanics, San Diego, California, 1999, pp. 87–92.

## Glossary

*Injury Biomechanics:* Biomechanics is the subset of the scientific discipline of Mechanics that deals with the forces, motions, deformations, ruptures, fractures, breaks, etc. of living tissue. The science of Biomechanics applies at the microscopic (cellular, sub-cellular, etc.) and the macroscopic (tissue, organ, full body, etc.) scales. Injury Biomechanics is the application of Biomechanics to the understanding of the causation and mechanism of injury.

*Normal:* in this case "normal" means in a direction perpendicular to the arc.

*G:* is the designated symbol for one unit of gravitational acceleration. On earth, the value of G is $32.2 \ ft/s^2$

*N:* refers to a Newton, the unit of force or weight.

*Rad:* is the symbol for radian, which, like degrees, is a measure of angle. Approximately 6 radians represents one revolution or 360 degrees. The actual value for one revolution is $2\pi$ radians where $\pi$ has an approximate value of 3.14.

*$E_{SF}$:* infant skull fracture energy.

Case 3:14-cv-00047-TJC-PDB   Document 10-7   Filed 06/06/14   Page 25 of 40 PageID 722

*Neurol Med Chir (Tokyo)* 46, 57~61, 2006



# Shaken Baby Syndrome: An Odyssey

Ronald H. USCINSKI

*Department of Neurosurgery, George Washington University Medical Center, Washington, D.C.,
U.S.A.; Department of Neurosurgery, Georgetown University Medical Center, Washington, D.C.,
U.S.A.; Potomac Institute for Policy Studies, Arlington, Virginia, U.S.A.*

## Abstract

Shaken baby syndrome is evaluated in the context of its historical evolution and its veracity in referring
to causal injury mechanisms. A rational assessment of the injury causation and consequent pathologi-
cal states associated with the syndrome is presented. It is now evident that shaken baby syndrome
evolved as a result of a faulty application of scientific reasoning and a lack of appreciation of
mechanisms of injury. A brief explanation of the commonly understood usage and interface of scientif-
ic methodology and reasoning as applied to clinical medicine is given.

Key words:  shaken baby syndrome,  injury biomechanics,  subdural hematoma

## Introduction

Shaken baby syndrome is characterized as a constel-
lation of clinical findings including subdural bleed-
ing, retinal hemorrhages, and associated fractures of
the extremities or ribs, with no external evidence of
cranial trauma. This widely proclaimed yet still
hypothetical supposition has become a virtually
unquestioned assumption nowadays as a modality
for causing inflicted intracranial injury in infants.
In 1997 the author was asked to review the case of a
child fatally injured supposedly by shaking, and in
doing so researched the entire body of literature
referencing the so-called "shaken baby syndrome."
This article is a product of that effort, and in a sense
represents an intellectual "odyssey."[15] The paper is
divided into three parts. The first places the syn-
drome in the historical perspective of the original
papers providing the initial description of shaken
baby syndrome. The second part gives a brief discus-
sion of the physical laws of motion governing injury
to relevant body structures, and encompasses a brief
overview of the known pathophysiology of certain
relevant forms of intracranial injury. The final
section discusses the methodology of scientific
reasoning and experimentation and its significance
in the context of the immediate subject of the
so-called inflicted shaking injury and the broader
context of observing and understanding phenomena
in our physical world.

## Historical Perspective

The quantity of articles dealing with shaking as a
putative mechanism for inflicting intracranial injury
in infants has increased significantly since the 1970s
when the original description of shaking first
appeared in a paper published in *The British Medical
Journal* in 1971 by Guthkelch.[8] Caffey,[2,3] who is
generally credited with identifying and characteriz-
ing injuries to infants by shaking, published exten-
sively on the subject thereafter. However, it is in the

---

This excellent paper was presented on May 25, 2005 at the 33rd Annual Meeting of The Japanese Society for Pediatric
Neurosurgery in Nara, chaired by Professor Toshisuke Sakaki. All of the audience was greatly impressed by this new and
unique concept of the so-called Shaken Baby Syndrome.
    Shaken Baby Syndrome has now become a social issue in Japan and neurosurgeons are very much involved in its
management. The topic was quite timely, so we thank Dr. Sakaki for selecting this paper as a special lecture for us.
    Dr. Ronald H. Uscinski and I were residents together in neurosurgery at the Georgetown University Hospitals,
Washington, D.C. in the early 1970s. I am very proud that such an excellent paper was produced in Washington, D.C. and
presented in Nara.

Akira YAMAURA, M.D. (Advisory Board of *Neurologia medico-chirurgica*)
President, Chiba College of Health Sciences, Chiba

Guthkelch article that shaking is invoked specifically as a mechanism for causing intracranial injury in infants with no external evidence of cranial trauma. Guthkelch hypothesized that "It seems clear that the relatively large head and puny neck muscles of the infant must render it particularly vulnerable to whiplash injury in this sort of situation," and moreover that "the rotation-acceleration strains on the brain would tend to occur fairly symmetrically also, in an anteroposterior direction. This may be the same reason why the infantile subdural haematoma is even more often bilateral..."

It is significant that as a mechanical justification for invoking shaking as a mechanism for causing intracranial injury in infants, the original and subsequent authors all reference a single paper by Ommaya et al., published in 1968.[16] In this paper, Ommaya, a neurosurgeon studying head injury and building on earlier work by Holbourn,[9,10] attempted to quantify experimentally the rotational acceleration necessary to cause intracranial injury via a whiplash in rhesus monkeys. The animals in Ommaya's experiment were placed in a contoured fiberglass chair with the head free to rotate; the chair was mounted on wheels and placed on tracks; and the apparatus was systematically impacted with a piston to simulate accelerations analogous to rear-end motor vehicle collisions, with the entire event photographed using a high-speed camera. Ommaya found intracranial injury in 18 of the animals, with concomitant neck injury in 11 of the 18. The purely isolated concept of rotational acceleration of sufficient magnitude to cause intracranial injury without impact and therefore without external evidence of injury was seized upon qualitatively by Guthkelch,[8] Caffey,[2,3] and others as the explanation for hitherto unexplained intracranial injury in infants. This concept was hypothesized and put forth by them as being the result of manual shaking.

Hence, the Ommaya paper emerges as the sole source of experimental data from which the initial hypothetical shaking mechanism was drawn. Significantly, Ommaya was actually attempting to quantify the requisite rotational acceleration necessary to cause head injury via whiplash movement of the head in humans during rear end motor vehicle collisions, with attendant vehicular impact. He never addressed the question as to whether human beings can shake infants with enough force to produce the acceleration necessary to cause intracranial injury. It is also significant that neither Guthkelch,[8] Caffey,[2,3] nor any subsequent investigators who have sought to identify and characterize ostensible shaking injuries to the infant head ever asked whether the infant torso and neck anatomy, quite

different physiologically from that of the rhesus monkey and of the "non-infant" human, could withstand such shaking. Nonetheless, the mechanism of shaking and the so named syndrome gained immediate acceptance and enormously widespread popularity, with no real investigation or even question as to its scientific validity.

The stage was set; the shaking hypothesis rapidly engendered numerous articles purporting to accept or validate the hypothesis. Ratification within the medical community was based principally on anecdotal reports and case studies. The nearly simultaneous establishment in the United States of the Mandated Reporting Laws[4] plus the emerging litigious atmosphere encompassing clinical medicine in America in effect rendered the medical reporting of all cases of even remotely suspected child abuse absolutely compulsory.

The combination of these factors, plus an unspoken, unproved, but increasingly pervasive assumption that all unexplained injuries in children were to be regarded as inflicted injuries, provided a new paradigm for a self-fulfilling prophecy. The hypothesis rapidly metamorphosed to a syndrome; its acceptance expanded exponentially, and "shaken baby" became a term synonymous and ultimately identical with intentional child abuse.

## Injury Biomechanics

The causes of trauma obey the laws of injury biomechanics. These laws come from the generalized laws that govern motion, deformation, and forces existing in our universe. An example of one of these universal laws is Newton's second law of motion. Newton's second law governs the relationship between mass, acceleration, and force. In other words, given a mass such as a head, the acceleration of such a mass is governed by Newton's second law when there is a change in velocity divided by a change in time.

In 1943 the physicist Holbourn published a laboratory investigation of traumatic brain injury.[9] Holbourn understood that the deformable brain was incompressible, hypothesized a rotational acceleration level beyond which injury would occur, and that a smaller mass of brain would require larger rotational acceleration. Ommaya himself alluded to this point in his paper,[16] although this seems not to have been recognized by Guthkelch,[8] Caffey,[2,3] and others. In 1987 Duhaime et al.,[7] using available data on scaled injury thresholds, demonstrated that shaking a mechanical model to cause intracranial injury in the form of concussion, subdural hematoma, and diffuse axonal injury, failed to reach such

thresholds. The model used three different examples of the infant neck in order to reproduce mobility. None of these examples addressed the potential for structural failure of the neck. Following the same line of thought from 1987, two of the same authors repeated the experiment,[17] again using a model not addressing neck injury mechanisms, again focusing on rotational accelerations as the mechanism for causing intracranial injury as transmitted through the infant neck, and again demonstrating requisite accelerations to be not achievable by manual shaking.

While the above articles addressed experimentally the impossibility of causing intracranial injury in infants by manual shaking, no work addressed the potential consequence of such shaking activity on the infant neck, the critical link between the torso where the physical act of shaking is initiated, and the infant head where the injury is hypothesized to occur. Bandak precisely addressed this question in a quantitative manner in 2005.[1] In focusing attention on the infant neck, and demonstrating thereby that any transmission of forces generated by shaking the infant torso must necessarily be transmitted through the underdeveloped infant neck to the disproportionately large head, Bandak showed clearly that cervical spinal cord or brainstem injury in the infant would occur at significantly lower levels of shaking accelerations than those purported in the shaken baby syndrome literature as a cause of subdural hematomas. It is now clear that if an infant is subjected to shaken baby syndrome accelerations one should expect to see injury in the infant neck before it is seen in the head. Moreover, such injury should include injury to the cervical spinal cord and brainstem, obviously with the expected accompanying clinical picture.

Based on the above cited material, it is clear that the hypothetical mechanism of manually shaking infants in such a way as to cause intracranial injury is based on a misinterpretation of an experiment done for a different purpose, and contrary to the laws of injury biomechanics as they apply specifically to the infant anatomy. Finally, manual shaking of an infant, if injurious, should result in an entirely different injury biomechanically, physiologically, and clinically, than hypothesized in 1971.

## The "Unexplained Head Injury"

With regard to the cardinal aspect of inflicted injury by the hypothetical shaking mechanism, the "unexplained head injury," the following salient points are worthy of consideration. First, the so-called trivial head impact occurring after a fall of an apparently short distance is believed in most instances to be an innocuous event. In fact this is not so. The free fall velocity from as little as 3 feet results in the equivalent of greater than 9 miles per hour against a hard surface, or more than twice the skull fracture energy for an infant, again as demonstrated by Bandak.[1] Cadaver testing demonstrated skull fractures in infant specimens in every case when dropped from a height of 3 feet (84 cm), or the height of a changing table, onto a firm or hard surface. Fractures in the thin parietal bone were reliably produced when specimens were dropped even onto a softly cushioned surface.[18-20]

Therefore, while the majority of such falls may be seen superficially as innocuous, there exists demonstrably proven potential for serious injury. This is compounded given the potential physiologic response to such injury including vomiting, aspiration, seizing, or other airway compromise with attendant potential for hypoxia, all further complicating the clinical picture. One concludes that rather than resorting to simple generalization, each case warrants careful and individual evaluation.

The second point is that subdural hematoma has hitherto been regarded as a cardinal sign in infants of inflicted injury. While acute subdural hematoma is typically seen after an obvious fall with impact, it must be differentiated from chronic subdural hematoma. Most neurosurgeons treating adult or pediatric patients are aware that chronic subdural hematoma certainly started acutely, but by definition its presence was either not recognized or its significance was not appreciated at the time of injury. This need not imply an intentional injury, and it is a matter worthy of some reflection that intentional injury is rarely diagnosed or even considered in an adult presenting with a chronic subdural hematoma. Yet the same injury with the same pathophysiology and the same pathologic anatomy is nowadays presumed to be intentional in the infant. The scientific grounding for this presumption remains unclear.

Some additional observations are noteworthy here. First, it has long been known among clinical neurosurgeons operating on patients with chronic subdural hematomas that at surgery fresh blood may be found in addition to the older blood comprising the hematoma. Second, it has also been demonstrated experimentally that chronic subdural hematomas enlarge by rebleeding from the neovascular membrane[11-13,21] and that this bleeding has been shown to occur without accompanying trauma. Therefore, at clinical presentation a chronic subdural hematoma may exhibit fresh blood and this may be

60                                                                      R. H. Uscinski

mistakenly diagnosed as evidence of recent injury. Lastly, it is known that intracranial hemorrhage may occur even after an apparently uneventful vaginal birth,[5] and it is also well known that a chronic subdural hematoma with well-developed outer and inner membranes is at least several weeks, or even months, old.

The above observations lead one to conclude that for an infant presenting with ostensibly unexplained intracranial bleeding with or without external evidence of injury under given circumstances, accidental injury from a seemingly innocuous fall, perhaps even a remote one, or even an occult birth injury, must be considered before assuming intentional injury.

A recent paper by Donohoe[6] attempted to evaluate the available medical scientific evidence published from 1966 to 1998 wherein internationally accepted methods were used to determine the degree of confidence that accrues to claims regarding the condition termed "shaken baby syndrome." He concluded that some 32 years of cumulative material yielded inadequate scientific evidence to establish a firm conclusion on most aspects of causation, diagnosis, treatment, or any other matters pertaining to shaken baby syndrome. Donohoe's assessment focused on the methods and quality of the actual research. The scientific status of the syndrome itself was not addressed; rather it was the methodology supporting its validity that was found to be insufficient. Another paper by Leestma[14] searched all of the peer reviewed English language medical case literature and analyzed 324 cases that contained detailed individual case information. This search yielded 54 cases in which "some fashion of admission was noted that the injured baby had been shaken" (author's words). The details for all 54 cases were analyzed and of those, 11 cases were found wherein the reviewed material yielded no evidence of impact, and 12 cases had evidence of impact. The remaining cases provided either insufficient information or were excluded from the series for other reasons. After attempted statistical analysis of the material, no conclusions could be drawn by the author regarding which injuries occurred because of inflicted or accidental physical forces or by underlying or secondary disease processes, chiefly due to a paucity of data and inconsistent recording of relevant clinical information. That is, it was impossible to determine with scientific rigor what role shaking may have played in abusive head injury in these reported cases. Finally, it was not possible from the case analyses to infer that any particular form of intracranial or intraocular pathology was causally related to shaking, and that most of the pathologies in allegedly shaken babies were due to impact injuries to the head and body.

## Science and Shaking

The practice of clinical medicine is considered to be an artistic and a scientific endeavor. In its highest form this is accomplished through the elicitation of a careful and accurate history, and the performance of a thorough physical examination. It is in this manner that an appropriate diagnosis or differential diagnosis is made. In doing so, the physician must understand the principles underlying the normal and pathologic characteristics of the individual patient before him, and how to identify accurately, delineate, and ultimately integrate these characteristics in a way that elucidates the condition of his patient clearly and concisely. The understanding of such principles, however intricate and a priori compassionate, must be grounded in objectivity, logic, and rationality, and must be in conformity with known biologic and physical laws.

There is a balance between the qualitative aspect of caring for people who are sick, and the quantitative, ultimately cognitive understanding of science underlying the practice of clinical medicine. Although this latter understanding may be considered an applied science, it is grounded in principles of science nonetheless. Thus, within the framework of our approach to medicine, the same principles of scientific methodology and understanding are relevant as they are to understanding the nature of the world around us.

Advances in such scientific understanding may occur in two different ways. The first is by objective observation of phenomena occurring in nature, and correlation of this observation with what is already known of the physical universe to produce a more complete understanding and a higher order of comprehension. The second method is by experimentation under controlled conditions where investigators test hypotheses formulated in a methodical, logical, and rational way, in order to explain observed phenomena. This is how our understanding of the world advances, and this is also precisely how medicine advances. Verification of observation leads to verification by experimentation. This is sound scientific methodology. When this methodology produces descriptions and explanations that are in conformity, one has glimpsed a truth. When such descriptions and explanations are at variance, something is amiss, and truth is not identified.

*Neurol Med Chir (Tokyo) 46, February, 2006*

*Shaken Baby Syndrome: An Odyssey*

61

## References

1) Bandak FA: Shaken baby syndrome: a biomechanics analysis of injury mechanisms. *Forensic Sci Int* 151: 71–79, 2005

2) Caffey J: On the theory and practice of shaking infants. Its potential residual effects of permanent brain damage and mental retardation. *Am J Dis Child* 124: 161–169, 1972

3) Caffey J: The whiplash shaken infant syndrome: Manual shaking by the extremities with whiplash-induced intracranial and intraocular bleeding, linked with residual permanent brain damage and mental retardation. *Pediatrics* 54: 396–403, 1974

4) The Child Abuse Prevention and Treatment Act (CAPTA) of 1974, Public Law No 93-247 (January 31, 1974)

5) Cunningham F, Hauth J, Leveno K, Gilstrap L III, Bloom S, Wenstrom K: *Williams Obstetrics, ed 22.* New York, McGraw-Hill Medical Publishing Division, 2005, section V: p 682

6) Donohoe M: Evidence-based medicine and shaken baby syndrome: part I: literature review, 1966–1998. *Am J Forensic Med Pathol* 24(3): 239–242, 2003

7) Duhaime A, Gennarelli T, Thibault L, Bruce D, Margulies S, Wiser R: The shaken baby syndrome. A clinical, pathological, and biomechanical study. *J Neurosurg* 66: 409–415, 1987

8) Guthkelch AN: Infantile subdural haematoma and its relationship to whiplash injuries. *Br Med J* 2(759): 430–431, 1971

9) Holbourn AH: Mechanics of head injuries. *Lancet* 9: 438–441, 1943

10) Holbourn AH: The mechanics of trauma with special reference to herniation of cerebral tissue. *J Neurosurg* 1: 191–200, 1944

11) Ito H, Komai T, Yamamoto S: Fibrinolytic enzyme in the lining walls of chronic subdural hematoma. *J Neurosurg* 48: 197–200, 1978

12) Ito H, Yamamoto S, Komai T, Mizukoshi H: Role of local hyperfibrinolysis in the etiology of chronic subdural hematoma. *J Neurosurg* 45: 26–31, 1976

13) Kawakami K, Chikama M, Tamiya T, Shimamura Y: Coagulation and fibrinolysis in chronic subdural hematoma. *Neurosurgery* 25: 25–29, 1989

14) Leestma JE: Case analysis of brain-injured admittedly shaken infants: 54 cases, 1969–2001. *Am J Forensic Med Pathol* 26(3): 199–212, 2005

15) Merriam-Webster Online Dictionary. Springfield, Mass, Merriam-Webster, Inc, ©2005. Odyssey (noun). Available from: http://www.m-w.com/dictionary.htm

16) Ommaya AK, Faas F, Yarnell P: Whiplash injury and brain damage. *JAMA* 204: 75–79, 1968

17) Prange M, Coats B, Duhaime A, Margulies S: Anthropomorphic simulations of falls, shakes, and inflicted impacts in infants. *J Neurosurg* 99: 143–150, 2003

18) Weber W: [Experimental studies of skull fractures in infants]. *Z Rechtsmed* 92: 87–94, 1984 (Ger, with Eng abstract)

19) Weber W: [Biomechanical fragility of the infant skull]. *Z Rechtsmed* 94: 93–101, 1985 (Ger, with Eng abstract)

20) Weber W: [Predilection sites of infantile skull fractures following blunt force]. *Z Rechtsmed* 98: 81–93, 1987 (Ger, with Eng abstract)

21) Yamashima T, Yamamoto S, Friede R: The role of endothelial gap junctions in the enlargement of chronic subdural hematomas. *J Neurosurg* 59: 298–303, 1983

*Address reprint requests to:* R. H. Uscinski, M.D., Potomac Institute for Policy Studies, Ballston Metro Center Office Tower, 901 Stuart St. #200, Arlington, VA 22203, U.S.A.
e-mail: ruscinski@potomacinstitute.org

*B 11*

**2007-01-1170**

# Inertial Neck Injuries In Children Involved In Frontal Collisions

**Michael Prange, William Newberry, Tara Moore, Daniel Peterson,
Brian Smyth, Catherine Corrigan**
Exponent, Inc.

Copyright © 2007 SAE International

## ABSTRACT

There is a paucity of data regarding the potential for pediatric cervical spine injury as a result of acceleration of the head with no direct impact during automotive crashes. Sled tests were conducted using a 3-year-old anthropomorphic test device (ATD) to investigate the effect of restraint type and crash severity on the risk of pediatric inertial neck injury. At higher crash severities, the ATD restrained by only the vehicle three-point restraints sustained higher peak neck tension, peak neck extension and flexion moments, neck injury criterion (Nij) values, peak head accelerations, and HIC values compared to using a forward-facing child restraint system (CRS). The injury assessment reference values (IARVs) for peak tension and Nij were exceeded in all 48 and 64 kph delta-V tests using any restraint type. The test at a delta-V of 64 kph using only the vehicle belts as restraints resulted in peak upper neck tension, peak upper neck extension moment, and Nij values two times greater than the corresponding IARV. Only small differences were found in the injury metrics between a CRS installed with and without webbing tension except that head excursion was greater in the installation without webbing tension. These data show that the potential for neck injury exists for children involved in severe frontal crashes and restrained in either a forward-facing CRS or by vehicle belts–only, even in the absence of head contact.

## INTRODUCTION

According to the National Highway Traffic Safety Administration (NHTSA), motor vehicle crashes are the leading cause of death in children ages 3 to 14 years old (NHTSA 2004). Child restraint systems (CRS) have been found to reduce fatal and serious injures (Arbogast et al. 2004; NHTSA 2004; Elliott et al. 2006). However, in 2004, approximately half of the fatally injured children ages 1 to 4 years old were using a child safety system at the time of the crash. These data demonstrate that while current child restraint systems are effective in reducing fatal and serious injuries, a substantial number of fatalities occur to children restrained in child seats in motor vehicle crashes.

Currently the guidelines regarding child restraint usage from the American Academy of Pediatrics and NHTSA specify that a child ages from 1 to about 4 years old and weighing 20 to 40 pounds should be placed in a forward-facing CRS in the rear seat when riding in a motor vehicle. A child up to 80 pounds or more, between ages 4 and 8 years old, and shorter than 4 feet 9 inches tall should be seated in a belt-positioning booster in the rear seat of the vehicle. The majority of children involved in motor vehicle crashes are restrained by some means (Arbogast et al. 2004; Durbin et al. 2005). However, child restraint misuse and inappropriately restrained children have been reported at a significant rate (Bull et al. 1988; Hummel et al. 1997; Arbogast et al. 2004; Winston et al. 2004; Durbin et al. 2005; Brown et al. 2006). Improperly restrained children have been shown to have a significant increase in the severity of injuries (Brown et al. 2006).

While proper use of a child restraint has resulted in a significant reduction of the risk of head injuries, the risk of spinal injuries was not significantly reduced (Valent et al. 2002). Although cervical spine injuries are uncommon in the pediatric population, the mortality rate from these injuries is high (Givens et al. 1996; Patel et al. 2001). Motor vehicle crashes are a common cause of cervical spine injuries in young children (Givens et al. 1996; Zuckerbraun et al. 2004). Investigations using field accident data have found that the change of velocity (delta-V) of the vehicle during a crash is a strong predictor of injury risk for children (Brown 2006).

Currently the Federal Motor Vehicle Safety Standard for child restraint systems (FMVSS 213) does not explicitly incorporate any neck injury criteria. The standard currently requires child restraint systems (CRS) to be tested using peak sled accelerations of 19-25 g and a pulse duration of 75-90 ms. These requirements include only injury criteria for the head and chest. In 2002 NHTSA published a notice of proposed rule making (NPRM) that suggested amending FMVSS 213 to specify using the Hybrid III and CRABI ATDs with neck load cells and specifying a neck injury criteriion (Van Arsdell 2005). The injury criteria proposed was the Nij criterion specified in FMVSS 208 without the peak tension and compression limits. The comments in response to this proposal mostly opposed the new neck

injury criterion. The respondents expressed concerns regarding increased cost and unintended consequences of instituting multiple, unevaluated changes to the standard, while the use of current CRS designs have resulted in extremely low injury rates despite extensive misuse. NHTSA conducted testing that showed many of the CRS currently on the market failed to meet this neck injury criterion, and no neck injury criterion was incorporated into the final rule. NHTSA suggested that the HIC36 requirement will "serve as a surrogate of sorts for a neck injury criterion." (Van Arsdell 2005)

While neck injuries are uncommon in restrained pediatric occupants, case studies have been reported in the literature detailing restrained children who have sustained cervical spine and spinal cord trauma in frontal crashes without evidence of head contact (Fuchs et al. 1989; Huelke et al. 1992; Newman and Dalmotas 1993; Trosseille and Tarriere 1993; Weber et al. 1993; Stalnaker 1993). Many of these cases involved young children (< 6-years-old) involved in severe or moderate severity frontal crashes (delta-V ≥ 45kph) and restrained in various configurations including lap belt only, lap-and-shoulder belts, and a variety of CRS systems. The injuries consisted of fractures, dislocations, and/or spinal cord damage in the high cervical spine. The postulated mechanism for these types of injuries is inertially-induced loading of the cervical spine during these crashes (Huelke et al. 1992; Newman and Dalmotas 1993). Additionally, the authors have personally investigated a number of other frontal collisions in which children restrained in a variety of configurations (including vehicle restraints only, forward-facing CRS, and booster seats) have sustained cervical spine injuries without any evidence of head contact.

The anatomy and anthropometry of the young pediatric population make them particularly vulnerable to inertial neck injuries. As observed in a number of previous studies, children are not miniature adults. Young children have a relatively large head and smaller neck (Burdi et al. 1969; Huelke 1998). Also, the pediatric spinal ligaments are more lax and the neck musculature is less developed, allowing for increased motion of the cervical spine (Fuchs et al. 1989). The vertebral bodies are not fully ossified and the facet joints are more horizontal than in adult spines (Fuchs et al. 1989). All of these anatomical characteristics of children make them more susceptible to inertial neck injuries in frontal collisions.

The purpose of this study is to investigate the biomechanical response of children during frontal crashes without head contact. One aim of these tests is to systematically examine the effect of crash severity on the potential for pediatric inertial neck injuries. Also, this study examines the injury risk to a child properly restrained (forward-facing CRS installed properly), misusing a restraint (forward-facing CRS installed without recommended vehicle webbing tension), and using an age-inappropriate restraint configuration (three-point vehicle belts only).

## METHODS

To investigate the potential for inertial neck injuries, sled tests were conducted using anthropomorphic test devices (ATD) in different restraint configurations at different crash severities. Tests were conducted using a pneumatic acceleration system, a programmable wire-bending decelerator, and a 170-ft rail that minimizes test article disturbance during the acceleration phase (Seattle Safety LLC). Tests were conducted at 32, 48, and 64 kilometer per hour (kph) change of velocity for each restraint configuration.

A 1996-2004 model Chrysler minivan second row bench seat was rigidly secured to the sled. The bench seat and buckle stalks were replaced with the same type of seat after each severe (64 kph) test. The vehicle seatbelt restraint system and corresponding hardpoints used in each tests were from the Chrysler minivan. The seatbelts consisted of a three-point continuous loop system with a vehicle-sensitive and webbing sensitive, emergency-locking retractor. The system did not include an automatic-locking feature. The entire restraint system (belt, retractor, anchors), with the exception of the buckle stalk, was replaced by an unused system prior to each test.

## ANTHROPOMORPHIC TEST DEVICES AND RESTRAINT CONFIGURATIONS

A 3-year-old Hybrid III ATD was placed on the right outboard position of the bench seat. The ATD was secured in three different restraint configurations at the three different impact severities. For the first configuration, the ATD was placed in a properly installed forward-facing CRS. A new model CRS [Titan, Model# 3671595P1 Evenflo Company, Inc.] was used for each test in this series. The model of CRS used during these tests weighed 10.4 pounds and was chosen based on its high rating by Consumer Reports (May 2003). In the first configuration, the CRS was installed according to the manufacturer's instructions. The installer applied his body weight to the seat and then tightened the vehicle restraints so that there was tension in the webbing. Because the vehicle restraint system did not include an automatic-locking feature, the vehicle belts were routed through the CRS and secured using the manufacturer supplied locking clip according to the instruction manual. Tethers were not used in any of the sled tests conducted as part of this study. To investigate a common misuse of a CRS, the second configuration used the same model forward-facing CRS installed according to the manufacturer's instructions, except without applying tension to the webbing. The vehicle belts were positioned such that the webbing had a minimal amount of tension while not allowing any slack to occur between the belt and CRS   Again, the CRS was replaced by a new unused CRS at the beginning of each test. For each CRS configuration, the location of the latchplate and locking clip was measured relative to the vehicle restraint anchor position. Similarly, the location of the CRS belts and chest clip were measured relative to the

CRS. These locations were the same for each test to ensure the repeatability of the CRS and ATD installation between tests. The third configuration examined an inappropriate restraint configuration for a 3-year-old with the ATD placed on the bench seat without the CRS and restrained only by the vehicle restraints.

In each of the same tests, a six-year-old Hybrid III ATD was placed on the left outboard position in 3 different restraint configurations. The ATD was placed in a booster seat [TurboBooster, Model# 8498SRT Graco Children's Products Inc.] and restrained with the vehicle belt system for the first configuration. The booster seat was replaced with a new seat before each test. This model booster seat was chosen based on its high rating by Consumer Reports (May 2003). For the second configuration, the ATD was placed on the bench seat and restrained by the vehicle belts with the shoulder belt placed behind the torso of the ATD. The third configuration consisted of the ATD seated on the bench seat restrained by the vehicle belts with the shoulder belt placed across the torso. The vehicle restraints were replaced with an unused restraint prior to each test. The results from the 6-year-old ATD are beyond the scope of this communication and will be presented in a subsequent paper.

## INSTRUMENTATION

The impact velocity of the sled was measured using a velocity trap and the sled acceleration was measured using sled-mounted accelerometers. Shoulder and lap belt loads were measured during each test. High-speed video was recorded using an on-board digital camera on the right and an off-board digital camera on the left side. Target markers were placed on the rigid sled frame, on the CRS (when used), and at the approximate center of gravity of the ATD head as viewed from the side.

Head acceleration was measured with three uniaxial accelerometers mounted at the head center of gravity. Six axis load cells measured neck loads, one at the upper neck and the other at the lower neck location. Chest acceleration was measured using three uniaxial accelerometers and chest deflection was measured using a potentiometer.

## DATA ANALYSIS

Each channel of data was recorded at 10,000 samples per second and filtered according to crash test standards [SAE J211]. The high-speed digital video was recorded at 500 frames per second.

The head acceleration data and neck load data were only analyzed for the inertial pulse prior to contact with any structure, including contact between the head and other parts of the ATD. Peak resultant acceleration, $HIC_{15}$, and $HIC_{36}$ were calculated from the head acceleration data acquired. Head excursion from the initial seated position was measured from the high-speed video using Image Express (Sensors Applications

Inc., Utica, NY). Tensile load, peak neck moment and neck injury criterion (Nij) were calculated using the data obtained from the upper neck load cell. The Nij was calculated according to the FMVSS 208 specification for the 3-year-old ATD.

## RESULTS

The results for each of the nine tests conducted are reported in the appendix in Table A1 and discussed below.

### CRASH SEVERITY

The measured delta-V of each sled test was within 1 kph of the target crash severity. The average peak sled accelerations for the 32, 48, and 64 kph tests were -16.6, -25.2, and -33.6 g respectively. The pulse durations of each test were similar with the average pulse time of 96 ms. The shape of the acceleration-time history was approximately a haversine shape (Figure 1).



Figure 1: Typical sled accelerations.
Tightly installed CRS tests at 3 different severities.

### UPPER NECK LOADS

The peak axial loads measured in the upper neck were tensile forces for all tests (Figure 2). Increased crash severity generally resulted in increased peak upper neck tension for each restraint configuration. The 48 kph tests produced peak tension values greater than the 32 kph tests for each type of restraint. The peak tension values for the 48 kph and 64 kph tests were comparable for a tightly installed CRS. In contrast, the tension measured during the 64 kph belts-only test was 35% greater than the 48 kph test using the same restraint configuration.



Figure 2: Peak upper neck tension

Upper neck peak tension varied between the different restraint configurations tested (Figure 2). The belts-only 32 kph test resulted in decreased upper neck tensile load compared to the tight and loose CRS installations. In contrast, the upper neck tension in the 64 kph belts-only test was greater than the CRS configurations. The CRS installation without webbing tension produced upper neck tensile forces slightly lower than the tight installation at 32 and 48 kph. Tensile loads were comparable for both CRS tests at 64 kph.

The peak upper neck moments measured in the 3-year-old ATD were all extension moments. The peak extension moments increased with increasing crash severity for the belts-only restraint configuration (Figure 3) and were comparable for all crash severities in both CRS configurations. The peak neck moments were similar across delta-V for both CRS tests. For the 48 and 64 kph tests, the peak moment was more than double the value recorded during the CRS tests.



Figure 3: Peak upper neck extension moments

The peak flexion moments in the upper neck were greater in the belts-only tests when compared to the CRS tests at the same crash severity (Figure 4). The flexion moment during the belts-only, 32 kph tests was greater than that in any accident severity in both CRS restraint configurations.



Figure 4: Peak upper neck flexion moments

UPPER NECK INJURY ASSESSMENT REFERENCE VALUES

Peak tensile load

One of the neck injury assessment reference values specified in FMVSS 208 for the 3-year-old dummy is a peak tensile upper neck load of 1130N. Eight out of the nine tests conducted in this study resulted in peak upper neck loads greater than this reference value (Figure 2). Only the belts-only 32 kph test resulted in peak upper neck tension less than this criterion (1084N).

Neck Injury criterion - Nij

The injury criteria Nij was calculated for each sled test using the methods and critical values specified for the 3-year-old ATD in the federal motor vehicle safety standards. The maximum value of Nij for each test was in tension and extension (Nte). The maximum Nij values during the 32 kph tests for the CRS and belts-only configurations were approximately 1 (Figure 5). The 32 kph, belts-only test was the only test to be below the Nij criterion.



Figure 5: Neck injury criterion -Nij

The peak Nij value increased slightly with increased crash severity for both CRS configurations For both configurations, the Nij increased from approximately 1.1 in the 32 kph CRS tests to 1.35 in the 64 kph tests (Figure 5). Also, the relative contribution of the upper neck tension increased slightly with increased delta-V in the CRS tests. The tension component of peak Nij was approximately 60% for both 32 kph CRS tests and increased to 75% when the delta-V was increased to 64 kph.

There was a more dramatic increase in the peak Nij with increased delta-V for the belts-only configuration (Figure 5). The peak Nij more than doubled between the 32 and 64 kph belts-only tests. The tension component of the peak Nij was approximately 50% for the 32 kph and 48 kph belts-only tests. The contribution of tension decreased to 28% of the peak Nij during the 64 kph belts-only test.

The peak Nij values for all restraint configurations were similar at the 32 and 48 kph crash severities. The peak Nij values ranged between 0.8 and 1.0 for each of the restraints used at 32 kph. The 48 kph tests produced a peak Nij of between 1.1 and 1.45 for each restraint configuration. Both CRS tests at 64 kph also showed similar peak Nij values (1.35). The peak Nij value for the belts-only 64 kph test was greater than the CRS tests at the same crash severity. This test resulted in a peak Nij of 2.0, exceeding both the tension and extension component of the Nij criterion at the same point in time. The belts-only tests showed a lower contribution of tension to the peak Nij value at each crash severity compared to the CRS tests. The most dramatic difference was during the 64 kph tests where the neck tension comprised approximately 75% of the peak Nij for the CRS tests and only 28% for the belts-only configuration.

The CRS configurations at each crash severity had minimal flexion moments of the upper neck (Figure 4). The tension-flexion neck injury criterion from each of these tests was below 0.35.

## LOWER NECK LOADS

The peak tension in the lower neck load cell increased with increased crash severity for each restraint configuration (Figure 6). All configurations at 48 kph were greater than all configurations at 32 kph. Similarly, all tests at 64 kph were greater than all configurations at 48 kph. Within each restraint configuration the peak tension more than doubled between the 32 kph and 48 kph tests. The 64 kph peak tension increased 55%, 29%, and 47% over the 48 kph sled test within the CRS tests with and without webbing tension and belts-only configurations respectively.



Figure 6: Peak lower neck tension

At each crash severity, the peak lower neck tension varied between the different restraint configurations. At each severity, the peak tension for the belts-only configuration of the 3-year-old was greater than both the CRS configurations. The lower neck tension in the belts-only configuration increased between 30% and 50% over the CRS configurations for the three crash severities tested. The two CRS configurations resulted in similar lower neck loads at each crash severity.

## LOWER NECK·MOMENTS

During all sled tests conducted, the peak moments in the lower neck were flexion moments and the extension moments were minimal. For the belts-only tests, the peak lower neck moment increased with increased crash severity (Figure 7). In contrast, the peak moments were similar in both CRS configurations across all crash severities, with slightly lower values in the CRS installed without webbing tension.



Figure 7: Peak lower neck flexion moments

The peak moments measured during the 32 kph CRS tests were greater than the belts-only test. However, the 64 kph tests resulted in greater peak moments in the belts-only configuration when compared to the two CRS installations. The moments in the 48 kph tests were similar across restraint configurations.

## HEAD ACCELERATIONS

Noise spikes were observed in the longitudinal head acceleration (Ax) data in the CRS tests with webbing tension and the 32 kph and 48 kph belts-only test. This accelerometer then failed after the crash pulse during the 48 kph belts-only test and had to be replaced. These noise spikes were confirmed after reviewing the video, which demonstrated that no impact to the head corresponded to these short duration spikes. These spikes were disregarded during the peak acceleration and HIC analyses. HIC values varied less than 3% between the data with and without the noise spike.

For the belts-only tests, the high-speed video revealed that the ATD head contacted the upper and/or lower extremity during its forward movements. This was confirmed with the head acceleration data that showed a short duration pulse corresponding to the head contact. This contact occurred after the peak inertial head acceleration pulse. These head impact pulses were not observed in the head acceleration data traces for the CRS tests. The purpose of this study was to examine the response of the ATD during the inertial pulse without any head contact. Therefore, the HIC values for the belts-only tests were computed only up until the occurrence of head impact with the extremities.

Peak resultant linear acceleration of the head increased with increased crash severity for each restraint configuration (Figure 8). Within the same restraint configuration, the peak accelerations approximately doubled between the 32 kph to the 64 kph tests. The peak head acceleration measured during the belts-only configuration was higher than the CRS tests for each crash severity. The test using belts-only resulted in 30% to 50% greater head accelerations than both CRS configurations.



Figure 8: Peak resultant head accelerations
(prior to head contact with the lower extremities in the belts-only configuration)

## HEAD EXCURSIONS

The peak horizontal excursion of the ATD head differed between the restraint configurations (Figure 9). The CRS tests without webbing tension resulted in increased head excursion over the CRS tests with webbing tension and belts-only tests at the same crash severity. The belts-only tests had smaller excursion than the CRS tests at each crash severity. For all restraint configurations, the excursion of the head increased with increased delta-V.



Figure 9: Peak horizontal head excursion from pre-impact seated position

HEAD INJURY ASSESSMENT REFERENCE VALUE

The federal safety standards (FMVSS 208) and other researches have defined the head injury criterion as a $HIC_{15}$ value of 570 for the 3-year-old ATD (FMVSS 208, Mertz et al, 2003). The $HIC_{15}$ measurements were below this reference value for all 32 kph tests (Figure 10). Also, the 48 kph tests using the tight and loose CRS restraints resulted in $HIC_{15}$ values below this value. However the 48 kph, belts-only test resulted in a $HIC_{15}$ value greater than the reference value of 570. All restraints at 64 kph exceeded the reference value. The 64 kph, belts-only test resulted in a $HIC_{15}$ value more than three times greater than the injury reference value.



Figure 10: Head Injury Criteria $HIC_{15}$
(accelerations evaluated prior to head contact in the belts-only configuration)

The federal safety standard 213 defines the reference value for head injury ($HIC_{36}$) to be a value of 1000 for all ATDs tested in child restraint systems. Examining the $HIC_{36}$ values revealed that the 32 and 48 kph tests resulted in $HIC_{36}$ values below this reference value. The increased crash severity of 64 kph resulted in $HIC_{36}$ values greater than 1000 for all three restraint configurations tested. During the 64 kph belts-only test, the $HIC_{36}$ value was more than twice this injury reference value.



Figure 11: Head Injury Criteria $HIC_{36}$
(accelerations evaluated prior to head contact in the belts-only configuration)

The head injury criteria $HIC_{15}$ and $HIC_{36}$ increased with increased crash severity (Figures 10,11). Within the same restraint configuration, the $HIC_{15}$ values for the 48 kph tests were more than three times greater than the 32 kph tests. The CRS configurations produced an increase of approximately 50% between the 48 and 64 kph tests. The belts-only tests showed an increase of almost 150% between these two severities. Similar increases in $HIC_{36}$ were noted with increasing crash severity.

The belts-only configuration resulted in a greater $HIC_{15}$ value than the CRS configurations for each crash severity (Figure 10). As the delta-V increased this difference increased. The $HIC_{15}$ values during the 32 kph tests are similar for all restraints. At 48 kph, the belts-only test resulted in a value more than 50% greater than the $HIC_{15}$ determined for CRS configurations at the same delta-V. The belts-only test at 48 kph produced a $HIC_{15}$ value comparable to the CRS tests performed at an increased delta-V of 64 kph. The $HIC_{15}$ value for the belts-only test at 64 kph was more than double the value calculated for the CRS tests at the same severity. A similar increase in the 64 kph belts only configuration was also observed in the $HIC_{36}$ data (Figure 11).

CHEST ACCELERATION

The 3 ms clip peak chest resultant acceleration increased with increasing delta-V for each restraint configuration (Figure 12). The peak acceleration increased approximately 60% between the 32 and 48 kph tests for each restraint configuration. The CRS tests produced only an approximate 15% increase from 48 to 64 kph. However, the belts-only configuration produced an increase of 45% between the same severities.



Figure 12: Resultant chest accelerations (3 ms clip)

During the 32 and 48 kph tests, the belts-only test resulted in slightly lower chest accelerations than both CRS configurations. The peak acceleration during the 64 kph tests were similar between the restraint configurations. The peak accelerations measured during the 48 kph were greater than all tests conducted at 32 kph. Similarly, the 64 kph tests for all restraint configurations resulted in accelerations greater than all the 48 kph tests.

CHEST DEFLECTION

As the crash severity increased, the peak chest deflections also increased within each restraint configuration (Figure 13). The peak chest deflections were similar for the two CRS restraint configurations at each crash severity. The belts-only configuration resulted in more chest deflection than the CRS restraints at each delta-V.



Figure 13: Peak chest deflections

CHEST INJURY ASSESSMENT REFERENCE VALUE

The federal safety standards define the injury reference value for chest injury to be an acceleration (3 ms clip) of 55 g for the 3-year-old ATD. This value was exceeded during the 64 kph tests for all restraint configurations. The peak chest acceleration during the 48 kph test using the CRS installed without webbing tension was also greater than the reference value.

Mertz et al (2003) defined the reference value for peak chest deflection as 28mm for the 3-year-old ATD loaded by a shoulder belt. This value was only exceeded during the 64 kph test with the belts-only restraint configuration.

DISCUSSION

The purpose of this study was to examine the inertial neck loads produced in a 3-year-old ATD during frontal crashes at different severities and using various restraint configurations. Peak upper and lower neck tension, peak upper neck extension moments, peak upper neck flexion moments, and Nij values were higher for the ATD restrained by only the vehicle belts compared to using a forward-facing CRS. This demonstrates that of the configurations tested, the 3-year-old restrained in the vehicle seatbelts without a CRS has the highest risk of neck injuries caused by inertial (non-contact) conditions. Lower neck loads were less than upper neck loads, consistent with anecdotal field accident data showing more upper neck injuries (Fuchs et al. 1989).

Only small differences were found in the ATD response between a CRS installed with and without webbing tension, except for head excursion. During the tests of the improper CRS installation, the CRS was not coupled to the vehicle seat during the initial phase of the crash pulse due to the lack of tension in the vehicle belts. Therefore during this initial phase of the deceleration, the CRS moved relative to the seat and basically increased the effective mass of the ATD (ATD 35 lbs, CRS 11 lbs). However, this effect was minimal resulting in only small differences in the injury metrics. For the 3-year-old, this study demonstrates that a properly installed forward-facing CRS restraint configuration minimized the potential for head and neck injury. However, in every test at 48 and 64 kph delta-V, irrespective of restraint type, the injury reference values for peak upper neck tension and Nij were exceeded. This demonstrates that the potential for inertial neck injuries exists during severe frontal crashes even for properly restrained children.

The CRS installed without webbing tension resulted in larger head excursions than the CRS with webbing tension. The difference between head excursions in the two configurations was approximately five to ten centimeters. The addition of a top tether would likely reduce head excursions in the CRS configurations. Additionally, research using ATD and cadaver data has shown increased head excursions in the cadaver test compared to a test conducted using the same crash

parameters and a 3-year-old ATD (Wisman et al. 1979). Any increase in total head excursion will increase the risk of head contact with forward structures. In the absence of contact, injuries are not caused by excursion. Injuries are the result of relative motion between the child's head and torso as the torso is decelerated by its interaction with the restraint system. This is shown in the fact that the CRS installed without webbing tension resulted in increased head excursions but comparable head and neck loads to the CRS installed with webbing tension. Because of their anthropometry with the head mass being a larger portion of the total body mass and their relatively less developed neck anatomy, children will by their nature be more susceptible to inertial neck injury. Any attempt to use technologies such as force-limiters to decrease the ride-down accelerations of the torso will necessarily increase the excursion of the child occupant, increasing the risk of impacting interior vehicle structures.

Increased head accelerations in the belts only configuration were associated with increased neck loads in that configuration, compared to both CRS configurations (Figure 8). Chest accelerations were comparable for all three configurations (Figure 12), suggesting that all configurations provided similar restraint at the mid-torso, where the accelerometer is located. However, differences in upper torso restraint due to geometrical differences between the CRS (both shoulders restrained) and vehicle belt restraint (one shoulder restrained) configurations affect the upper torso kinematics, as well as the motion of the head and neck. The decreased neck loads measured in CRS tests could also be a result of the added compliance of the CRS structure and CRS belts. This increased compliance allows for decreased ride-down accelerations and increased excursion of the ATD when restrained in a CRS (Figure 9).

Other researchers have also performed sled testing using the 3-year-old ATD. To our knowledge, no other testing has been performed at speeds as high as the 64 kph delta-V done in this series, nor has there been a study evaluating the effect of vehicle restraint webbing tension using instrumented ATDs. Henderson et al. (1997) performed 48 kph sled tests with a 3-year-old ATD restrained in three-point restraints. They reported neck tensile forces and HIC values comparable to those reported in this study; however, they measured upper neck flexion moments several times larger than those reported in the current study. Kapoor et al. (2006) performed a sled test at 48 kph using a 3-year-old ATD restrained in a forward-facing CRS and reported lower values of upper and lower neck tension, Nij, and $HIC_{15}$, compared to the present study. Values for neck moments and $HIC_{36}$ were comparable. Menon et al. (2004) performed a series of sled tests using a 3-year-old ATD in three restraint configurations, including a forward-facing CRS and vehicle belts only. While these tests were performed at different velocities than the current study, preventing direct comparisons with the current work, trends in the two studies could be

compared. For most measurements, the two studies reported similar trends. For example, in both studies, Nij increased with increased crash severity. Nij values were higher for the belts only configuration than the forward-facing CRS configuration in both studies. However, Menon et al. reported higher head accelerations in the forward-facing CRS configuration compared to vehicle belts only; we observed the reverse.

NHTSA published an NPRM that suggested amending FMVSS 213 to incorporate a neck injury criterion. The injury criterion proposed was the Nij criterion specified in FMVSS 208 without the peak tension and compression limits. The comments in response to this proposal mostly opposed the new neck injury criterion, and no neck injury criterion was incorporated into the final rule. A $HIC_{36}$ criterion of 1000 was used to help reduce the potential for neck injury. Interestingly, the results of the current study show that $HIC_{36}$ only exceeded 1000 in the 64 kph tests, while Nij exceeded 1.0 in several tests where the $HIC_{36}$ value was below the threshold. Therefore, it is possible that there are mechanisms of neck injury that are not captured by the $HIC_{36}$ criterion.

Due to the complexity and variation of vehicles, vehicle restraint systems, child restraint systems, and their occupants, it is impossible to examine all aspects of child restraint systems in a single series of tests. The sled tests conducted were limited to frontal crashes only, a configuration chosen because frontal collisions have been identified as a major source of cervical spine injuries to child occupants. Also, the crash pulse used for these tests had the same duration for each severity tested. This pulse does not represent all real-world crashes and the effects of crash duration and pulse shape were not examined. Test-to-test variability was minimized by using a repeatable sled crash pulse, installing new restraints (vehicle and CRS) for each test, and replicating the vehicle and CRS belt geometry for each restraint configuration. However, each restraint configuration was tested only once at each crash severity therefore no quantitative information is available on the variability of each test. Because this study focused on inertial (non-contact) injuries only, a front seat was not present during these frontal tests. However, the presence of a front seat could lead to head contacts during real-world crashes and associated changes in head accelerations and neck loads.

Only one type of child restraint was used during the sled tests. The consequences of different models or brands of CRS were not examined. Lower anchors were not present in the bench seat used for the sled tests. Therefore, the LATCH (Lower Anchors and Tethers for Children) system was not evaluated in this series of tests. The effects of not installing a CRS with the recommended tension in the vehicle belts were examined in this study. However, various types of restraint misuse have been documented, which have different effects on occupant kinematics and loading. The consequences of each misuse scenario were not investigated.

The issue of biofidelitiy of the child dummies has been extensively discussed in the literature (e.g. Wismans et al. 1979, Brun Cassan et al. 1993; Menon et al. 2004). Because of the paucity of data on the mechanical properties of the pediatric cervical spine, relative to that available for adults, identifying tolerance values for children is difficult. Much of the pediatric data used in the current FMVSS standards were obtained by scaling adult tolerance values and from animal models (Backaitis et al. 1975; Irwin and Mertz 1997; van Ratingen et al. 1997; Pintar et al. 2000; Ching et al. 2001; Hilker et al. 2002; Nuckley et al. 2002; Mertz et al. 2003). Research to obtain data from pediatric cadaver testing and other sources is ongoing (e.g., Nuckley et al. 2005; Ouyang et al. 2005; Prange et al. 2004) and should be used as it becomes available.

Our sled test series demonstrated a substantial increase of the peak Nij value with increased crash severity regardless of restraint configuration. These results suggest that all children involved in severe frontal collisions have a risk of sustaining a serious cervical spine injury. Analyses of real-world data (Valent et al. 2002; Zuckerbraun et al. 2004) have not shown significant rates of neck injuries for children involved in automotive crashes. However, many of these analyses do not examine the severity of the crashes. As shown in our study, neck injury potential increases substantially with increased delta-v. Because the occurrence of crashes with frontal delta-V's of 48 to 64 kph involving children are rare in the real-world, the sample size of these field accident analyses might not be large enough to capture many of these injuries.

In our test series, the 64 kph delta-v tests resulted in a peak Nij of 1.35 for the CRS restraints and 2.0 for the belts-only configuration. The risk of serious (AIS 3+) neck injury for these Nij values is approximately 25% and 95%, respectively (Mertz et al. 2003). Henderson et al. found no instances of cervical spine injuries for properly restrained children in a study of 62 children involved in frontal collisions (Henderson et al. 1994). They reported the absence of neck injuries in 4 cases of children properly restrained in forward-facing child restraints at delta-Vs of over 60 kph. This could be the result of the limited number of cases investigated and the 25% risk of serious neck injury associated with the properly restrained ATD in our severe sled test. Henderson et al. did report a fatal neck injury of a child improperly restrained by a vehicle's three-point belt during a 65-70 kph delta-V crash. This is consistent with the high risk of neck injury associated with an Nij value measured during our sled test at 64 kph, belts-only configuration. Our data indicate that if a child is involved in a rare, severe frontal collision, there is a risk of inertially-induced cervical spine injury.

## CONCLUSIONS

A series of frontal sled tests was performed using a 3-year-old ATD seated in three different restraint configurations: a properly installed CRS, an improperly installed CRS, and using the vehicle belts only (no CRS). ATD injury measurements increased with increased crash severity. The belts only configuration produced the highest neck tensions, neck moments, Nij values, head accelerations, and HIC values. With the exception of head excursions, the amount of vehicle belt webbing tension used to install a CRS did not substantially affect head accelerations and neck loads.

## REFERENCES

Arbogast, K. B., D. R. Durbin, et al. (2004). "An evaluation of the effectiveness of forward facing child restraint systems." Accid Anal Prev 36(4): 585-9.

Backaitis S. H., J. W. Medlin Jr. et al. (1975). "Performance evaluation of child dummies and baboons in child restraint systems in a systematized crash enviroment." Society of Automotive Engineers SAE 751153.

Brown, J., M. E. McCaskill, et al. (2006). "Serious injury is associated with suboptimal restraint use in child motor vehicle occupants." J Paediatr Child Health 42(6): 345-9.

Brun Cassan, F., M. Page et al. (1993). "Comparative study of restrained child dummies and cadavers in experimental crashes." Society of Automotive Engineers SAE 933105.

Bull, M. J., K. B. Stroup, et al. (1988). "Misuse of car safety seats." Pediatrics 81(1): 98-101.

Burdi, A., D. Huelke, et al. (1969). "Infants and children in the adult world of automobile safety design: pediatric and anatomical considerations for design of child restraints." J Biomech 2: 267-280.

Ching, R. P., D. J. Nuckley et al. (2001). "Tensile mechanics of the developing cervical spine." Society of Automotive Engineers SAE 2001-22-0015.

Durbin, D. R., I. Chen, et al. (2005). "Effects of seating position and appropriate restraint use on the risk of injury to children in motor vehicle crashes." Pediatrics 115(3): e305-9.

Elliott, M. R., K. A. Arbogast, et al. (2006). "A Latent Class Analysis of Injury Patterns Among Rear-Seated, Seat-Belted Children." J Trauma 61(5): 1244-1248.

Fuchs, S., M. J. Barthel, et al. (1989). "Cervical spine fractures sustained by young children in forward-facing car seats." Pediatrics 84(2): 348-54.