Givens, T. G., K. A. Polley, et al. (1996). "Pediatric cervical spine injury: a three-year experience." J Trauma 41(2): 310-4.

Henderson, M., J. Brown et al. (1994) "Injuries to restrained children." Association for the Advancement of Automotive Medicine, 38th Annual Conference, Lyon, France, AAAM.

Henderson, M., J. Brown et al. (1997). "Children in adult seat belts and child harnesses: crash sled comparisons of dummy responses." Society of Automotive Engineers SAE 973308.

Hilker, C. E. N. Yoganandan et al. (2002). "Experimental determination of adult and pediatric neck scale factors." Society of Automotive Engineers SAE 2002-22-0020.

Huelke, D. F. (1998). An overview of anatomical considerations of infants and children in the adult world of automobile safety design. Association for the Advancement of Automotive Medicine, 42nd Annual Conference, Charlottesville, Virginia, AAAM.

Huelke, D. F., G. M. Mackay, et al. (1992). Car crashes and non-head impact cervical spine injuries in infants and children, SAE: 671-676.

Hummel, T., K. Lanwieder, et al. (1997). Injury risks, misuse rates and the effect of misuse depending on the kind of child restraint system. Second Child Occupant Protection Symposium, Society of Automotive Engineering.

Irwin, A., and H. J. Mertz (1997). "Biomechanical basis for the CRABI and Hybrid III child dummies." Society of Automotive Engineers SAE 973317.

Kapoor, T., W. Altenhof et al. (2006). "Injury potential of a three-year-old Hybrid III dummy in forward and rearward facing positions under CMVSS 208 testing conditions." Accid Anal Prev, in press.

Menon, R.,Y. Ghati, et al. (2004). "Evaluation of restraint type and performance test with 3- and 6-year-old dummies at a range of speeds." Society of Automotive Engineers SAE 2004-01-0319.

Mertz, H. J., A. L. Irwin et al. (2003). "Biomechanical and scaling bases for frontal and side impact injury assessment reference values." Stapp Car Crash Journal 47: 155-188.

Newman, J. A. and D. Dalmotas (1993). Atlanto-occipital fracture dislocation in lap-belt restrained children. Child Occupant Protection Symposium, Society of Automotive Engineering SAE 933099.

NHTSA (2004). Traffic Safety Facts 2004:Children. Washington DC, National Highway Traffic Safety Administration's National Ceneter for Statistics and Analysis.

Nuckley, D. J., S. M. Hertsted et al. (2002). "Compressive tolerance of the maturing cervical spine." Stapp Car Crash Journal 46: 431-440.

Nuckley, D. J., S. M. Hertsted et al. (2005). "Effect of displacement rate on the tensile mechanics of pediatric functional spinal units." Journal of Biomechanics 38: 2266-2275.

Ouyang, J., Q. Zhu et al. (2005) "Biomechanical assessment of the pediatric cervical spine under bending and tensile loading." Spine 30(24): E716-E723.

Patel, J. C., J. J. Tepas, 3rd, et al. (2001). "Pediatric cervical spine injuries: defining the disease." J Pediatr Surg 36(2): 373-6.

Pintar, F. A., R. G. Mayer et al. (2000). "Child neck strength characteristics using an animal model." Society of Automotive Engineers SAE 2000-01-SC06.

Prange, M. T., J.L. Luck, et al. (2004) "Mechanical Properties and Anthropometry of the Human Infant Head," Stapp Car Crash Journal Vol. 48: 279–299.

Stalnaker, R. L. (1993). "Spinal cord injuries to children in real world accidents." Society of Automotive Engineers SAE 933100.

Trosseille, X. and C. Tarriere (1993). Neck injury criteria for children from real crash resonstructions. Child Occupant Protection Symposium, Society of Automotive Engineering.

Valent, F., G. McGwin, Jr., et al. (2002). "Restraint use and injury patterns among children involved in motor vehicle collisions." J Trauma 52(4): 745-51.

Van Arsdell, W. W. (2005). "The evolution of FMVSS 213: Child Restraint Systems." Society of Automotive Engineers SAE 2005-01-1840.

van Ratingen, M. R., D. Twisk et al. (1997). "Biomechanically based design and performance targets for a 3-year-old child crash dummy for front and side impact." Society of Automotive Engineers SAE 973316.

Weber, K., D. Dalmotas, et al. (1993). Investigation of dummy response and restraint configuration factors asssociated with upper spinal cord injury in a forward-facing child restraint. Child Occupant Protection Symposium, Society of Automotive Engineering.

Winston, F. K., I. G. Chen, et al. (2004). "Recent trends in child restraint practices in the United States." Pediatrics 113(5): e458-64.

Wismans, J., J. Maltha et al. (1979). "Child restraint evaluation by experimental and mathematical simulation." Society of Automotive Engineers SAE 791017.

Zuckerbraun, B. S., K. Morrison, et al. (2004). "Effect of age on cervical spine injuries in children after motor vehicle collisions: effectiveness of restraint devices." J Pediatr Surg **39**(3): 483-6.

## CONTACT

Dr. Michael T. Prange has a Ph.D. in Bioengineering from the University of Pennsylvania and currently works for Exponent. He can be contacted at (215) 594-8800 or mprange@exponent.com.

**APPENDIX**

| | CRS with tension | | | CRS without tension | | | Vehicle belts only | | |
|---|---|---|---|---|---|---|---|---|---|
| | 32 kph | 48 kph | 64 kph | 32 kph | 48 kph | 64 kph | 32 kph | 48 kph | 64 kph |
| peak sled acceleration (g) | -16.7 | -25.3 | -33.7 | -16.6 | -25.0 | -33.5 | -16.6 | -25.2 | -33.5 |
| sled delta-V (kph) | 32.6 | 48.2 | 64.0 | 32.7 | 48.0 | 64.2 | 32.7 | 48.2 | 64.2 |
| sled pulse duration (ms) | 96.7 | 96 | 93.6 | 96.9 | 97.1 | 94.9 | 97.5 | 95.6 | 95.6 |
| peak head acceleration (g) | 41.4 | 74.3 | 86.2 | 43.5 | 72.2 | 85.0 | 61.1 | 95.7 | 121.1 |
| peak upper neck tension (N) | 1430 | 2130 | 2151 | 1299 | 1781 | 2136 | 1084 | 2229 | 3010 |
| peak upper neck extension moment (Nm) | -11.7 | -13.8 | -12.8 | -11.9 | -11.6 | -14.0 | -17.1 | -29.0 | -40.1 |
| peak upper neck flexion moment (Nm) | 2.3 | 6.6 | 5.8 | 3.4 | 5.7 | 5.6 | 13.2 | 10.1 | 18.2 |
| peak lower neck tension (N) | 625 | 1358 | 2100 | 691 | 1453 | 1869 | 926 | 1904 | 2807 |
| peak lower neck flexion moment (Nm) | 99 | 113 | 97 | 94 | 97 | 86 | 65 | 102 | 138 |
| peak chest acceleration - 3ms clip (g) | 31.9 | 52.2 | 60.4 | 35.2 | 55.5 | 64.5 | 26.5 | 42.4 | 61.7 |
| peak chest deflection (mm) | 19 | 20 | 26 | 19 | 20 | 24 | 22 | 26 | 33 |
| $HIC_{36}$ | 137 | 544 | 808 | 148 | 496 | 737 | 192 | 819 | 1971 |
| $HIC_{15}$ | 230 | 802 | 1243 | 248 | 699 | 1171 | 250 | 836 | 2266 |
| Nij | 1.09 | 1.39 | 1.44 | 1.06 | 1.15 | 1.40 | 0.86 | 1.50 | 2.01 |
| Ntf | 0.08 | 0.28 | 0.34 | 0.11 | 0.22 | 0.27 | 0.58 | 1.12 | 1.35 |

Table A1: Results from the sled tests using 3 different restraint configurations and 3 different crash severities.

**From:** Infant injury evaluation [EBMS@PEACH.EASE.LSOFT.COM] on behalf of Michael Prange [mprange@EXPONENT.COM]
**Sent:** Wednesday, June 20, 2007 1:29 PM
**To:** EBMS@PEACH.EASE.LSOFT.COM
**Subject:** More biomechanical data

**Attachments:** Prange 2007-01-1170.pdf

More evidence that shaking alone does not result in head injuries and that neck injuries are more likely to occur than head injuries in shaking without impact.

Just to put the injury tolerance levels and the loads during shaking into perspective:

I recently published a paper (see attached) where we ran frontal crash simulations using a pneumatic sled and measured the head and neck response of a 3-year-old dummy restrained at the torso by the 5-point belt of a forward-facing child car seat. So, this is a situation analogous to shaking where the torso is held and the head rotates about the neck without contact. Because we simulated a frontal crash and the child seat was faced forward, the deceleration created flexion of the head (chin-to-chest).

During a 20mph crash, the resulting head accelerations were 40-45g, well below the injury tolerance (~175g). However the upper neck tension was 250-350lbs. These values are in the range of the neck injury tolerance value of 254 lbs used in federal crash test standards. The 30mph crashes resulted in 70-75g head acceleration and 450-500lbs upper neck tension. The chest acceleration was 50-55g. The 40mph crashes produced 80-85g head acceleration and 500-700 lbs of tension in the upper neck.

I have investigated several real-world crashes that reflect the above results. Young children restrained in very severe frontal crashes. No evidence of head impact and no serious head injuries with severe tensile neck injuries (AO dislocations, spinal cord damage, etc).

Conclusions:

1. A severe crash (30mph) results in inertial loading of the head below head injury levels (assuming the occupant does not contact the vehicle interior). If a person is to shake (without impact) a 3-year-old child and cause serious head injuries then he/she has to produce loads more severe than a car hitting a wall at 30mph (30mph velocity stopping in less than 0.1 sec). This is absolutely impossible.

2. Even if someone could … During a situation where the torso is held and the head rotates as a result of inertial loading (non-impact), the neck forces exceed the injury tolerance before the head acceleration reached injurious levels. The 30mph crash resulted head accelerations below levels for serious head injury while still producing neck loads approximately double the accepted neck injury tolerance.

Notes: We did not measure angular acceleration of the head in these tests. Currently, similar 1-year-old crash test data is not available due to the fact that this age is usually tested in the appropriate restraint configuration using a rear-facing child seat.

-Michael Prange

**From:** Infant injury evaluation [EBMS@PEACH.EASE.LSOFT.COM] on behalf of
jgalaznik1@AOL.COM
**Sent:** Thursday, June 28, 2007 11:43 AM
**To:** EBMS@PEACH.EASE.LSOFT.COM
**Subject:** Prange 2007---critique and raw data

**Attachments:** Prange 2007.doc

At Chicago, Kirk T said at one point that sometimes the biomechanical engineer does not always know exactly what specific piece of data and analysis that the rest of us are looking for. At Chicago, Chris Van Ee said something to me indicating that in their MVA testings the real injuring forces on the neck are all basically Tension forces.

I've spent several days going over the the Prange 2007 article. I posted initial questions. Mike responded. I wrote up another set of questions for Mike OFF-LIST. Then I ask if we could meet with him and review the videos and the raw data. Then yesterday we were able to meet with Mike Prange at his office for 2 hours to go over the video and the raw data with my specific questions, trying to get at the specific points of analysis that I wanted clarified.

Attached in a fairly extensive word docuement (four pages) framing of the answers I think that I got, and how I think that these answers impact the legal world of SBS. I wrote this up this AM. Mike has not edited it. If I got things wrong, then they are my mistakes and I would appreciate correction, because I plan to use this in court and in making cases for appeals. [I've already given Prange 2007 along with Ouyang 2005, Luck 2006 to a lawyer in the middle of mounting an appeal.]

I've tried to be very clear in what I am thinking. However, if you are going to read my attached analysis, I might suggest that you have a copy of Prange 2003 and Prange 2007. I am sending a second e-mail with the Prange 2003 and Pragne 2007 attached, if you don't have them handy.

Again I would appreciate feed back, even if it is negative, because I'm going with this for future testimonies and trials in the very near future.
John G

---

AOL now offers free email to everyone. Find out more about what's free from AOL at **AOL.com**.

**From:** Infant injury evaluation [EBMS@PEACH.EASE.LSOFT.COM] on behalf of Michael Prange [mprange@EXPONENT.COM]
**Sent:** Wednesday, June 20, 2007 1:29 PM
**To:** EBMS@PEACH.EASE.LSOFT.COM
**Subject:** More biomechanical data

**Attachments:** Prange 2007-01-1170.pdf

More evidence that shaking alone does not result in head injuries and that neck injuries are more likely to occur than head injuries in shaking without impact.

Just to put the injury tolerance levels and the loads during shaking into perspective:

I recently published a paper (see attached) where we ran frontal crash simulations using a pneumatic sled and measured the head and neck response of a 3-year-old dummy restrained at the torso by the 5-point belt of a forward-facing child car seat. So, this is a situation analogous to shaking where the torso is held and the head rotates about the neck without contact. Because we simulated a frontal crash and the child seat was faced forward, the deceleration created flexion of the head (chin-to-chest).

During a 20mph crash, the resulting head accelerations were 40-45g, well below the injury tolerance (~175g). However the upper neck tension was 250-350lbs. These values are in the range of the neck injury tolerance value of 254 lbs used in federal crash test standards. The 30mph crashes resulted in 70-75g head acceleration and 450-500lbs upper neck tension. The chest acceleration was 50-55g. The 40mph crashes produced 80-85g head acceleration and 500-700 lbs of tension in the upper neck.

I have investigated several real-world crashes that reflect the above results. Young children restrained in very severe frontal crashes. No evidence of head impact and no serious head injuries with severe tensile neck injuries (AO dislocations, spinal cord damage, etc).

Conclusions:

1. A severe crash (30mph) results in inertial loading of the head below head injury levels (assuming the occupant does not contact the vehicle interior). If a person is to shake (without impact) a 3-year-old child and cause serious head injuries then he/she has to produce loads more severe than a car hitting a wall at 30mph (30mph velocity stopping in less than 0.1 sec). This is absolutely impossible.

2. Even if someone could … During a situation where the torso is held and the head rotates as a result of inertial loading (non-impact), the neck forces exceed the injury tolerance before the head acceleration reached injurious levels. The 30mph crash resulted head accelerations below levels for serious head injury while still producing neck loads approximately double the accepted neck injury tolerance.

Notes: We did not measure angular acceleration of the head in these tests. Currently, similar 1-year-old crash test data is not available due to the fact that this age is usually tested in the appropriate restraint configuration using a rear-facing child seat.

-Michael Prange

Prange, M., T. Moore, W. Newberry, D. Peterson, B. Smyth, and C. Corrigan, "Inertial Neck Injuries in Children Involved In Frontal Collisions", Society of Automotive Engineers World Congress, SAE 2007-01-1170, 2007.

From my perspective, this is a major new article that counters several specific issues that we face:

- It is from 2007, and it involves PRIMARY research.  In seeking a post conviction appeal and raising the issue of new evidence, this new evidence must meet the following conditions:
  1. The evidence has been discovered after trial and it could not have been obtained at or prior to trial through reasonable diligence;
  2. The evidence is not cumulative;
  3. It is not being used solely to impeach credibility;
  4. It would likely compel a different verdict.

This means we will always need new evidence, and this new evidence cannot be just a restatement of prior publications or rehashing of old data.  It needs to be based on new primary data.  When seeking an appeal, finding old articles that support our points does not appear to be helpful.

- Prange 2007 does demonstrate with primary new data that neck injury would be predicted BEFORE head injury in a MVA/impulse-loaded event, but we have been arguing this already, however, this new article is presenting Primary Raw Data supporting this.

- In my opinion, the raw data takes, "chin/chest" and "occiput/back" impact off the table.  This is important.

THIS IS HUGE.

In consulting on cases, I have encountered several basic arguments from the proponents of SBS or accusing pediatricians to counter our claims that one should expect neck injury before head injury.

----First, the proponents of SBS argue that we don't know the properties of real human neck.  [We now have Duncan 1874, Ouyang 2005, and Luck 2006 to counter this.]
----Second, the proponents of SBS argue that it does not matter if the defense asserts that shaking alone cannot do it and that impact is required, because when the head/chin hits the chest and the head/occiput hits the back, you actually have impact.  Therefore, everything that the defense is trying to say is 'pure shaking' is in reality, a 'Shaken Impact'.
----Third, the proponents of SBS argue that the neck is not injured, because it is PROTECTED from injury by its very flexible and stretchable nature.
----Fourth, the proponents of SBS argue that the neck is not injured BECAUSE it is PROTECTED from stretch by the head/chin to chest and head/occiput to back impact.
This logic is demonstrated by the following quote from the testimony of a prominent proponent of SBS:
"neck injury certainly wouldn't be characteristic of SBS basically because the child has such a large head that it is going to hit their chest and their back before they stretch their neck.  And children also have very flexible necks flexible necks compared to adults.  An infant won't [have a neck injury] because there is no stretch on the neck.  So, in essence, there's not a really good reason to have a neck injury, but every once in a while.  You rarely do see a case of that where it's a ___ neck injury and not, like I said, the spinal fluid circulating around blood, Your could say, well, some of

that's coming from the neck area, some of it's in the back area, but that just means that's incidental to SAH."

When Dr. Prange shared this article, his summary stated, "During a 20 mph crash, the resulting head accelerations were 40-45 $g$, well below the injury tolerance (approx 175 $g$). However, the UPPER NECK TENSION was 250-350 lbs. These values are in the range of the neck injury tolerance value of 254 lbs used in federal crash tests standards. The 30 mph crashes resulted in 70-75 $g$ head acceleration and 450-500 lbs upper neck tension. The 40 mph crashes produced 80-85 $g$ head acceleration and 500-700 lbs of tension in the upper neck.

Conclusion:

- A severe crash (30 mph) results in inertial loading of the head below head injury levels (assuming the occupant does not contact the vehicle interior). If a person is to shake (WITHOUT IMPACT) a 3-year-old and cause serious head injuries then he/she has to produce loads more severe than a car hitting a wall at 30 mph (30 mph velocity stopping in less than 0.1 sec). This is impossible.

- Even if someone could ...During a situation where the torso is held and the head rotates as a result of inertial loading (non-impact), the neck forces exceed the injury tolerance before the head acceleration reached injurious levels. The 30 mph crash resulted head accelerations below levels for serious head injury while still producing neck loads approximately double the accepted neck injury tolerance."

He presented the "Peak UPPER Neck Tension" data in Figure 2.
He presented the "Peak resultant head accelerations" data in Figure 8.
He presented the HIC15 data in Figure 10, and HIC 36 data in Figure 11.

This seems quite clear and supports Prange's above conclusions. However, it does not totally arm one to counter the proponents of SBS in court.

They will say that not only does the head hit the chest [and back] in a shaking, but also the head may sometimes even hit the knee. However, the head hitting the leg only occurred in the 'belts-only' testing, not in the Child Restraint System (CRS) testing. Abusive shaking with hands about the chest is most analogous to Car Restraint System (CRS) testing properly installed CRS with belt tension. CRS testing without belt tension has slack between CRS and engagement of deceleration forces and 'belts-only' testing had slack between infant and engagement of deceleration forces, and when deceleration forces did engage, they were not symmetrical and encouraged much bending at or below the waist. Also on viewing the video of the 'belts-only' testing, the hips are already flexed to >90 degrees BEFORE the start of the test, setting up the potential impact with the head. This configuration would never be present in an "abusive shaking". As in the trial testimony quoted above, the proponents of SBS may claim that the head/chin to chest and/or head/occiput to back impact is the injuring impact, and that these impacts somehow protect the neck from injury.

Duhaime '87 through Prange '03 articles invite and suggest support for this challenge. I would suggest that you get out the Prange 2003 and go to Figure 2. Now look at the plotting of the "Angular Acceleration". Note that the peak angular acceleration (2,600 rad/sec[2]) was recorded at

the EXACT MOMENT of impact of the head on chest or back and that this was very brief and that it was many times greater than angular accelerations anywhere else during the shaking cycle. This is a product of the ATD design with a single low hinge neck and the kind of 'unnatural' shaking motion that has to be generated in order to get this dummy to shake.

Note that when shaken, the newer ATDs like Carole Jenny efforts with the APRICA 3.4, a 7.5-pound dummy with upper and lower hinge, could only produce angular accelerations of 900-1400 rad/sec$^2$. On page 3 of 8 of the report, she states that, "Also the neck displacement is 155 degrees in the APRICA 3.4 and 95 degrees in the CRABI. The APRICA neck is much more flexible than the CRABI neck. The chin of the APRICA ATD gets closer to the chest and the back of the head goes further back." (Carole Jenny's report "Commonwealth v. Ann Power, December 29, 2005) NOTE, THAT SHE DID NOT SAY THAT THE HEAD ACTUALLY HIT THE CHEST OR BACK, BUT IMPLIED THAT WITH A BETTER NECK THAT IT MIGHT. I would also point out that she only got 900-1400 rad/sec$^2$ and basically confirmed Prange 2003, when they said that the 2600 rad/sec$^2$ was not the real number, but that it was the maximal potential that might ever be expected in a horizontal abusive shaking event.

THE UNADDRESSED ISSUE IS STILL CHIN/CHEST AND OCCIPUT/ BACK IMPACT.
---Is it protective of the Neck?
---Is it in any shape or form of a magnitude that might be injurious?
To counter and shut down the SBS proponent's arguments, we need raw data to prove that the answer to both of these questions is unequivocally "NO"!!!

On the surface, the Prange 2007 article would appear to have not addressed these issues, and unless we can take these issues off the table, then the proponents of SBS will continue to hide behind these issues.

**If they can be taken off the table, then every case should be subject to appeal, where the proponents of SBS have obtained a conviction and have asserted any of their counter arguments.**

However, on close reading of the Prange 2007 article, particularly for the "CRS with Tension" data (the most analogous to abusive shaking dynamics), several things leap out:

First, the Peak Upper Neck Tension EXCEEDS Peak Lower Neck Tension at 20-30 mph crashes (compare Figure 2 with Figure 6).

Second, the Peak Upper Neck EXTENSION Moment was 2-4 times greater than the Peak Upper Neck Flexion Moment. Moment is TORQUE about an axis of rotation. The counter intuitive observation from this data is that the Peak FORCES responsible for generating rotational acceleration at the UPPER NECK occurred in **EXTENSION**—not FLEXION as when the head finally stops its forward motion.

**If the raw data clearly demonstrates that in a real MVA with the forward facing child, the Peak Upper Neck Tension and Moment occur prior to the end of the forward head motion and that impact does not occur (or if it does occur that it is minimal and clearly benign) then these issues are off the table.**

I met with and asked Dr. Michael Prange to review the raw data with me and explain it. I wanted to know exactly when in the forward arcing motion of the head that the "Peak Upper Neck Tension"/damaging stretching occurred.  If it were prior to the end of the forward arcing motion, then Chin to Chest impact is **IRRELEVANT TO ANY CONSIDERATION OF NECK INJURY.**  The proponents of SBS would be debunked in this area.

On the video and in the raw data, if one describes the arcing motion against the faced of a clock, starting from vertical (12:00) BEFORE the crash and ending at slightly past horizontal (3-3:30) at the end of forward motion;  **Then the Peak Upper Neck Tension/damaging stretch occurred between 1:00-1:30.  IT IS NOT RELATED TO IMPACT AT ALL.  By this data, the potential for chin/chest impact or the flexibility of the neck cannot be asserted to be in anyway protective of the neck.**

The second issue was with peak angular acceleration.  Torque about an axis is what generates rotational acceleration.  The Prange 2007 (Figure 3 vs. Figure 4) indicates that the EXTENSION MOMENT/torque was 2-4 times greater than the Flexion Moment/torque.  Although they did not actually record angular acceleration, the peak angular acceleration of the head would be expected to occur when the peak torque was acting.  We needed to know when this was occurring and did it in any way correspond to the final forward motion of the head and/or impact of the head/chin on the chest.

On the video and in the raw data, it is clear that the answer is 'NO'.  The Peak Upper Neck Extension Moment occurred approximately between 1:00 and 2:00 on the clock face—not at the end of forward motion (3:00-3:30) and certainly not corresponding to any impact of head/chin on chest.

In my opinion, the raw data behind the Prange 2007 article clearly takes head/chin to chest impact (and head/occiput to back impact) off the table.  It is not protective of the neck, and it is not a contributor to Peak Angular Acceleration---even if the neck were flexible enough to allow it to occur.

In hindsight, this is obvious.  SBS was originally described as 'whiplash' injury.  Whiplash occurs when something (head) is moving in one direction by inertia (momentum/velocity x mass, but not accelerating) and is then has its motion jerked/stopped and accelerated in the opposite direction by a force.  As the head is moving forward at first with the body and the body is then accelerated in the opposite direction, the head initially continues forward by inertia, until the neck suddenly becomes taut and JERKS the head.  This is the point of maximum tension stress on the upper neck and by the raw data the point of maximum torque that would be causing peak angular acceleration of the head.

The Prange 2007 article and the raw data behind it should make every prior SBS/Shaken Impact conviction open for appeal on the basis of NEW EVIDENCE, if there was testimony during the prosecution's case-in-chief that Head/Chin to chest or Head/Occiput to back impact constituted the "Impact" part of Shaken Impact Syndrome or that these hypothesized impacts were somehow protective of the neck from stretch.

**From:** Infant injury evaluation [EBMS@PEACH.EASE.LSOFT.COM] on behalf of Kirk Thibault
[kthibault@BIOMECHANICSINC.COM]
**Sent:** Thursday, June 28, 2007 1:28 PM
**To:** EBMS@PEACH.EASE.LSOFT.COM
**Subject:** Re: Prange 2007---critique and raw data

**Attachments:** composite.jpg

John - on the very specific topic of the timing of peak neck tension and head impact (i.e., bottoming out of the head/chin on some structure).

Attached is a composite of data taken from a sled test simulating a 35 mph frontal collision. The data are from the Hybrid III 3 yo that was forward facing and restrained in an appropriate 5point harness. The plot overlays the resultant head acceleration and the neck force in the axial (Fz) direction as a function of time. I have not seen Michael's raw data (accel or force v time curves) but I suspect they are similar.

The notable point is the peaking of the tensile neck loads prior to the head striking anything (i.e., neck forces peak due to the inertial loads acting on the head neck system while the torso is restrained and the system is undergoing frontal decel). It is interesting to note that the inertial head accel peak coincides with the peak in the Fz, as one would expect. There is a spike in the head accel trace following this peak due to the head striking the lap of the dummy.

Is this what you are interested in understanding? Your argument, although interesting, is somewhat academic, as the loads experienced in this type of event are substantially greater than those experienced during shaking. I have not heard the "neck being protected by the chin bottoming out on the chest" yet, and, to my knowledge, the only person who really makes a big deal about this contact is Cory, arguing that it substantially increases the head accelerations (Cory and Jones reported peak resultant head accels with their shaking doll of over 100g and HICs > 1000 because of the spikey nature of this contact - I'm not sure how legit their model was in this regard).

Kirk



35 mph frontal sled test
3yo Hill, restrained in
forward facing, 5-point restraint.

*spike in head accel due to
head impact with lap.

peak

peak2*

peak1

Neck Fz (+ Tension)

Head Acc. Resultant

Time (msec)

0    25    50    75    100    125    150    175

**From:** Infant injury evaluation [EBMS@PEACH.EASE.LSOFT.COM] on behalf of
jgalaznik1@AOL.COM
**Sent:** Thursday, June 28, 2007 10:18 PM
**To:** EBMS@PEACH.EASE.LSOFT.COM
**Subject:** Re: Prange 2007--critique

Kirk,

This is exactly the kind of data I was looking for.

Mike's data was collected from an ATD with 6 way sensors at the upper and lower neck--so it gave a
graph of upper neck tension and lower neck tension vs time. It also had a graph of upper neck moment
and lower neck moment vs. time.  None of his CRS tests resulted in head impact with the lap, legs, or
knees.
The peak upper neck tensions occurred at or very near the peak upper neck EXTENSION moment, and
both of these occurred well before end of the arcing motion. This was specifically what I was looking
for.  Your peak total neck tension (not broken into upper and lower) and peak head acceleration (if you
ignore the head lap contact), which I think corresponds to Mike's peak upper neck EXTENSION
moment--looks similar to his. Again his datat devided upper neck moment from lower neck moment and
extension moment from flexion moment.

I appreciate that these numbers are for 30+ mile MVA's and that the forces and accelerations that would
have to be exerted on the chest of infant or toddler or 3 year old to reproduce these accelerations are
many times beyond human strength.  However, armed with this I feel very good about saying that neck
injury is clearly predicted before head injury (that is not new), BUT now when they come back with an
explanation for why the neck is not injured that includes anything like:
  ---we don't know the strength of an infants neck;
---the increased flexibility  and infantile anatomy somehow protects the neck; or
---head impacting on the chest and/or back is damaging impact of a 'pure shaking' event that makes it ,in
fact, a "Shaken Impact", we can now specifically confront them with this recently published data.  We
can actually try to draw them into saying or speculating on these issues, and then try to back them into
an impeachable position. The jury won't understand the physics but if we can make them squirm, stutter,
or confess that they are totally unaware of new literature --that should to some degree help our case.

Again, in my opinion, any case that resulted in a conviction where the SBS proponent made these kinds
of statements to discredit the defense's claim that neck injury should occur before head injury in cases of
impulse loading, then in my opinion we now have legitimate grounds to say that new evidence has
recently come forward to prove them wrong and that this is new evidence and therefore warrents a new
trial.
New evidence is apparently tricky. I worked on an appeal case where trial was third week of November
and the article I would like to have claimed as new evidence came out the first week of November. I
could not claim it was new.

The quote from a prior testimony of a porponent of SBS that I included is real; the lawyer in an
upcoming case where this expert is expected to testify for the prosecution just sent it to me.
John G

file://C:\Documents and Settings\John Plunkett\My Documents\Galaznik 2007-06-28 - 2.htm   7/1/2007

**From:** Infant injury evaluation [EBMS@PEACH.EASE.LSOFT.COM] on behalf of
jgalaznik1@AOL.COM
**Sent:** Friday, June 29, 2007 8:54 AM
**To:** EBMS@PEACH.EASE.LSOFT.COM
**Subject:** Re: Prange 2007---critique and raw data

Kirk,

I've had a chance to sleep on your response.

"Cory and Jones reported peak resultant head accels with their shaking doll of over 100g and
HCIs>1000 because of the spikey nature of this contact--I'm not sure how legit their model was in this
regard."

This sounds like the kind of report out of Cory and Jones that would lead the pediatiric proponents of
SBS to make statements in court like those I have reported.  If the head were to have to be stopped by
the forces coming through the neck, 100Gs of head accel and a 2-3 pound head would require 2-300
pounds of force to stop it and even they knew this would break the neck. They could not allow this data
to come out without offering an explanation to their followers that might be used in court to preserve the
possibility that pure shaking can still do it.  They want the 100Gs and the HIC >1000 for brain damage
to make the case that "shaking alone" can to it.  But then they needed an explanation as to why the neck
did not break in order to get head injury BEFORE neck injury.

ANSWER: The neck is protected from stretch by this damaging IMPACT of the chin with the chest and
occiput with back.

This "answer" coupled with the rumored report of 100Gs and a HIC> 1000, is all a pediatrician needs to
confidently make the arguments in court that I mentioned---1. real properties of neck not known. 2. the
impact of a pure shaking is of such a magnitude as to make every pure shaking in affect a "Shaken
Impact".  3. The neck is super flexible and stretchible and easily allows this impact. 4. The neck itself
is 'protected' from damaging forces in this 'violent abusive shaking' by the forces being absorbed by the
chin/chest and occiput/back impact.  [That actually sounds logical enough to a jury to buy in to--how
can you blame them for not believeing it?]

What did Cory have to do to get to 100Gs ---even if only a brief spike----???use a single low hinge neck
and a "gravity assisted" motion (vertical not horizontal) starting with the ATD above shoulder height
and ending with the ATD at knee/distal thigh level and have a steel plate on the chin and another on the
chest????

Mike's data didn't appear to have a 100G peak, occurring at the end of the forward arcing motion that I
would think should correspond to impact of chin on chest.  If the chin is making contact in Mike's data--
Bottoming Out on the Chest--then it would have appeared to have done so 'gently' without any measured
impact spike.  To me, this is what Challenges/Debunks their claim that this is the damaging head
impact--the 100Gs and HIC>1000.
And since the damaging Peak Upper Neck Tension had already occurred back at the 1:00-1:30 head
position in the forward arcing motion--then this gentle bottoming out/impact of chin/chest does not
protect the upper neck from damage.
----------
Mike's data did contain "Peak Lower Neck Flexion Moment" and it was substantial (His Figure 7), but
peak lower neck tension were < upper neck tension at 20-30mph velocity crashes and = upper neck
tension at 40 mph crashes.  I think that he also indicated that there was no compressing forces

measurable in the anterior neck---leading him to indicate that the neck acts like a rope.  This makes me wonder if the ATDs chin is "gently" bottoming out on the upper chest/anterior base of the neck BEFORE the final terminal stopping of the heads forward arcing motion. If chin were to actually have the rigidity to serve as fulcrum, then:

---if base of neck to CG of head were 8cm
---if tip of chin to CG of the head were 8cm
---if bottomed out chin/chest point were 3-4 cm from the lower neck sensor.

Then WHAT?

All forces at the lower/base of the neck would be tension---Mike would still say that the neck  is acting like a rope.  The Flexion moment at the upper neck would be small---and it has bottomed out and moment at the upper neck minimized.  The axis of rotation would now be about the point of chin/chest contact and the lower neck would to some extent be protected because pure torque would have been tranformed to tension. ·This would result in some protection of the lower neck in an MVA and predominance of upper neck injury when neck injury is observed.

Again I would appreciate feedback.

John G

**From:** Infant injury evaluation [EBMS@PEACH.EASE.LSOFT.COM] on behalf of Kirk Thibault [kthibault@BIOMECHANICSINC.COM]
**Sent:** Friday, June 29, 2007 9:30 AM
**To:** EBMS@PEACH.EASE.LSOFT.COM
**Subject:** Re: Prange 2007---critique and raw data

**Attachments:** Cory2003-T3.jpg

John - your emails are so packed with things that I'll have to take some time to digest and respond. In the meantime, attached is Table 3 from Cory and Jones, 2003 where they report the peak tangential accelerations of the head (among other parameters) and HIC for various tests. As the numbers for acceleration are given in units of meters/second2, just divide by 10 to get a quick estimate of acceleration in units of "g" (g = 9.81 m/sec2 - close enough).

This is where I was getting those figures - it is not "rumor", it is published data. The pulse width they report for these peaks is on the order of 15-20 milliseconds. Obviously this gets the head accels and HICs nice and high to make the point that shaking can cause accels much higher than those reported in the 1987 Duhaime, et al study. There is no mention of the neck in this paper and the effect that this contact has on the neck loads. I suppose whoever is arguing that the contact between chin and chest is protective is basically arguing that this contact prevents the neck from exceeding some non-injurious range of motion with respect to angular displacement. However, as we have already pointed out, the neck tension is important. So, when you look at Duncan;s tests, for example, he applied axial tension to the surrogates he tests. Presumably the neck angular range of motion was not exceeded, but he managed to cause structural disruption of the spine due to the axial forces applied in tension.

Cory and Jones do not publish the acceleration-time curves for their tests so it is not possible to compare their shaking (with head contact to the torso) events to anything. They only publish peak values and the width of the "peak" event, whatever that means. There is no clip value specified, so it is not possible to determine where or how they are expressing the width of the "spike". This is sort of a classic case of one trying to have their cake and eat it too. We want the head accels to be real high, generated by shaking with impact, but we want the neck loads to be real low, from a protective impact no less. So where are the mandible injuries, bruising to the chest, etc.? They are in the same pace as the bruising and grip marks on the torso that never seem to be present, despite underlying posterior rib fractures.

Kirk

Table III. Results recorded from the body and head accelerometer data and the calculated Head Injury Criterion (HIC) values for the parameter combination model shake tests.

| Test-Name | Results for model head | | | | | | Results for model body | | |
| --- | --- | --- | --- | --- | --- | --- | --- | --- | --- |
| | Peak tangential head AccN (m/s²) | Peak angular head AccN (rad/s²) | Peak tangential head velocity (m/s) | Peak angular head velocity (rad/s) | Time duration of peak head AccN curve (ms) | Head Injury Criterion (HIC) | Peak body AccN (m/s²) | Peak body velocity (m/s) | Time duration of peak body AccN curve (ms) |
| Para-1 | 1385.47 | 8149.80 | 7.16 | 42.13 | 13 | 684 | 71.51 | 3.53 | 103 |
| Para-2 | 1577.35 | 9278.53 | 8.63 | 50.78 | 11 | 1001 | 91.33 | 6.18 | 129 |
| Para-3 | 1558.02 | 9164.85 | 8.34 | 48.47 | 11 | 952 | 98.14 | 5.89 | 121 |
| Para-4 | 1785.86 | 10216.88 | 10.30 | 60.59 | 15 | 1421 | 73.97 | 4.02 | 144 |
| Para-5 | 1515.65 | 8916.56 | 9.22 | 54.24 | 17 | 1089 | 67.98 | 4.02 | 130 |
| Para-6 | 1366.93 | 8040.74 | 8.53 | 50.20 | 17 | 821 | 54.74 | 4.61 | 161 |
| Para-7 | 1389.10 | 8171.15 | 8.83 | 51.94 | 18 | 866 | 79.66 | 5.89 | 174 |
| Para-8 | 1353.00 | 7958.80 | 8.04 | 47.32 | 18 | 735 | 66.81 | 5.49 | 136 |
| Para-9 | 1542.92 | 9076.98 | 8.93 | 52.51 | 17 | 1008 | 71.22 | 5.98 | 143 |
| Para-10 | 1353.58 | 7982.26 | 8.73 | 51.36 | 18 | 846 | 64.06 | 5.79 | 172 |
| Mean | 1488.16 | 8695.46 | 8.66 | 50.95 | 16 | 938 | 73.74 | 5.12 | 140 |

B 12

*The American Journal of Forensic Medicine and Pathology*   22(1):1–12, 2001.   ©2001 Lippincott Williams & Wilkins, Inc., Philadelphia

# Fatal Pediatric Head Injuries Caused by Short-Distance Falls

John Plunkett, M.D.

Physicians disagree on several issues regarding head injury in infants and children, including the potential lethality of a short-distance fall, a lucid interval in an ultimately fatal head injury, and the specificity of retinal hemorrhage for inflicted trauma. There is scant objective evidence to resolve these questions, and more information is needed. The objective of this study was to determine whether there are witnessed or investigated fatal short-distance falls that were concluded to be accidental. The author reviewed the January 1, 1988 through June 30, 1999 United States Consumer Product Safety Commission database for head injury associated with the use of playground equipment. The author obtained and reviewed the primary source data (hospital and emergency medical services' records, law enforcement reports, and coroner or medical examiner records) for all fatalities involving a fall.

The results revealed 18 fall-related head injury fatalities in the database. The youngest child was 12 months old, the oldest 13 years. The falls were from 0.6 to 3 meters (2–10 feet). A noncaretaker witnessed 12 of the 18, and 12 had a lucid interval. Four of the six children in whom funduscopic examination was documented in the medical record had bilateral retinal hemorrhage. The author concludes that an infant or child may suffer a fatal head injury from a fall of less than 3 meters (10 feet). The injury may be associated with a lucid interval and bilateral retinal hemorrhage.

**Key Words:** Child abuse—Head injury—Lucid interval—Retinal hemorrhage—Subdural hematoma.

Many physicians believe that a simple fall cannot cause serious injury or death (1–9), that a lucid interval does not exist in an ultimately fatal pediatric head injury (7–13), and that retinal hemorrhage is highly suggestive if not diagnostic for inflicted trauma (7,12,14–21). However, several have questioned these conclusions or urged caution when interpreting head injury in a child (15,22–28). This controversy exists because most infant injuries occur in the home (29,30), and if there is history of a fall, it is usually not witnessed or is seen only by the caretaker. Objective data are needed to resolve this dispute. It would be helpful if there were a database of fatal falls that were witnessed or wherein medical and law enforcement investigation unequivocally concluded that the death was an accident.

The United States Consumer Product Safety Commission (CPSC) National Injury Information Clearinghouse uses four computerized data sources (31). The National Electronic Injury Surveillance System (NEISS) file collects current injury data associated with 15,000 categories of consumer products from 101 U.S. hospital emergency departments, including 9 pediatric hospitals. The file is a probability sample and is used to estimate the number and types of consumer product–related injuries each year (32). The Death Certificate (DC) file is a demographic summary created by information provided to the CPSC by selected U.S. State Health Departments. The Injury/Potential Injury Incident (IR) file contains summaries, indexed by consumer product, of reports to the CPSC from consumers, medical examiners and coroners (Medical Examiner and Coroner Alert Project [MECAP]), and newspaper accounts of product-related incidents discovered by local or regional CPSC staff (33). The In-Depth Investigations (AI) file contains summaries of investigations performed by CPSC staff based on reports received from the NEISS, DC, or IR files (34). The AI files provide details about the incident from victim and witness interviews, accident reconstruction, and review of law enforce-

Manuscript received April 10, 2000; revised September 15, 2000; accepted September 24, 2000.

From the Departments of Pathology and Medical Education, Regina Medical Center, 1175 Nininger Road, Hastings MN 55033, U.S.A.; Email: plunkettj@reginamedical.com.

*J. PLUNKETT*

ment, health care facility, and coroner or medical examiner records (if a death occurred).

## METHODS

I reviewed the CPSC, DC, IR, and AI files for all head and neck injuries involving playground equipment recorded by the CPSC from January 1, 1988 through June 30, 1999. There are 323 entries in the playground equipment IR file, 262 in the AI file, 47 in the DC file, and more than 75,000 in the NEISS file. All deaths in the NEISS file generated an IR or AI file. If the file indicated that a death had occurred from a fall, I obtained and reviewed each original source record from law enforcement, hospitals, emergency medical services (EMS), and coroner or medical examiner offices except for one autopsy report. However, I discussed the autopsy findings with the pathologist in this case.

## RESULTS

There are 114 deaths in the Clearinghouse database, 18 of which were due to head injury from a fall. The following deaths were excluded from this study: those that involved equipment that broke or collapsed, striking a person on the head or neck (41); those in which a person became entangled in the equipment and suffocated or was strangled (45), those that involved equipment or incidents other than playground (6 [including a 13.7-meter fall from a homemade Ferris wheel and a 3-meter fall from a cyclone fence adjacent to a playground]); and falls in which the death was caused exclusively by neck (carotid vessel, airway, or cervical spinal cord) injury (4).

The falls were from horizontal ladders (4), swings (7), stationary platforms (3), a ladder attached to a slide, a "see-saw", a slide, and a retaining wall. Thirteen occurred on a school or public playground, and five occurred at home. The database is not limited to infants and children, but a 13-year-old was the oldest fatality (range, 12 months–13 years; mean, 5.2 years; median, 4.5 years). The distance of the fall, defined as the distance of the closest body part from the ground at the beginning of the fall, could be determined from CPSC or law enforcement reconstruction and actual measurement in 10 cases and was 0.6 to 3.0 meters (mean, 1.3 ± 0.77; median, 0.9). The distance could not be accurately determined in the seven fatalities involving swings and one of the falls from a horizontal ladder, and may have been from as little as 0.6 meters to as much as 2.4 meters. The maximum height for a fall from a swing was assumed to

be the highest point of the arc. Twelve of the 18 falls were witnessed by a noncaretaker or were videotaped; 12 of the children had a lucid interval (5 minutes–48 hours); and 4 of the 6 in whom funduscopic examination was performed had bilateral retinal hemorrhage (Table 1).

## CASES

### Case 1

This 12-month-old was seated on a porch swing between her mother and father when the chain on her mother's side broke and all three fell sideways and backwards 1.5 to 1.8 meters (5–6 feet) onto decorative rocks in front of the porch. The mother fell first, then the child, then her father. It is not known if her father landed on top of her or if she struck only the ground. She was unconscious immediately. EMS was called; she was taken to a local hospital; and was ictal and had decerebrate posturing in the emergency room. She was intubated, hyperventilated, and treated with mannitol. A computed tomography (CT) scan indicated a subgaleal hematoma at the vertex of the skull, a comminuted fracture of the vault, parafalcine subdural hemorrhage, and right parietal subarachnoid hemorrhage. There was also acute cerebral edema with effacement of the right frontal horn and compression of the basal cisterns. She had a cardiopulmonary arrest while the CT scan was being done and could not be resuscitated.

### Case 2

A 14-month-old was on a backyard "see-saw" and was being held in place by his grandmother. The grandmother said that she was distracted for a moment and he fell backward, striking the grass-covered ground 0.6 meters (22.5 inches) below the plastic seat. He was conscious but crying, and she carried him into the house. Within 10 to 15 minutes he became lethargic and limp, vomited, and was taken to the local hospital by EMS personnel. He was unconscious but purposefully moving all extremities when evaluated, and results of funduscopic examination were normal. A CT scan indicated an occipital subgaleal hematoma, left-sided cerebral edema with complete obliteration of the left frontal horn, and small punctate hemorrhages in the left frontal lobe. There was no fracture or subdural hematoma. He was treated with mannitol; his level of consciousness rapidly improved; and he was extubated. However, approximately 7 hours after admission he began to have difficulty breathing, both pupils suddenly dilated, and he was rein-

FATAL HEAD INJURIES WITH SHORT-DISTANCE FALLS 3

TABLE 1. Summary of cases

| No. | CPSC No. | Age | Sex | Fall from | Distance M/F | Witnessed | Lucid interval | Retinal hemorrhage | Subdural hemorrhage | Autopsy | Cause of death | FP |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 1 | DC 9108013330 | 12 mos | F | Swing | 1.5–1.8/5.0–6.0 | No | No | N/R | Yes +IHF | No | Complex calvarial fracture with edema and contusions | No |
| 2 | AI 890208HBC3088 | 14 mos | M | See-saw | 0.6/2.0 | No | 10–15 minutes | No | No | No | Malignant cerebral edema with herniation | No |
| 3 | IR F910368A | 17 mos | F | Swing | 1.5–1.8/5.0–6.0 | No | No | N/R | Yes +IHF | Yes | Acute subdural hematoma with secondary cerebral edema | Yes |
| 4 | AI 921001HCC2263 | 20 mos | F | Platform | 1.1/3.5 | No | 5–10 minutes | Bilateral multilayered | Yes +IHF | Limited | Occipital fracture with subdural/subarachnoid hemorrhage progressing to cerebral edema and herniation | Yes |
| 5ª | DC 9312060661 | 23 mos | F | Platform | 0.70/2.3 | Yes | 10 minutes | Bilateral, NOS | Yes | Yes | Acute subdural hematoma with associated cerebral edema | Yes |
| 6 | DC 9451016513 | 26 mos | M | Swing | 0.9–1.8/3.0–6.0 | Yes | No | Bilateral multilayered | Yes +IHF | Yes | Subdural hematoma with associated cerebral edema | Yes |
| 7ª | AI 891215HcC2094 | 3 yrs | M | Platform | 0.9/3.0 | Yes | 10 minutes | N/R | Yes | No | Acute cerebral edema with herniation | No |
| 8 | AI 910515HCC2182 | 3 yrs | F | Ladder | 0.6/2.0 | yes | 15 minutes | N/R | (autopsy only) | Yes | Complex calvarial fracture, contusions, cerebral edema with herniation | Yes |
| 9 | DC 9253024577 | 4 yrs | M | Slide | 2.1/7.0 | Yes | 3 hours | N/R | No | Yes | Epidural hematoma | Yes |
| 10 | AI 920710HWE4014 | 5 yrs | M | Horizontal ladder | 2.1/7.0 | No | No | N/R | Yes | No | Acute subdural hematoma with acute cerebral edema | Yes |
| 11 | AI 960517HCC5175 | 6 yrs | M | Swing | 0.6–2.4/2.0–8.0 | No | 10 minutes | No | Yes +IHF | No | Acute subdural hematoma | Yes |
| 12 | AI 970324HCC3040 | 6 yrs | M | Horizontal ladder | 3.0/10.0 | Yes | 45 minutes | N/R | No | No | Malignant cerebral edema with herniation | Yes |
| 13 | AI 881229HCC3070 | 6 yrs | F | Horizontal ladder | 0.9/3.0 | Yes | 1+ hour | N/R | Yes +IHF | Yes | Subdural and subarachnoid hemorrhage, cerebral infarct, and edema | Yes |
| 14 | AI 930930HWE5025 | 7 yrs | M | Horizontal ladder | 1.2–2.4/4.0–8.0 | Yes | 48 hours | N/R | N/R | Yes | Cerebral infarct secondary to carotid/vertebral artery thrombosis | Yes |
| 15 | AI 970409HCC1096 | 8 yrs | F | Retaining wall | 0.9/3.0 | Yes | 12+ hours | N/R | Yes (autopsy only) | Yes | Acute subdural hematoma | Yes |
| 16 | AI 890621HCC3195 | 10 yrs | M | Swing | 0.9–1.5/3.0–5.0 | Yes | 10 minutes | Bilateral multilayered | Yes | Yes | Acute subdural hematoma contiguous with an AV malformation | No |
| 17 | AI 92042BHCC1671 | 12 yrs | F | Swing | 0.9–1.8/3.0–6.0 | Yes | No | N/R | No | Yes | Occipital fracture with extensive contra-coup contusions | Yes |
| 18 | AI 891016HCC1511 | 13 yrs | F | Swing | 0.6–1.8/2.0–6.0 | Yes | No | N/R | Yes +IHF | Yes | Occipital fracture, subdural hemorrhage, cerebral edema | Yes |

ªThe original CT scan for case #7 and the soft tissue CT windows for case #5 could not be located and were unavailable for review.
CPSC, Consumer Products Safety Commission; AI, accident investigation; IR, incident report; DC, death certificate; M, male; F, female; Distance, the distance of the closest body part from the ground at the start of the fall (see text); M/F, meters/feet; Witnessed, witnessed by a noncaretaker or videotaped; N/R, not recorded; IHF, including interhemispheric or falx; FP, forensic pathologist–directed death investigation system.

4                                    *J. PLUNKETT*

tubated. A second CT scan demonstrated progression of the left hemispheric edema despite medical management, and he was removed from life support 22 hours after admission.

### Case 3

This 17-month-old had been placed in a baby carrier–type swing attached to an overhead tree limb at a daycare provider's home. A restraining bar held in place by a snap was across her waist. She was being pushed by the daycare provider to an estimated height of 1.5 to 1.8 meters (5–6 feet) when the snap came loose. The child fell from the swing on its downstroke, striking her back and head on the grassy surface. She was immediately unconscious and apneic but then started to breathe spontaneously. EMS took her to a pediatric hospital. A CT scan indicated a large left-sided subdural hematoma with extension to the interhemispheric fissure anteriorly and throughout the length of the falx. The hematoma was surgically evacuated, but she developed malignant cerebral edema and died the following day. A postmortem examination indicated symmetrical contusions on the buttock and midline posterior thorax, consistent with impact against a flat surface; a small residual left-sided subdural hematoma; cerebral edema with anoxic encephalopathy; and uncal and cerebellar tonsillar herniation. There were no cortical contusions.

### Case 4

A 20-month-old was with other family members for a reunion at a public park. She was on the platform portion of a jungle gym when she fell from the side and struck her head on one of the support posts. The platform was 1.7 meters (67 inches) above the ground and 1.1 meters (42 inches) above the top of the support post that she struck. Only her father saw the actual fall, although there were a number of other people in the immediate area. She was initially conscious and talking, but within 5 to 10 minutes became comatose. She was taken to a nearby hospital, then transferred to a tertiary-care facility. A CT scan indicated a right occipital skull fracture with approximately 4-mm of depression and subarachnoid and subdural hemorrhage along the tentorium and posterior falx. Funduscopic examination indicated extensive bilateral retinal and preretinal hemorrhage. She died 2 days later because of uncontrollable increased intracranial pressure. A limited postmortem examination indicated an impact subgaleal hematoma overlying the fracture in the mid occiput.

### Case 5

A 23-month-old was playing on a plastic gym set in the garage at her home with her older brother. She had climbed the attached ladder to the top rail above the platform and was straddling the rail, with her feet 0.70 meters (28 inches) above the floor. She lost her balance and fell headfirst onto a 1-cm (⅜-inch) thick piece of plush carpet remnant covering the concrete floor. She struck the carpet first with her outstretched hands, then with the right front side of her forehead, followed by her right shoulder. Her grandmother had been watching the children play and videotaped the fall. She cried after the fall but was alert and talking. Her grandmother walked/carried her into the kitchen, where her mother gave her a baby analgesic with some water, which she drank. However, approximately 5 minutes later she vomited and became stuporous. EMS personnel airlifted her to a tertiary-care university hospital. A CT scan indicated a large right-sided subdural hematoma with effacement of the right lateral ventricle and minimal subfalcine herniation. (The soft tissue windows for the scan could not be located and were unavailable for review.) The hematoma was immediately evacuated. She remained comatose postoperatively, developed cerebral edema with herniation, and was removed from life support 36 hours after the fall. Bilateral retinal hemorrhage, not further described, was documented in a funduscopic examination performed 24 hours after admission. A postmortem examination confirmed the right frontal scalp impact injury. There was a small residual right subdural hematoma, a right parietal lobe contusion (secondary to the surgical intervention), and cerebral edema with cerebellar tonsillar herniation.

### Case 6

A 26-month-old was on a playground swing being pushed by a 13-year-old cousin when he fell backward 0.9 to 1.8 meters (3–6 feet), striking his head on hard-packed soil. The 13-year-old and several other children saw the fall. He was immediately unconscious and was taken to a local emergency room, then transferred to a pediatric hospital. A CT scan indicated acute cerebral edema and a small subdural hematoma adjacent to the anterior interhemispheric falx. A funduscopic examination performed 4 hours after admission indicated extensive bilateral retinal hemorrhage, vitreous hemorrhage in the left eye, and papilledema. He had a subsequent cardiopulmonary arrest and could not be resuscitated. A postmortem examination confirmed the retinal hemorrhage and indicated a right parietal scalp impact injury but no calvarial frac-

ture, a "film" of bilateral subdural hemorrhage, cerebral edema with herniation, and focal hemorrhage in the right posterior midbrain and pons.

## Case 7

This 3-year-old with a history of TAR (thrombocytopenia–absent radius) syndrome was playing with other children on playground equipment at his school when he stepped through an opening in a platform. He fell 0.9 meters (3 feet) to the hard-packed ground, striking his face. A teacher witnessed the incident. He was initially conscious and able to walk. However, approximately 10 minutes later he had projectile vomiting and became comatose, was taken to a local hospital, and subsequently transferred to a pediatric hospital. A CT scan indicated a small subdural hematoma and diffuse cerebral edema with uncal herniation, according to the admission history and physical examination. (The original CT report and scan could not be located and were unavailable for review.) His platelet count was 24,000/mm$^3$, and he was treated empirically with platelet transfusions, although he had no evidence for an expanding extra-axial mass. Resuscitation was discontinued in the emergency room.

## Case 8

This 3-year-old was at a city park with an adult neighbor and four other children, ages 6 to 10. She was standing on the third step of a slide ladder 0.6 meters (22 inches) above the ground when she fell forward onto compact dirt, striking her head. The other children but not the adult saw the fall. She was crying but did not appear to be seriously injured, and the neighbor picked her up and brought her to her parents' home. Approximately 15 minutes later she began to vomit, and her mother called EMS. She was taken to a local emergency room, then transferred to a pediatric hospital. She was initially lethargic but responded to hyperventilation and mannitol; she began to open her eyes with stimulation and to spontaneously move all extremities and was extubated. However, she developed malignant cerebral edema on the second hospital day and was reintubated and hyperventilated but died the following day. A postmortem examination indicated a subgaleal hematoma at the vertex of the skull associated with a complex fracture involving the left frontal bone and bilateral temporal bones. There were small epidural and subdural hematomas (not identifiable on the CT scan), bilateral "contra-coup" contusions of the inferior surfaces of the frontal and temporal lobes, and marked cerebral edema with uncal herniation.

## Case 9

A 4-year-old fell approximately 2.1 meters (7 feet) from a playground slide at a state park, landing on the dirt ground on his buttock, then falling to his left side, striking his head. There was no loss of consciousness, but his family took him to a local emergency facility, where an evaluation was normal. However, he began vomiting and complained of left neck and head pain approximately 3 hours later. He was taken to a second hospital, where a CT scan indicated a large left parietal epidural hematoma with a midline shift. He was transferred to a pediatric hospital and the hematoma was evacuated, but he developed malignant cerebral edema with right occipital and left parietal infarcts and was removed from the respirator 10 days later. A postmortem examination indicated a small residual epidural hematoma, marked cerebral edema, bilateral cerebellar tonsillar and uncal herniation, and hypoxic encephalopathy. There was no identifiable skull fracture.

## Case 10

A 5-year-old was apparently walking across the horizontal ladder of a "monkey bar," part of an interconnecting system of homemade playground equipment in his front yard, when his mother looked out one of the windows and saw him laying face down on the ground and not moving. The horizontal ladder was 2.1 meters (7 feet) above compacted dirt. EMS were called, he was taken to a local hospital, and then transferred to a pediatric hospital. A CT scan indicated a right posterior temporal linear fracture with a small underlying epidural hematoma, a 5-mm thick acute subdural hematoma along the right temporal and parietal lobes, and marked right-sided edema with a 10-mm midline shift. He was hyperventilated and treated with mannitol, but the hematoma continued to enlarge and was surgically evacuated. However, he developed uncontrollable cerebral edema and was removed from life support 10 days after the fall.

## Case 11

A 6-year-old was on a playground swing at a private lodge with his 14-year-old sister. His sister heard a "thump," turned around, and saw him on the grass-covered packed ground beneath the swing. The actual fall was not witnessed. The seat of the swing was 0.6 meters (2 feet) above the ground, and the fall distance could have been from as high as 2.4 meters (8 feet). He was initially conscious and talking but within 10 minutes became comatose and was taken to a local emergency room, then transferred to a tertiary-care hospital. A CT

6                                       J. PLUNKETT

scan indicated a large left frontoparietal subdural hematoma with extension into the anterior inter-hemispheric fissure and a significant midline shift with obliteration of the left lateral ventricle. There were no retinal hemorrhages. He was treated aggressively with dexamethasone and hyperventilation, but there was no surgical intervention. He died the following day.

## Case 12

This 6-year-old was at school and was sitting on the top crossbar of a "monkey bar" approximately 3 meters (10 feet) above compacted clay soil when an unrelated noncaretaker adult saw him fall from the crossbar to the ground. He landed flat on his back and initially appeared to have the wind knocked out of him but was conscious and alert. He was taken to the school nurse who applied an ice pack to a contusion on the back of his head. He rested for approximately 30 minutes in the nurse's office and was being escorted back to class when he suddenly collapsed. EMS was called, and he was transported to a pediatric hospital. He was comatose on admission, the fundi could not be visualized, and a head CT scan was interpreted as normal. However, a CT scan performed the following morning approximately 20 hours after the fall indicated diffuse cerebral edema with effacement of the basilar cisterns and fourth ventricle. There was no identifiable subdural hemorrhage or calvarial fracture. He developed transtentorial herniation and died 48 hours after the fall.

## Case 13

This 6-year-old was playing on a school playground with a 5th grade student/friend. She was hand-over-hand traversing the crossbar of a "monkey bar" 2.4 meters (7 feet 10 inches) above the ground with her feet approximately 1 meter (40 inches) above the surface. She attempted to slide down the pole when she reached the end of the crossbar but lost her grip and slid quickly to the ground, striking the compacted dirt first with her feet, then her buttock and back, and finally her head. The friend informed the school principal of the incident, but the child seemed fine and there was no intervention. She went to a relative's home for after-school care approximately 30 minutes after the fall, watched TV for a while, then complained of a headache and laid down for a nap. When her parents arrived at the home later that evening, 6 hours after the incident, they discovered that she was incoherent and "drooling." EMS transported her to a tertiary-care medical center. A CT scan indicated a right parieto-occipital skull frac-

ture, subdural and subarachnoid hemorrhage, and a right cerebral hemisphere infarct. The infarct included the posterior cerebral territory and was thought most consistent with thrombosis or dissection of a right carotid artery that had a persistent fetal origin of the posterior cerebral artery. She remained comatose and was removed from the respirator 6 days after admission. A postmortem examination indicated superficial abrasions and contusions over the scapula, a prominent right parietotemporal subgaleal hematoma, and a right parietal skull fracture. She had a 50-ml subdural hematoma and cerebral edema with global hypoxic or ischemic injury ("respirator brain"), but the carotid vessels were normal.

## Case 14

A 7-year-old was on the playground during school hours playing on the horizontal ladder of a "monkey bar" when he slipped and fell 1.2 to 2.4 meters (4–8 feet). According to one witness, he struck his forehead on the bars of the vertical ladder; according to another eyewitness he struck the rubber pad covering of the asphalt ground. There are conflicting stories as to whether he had an initial loss of consciousness. However, he walked back to the school, and EMS was called because of the history of the fall. He was taken to a local hospital, where evaluation indicated a Glasgow coma score of 15 and a normal CT scan except for an occipital subgaleal hematoma. He was kept overnight for observation because of the possible loss of consciousness but was released the following day. He was doing homework at home 2 days after the fall when his grandmother noticed that he was stumbling and had slurred speech, and she took him back to the hospital. A second CT scan indicated a left carotid artery occlusion and left temporal and parietal lobe infarcts. The infarcts and subsequent edema progressed; he had brainstem herniation; and he was removed from life support 3 days later (5 days after the initial fall). A postmortem examination indicated ischemic infarcts of the left parietal, temporal, and occipital lobes, acute cerebral edema with herniation, and thrombosis of the left vertebral artery. Occlusion of the carotid artery, suspected premortem, could not be confirmed.

## Case 15

This 8-year-old was at a public playground near her home with several friends her age. She was hanging by her hands from the horizontal ladder of a "monkey bar" with her feet approximately 1.1 meters (3.5 feet) above the ground when she attempted to swing from the bars to a nearby 0.9-

Case 3:14-cv-00047-TJC-PDB   Document 10-8   Filed 06/06/14   Page 24 of 41 PageID 761

meter (34-inch) retaining wall. She landed on the top of the wall but then lost her balance and fell to the ground, either to a hard-packed surface (one witness) or to a 5.1-cm (2-inch) thick resilient rubber mat (a second witness), striking her back and head. She initially cried and complained of a headache but continued playing, then later went home. Her mother said that she seemed normal and went to bed at her usual time. However, when her mother tried to awaken her at approximately 8:30 the following morning (12 hours after the fall) she complained of a headache and went back to sleep. She awoke at 11 a.m. and complained of a severe headache then became unresponsive and had a seizure. EMS took her to a nearby hospital, but she died in the emergency room. A postmortem examination indicated a right temporoparietal subdural hematoma, extending to the base of the brain in the middle and posterior fossae, with flattening of the gyri and narrowing of the sulci. (The presence or absence of herniation is not described in the autopsy report.) There was no calvarial fracture, and there was no identifiable injury in the scalp or galea.

### Case 16

A 10-year-old was swinging on a swing at his school's playground during recess when the seat detached from the chain and he fell 0.9 to 1.5 meters (3–5 feet) to the asphalt surface, striking the back of his head. The other students but not the three adult playground supervisors saw him fall. He remained conscious although groggy and was carried to the school nurse's office, where an ice pack was placed on an occipital contusion. He suddenly lost consciousness approximately 10 minutes later, and EMS took him to a local hospital. He had decerebrate posturing when initially evaluated. Funduscopic examination indicated extensive bilateral confluent and stellate, posterior and peripheral preretinal and subhyaloid hemorrhage. A CT scan showed a large acute right frontoparietal subdural hematoma with transtentorial herniation. The hematoma was surgically removed, but he developed malignant cerebral edema and died 6 days later. A postmortem examination indicated a right parietal subarachnoid AV malformation, contiguous with a small amount of residual subdural hemorrhage, and cerebral edema with anoxic encephalopathy and herniation. There was no calvarial fracture.

### Case 17

A 12-year-old was at a public playground with a sister and another friend and was standing on the seat of a swing when the swing began to twist. She lost her balance and fell 0.9 to1.8 meters (3–6 feet) to the asphalt surface, striking her posterior thorax and occipital scalp. She was immediately unconscious and was taken to a tertiary-care hospital emergency room, where she was pronounced dead. A postmortem examination indicated an occipital impact injury associated with an extensive comminuted occipital fracture extending into both middle cranial fossa and "contra-coup" contusions of both inferior frontal and temporal lobes.

### Case 18

This 13-year-old was at a public playground with a friend. She was standing on the seat of a swing with her friend seated between her legs when she lost her grip and fell backwards 0.6 to 1.8 meters (2–6 feet), striking either a concrete retaining wall adjacent to the playground or a resilient 5.1-cm (2 inch) thick rubber mat covering the ground. She was immediately unconscious and was given emergency first aid by a physician who was nearby when the fall occurred. She was taken to a nearby hospital and was purposefully moving all extremities and had reactive pupils when initially evaluated. A CT scan indicated interhemispheric subdural hemorrhage and generalized cerebral edema, which progressed rapidly to brain death. A postmortem examination indicated a linear nondepressed midline occipital skull fracture, subdural hemorrhage extending to the occiput, contusion of the left cerebellar hemisphere, bifrontal "contra-coup" contusions, and cerebral edema.

## DISCUSSION

### General

Traumatic brain injury (TBI) is caused by a force resulting in either strain (deformation/unit length) or stress (force/original cross-sectional area) of the scalp, skull, and brain (35–37). The extent of injury depends not only on the level and duration of force but also on the specific mechanical and geometric properties of the cranial system under loading (38–40). Different parts of the skull and brain have distinct biophysical characteristics, and calculating deformation and stress is complex. However, an applied force causes the skull and brain to move, and acceleration, the time required to reach peak acceleration, and the duration of acceleration may be measured at specific locations (36,41). These kinematic parameters do not cause the actual brain damage but are useful for analyzing TBI because they are easy to quantify. Research in TBI using physical models and animal experiments has shown that a force resulting in angular acceleration pro-

*8*                                      *J. PLUNKETT*

duces primarily diffuse brain damage, whereas a force causing exclusively translational acceleration produces only focal brain damage (36). A fall from a countertop or table is often considered to be exclusively translational and therefore assumed incapable of producing serious injury (3,7–9). However, sudden impact deceleration *must* have an angular vector unless the force is applied only through the center of mass (COM), and deformation of the skull during impact *must* be accompanied by a volume change (cavitation) in the subdural "space" tangential to the applied force (41). The angular and deformation factors produce tensile strains on the surface veins and mechanical distortions of the brain during impact and may cause a subdural hematoma without deep white matter injury or even unconsciousness (42–44).

Many authors state that a fall from less than 3 meters (10 feet) is rarely if ever fatal, especially if the distance is less than 1.5 meters (5 feet) (1–6,8,9). The few studies concluding that a short-distance fall may be fatal (22–24,26,27) have been criticized because the fall was not witnessed or was seen only by the caretaker. However, isolated reports of observed fatal falls and biomechanical analysis using experimental animals, adult human volunteers, and models indicate the potential for serious head injury or death from as little as a 0.6-meter (2-foot) fall (48–52). There are limited experimental studies on infants (cadaver skull fracture) (53,54) and none on living subadult nonhuman primates, but the adult data have been extrapolated to youngsters and used to develop the Hybrid II/III and Child Restraint–Air Bag Interaction (CRABI) models (55) and to propose standards for playground equipment (56,63). We simply do not know either kinematic or nonkinematic limits in the pediatric population (57,58).

Each of the falls in this study exceeded established adult kinematic thresholds for traumatic brain injury (41,48–52). Casual analysis of the falls suggests that most were primarily translational. However, deformation and *internal* angular acceleration of the skull and brain *caused by the impact* produce the injury. What happens during the impact, not during the fall, determines the outcome.

### Subdural Hemorrhage

A "high strain" impact (short pulse duration and high rate for deceleration onset) typical for a fall is more likely to cause subdural hemorrhage than a "low strain" impact (long pulse duration and low rate for deceleration onset) that is typical of a motor vehicle accident (42,61). The duration of deceleration for a head-impact fall against a nonyielding surface is usually less than 5 milliseconds (39,59–61). Experimentally, impact duration longer than 5 milliseconds will not cause a subdural hematoma unless the level of angular acceleration is above $1.75 \times 10^5$ rad/s² (61). A body in motion with an angular acceleration of $1.75 \times 10^5$ rad/s² has a tangential acceleration of 17,500 m/s² at 0.1 meters (the distance from the midneck axis of rotation to the midbrain COM in the Duhaime model). A human cannot produce this level of acceleration by impulse ("shake") loading (62).

An injury resulting in a subdural hematoma in an infant may be caused by an accidental fall (43,44,64). A recent report documented the findings in seven children seen in a pediatric hospital emergency room after an accidental fall of 0.6 to 1.5 meters who had subdural hemorrhage, no loss of consciousness, and no symptoms (44). The characteristics of the hemorrhage, especially extension into the posterior interhemispheric fissure, have been used to suggest if not confirm that the injury was nonaccidental (9,62,65–68). The hemorrhage extended into the posterior interhemispheric fissure in 5 of the 10 children in this study (in whom the blood was identifiable on CT or magnetic resonance scans and the scans were available for review) and along the anterior falx or anterior interhemispheric fissure in an additional 2 of the 10.

### Lucid Interval

Disruption of the diencephalic and midbrain portions of the reticular activating system (RAS) causes unconsciousness (36,69,70). "Shearing" or "diffuse axonal" injury (DAI) is thought to be the primary biophysical mechanism for immediate traumatic unconsciousness (36,71). Axonal injury has been confirmed at autopsy in persons who had a brief loss of consciousness after a head injury and who later died from other causes, such as coronary artery disease (72). However, if unconsciousness is momentary or brief ("concussion") subsequent deterioration *must* be due to a mechanism other than DAI. Apnea and catecholamine release have been suggested as significant factors in the outcome following head injury (73,74). In addition, the centripetal theory of traumatic unconsciousness states that primary disruption of the RAS will not occur in isolation and that structural brainstem damage from inertial (impulse) or impact (contact) loading *must* be accompanied by evidence for cortical and subcortical damage (36). This theory has been validated by magnetic resonance imaging and CT scans in adults and children (75,76). Only one of the children in this study (case 6) had evidence for any component of DAI. This child had focal hemor-

rhage in the posterior midbrain and pons, thought by the pathologist to be primary, although there was no skull fracture, only "a film" of subdural hemorrhage, no tears in the corpus callosum, and no lacerations of the cerebral white matter (grossly or microscopically).

The usual cause for delayed deterioration in infants and children is cerebral edema, whereas in adults it is an expanding extra-axial hematoma (77). If the mechanism for delayed deterioration (except for an expanding extra-axial mass) is venospasm, cerebral edema may be the only morphologic marker. The "talk and die or deteriorate (TADD)" syndrome is well characterized in adults (78). Two reports in the pediatric literature discuss TADD, documenting 4 fatalities among 105 children who had a lucid interval after head injury and subsequently deteriorated (77,79). Many physicians believe that a lucid interval in an ultimately fatal pediatric head injury is extremely unlikely or does not occur unless there is an epidural hematoma (7,8,11). Twelve children in this study had a lucid interval. A noncaretaker witnessed 9 of these 12 falls. One child had an epidural hematoma.

### Retinal Hemorrhage

The majority of published studies conclude that retinal hemorrhage, especially if bilateral and posterior or associated with retinoschisis, is highly suggestive of, if not diagnostic for, nonaccidental injury (9,14–21). Rarely, retinal hemorrhage has been associated with an accidental head injury, but in these cases the bleeding was unilateral (80). It is also stated that traumatic retinal hemorrhage may be the direct mechanical effect of violent shaking (15). However, retinal hemorrhage may be caused experimentally either by ligating the central retinal vein or its tributaries or by suddenly increasing intracranial pressure (81,82); retinoschisis is the result of breakthrough bleeding and venous stasis not "violent shaking" (15,83). Any sudden increase in intracranial pressure may cause retinal hemorrhage (84–87). Deformation of the skull coincident to an impact nonselectively increases intracranial pressure. Venospasm secondary to traumatic brain injury selectively increases venous pressure. Either mechanism may cause retinal hemorrhage irrespective of whether the trauma was accidental or inflicted. Further, retinal and optic nerve sheath hemorrhages associated with a ruptured vascular malformation are due to an increase in venous pressure not extension of blood along extravascular spaces (81–83,88). Dilated eye examination with an indirect ophthalmoscope is thought to be more sensitive for detecting retinal bleeding than routine ex-

amination and has been recommended as part of the evaluation of any pediatric patient with head trauma (89). None of the children in this study had a formal retinal evaluation, and only six had funduscopic examination documented in the medical record. Four of the six had bilateral retinal hemorrhage.

### Pre-existing Conditions

One of these children (case 16) had a subarachnoid AV malformation that contributed to development of the subdural hematoma, causing his death. One (case 7) had TAR syndrome (90), but his death was thought to be caused by malignant cerebral edema not an expanding extra-axial mass.

### Cerebrovascular Thrombosis

Thrombosis or dissection of carotid or vertebral arteries as a cause of delayed deterioration after head or neck injuries is documented in both adults and children (91,92). Case 14 is the first report of a death due to traumatic cerebrovascular thrombosis in an infant or child. Internal carotid artery thrombosis was suggested radiographically in an additional death (case 13) but could not be confirmed at autopsy. However, this child died 6 days after admission to the hospital, and fibrinolysis may have removed any evidence for thrombosis at the time the autopsy was performed.

### Limitations

1. Six of the 18 falls were not witnessed or were seen only by the adult caretaker, and it is possible that another person caused the nonobserved injuries.
2. The exact height of the fall could be determined in only 10 cases. The others (7 swing and 1 stationary platform) could have been from as little as 0.6 meters (2 feet) to as much as 2.4 meters (8 feet).
3. A minimum impact velocity sufficient to cause fatal brain injury cannot be inferred from this study. Likewise, the probability that an individual fall will have a fatal outcome cannot be stated because the database depends on voluntary reporting and contractual agreements with selected U.S. state agencies. The NEISS summaries for the study years estimated that there were more than 250 deaths due to head and neck injuries associated with playground equipment, but there are only 114 in the files. Further, this study does not include other nonplayground equipment–related fatal falls, witnessed or not witnessed, in the CPSC database (32).

*10*                                    *J. PLUNKETT*

## CONCLUSIONS

1. Every fall is a complex event. There must be a biomechanical analysis for any incident in which the severity of the injury appears to be inconsistent with the history. The question is not "Can an infant or child be seriously injured or killed from a short-distance fall?" but rather "If a child falls (x) meters and strikes his or her head on a nonyielding surface, what will happen?"

2. Retinal hemorrhage may occur whenever intracranial pressure exceeds venous pressure or whenever there is venous obstruction. The characteristic of the bleeding cannot be used to determine the ultimate cause.

3. Axonal damage is unlikely to be the mechanism for lethal injury in a low-velocity impact such as from a fall.

4. Cerebrovascular thrombosis or dissection must be considered in any injury with apparent delayed deterioration, and especially in one with a cerebral infarct or an unusual distribution for cerebral edema.

5. A fall from less than 3 meters (10 feet) in an infant or child may cause fatal head injury and may not cause immediate symptoms. The injury may be associated with bilateral retinal hemorrhage, and an associated subdural hematoma may extend into the interhemispheric fissure. A history by the caretaker that the child may have fallen cannot be dismissed.

**Acknowledgements:** The author thanks the law enforcement, emergency medical services, and medical professionals who willingly helped him obtain the original source records and investigations; Ida Harper-Brown (Technical Information Specialist) and Jean Kennedy (Senior Compliance Officer) from the U.S. CPSC, whose enthusiastic assistance made this study possible; Ayub K. Ommaya, M.D., and Werner Goldsmith, Ph.D., for critically reviewing the manuscript; Jan E. Leestma, M.D., and Faris A. Bandak, Ph.D., for helpful comments; Mark E. Myers, M.D., and Michael B. Plunkett, M.D., for review of the medical imaging studies; Jeanne Reuter and Kathy Goranowski, for patience, humor, and completing the manuscript; and all the families who shared the stories of their sons and daughters and for whom this work is dedicated.

## APPENDIX

Newtonian mechanics involving constant acceleration may be used to determine the impact velocity in a gravitational fall. However, constant acceleration formulas cannot be used to calculate the relations among velocity, acceleration, and distance traveled *during* an impact because the deceleration

is not uniform (45). This analysis requires awareness of the shape of the deceleration curve, knowledge of the mechanical properties and geometry of the cranial system, and comprehension of the stress and strain characteristics for the specific part of the skull and brain that strikes the ground. A purely translational fall requires that the body is rigid and that the external forces acting on the body pass only through the COM, i.e., there is no rotational component. A 1-meter-tall 3-year-old hanging by her knees from a horizontal ladder with the vertex of her skull 0.5 meters above hard-packed earth approximates this model. If she looses her grip and falls, striking the occipital scalp, her impact velocity is 3.1 m/second. An exclusively angular fall also requires that the body is rigid. In addition, the rotation must be about a fixed axis or a given point internal or external to the body, and the applied moment and the inertial moment must be at the identical point or axis. If this same child has a 0.5-meter COM and has a "matchstick" fall while standing on the ground, again striking her occiput, her angular velocity is 5.42 rad/second and tangential velocity 5.42 m/second at impact. The impact velocity is higher than predicted for an exclusively translational or external-axis angular fall when the applied moment and the inertial moment are at a different fixed point (slip and fall) or when the initial velocity is not zero (walking or running, then trip and fall), and the vectors are additive. However, the head, neck, limbs, and torso do not move uniformly during a fall because relative motion occurs with different velocities and accelerations for each component. Calculation of the impact velocity for an actual fall requires solutions of differential equations for each simultaneous translational and rotational motion (45). Further, inertial or impulse loading (whiplash) may cause head acceleration more than twice that of the midbody input force and may be important in a fall where the initial impact is to the feet, buttock, back, or shoulder, and the final impact is to the head (46,47).

The translational motion of a rigid body at constant gravitational acceleration (9.8 m/s$^2$) is calculated from:

$$F = ma \qquad v^2 = 2as \qquad v = at$$

where F = the sum of all forces acting on the body (newton), m = mass (kg), a = acceleration (m/s$^2$), v = velocity (m/s), s = distance (m), and t = time (s).

The angular motion of a rigid body about a fixed axis at a given point of the body under constant gravitational acceleration (9.8 m/s$^2$) is calculated from:

$$M = I\alpha \qquad \omega = v^t/r \qquad \alpha = a^t/r$$

where M = the applied moment about the COM or about the fixed point where the axis of rotation is located, I = the inertial moment about this same COM or fixed point, $\alpha$ = angular acceleration (rad/s$^2$), $\omega$ = angular velocity (rad/s), r = radius (m), $v^t$ = tangential velocity (m/s), and $a^t$ = tangential acceleration (m/s$^2$).

The angular velocity $\omega$ for a rigid body of length L rotating about a fixed point is calculated from:

$$\tfrac{1}{2}I_0\omega^2 = maL/2 \qquad I_0 = (1/3)\ mL^2$$

where $I_0$ = the initial inertial moment, $\omega$ = angular velocity (rad/s), m = mass (kg), a = gravitational acceleration (9.8 m/s$^2$), and L = length.

## REFERENCES

1. Chadwick DL, Chin S, Salerno C, et al. Deaths from falls in children: how far is fatal? *J Trauma* 1991;31:1353–5.
2. Williams RA. Injuries in infants and small children resulting from witnessed and corroborated free falls. *J Trauma* 1991;31:1350–2.
3. Duhaime AC, Alario AJ, Lewander WJ, et al. Head injury in very young children: mechanisms, injury types, and ophthalmologic findings in 100 hospitalized patients younger than 2 years of age. *Pediatrics* 1992;90:179–85.
4. Lyons TJ, Oates RK. Falling out of bed: a relatively benign occurrence. *Pediatrics* 1993;92:125–7.
5. Swalwell C. Head injuries form short distance falls. *Am J Forensic Med Pathol* 1993;14:171–2.
6. Sheridan F, Anthony RM, Rieber GD, et al. Head injuries from short distance falls. *Am J Forensic Med Pathol* 1993;14:172–3.
7. Duhaime AC, Christian CW, Rorke LB, et al. Non-accidental head injury in infants: the "shaken baby syndrome." *N Engl J Med* 1998;338:1822–1829.
8. Case ME, Graham MA, Corey Handy T, et al. Position paper on shaken baby. Adopted by the Board of Directors, United States National Association of Medical Examiners, San Francisco, October 30, 1998. St. Louis: The National Association of Medical Examiners.
9. Showers J. Never shake a baby. The Second National Conference on Shaken Baby Syndrome. National Association of Children's Hospitals and Related Institutions, 1999. Available at: www.childrenshospitals.net/nachri/news/pr%5Fsbs.html.
10. Tullous M, Walker MD, Wright LC. Evaluation and treatment of head injuries in children. In Fuhrman BP, Zimmerman JJ, eds. *Pediatric critical care.* St. Louis: Mosby Year Book, 1992:1165–82.
11. Willman KY, Bank DE, Senac M, Chadwick DL. Restricting the time of injury in fatal inflicted head injury. *Child Abuse Negl* 1997;21:929–40.
12. Amaya M, Bechtel K, Blatt SD, et al. Shaken baby syndrome and the death of Matthew Eappen. (November 11, 1997). Available at: www.silcon.com/&thksim;ptave/shaken.htm.
13. Jenny C, Hymel KP. Recognizing abusive head trauma in children. *JAMA* 1999;282:1421–2.
14. Eisenbrey AB. Retinal hemorrhage in the battered child. *Childs Brain* 1979;5:40–4.
15. Greenwald MJ, Weiss A, Oesterle CS, et al. Traumatic retinoschisis in battered babies. *Ophthalmology* 1986;93:618–24.
16. Rao N, Smith RE, Choi JH, et al. Autopsy findings in the eyes of fourteen fatally abused children. *Forensic Sci Int* 1988;39:293–9.
17. Elner SG, Elner VM, Arnall M, Albert DM. Ocular and associated systemic findings in suspected child abuse: a necropsy study. *Arch Opthalmol* 1990;108:1094–101.
18. Williams DF, Swengel RM, Scharre DW. Posterior segment manifestations of ocular trauma. *Retina* 1990;10 (suppl):535–44.
19. Rosenberg NM, Singer J, Bolte R, et al. Retinal hemorrhage. *Pediatr Emerg Care* 1994;10:303–5.
20. Swenson J, Levitt C. Shaken baby syndrome: diagnosis and prevention. *Minn Med* 1997;80:41–4.
21. Altman RL, Kutscher ML, Brand DA. The "shaken-baby syndrome." *N Engl J Med* 1998;339:1329–30.
22. Hall JR, Reyes HM, Horvat M, et al. The mortality of childhood falls. *J Trauma* 1989;29:1273–5.
23. Rieber GD. Fatal falls in childhood: how far must children fall to sustain fatal head injury: report of cases and review of the literature. *Am J Forensic Med Pathol* 1993;14:201–7.
24. Root I. Head injuries from short distance falls. *Am J Forensic Med Pathol* 1992;13:85–7.
25. Nashelsky MB, Dix JD. The time interval between lethal infant shaking and onset of symptoms: a review of the shaken baby syndrome literature. *Am J Forensic Med Pathol* 1995;16:154–7.
26. Wilkins B. Head injury: abuse or accident? *Arch Dis Child* 1997;76:393–7.
27. Shaken babies (editorial). *Lancet* 1998;352:335.
28. Plunkett J. Restricting the time of injury in fatal inflicted head injuries. *Child Abuse Negl* 1998;22:943–4.
29. Sweeney TB. X-rated playgrounds? *Pediatrics* 1979;64:961.
30. Tursz A, LeLong N, Crost M. Home accidents to children under 2 years of age. *Paediatr Perinatol Epidemiol* 1990;4:408–21.
31. National Injury Information Clearinghouse. US Consumer Product Safety Commission (1997). Washington DC 20207. Available at: www.cpsc.gov/about/clrnghse.html.
32. Consumer Product Safety Review 1999;4:#2:3–7. Available at: www.cpsc.gov/cpscpub/pubs/cpsr.html.
33. A description of the injury or potential injury incident data base (IPII). Division of Hazard and Injury Data Systems. US Consumer Product Safety Commission (1997). Washington DC 20207. Available at: www.cpsc.gov/about/guide.html#OIPA.
34. A description of the indepth investigation database (INDP), fiscal year 1987–fiscal year 1991. Division of Hazard and Injury Data Systems. US Consumer Product Safety Commission (1992). Washington D.C. 20207. Available at: www.cpsc.gov/about/guide.html#OIPA.
35. Ommaya AK, Gennarelli TA. Cerebral concussion and traumatic unconsciousness. *Brain* 1974;97:633–54.
36. Ommaya AK. Head injury mechanisms and the concept of preventive management: a review and critical synthesis. *J Neurotrauma* 1995;12:527–46.
37. Gurdjian ES, Hodgson VR, Thomas LM, Patrick LM. Significance of relative movements of scalp, skull and intracranial contents during impact injury of the head. *J Neurosurg* 1968;29:70–2.
38. Ommaya AK, Grubb RL, Naumann RA. Coup and contra-coup injury: observations on the mechanics of visible brain injuries in the rhesus monkey. *J Neurosurg* 1971;35:503–16.
39. Gurdjian ES. Recent advances in the study of the mechanism of impact injury of the head: a summary. *Clin Neurosurg* 1972;19:1–42.
40. Gennarelli TA, Thibault LE, Adams JH, et al. Diffuse axonal injury and traumatic coma in the primate. *Ann Neurol* 1982;12:564–74.
41. McElhaney JH, Roberts VL, Hilyard JF. Head injury tolerance and criteria. In *Handbook of human tolerance.* Yatabecho, Tukuba-gun, Ibaraki, Japan: Japan Automobile Research Institute, Inc., 1976:237–335.
42. Gurdjian ES, Hodgson VR, Thomas LM, Patrick LM. Impact head injury: mechanism and prevention. In Brinkhous

B 13

| From: | Vincent Dimaio[SMTP:dimaio@CO.BEXAR.TX.US] |
|---|---|
| **Reply To:** | National Association of Medical Examiners |
| **Sent:** | Thursday, February 07, 2002 2:44 PM |
| **To:** | NAME-L@LISTSERV.CC.EMORY.EDU |
| **Subject:** | Position Paper Fatal Abusive head injuries |

I have just been given a copy of a Internet posting by The National Center on Shaken Baby Syndrome. In it they cite "Position paper on fatal abusive head injuries in infants and young children". I have been dreading this. I would like to clarify some aspects of this position paper.

As editor of the AJFMP, I had serious misgivings about publishing this paper, not because of its contents but in that it is described as a position paper. Position papers in NAME reflect the opinions of the Board of Directors, not necessarily the membership or even the forensic pathology literature.

The AJFMP is a peer review journal. If one bothers to read the box in the lower left corner of the first page of the article, one will see that the paper was rejected as a position paper by the three reviewers. They felt that it should be published as a regular paper if published. As an aside, the paper in its original form was rejected by 4 of 5 reviewers (the reason for so many reviewers was the fact that this was a position paper). Thus, the "peers" rejected it as a position paper. The paper was published because (1) whether one agrees or not, the authors have a right to their opinion and (2) as a courtesy to the Board of Directors (though with the stipulation that the peer reviewers opinion also be printed).

Shaken baby syndrome is controversial in that a number of individuals doubt its existence - including Gennarelli whose research is cited by many as an explanation for the injuries produced.

**From:** Gregory G. Davis [gdavis@path.uab.edu]
**Sent:** Tuesday, October 17, 2006 9:43 AM
**To:** 'plunkettj@frontiernet.net'; 'rkwrightmd@gmail.com'
**Subject:** NAME position paper renewal process

Dear John and Ron,

Having returned from the NAME meeting, I am now able to answer your questions, mostly.

Beyond the details that Randy has already related to you, I do not know how the "Shaken Baby" position paper was renewed. No mechanism for renewal of position papers existed at that time. The Board of Directors of NAME has addressed the matter by taking the following two steps.

1. A new addition to the guidelines for position papers was adopted. The ten points listed on the NAME website remain in effect, and to those ten points has been added an eleventh point, which is quoted below.

"11. NAME's endorsement of a position paper ends five years from publication of the position paper. NAME may renew its endorsement of a position paper by following steps 2-10 above, with revision of the original manuscript as appropriate for changes in knowledge or understanding that occur during the five year life of the original position paper."

2. The Board rescinded the renewal of the Shaken Baby position paper, because that paper did not go through the approved renewal process. The Shaken Baby paper may be revised and resubmitted, whereupon it will go through steps 2-10 listed below.

1. Position papers state positions officially endorsed by the National Association of Medical Examiners (NAME) as authorized by the Board of Directors and are intended to assist in the practice of medicolegal death investigation. Position papers discuss subjects in the field of forensic pathology of vital interest to the public and to the membership at large. A position paper will discuss not only the majority opinion about its subject but will also address accepted (mainstream) minority opinions.

2. A position paper is initiated by the President or by direction of the Board of Directors.

3. The President, with the Executive Committee's approval, appoints the lead author.

4. The lead author, with the Executive Committee's approval, selects experts and co-authors to assist in preparing the first draft of the paper.

5. The first draft is submitted to the Board of Directors for review and comment. The Board of Directors votes (simple majority) to accept or reject the paper in concept.

6. The draft is re-edited and posted on the NAME website for 30 days during which time the general membership has the opportunity to review and comment.

7. The authors re-edit the paper based on members' comments and then submit it to the Executive Committee for approval. The Executive Committee votes (simple majority) to accept, accept with additional revisions, or reject the paper.

8. Following Executive Committee approval, the position paper is presented to the Board of Directors no less than 1 month prior to the next Board of Directors' meeting for final approval. Final approval requires a super-majority (3/4) for acceptance.

9. Accepted position papers will be published as approved (with the exception of stylistic changes) in the American Journal of Forensic Medicine and Pathology as a position endorsed by the National Association of Medical Examiners for five years.

10. A paper rejected by the Executive Committee or Board of Directors may be submitted to any medical journal as the product of the authors, but it may not be identified as an endorsed opinion of NAME.

*Position paper was never re-submitted due controversy*

*B 14*

*Topics in Magnetic Resonance Imaging*
13(2): 85-94
© 2002 Lippincott Williams & Wilkins, Inc., Philadelphia

# Ethical Issues in Imaging Nonaccidental Injury: Child Abuse

Patrick D. Barnes, M.D.

**Summary:** One of the most controversial areas of nonaccidental injury is the medical diagnosis of inflicted central nervous system injury and its impact on medical, social, and legal outcomes for children and families. This review addresses the role of the neuroradiologist in the clinical care of the pediatric patient and as an expert medical witness in the area of nonaccidental injury. **Key Words:** Magnetic resonance imaging—Pediatric neuroradiology—Nonaccidental injury—Child abuse.

## INTRODUCTION

Traumatic central nervous system (CNS) injury is reportedly the leading cause of morbidity and mortality in children, accounting for nearly 100,000 emergencies per year in the United States and half the deaths from infancy through puberty (1,2). The major causes in this age group are accidental and include falls, vehicular accidents, and recreational mishaps. However, nonaccidental, inflicted, or intentional, trauma (nonaccidental injury [NAI]) is said to be an increasingly frequent cause of CNS injury and is stated to be responsible for about 80% of the deaths (estimated 3,000 per year) from brain injury in children less than 2 years old (3,4). The peak incidence of child abuse resulting in CNS injury is about 6 months of age. The acute life-threatening consequences of CNS injury as well as the long-term effects on the development of the child have been a focus of major interest since the landmark article by Caffey (5) in 1946 and the Rigler lecture by Silverman (6) in 1972. Computed tomography (CT) and, more recently, magnetic resonance imaging (MRI) reportedly have provided data that allow more accurate estimates of the incidence of CNS trauma associated with abuse, with a reported range from 7% to19% (2,7–35).

## MECHANISMS AND MANIFESTATIONS OF CNS INJURY IN NAI

Direct contact, or impact, phenomena are said to result in localized cranial distortion and thus produce focal injury, such as fracture, contusion, or an epidural hemorrhage. Accidental injury is said to be typically associated with this mechanism (10,23,36–38). Although common in abuse, it has been reported that impact injury (except for epidural hematoma) usually is not life threatening. In child abuse, it is indirect trauma (i.e., independent of skull deformation) that is considered responsible for the most severe CNS injury (10,23,36–38). Inertial loading accompanying sudden angular acceleration or deceleration of the head on the neck, as with shaking, results in shear strain deformation, disruption at tissue interfaces, and, therefore, diffuse injury. Such a mechanism would seem logical in the susceptible young infant who is predisposed by weak neck muscles, a relatively large head, and the vulnerability of an immature brain (10,23,36–38). It is this shaking mechanism that traditionally has been postulated to produce the primary injury pattern (i.e., subdural hematoma, retinal hemorrhages, and diffuse axonal injury) and secondary injury pattern (i.e., edema, swelling, hypoxia-ischemia, herniation) stated to be characteristic, if not pathognomonic, of the shaken baby syndrome (SBS) (10,23,36–51). Such patterns of damage often are associated with the most severe and fatal CNS injuries and are readily demonstrated by neuroimaging, surgical neuropathology, and postmortem neuropathology (7–57). It has further been declared that retinal hemorrhages of a par-

From the Lucile Packard Children's Hospital, Department of Radiology, Stanford University Medical Center, Palo Alto, California, U.S.A.
Address correspondence and reprint requests to Dr. Patrick D. Barnes, Lucile Packard Children's Hospital, Department of Radiology, Stanford University Medical Center, 725 Welch Road, Palo Alto, CA 94304, U.S.A.., or pbarnes@stanford.edu

ticular pattern are diagnostic of SBS/NAI; that such CNS injury on an accidental basis can only be associated with a massive force equivalent to a motor vehicle accident or a fall from a two-story building; that such injury is immediately symptomatic and cannot be followed by a lucid interval; and that changing symptoms in a child with prior head injury is due to newly inflicted injury and not just a rebleed (22,23,45,46,51,52,58–65). Therefore, from this reasoning, the last caretaker with the injured child is automatically considered guilty of abusive injury, especially if the incident is unwitnessed (43,59,63,64).

Imaging evidence of CNS injury may occur with, or without, other clinical findings of trauma (e.g., bruising) or other "higher specificity" imaging findings associated with violent shaking (e.g., metaphyseal, rib, or other typical skeletal injuries) (10,23). Therefore, clinical and imaging findings of injury out of proportion to the history of trauma and injuries of different ages have become two of the key diagnostic criteria indicating the "probability" of NAI/SBS or child abuse, particularly when encountered in a young infant (10,23,37). Such clinical and imaging findings traditionally have formed the basis on which radiologists and other health professionals have provided a medical diagnosis and offered expert testimony that such findings are "proof" of NAI/SBS.

## CONTROVERSY

Despite imaging advances, fundamental difficulties persist in extracting a definitive diagnosis of NAI/SBS based on a causative event (i.e., shaking) that is inferred, in a number of cases, from clinical, radiologic, and pathologic findings in the absence of witnessed or admitted violent shaking (22,23,43,51,61,63,64). This problem is magnified further by the lack of consistent and reliable criteria for the diagnosis of NAI/SBS, and that the vast body of literature on child abuse is composed of anecdotal case series, case reports, reviews, opinions, and position papers (2,23,43,56,51,63,64). Furthermore, many reports include cases having impact injury that not only raises doubt regarding the "shaking only" mechanism but also questions that this injury is always "nonaccidental." From an evidence-based medicine perspective, quality of evidence ratings for diagnostic criteria regarding the literature on SBS reveal that few published reports merit a rating above class IV (any design where the test is not applied in blinded evaluation, where evidence is provided by expert opinion alone, or in descriptive case series without controls) (66,67). Such quality of evidence ratings hardly earn a diagnostic criteria recommendation level of "optional," much less as a "guideline" or a "standard." This is particularly true of the neuroimaging literature on SBS/NAI,

the clinical SBS/NAI literature that uses neuroimaging, and the forensic pathology literature (7–35,44,45,52,53–56,63,64,66). The inclusion criteria for many of these series often encompass arbitrary diagnostic categories beyond "definite or confirmed abuse," such as "suspected abuse," "presumed abuse," "likely abuse," and "indeterminate."

The only attempt at a scientific study to test NAI/SBS used a biomechanical approach and measured stresses from shaking versus impact in a doll model. The study correlated those stresses with injury thresholds in subhuman primate experiments established in another study (38). Only stresses associated with impact, whether using an unpadded or padded surface, exceeded the injury thresholds that correlated with the pathologic spectrum of concussion, subdural hematoma, and diffuse axonal injury. The authors concluded that CNS injury in SBS/NAI in its most severe form usually is not caused by shaking alone. These authors also concluded that fatal cases of SBS/NAI, unless in children with predisposing factors (e.g., subdural hygroma, atrophy), are not likely to result from shaking during play, feeding, or swinging, or from more vigorous shaking by a caretaker given for discipline. Although subsequent reports substantiated that CNS injury in NAI from shaking usually is associated with impact, those and other publications also provided evidence that shaking alone can produce serious intracranial injury (23,33,57).

## NAI/SBS REVISITED

Some past and more recent reports have brought forward information based upon clinical, surgical, imaging, pathologic, biomechanical, social, and legal observations that raise serious doubt regarding NAI/SBS as the cause in all cases of infant CNS injury otherwise attributed to abuse using traditional diagnostic criteria for NAI/SBS (10,37,38,43,64,66,68–77). These reports include skull fracture and/or acute subdural hematoma from accidental simple falls in young infants, such as those associated with wide extracerebral spaces (e.g., benign external hydrocephalus, benign extracerebral collections of infancy, subdural hygromas) (49,72–74), and fatal pediatric head injuries caused by witnessed, accidental short-distance falls, including those with a lucid interval and retinal hemorrhages (75). Updated neuropathologic studies indicate the following: (1) cerebral swelling in young infants (<1 year of age) with "SBS," as compared with older infants, more often is due to diffuse axonal injury of hypoxic-ischemic origin rather than traumatic origin (the latter more appropriately termed multifocal traumatic axonal, or shear, injury); (2) although fractures, subdural hemorrhage (e.g.,

interhemispheric), and retinal hemorrhages commonly are present, the usual cause of death was increased intracranial pressure from brain swelling associated with hypoxia-ischemia; and (3) cervical epidural hemorrhage and focal axonal brain stem, cervical cord, and spinal nerve root injuries are characteristically seen in these infants (presumably due to shaking) and may be associated with apnea and responsible for the hypoxic-ischemic brain injury (53–56). Reports of neurosurgical, neuroradiologic, and neuropathologic findings in head trauma as correlated with biomechanical analyses indicate that subdural hematoma and retinal hemorrhages occur with rotational deceleration injuries, whether "accidental" (e.g., axis or center of rotation internal to the skull, including those due to short-distance falls) or "nonaccidental" (i.e., axis of rotation external to the skull, e.g., at the craniocervical junction or cervical spinal level in SBS) (33,68,78–81). To date, there is no scientific basis that indicates how much, or how little, force is necessary to produce traumatic injury to the developing CNS. Furthermore, the specificity of retinal hemorrhages for child abuse and their dating has been questioned. Such hemorrhages reportedly may be seen with a variety of conditions, including accidental trauma, resuscitation, increased intracranial pressure, increased venous pressure, subarachnoid hemorrhage, sepsis, coagulopathy, certain metabolic disorders, systemic hypertension, and other conditions (10,23,48,43).

In view of the medical imaging data available, it is clear that we do not have an established scientific platform from which to distinguish nonaccidental from accidental CNS injury and, in some cases, traumatic from nontraumatic CNS injury. It is obvious that carefully conducted research is needed to establish a sound scientific foundation for CNS injury in NAI, especially in those circumstances in which other characteristic injuries are not present (e.g., skeletal). The immaturity of the young infant brain (e.g., undermyelinated, larger extracerebral spaces) makes it more vulnerable to traumatic CNS injury than that of the older child or adult, whether accidental or nonaccidental, and relies on the attention of caretakers for its safety. However, as the infant becomes more mobile (rolling, crawling, walking), the risk of accidental CNS injury (e.g., from falls) becomes greater. The medical and imaging evidence, particularly when there is only CNS injury, cannot accurately diagnose presumed intentional injury. Only the social investigation may provide the basis for inflicted injury in the context of supportive medical, imaging, or pathologic findings. Furthermore, biomechanical factors must be considered when determining the mechanism of trauma. It should be remembered that there are nonabuse traumatic, as well as nontraumatic, causes of subdural collections, hemorrhagic or nonhemorrhagic, and retinal hemorrhages. One classic example is the newborn following labor and delivery. Such manifestations of birth trauma may persist beyond the neonatal period and mimic abuse. Other examples are infants following extracorporeal membrane oxygenation (ECMO) therapy and infants with other processes associated with increased intracranial venous pressure (e.g., infectious or postinfectious meningoencephalitis, venous thrombosis) (10,23,82,83).

## PEDIATRIC NEURORADIOLOGY IN THE CLINICAL EVALUATION OF NAI

The child with suspected abuse must not only receive protective evaluation, but also deserves a timely and complete clinical and imaging workup to evaluate the pattern of injury and timing issues and to exclude the mimics of abuse. For CNS injury, this includes not only CT but also MRI and, in some cases, ultrasound (US). Serial imaging, particularly with MRI, also may be necessary. Imaging protocols, utilization guidelines, and interpretative principles are presented in greater detail in a number of recent publications (10,22,23,31,32,76,84,85).

### Computed tomography

In general, CT is used primarily to identify acute or subacute hemorrhage, other collections, edema, skull fracture, and scalp injury (10,22,23,32). CT, particularly as a single examination, often cannot provide precise information with regard to the character and age of collections, particularly in the presence of anemia or coagulopathy and depending upon the nature and number of traumatic events (Fig. 1). Acute to subacute clotted hemorrhage appears high density (age range: 3 hours to 7 days, or sometimes up to 10 days). Hyperacute "unclotted" hemorrhage (<3 hours old), very chronic hemorrhagic collections (>10 to 14 days old), and nonhemorrhagic collections (e.g., subdural effusions or hygromas) all appear hypodense, or occasionally isodense, depending upon protein and cell content. The subarachnoid cerebrospinal fluid (CSF) spaces may be prominent in infants (e.g., normal infantile subarachnoid spaces, benign external hydrocephalus, or benign extracerebral collections) and appear low density on CT. US with Doppler may be used to separate out the fluid compartments, but MRI usually is needed for more definite evaluation (10,23,86–88).

Bone CT algorithms and display techniques are used along with skull films to evaluate for scalp and skull injuries. Scalp and skull injuries are difficult to time precisely by CT, unless serial CTs are available and depending upon the nature and number of traumatic events (10,23). In acute neurologic presentations, CT is indicated emergently to evaluate the need for immediate neurosur-

*P.D. BARNES*



**FIG. 1.** Probable hyperacute-acute subdural hematoma (SDH), evolving chronic SDH, and chronic SDH with rehemorrhage in a 3-month-old boy. The child presented with seizures, lethargy, and retinal hemorrhages. **A:** Unenhanced axial computed tomography (CT) at initial presentation shows a large interhemispheric high-density hemorrhage (arrows), smaller left convexity extracerebral high-density hemorrhages (single crossed arrows) within low-density extracerebral collections, and a diastatic left parietal fracture (double crossed arrows) with overlying scalp swelling and hemorrhage. Magnetic resonance imaging (MRI) was not done at that time to assist with timing assessment. Following recovery from the acute injury, the infant was placed in protective custody for supervised visits by the parents. Seventeen days later, the child was readmitted for acute seizures and neurologic deterioration. **B:** Unenhanced axial CT at that time shows a large high- and low-density left extracerebral collection (arrows) with swelling of the underlying left cerebral hemisphere and rightward shift of the midline markers. High-density hemorrhage also is seen in the interhemispheric fissure (single crossed arrow) and in the cavum velum interpositum (double crossed arrow). Two days later, axial T1 **(C, D)** and T2 **(E)** MRI show that the left extracerebral collection has T1-isointense and T2-hyperintense components (hyperacute unclotted portion; arrows) plus T1-hyperintense and T2-hypointense components (acute-to-early-subacute clotted portion; single crossed arrows). These findings are more consistent with a hyperacute-acute SDH (<3 days old) plus an early subacute SDH (<7 days old) than with an evolving chronic SDH or a chronic SDH with rehemorrhage (Table 1). In the latter, even higher T1 and T2 hyperintensities would be expected in a hemorrhage that is 19 days old. MRI findings with regard to the interhemispheric and left posterior parietooccipital convexity collections are most consistent with a combination of chronic subdural hemorrhage and more recent rehemorrhage (double crossed arrows). Extensive hematologic workup ruled out a coagulopathy. **F:** Axial diffusion trace MRI shows a high-intensity ischemic left parasagittal cerebral infarction (arrow) likely related to subfalcine herniation.

gical intervention (e.g., an expanding hemorrhagic collection) and as an additional guide for the medical management of increased intracranial pressure (e.g., cerebral edema). Repeat or serial imaging may be necessary. Particularly in the unstable infant, initial and repeat cranial US with Doppler at the bedside may not only be an effective method of evaluating structural abnormalities (e.g., white matter tears), but also may be used for monitoring

alterations in cerebral blood flow and intracranial pressure (23).

## Magnetic resonance imaging

Multiplanar MR probably is the most important technique for assessing the pattern, extent, and timing of the injury(s), particularly in the absence of characteristic findings on CT (10,22,23,31,32,76,84,85). MRI should be done as soon after the presentation as the child's condition allows, and a follow-up examination within 7 to 10 days may be needed. T1 and T2 spin-echo (SE) sequences are necessary for characterizing the nature and timing of hemorrhages and other collections as to hyperacute, acute, subacute, or chronic using established criteria (Table 1 and Fig. 1) (10,23,32,85). Fluid-attenuated inversion recovery (FLAIR) imaging is preferred over proton-density images because of its superior ability to specifically suppress CSF signal to assist in the identification of abnormal subarachnoid collections and very chronic subdural collections. FLAIR imaging also provides enhanced conspicuity for non-CSF lesions having long T2 relaxation times (e.g., subdural hematomas or hygromas, shear injury). Magnetically susceptible gradient-echo sequences (T2*) are important for identifying hemorrhagic lesions not shown by some SE techniques (e.g., fast SE), but cannot provide information on timing without supportive T1 and T2 findings, because acute hemorrhage (e.g., deoxyhemoglobin) and chronic hemorrhage (e.g., hemosiderin) both may appear T2* hypointense. Gadolinium-enhanced sequences may assist in the identification of otherwise subtle leptomeningeal changes. Magnetic resonance (MR) angiography and venography also may be important (i.e., to evaluate for venous thrombosis as a mimic of NAI/SBS) (10,23,32). Advanced MR techniques, such as diffusion, perfusion, and spectroscopy, may assist further with the detection, characterization, and timing of the injury components, especially for traumatic or hypoxic-ischemic

axonal injury (10,23,32,84). However, there may be a significant interval (hours to days?) between one or more episodes of trauma, resulting in CNS hemorrhage(s) as the primary injury and subsequent deterioration of the child associated with progression of the hemorrhage, brain swelling, and/or hypoxic-ischemic injury as the secondary injury. To date, none of the current or advanced MRI techniques alone can reliably distinguish NAI from accidental injury to the CNS.

## EXPERT MEDICAL TESTIMONY IN NAI

### Expert medical witness

Expert witnesses are persons who have expertise on the subject at issue and who are designated according to qualifications by the court to instruct the jury (89,90). From a point of ethics, it is not only acceptable, but it is encouraged, for physicians to serve as expert witnesses in civil and criminal cases. The code of medical ethics of the council on ethical and judicial affairs of the American Medical Association (AMA) states that physicians are professionals with special training and experience and have an ethical obligation to assist in the administration of justice (91). The American College of Radiology (ACR) also states that it is in the public interest for medical expert testimony (by radiologists) to be readily available (92). The AMA and ACR also have provided guidelines on the ethical and professional manner upon which expert medical witnesses conduct themselves. The AMA states that medical experts should have recent and substantive experience in the area in which they testify. The expert should testify honestly and truthfully to the best of his or her medical knowledge; should not become an advocate or a partisan in the legal proceeding; and should inform the attorney(s) for the party who calls upon the expert to provide all favorable and unfavorable information developed by the physician's evaluation. It is unethical for a physician to

TABLE 1. *Magnetic resonance imaging of intracranial hemorrhage and thrombosis[a]*

| Stage | Biochemical form | Site | T1-MRI | T2-MRI |
|---|---|---|---|---|
| Hyperacute[b] (+edema) (<24 hours) | Fe II oxyHb | Intact RBCs | Iso-Low I | High I |
| Acute (+edema) (1–3 days) | Fe II deoxy Hb | Intact RBCs | Iso-Low I | Low I |
| Early subacute (+edema) (3–7 days) | Fe III metHb | Intact RBCs | High I | Low I |
| Late subacute (−edema) (1–2 weeks) | Fe III metHb | Lysed RBCs (extracellular) | High I | High I |
| Early chronic (−edema) (>2 weeks) | Fe III transferrin | Extracellular | High I | High I |
| Chronic (cavity) | Fe III ferritin and hemosiderin | Phagocytosis | Iso-Low I | Low I |

[a] Modified from Barnes PD, Wolpert. MRI in Pediatric Neuroradiology. St. Louis: Mosby Year-Book, 1992; Kleinman P, Barnes P. Head trauma. In: Kleinman PK, ed. Imaging of Child abuse, 2nd ed. St. Louis: Mosby Year-Book. 1998; Bradley WG Jr. MR appearance of hemorrhage in the brain. Radiology 1993;189:15–26; does not include influence of fetal Hb.

[b] Computed tomography is more sensitive and more specific than magnetic resonance imaging or ultrasound for hyperacute/acute hemorrhage in all compartments.

RBCs, red blood cells; I, signal intensity; +, present; −, absent; Hb, hemoglobin; Fe II, ferrous; Fe III, ferric; Iso, isotense.

Case 3:14-cv-00047-TJC-PDB   Document 10-8   Filed 06/06/14   Page 35 of 41 PageID 772

90                                          P.D. BARNES

accept compensation that is contingent upon the outcome of the litigation (91). The ACR adds that the radiologist expert witness must maintain an active practice of radiology and be certified, familiar with, and actively involved in the clinical practice of the subject matter of the case for 3 of the previous 5 years at the time of the testimony (92). The testimony offered by the expert witness must be based upon a reasonable degree of medical or scientific certainty. That is, in the judgment of the expert witness, the causal relationship between an event and the outcome is probable, or more likely than not. The quality of the evidence, therefore, rises above speculation and conjecture and may be considered by the jury.

### Expert medical review, consultation, and testimony

Theoretically, the opinion of the medical expert should be the same whether rendered for the defense or for the prosecution (or plaintiff) (89,90,93). An expert medical review for a criminal (or civil) case may involve the viewing of imaging examinations, imaging reports, medical records, chronology of events, complaint or charges filed, expert letters of opinions, and depositions of the clients, providers, treating physicians, and expert witnesses. In a consultation with a legal representative of the party(s) involved, the expert radiologist's findings and opinions are conveyed and discussed with regard to causation, including pattern of injury and timing (and/or standard of care when appropriate). Occasionally, legal counsel requests that the radiology expert confer directly with other experts retained by counsel. A formal letter of opinion may be requested that details the imaging findings and their significance with regard to causation. Imaging evidence should always stand independent of the clinical evidence. If the imaging findings or opinions alone cannot provide support for, or against, causation, then the case must be tried on the basis of the clinical evidence/opinions alone.

After the expert review, the attorney may request permission to officially designate the radiologist as an expert witness and submit the expert's qualifications and official letter of opinion to the court. Many, but not all, jurisdictions require that the expert witness be qualified according to certain guidelines. Federal guidelines (Daubert, Supreme Court 1993) require that the expert witness be qualified by providing certain credentials, which include a curriculum vita, documentation of clinical experience (>50% of practice in the field of expert testimony), an accounting of previous deposition and trial testimony, a fee schedule, percentage (or amount) of income derived annually from expert testimony, and a detailed written letter of opinion that includes a list of the pertinent medical literature (89–93). The letter of opinion may be offered along with other "evidence" for review by a screening panel or for mediation to effect resolution, a settlement, or a trial.

A discovery deposition then may be scheduled to "discover" the basis for the opinions offered by the expert witness to prepare for possible mediation, settlement, or trial (89,90,93). In some criminal cases, expert medical testimony may be presented as part of a grand jury investigation. During the recorded deposition under oath, the expert witness is questioned regarding qualifications, clinical and expert witness experience, expert fees and income, all materials reviewed (offered as numbered exhibits) and relied upon as the basis for the expert's opinions in the case at hand, and the expert's opinions. The expert is specifically questioned regarding his or her intention to offer opinions on causation or standard of care, when applicable. The expert witness may be asked to assist the referring counsel in preparing strategy for the depositions of the adversary expert witnesses testifying in the same field of expertise.

In preparation for trial, the expert witness organizes and re-reviews all materials and exhibits, including the expert's own discovery deposition transcript. The expert may be asked to review certain medical records, other expert opinions, and other depositions, including those of the adversarial expert witnesses (89,90,93). Occasionally, legal counsel requests that the radiology expert confer with other experts before testifying. A pretrial conference often is scheduled for expert testimony preparation and rehearsal and to assist counsel in preparing strategy for cross-examination of adversarial expert witnesses. At trial, the expert witness is initially presented to the court (judge and/or jury) for direct examination by the retaining legal counsel to establish the expert's qualifications and to present the expert's opinions as supported by the evidentiary exhibits (89,90,93). The witness then undergoes cross-examination by the adversary legal counsel. The judge may allow for "re-direct" and for "re-cross" by the retaining and adversary counsels, respectively. It is advisable to use only the imaging films (i.e., direct evidence) as exhibits and not to use "artist-rendered" medical illustrations (i.e., indirect or potentially "fabricated" evidence) for presentation to the jury.

It is important for the expert witness to give the entirety of his or her opinion during direct examination by the retaining counsel and to address all pertinent issues (89,90,93). This will prevent the witness from being ambushed by the adversarial counsel during the cross-examination regarding issues not covered in the expert's direct testimony. The expert otherwise must rely on subsequent re-direct examination by the retaining counsel to clarify certain parts of the testimony. The expert witness must speak directly to the jurors in clear and understand-

able language, and with respect. Although the testimony is conveyed in response to questions (including hypotheticals) posed by counsel, the expert should avoid being led or translated by counsel. The expert should testify by presenting the findings/opinions in a logical sequence or chronology and by specifying the level of medical and/or scientific certainty based upon the expert's cited experience and/or published literature (if allowed). Repeating important points and providing a summary may be critical. During cross-examination, the expert witness must be especially careful not to hastily agree with adversarial counsel's translation of the expert's testimony.

## Irresponsible medical testimony: Jurors and jurists beware

Irresponsible medical testimony may be manifested in a number of ways (93,94). The irresponsible expert may not possess the proper qualifications. Unique theories of causation may be offered that are not supported by the pertinent medical literature, or the expert may use nonpertinent literature or may misrepresent the literature. The witness may offer unique or unusual interpretations of medical findings, or may allege nonexistent findings. The expert may misquote well-known journals or texts, make false statements, or omit important facts or knowledge pertinent to opinions being offered. Jurors and jurists should be aware of the following: complicated and technical expert testimony; constant leading or translation by counsel; use of manufactured and elaborate exhibits instead of the original medical evidence; expert opinions based upon the opinions of other experts retained by the same counsel; expert opinions offered outside one's specific field of expertise; not providing an expert in a field pertinent to the case; scripted or choreographed testimony by experts retained by same counsel; experts offering unique theories that are contrary to the prevailing literature and are not supported by the pertinent literature; expert testimony that contradicts expert's own publications; counsel's use of the phrase "experts on both sides agree"; and constant misrepresentation of expert testimony and scientific evidence by counsel in an attempt to confuse the jury. A number of remedies have been offered or instituted to deal with irresponsible medical testimony, including Federal guidelines (see earlier), peer review of expert testimony by professional societies, establishment of a general pool for expert witness fees, and use of expert panels or screening panels.

## Recommendations for pediatric neuroradiology

The pediatric neuroradiologist should describe the imaging findings in detail, including the pattern, distribution, and severity of injury with regard to scalp, skull, and intracranial abnormalities, including extracerebral collections and brain injury. A differential diagnosis is given and timing ranges are offered if possible. If NAI is at issue or suspected, then the radiologist must directly communicate the imaging findings to the primary care team and be available to consult with child protection services, other medical or surgical consults, including the pathologist or biomechanical specialist, law enforcement investigators, and attorneys for all parties, as appropriate. Pattern of injury and time parameters, as may be provided by MRI, are particularly important with regard to correlations with events as reported by witnesses and potential suspects. For example, such information may exonerate the last individual who was with the victim and implicate others who had access to the child before that time. This classically occurs when a previously injured child is left with a babysitter or at day care and then later collapses. The last caretaker then is charged with assault. In one such "homicide" case, a CT performed within a few hours of the alleged assault by a baby-sitter showed that the infant had a high-density subdural hemorrhage consistent with "acute" injury (95). An MRI performed shortly thereafter showed that the subdural hemorrhage was T1 hyperintense with some areas of T2 hypointensity and T2 hyperintensity. Using established criteria (Table 1), the MRI findings indicated that the injury was at least 3 days old. The State's expert witnesses ignored the MRI findings regarding timing and testified that the injury was acute SBS and could only be inflicted by the defendant. Nonetheless, the baby-sitter who had only been with the infant for a short time before the collapse was acquitted (95).

The radiologist must be aware of certain conditions that are known to have clinical and imaging features that may mimic abuse (16,32). These include accidental injury, certain coagulopathies, vascular diseases, infectious or postinfectious conditions (e.g., postvaccinal), metabolic disorders, neoplastic diseases, certain therapies, and some congenital and dysplastic disorders. The physician should not only rule them out, but also must consider the possibility of combined, or multifactorial, mechanisms with synergistic effects (i.e., an underlying condition with superimposed nonaccidental, or accidental, trauma). A case in point is that of a young infant who became progressively ill following a diphtheria-pertussis-tetanus (DPT) vaccination and subsequently became apneic. The father attempted to revive the child by "shaking" and then attempted cardiopulmonary resuscitation (CPR). The infant also received CPR by the rescue team at the home and again at the hospital. Retinal hemorrhages were present on ophthalmologic examination. The father was charged with abuse. Subsequent CT imaging with CT venography showed a combination of enhancing cerebral infarctions,

venous thromboses, and subdural hemorrhages. An MRI was not done, although the CT findings were verified by postmortem neuropathologic examination. The evidence was consistent with a hemorrhagic meningoencephalitis, likely postvaccinial, although additional trauma, either accidental (e.g., CPR) or nonaccidental (e.g., shaking) could not be ruled out. The father was convicted on the basis that the State's experts testified that the injuries could only be caused by SBS (96). The conviction is under appeal.

## CONCLUSION

Timely and thorough evaluation of alleged NAI cases clinically and radiologically, in addition to the social assessment, can make the difference between appropriate child protection and an improper breakup of the family or a wrongful indictment and conviction (10,23). Pediatric neuroradiology often plays a major role in this assessment.

## REFERENCES

1. Kraus J, Fife D, Cox P, et al. Incidence, severity, and external cause of pediatric head injury. Am J Dis Child 1986;140:687–693.
2. Zimmerman RA, Bilaniuk L. Pediatric head trauma. Neuroimaging Clin N Am 1994;4:349–366.
3. Bruce DA, Zimmerman RA. Shaken impact syndrome. Pediatr Ann 1989;18:482–494.
4. Harwood-Nash DC. Abuse to the pediatric central nervous system. AJNR Am J Neuroradiol 1992;13:569–575.
5. Caffey J. On the theory and practice of shaking infants. Its potential residual effects of permanent brain damage and mental retardation. Am J Dis Child 1972;124:161–169.
6. Silverman FN. Unrecognized trauma in infants, the battered child syndrome, and the syndrome of Ambroise Tardieu. Rigler lecture. Radiology 1972;104:337–353.
7. Alexander RC, Schor DP, Smith WL, Jr. Magnetic resonance of intracranial injuries from child abuse. J Pediatr 1986;109:975–979.
8. Ball WS Jr. Nonaccidental craniocerebral trauma (child abuse): MR imaging. Radiology 1989;173:609–610.
9. Barlow KM, Gibson RJ, McPhillips M, et al. Magnetic resonance imaging in acute nonaccidental head injury. Acta Paediatr 1999;88:734–740.
10. Barnes PD. Robson CD. CT findings in hyperacute nonaccidental brain injury. Pediatr Radiol 2000;30:74–81.
11. Bird CR, McMahan JR, Gilles RH, et al. Strangulation in child abuse: CT diagnosis. Radiology 1987;163:373–375.
12. Chabrol B, Decarie JC, Fortin G. The role of cranial MRI in identifying patients suffering from child abuse and presenting with unexplained neurologic findings. Child Abuse Negl 1999;23:217–228.
13. Cohen RA, Kaufman RA, Myers PA, et al. Cranial computed tomography in the abused child with head injury. AJNR Am J Neuroradiol 1985;6:883–888.
14. Dias MS, Backstrom J, Falk M, et al. Serial radiography in the infant shaken impact syndrome. Pediatr Neurosurg 1998;29:77–85.
15. Ewing-Cobbs L, Kramer L, Prasad M, et al. Neuroimaging, physical, and developmental findings after inflicted and noninflicted traumatic brain injury in young children. Pediatrics 1998;102:300–307.
16. Ewings-Cobbs L, Prasad M, Kramer L, et al. Acute neuroradiologic findings in young children with inflicted or noninflicted traumatic brain injury. Child Nerv Syst 2000;16:25–33.
17. Feldman KW, Weinberger E, Milstein JM, et al. Cervical spine MRI in abused infants. Child Abuse Negl 1997;21:199–205.
18. Greenberg J, Dohen WA, Cooper PR. The hyperacute extra-axial intracranial hematoma: Computed tomographic findings and clinical significance. Neurosurgery 1985;17:48–56.
19. Hart BL, Dudley MH, Zumwalt RE. Postmortem cranial MRI and autopsy correlation in suspected child abuse. Am J Forensic Med Pathol 1996;17:217–224.
20. Haseler LJ, Arenue E, Danielsen ER, et al. Evidence from proton MR spectroscopy for a metabolic cascade of neuronal damage in shaken baby syndrome. Pediatrics 1997;99:4–14.
21. Hymal KP, Rumack CM, Hay TC, et al. Comparison of intracranial CT findings in pediatric abusive and accidental head trauma. Pediatr Radiol 1997;27:743–747.
22. Kemp AM. Investigating subdural hemorrhage in infants. Arch Dis Child 2002;86:98–102.
23. Kleinman PK, Barnes PD. Head Trauma. In: Kleinman PK, ed. Diagnostic Imaging of Child Abuse, 2nd ed. St. Louis: Mosby Year-Book, 1998;285–342.
24. Merten DF, Osborne DRS, Radkowski MA, et al. Craniocerebral trauma in the child abuse syndrome: Radiological observations. Pediatr Radiol 1984;14:272–277.
25. Mogbo KI, Slovis TL, Canady AI, et al. Appropriate imaging in children with skull fractures and suspicion of abuse. Radiology 1998;208:521–524.
26. Petitti N, Williams DW. CT and MRI of nonaccidental pediatric head trauma. Acad Radiol 1998;5:215–223.
27. Sato Y, Yuh WT, Smith WL, et al. Head injury in child abuse: Evaluation with MRI. Radiology 1989;173:653–657.
28. Rao P, Carty H, Pierce A. The acute reversal sign: Comparison of medical and nonaccidental injury patients. Clin Radiol 1999;54:495–501.
29. Rooks VJ, Sisler C, Burton B. cervical spine injury in child abuse: Report of two cases. Pediatr Radiol 1998;28:193–195.
30. Zimmerman RA, Bilaniuk LT, Bruce D, et al. Interhemispheric acute subdural hematoma: A computed tomographic manifestation of child abuse by shaking. Neuroradiology 1979;16:39–40.
31. Suh DY, Davis PC, Hopkins KL, et al. Nonaccidental pediatric head injury: Diffusion weighted imaging. Neurosurgery 2001;49:309–320.
32. Biousse V, Suh DY, Newman NJ, et al. Diffusion-weighted MRI in shaken baby syndrome. Am J Ophthalmol 2002;133:249–255.
33. American College of Radiology. Imaging of the child with suspected physical abuse. In: American College of Radiology appropriateness criteria for imaging and treatment decisions. Am Coll Radiol 2000;805–809.
34. American Academy of Pediatrics. Section on radiology: Diagnostic imaging of child abuse. Pediatrics 2000;105:1345–1348.
35. American Academy of Pediatrics. Committee on child abuse and neglect. Shaken baby syndrome: Rotational cranial injuries—Technical report. Pediatrics 2001;108:206–210.
36. Duhaime AC. Alairo AJ, Lewander WJ, et al. Head injury in very young children: Mechanisms, injury types, and ophthalmologic findings in 100 hospitalized patients younger than 2 years of age. Pediatrics 1992;90:179–185.
37. Duhaime AC, Christian CW, Rorke LB, et al. Nonaccidental head injury in infants—The "shaken-baby syndrome." N Engl J Med 1998;338:1822–1829.
38. Duhaime AC, Gennarelli TA, Thibault LE, et al. The shaken baby syndrome: A clinical, pathological, and biomechanical study. J Neurosurg 1987;66:409–415.
39. Aldrich EF, Eisenberg HM, Saydjari C, et al. Diffuse brain swelling in severely head injured children. J Neurosurg 1992;76:450.
40. Barkovich AJ. MR and CT evaluation of profound neonatal and infantile asphyxia. AJNR Am J Neuroradiol 1992;13:959.
41. Bruce DA, Alavi A, Bilaniuk L, et al. Diffuse cerebral swelling following head injuries in children: The syndrome of "malignant brain edema." J Neurosurg 1981;54:170–178.
42. Dashti SR, Decker DD, Razzap A, et al. Current patterns of inflicted head injury in children. Pediatr Neurosurg 1999;31:302–306.

43. David TJ. Shaken baby syndrome: Nonaccidental head injury in infancy. J R Soc Med 1999;92:556–561.

44. Feldman KW, Bethel R, Shurgerman RP, et al. The cause of infant and toddler subdural hemorrhage: A prospective study. Pediatrics 2001;108:636–646.

45. Jenny C, Hymel KP, Ritzen A, et al. Analysis of missed cases of abusive head trauma. JAMA 1999;281:621–626.

46. Levitt CJ, Smith WL, Alexander RC. Abusive head trauma. In: Reece RM, ed. Child Abuse: Medical Diagnosis and Management. Philadelphia: Lea & Febiger, 1994:1–22.

47. Luerssen TG. Acute traumatic cerebral injuries. In: Check WR eds. Pediatric Neurosurgery. Philadelphia: W.B. Saunders, 1994:266–278.

48. Morris MW, Smith S, Cressman J, et al. Evaluation of infants with subdural hematoma who lack external evidence of abuse. Pediatrics 2000;105:549–453.

49. Parent AD. Pediatric chronic subdural hematoma: A retrospective comparative analysis. Pediatric Neurosurg 1992;18:266–271.

50. Reece RM, Sege R. Childhood head injuries. Arch Pediatr Adolesc Med 2000;154:11–15.

51. Shannon P, Becker L. Mechanisms of brain injury in infantile child abuse [Commentary]. Lancet 2001;358:686–687.

52. Case ME, Graham MA, Handy TC, et al. Position paper on fatal abusive head injuries in infants and young children. Am J Forensic Med Pathol 2001;22:112–122.

53. Geddes JF, Hackshaw AK, Vowles GH, et al. Neuropathology of inflicted head injury in children. I. Patterns of brain injury. Brain 2001;124:1290–1298.

54. Geddes JF, Vowles GH, Hackshaw AK, et al. Neuropathology of inflicted head injury in children. II. Microscopic brain injury in infants. Brain 2001;124:1299–1306.

55. Geddes JF, Whitwell HL, Graham DI. Traumatic axonal injury: Practical issues for diagnosis in medicolegal cases. Neuropathol Appl Neurobiol 2000:26:105–116.

56. Graham DI. Pediatric head injury [Editorial]. Brain 2001;124:1261–1262.

57. Hadley MN, Sonntag VKH, Rekate HL, et al. The infant whiplash-shake injury syndrome: A clinical and pathological study. Neurosurgery 1989;24:536–540.

58. American Academy of Pediatrics. Committee on Child Abuse Neglect. Distinguishing sudden infant death syndrome from child abuse fatalities. Pediatrics 2001;107:437–440.

59. Brown J, Minns R. Non-accidental head injury, with particular reference to whiplash shaking injury and medicolegal aspects. Dev Med Child Neurol 1993;35:849–869.

60. Gilliland MGF, Luckenbach MW, Chenier TC. Systemic and ocular findings in 169 prospectively studied child deaths: Retinal hemorrhages usually mean child abuse. Forensic Sci Int 1994;68:117–132.

61. Leventhal JM. The challenges of recognizing child abuse: Seeing is believing. JAMA 1999;281:657–659.

62. Leventhal JM. The prevention of child abuse and neglect: Successfully out of the blocks. Child Abuse Neglect 2001;25:431–439.

63. Plunkett J. Shaken baby syndrome and the death of Matthew Eappen: A forensic pathologist's response. Am J Forensic Med Pathol 1999;20:17–21.

64. Wilkins B. Head injury—Abuse or accident? Arch Dis Child 1997; 76:393–397.

65. Richman HA. From a radiologist's judgment to public policy on child abuse and neglect: What have we wrought? Pediatr Radiol 2000;30:219–228.

66. Donohoe M. Shaken baby syndrome and non-accidental injuries [Personal communication]. August 2001.

67. The Evidence-Based Radiology Working Group. Evidence-based radiology: A new approach to the practice of radiology. Radiology 2001;220:566–575.

68. Greenes DS, Schutzman SA. Clinical indicators of intracranial injury in head-injured infants. Pediatrics 1999;104:861–867.

69. Greenes DS, Schutzman SA. Clinical significance of scalp abnor-malities in asymptomatic head-injured infants. Pediatr Emerg Care 2001;17:88–92.

70. Greenes DS, Schutzman SA. Occult intracranial injury in infants. Ann Emerg Med 1998;32:680–686.

71. Gruskin KD, Schutzman SA. Head trauma in children younger than 2 years: Are there predictors for complications? Arch Pediatr Adolesc Med 1999;153:15–20.

72. Hwang SK, Kim SL. Infantile head injury, with special reference to the development of chronic subdural hematoma. Child Nerv Syst 2000;16:590–594.

73. Kim KA, Wang MY, Griffith PM, et al. Analysis of pediatric head injury from falls. Neurosurg Focus 2000;8:1–9.

74. Priatt JH Jr. A pitfall in the diagnosis of child abuse: External hydrocephalus, subdural hematoma, and retinal hemorrhages. Neurosurg Focus 1999;7:1–8.

75. Plunkett J. Fatal pediatric head injuries caused by short-distance falls. Am J Forensic Med Pathol 2001;22:1–11.

76. Schutzman SA, Barnes P, Duhaime A-C, et al. Evaluation and management of children younger than two years old with apparently minor head trauma: Proposed guidelines. Pediatrics 2001;107:983–993.

77. Schutzman SA, Greenes DS. Pediatric minor head trauma. Ann Emerg Med 2001;37:65–74.

78. Reiber GD. Fatal falls in childhood: How far must children fall to sustain fatal head injuries? Report of cases and review of the literature. Am J Forensic Med Pathol 1993;14:201–207.

79. Hall JR, Reyes HM, Horvat M, et al. The mortality of childhood falls. J Trauma 1989;29:1273–1275.

80. Aoki N, Masuzawa H. Infantile acute subdural hematoma: Clinical analysis of 26 cases. J Neurosurg 1984;61:273–280.

81. Howard MA, Bell BA, Uttley D. The pathophysiology of infant subdural hematomas. Br J Neurosurg 1993;7:355–365.

82. Deveber G, Andrew M, Adams C, et al. Cerebral sinovenous thrombosis in children. N Engl J Med 2001;345:417–423.

83. Lynch JK, Hirtz DG, DeVeber G, et al. Report of the National Institute of Neurological Disorders and Stroke Workshop on Perinatal and Childhood Stroke. Pediatrics 2002;109:116–123.

84. Barnes PD. State of the art: Neuroimaging and the timing of fetal and neonatal brain injury. J Perinatol 2001;21:44–60.

85. Bradley WG Jr. MR appearance of hemorrhage in the brain. Radiology 1993;189:15–26.

86. Veyrac C, Couture A, Baud C. Pericerebral fluid collections and ultrasound. Pediatr Radiol 1990;20:236–240.

87. Wilms G, CT and MR in infants with pericerebral collections and macrocephaly: Benign enlargement of the subarachnoid spaces versus subdural collections. Am J Neuroradiol 1993;14:855–860.

88. Chen CY, Chou TY, Zimmerman RA, et al. Pericerebral fluid collections: Differentiation of enlarged subarachnoid spaces from subdural collections with color doppler US. Radiology 1996;201:389–392.

89. Berlin L. Expert witness. Am Coll Radiol ACR Bulletin 1999;55:17–22.

90. Berlin L. Malpractice issues in radiology. On being an expert witness. AJR Am J Roentgenol 1997;168:607–610.

91. American Medical Association. Code of Medical Ethics, Section 9.07, Medical Testimony. Chicago, IL: American Medical Association, 1997:148–149.

92. American College of Radiology. Digest of council actions, 1986–1997, section II K1–3, testimony. Reston, VA: American College of Radiology, 1997;121–123.

93. Barnes PD. The pediatric radiologist as expert witness: How I do it. In: Shearer LT, Lebowitz RL, eds. Syllabus of the Society for Pediatric Radiology. Pediatric Imaging Course, Vancouver, BC, Canada, May 12, 1999, pp. 11–13.

94. Chadwick D. Krous HF. Irresponsible medical testimony. Child Maltreat 1997;2:313–321.

95. State of New Jersey v Ehnbahm. 2000.

96. State of New York v Scoon, 1998.

The American Journal of Forensic Medicine and Pathology  15(3):187–191. 1994.

©1994 Raven Press, Ltd., New York

*B 15*

# Patterns of Facial Resuscitation Injury in Infancy

James A. Kaplan, M.D., and Roger M. Fossum, M.D.

Cardiopulmonary resuscitation (CPR)-related artifacts in pediatric rescue that have the potential for serious complications in surviving patients have been well described in the medical literature. Medically trivial soft-tissue injuries, especially of the face and neck, carry predominantly forensic significance and have received less attention. We describe such injuries in nine of 25 consecutive cases of infants who received CPR, and correlate those injuries with specific rescue maneuvers. Techniques for effective investigation and interpretation of such injuries are suggested.
**Key Words:** Cardiopulmonary resuscitation artifact— Facial injury—Sudden infant death syndrome—Trauma— Infants—Smothering—Infanticide.

While significant and potentially life-threatening cardiopulmonary resuscitation (CPR)-associated iatrogenic injuries in a pediatric population have been well described, including multiple visceral organ laceration and fractures (1–14), less attention has been paid to the nature of superficial soft-tissue injuries that result from the repetitive, prolonged maneuvers of ventilating the arrested infant patient (15,16), and their distinction from suffocation injury. Every forensic pathologist comes to know the difficulty of separating subtle and apparently trivial facial injuries, which may accompany homicidal smothering of an infant, from the sometimes quite coarse and striking injuries that may result from attempted CPR of an infant who has died of sudden infant death syndrome (SIDS). In this article, we present a series of illustrative cases that describe a range of facial injuries resulting from resuscitation procedures and outline some suggestions for their recognition.

## METHODOLOGY

This study was undertaken by review of a series of 25 consecutive unexpected deaths of infants who had received documented CPR. Nine cases demonstrated facial injuries related to rescue attempts. All cases were completely investigated by this office, to include selected interviews with resuscitation personnel and review of all out-of-hospital-generated notes, as well as all investigation reports and in-house chart materials of pertinent cases.

These 25 infant deaths were further separated into two groups: five cases were identified as having been due to natural causes confirmed by histologic diagnosis non-SIDS (NSIDS), and the remaining 20 infants were diagnosed with SIDS. Ages in the SIDS group surveyed ranged from ½ to 9 months, and in the NSIDS group of infants from 1½ to 6 months; mean ages were 3.8 and 3.7 months, respectively. No cases involving accidental or undetermined manners of death were included in this study. All

Received June 1, 1993; accepted September 28, 1993.
From the Office of the Chief Medical Examiner, Concord, New Hampshire.
Address correspondence and reprint requests to Dr. J. A. Kaplan, Office of the Chief Medical Examiner, 250 Pleasant St., Concord, NH 03301

188 J. A. KAPLAN AND R. M. FOSSUM



FIG. 1. (a). Infant with air-bag-valve mask in place.
(b) Facial abrasions following air-bag-valve mask use.



FIG. 3. Typical resuscitation maneuvers for positioning infant head for maximal airway patency. Note fingertip positions.

cases were subjected to complete autopsy, including vitreous electrolyte determination, toxicologic analysis, and histologic examination of all organ systems.

Cases that manifested facial injuries were correlated with a history of air-bag-valve ventilation,

mouth-to-mouth ventilation, and infants that had received subsequent orotracheal intubation.

## RESULTS

### Air-Bag-Valve Mask Injuries

A plastic mask (Fig. 1a) is held tightly over the infant's nose and mouth while the bag is manually compressed in steady cadence, causing side-to-side relative movement of the skin-mask interface. Resulting injuries include fresh abrasions (Fig. 1b) distributed characteristically over the nasal bridge, undersurface of the nose, lip, cheeks, and anterior chin surface (Fig. 2). These injuries are usually distributed symmetrically around the nose and mouth, in a constellation that corresponds to the air-valve mask configuration (Fig. 1). Additionally, attempts by the resuscitating hand to position the patient's head and neck relative to the torso for maximal airway patency, and as well to maintain air-valve mask seal to the face, lead to the infliction of impression-type fingernail abrasions to the head and



FIG. 2. Additional pattern of air-bag-valve mask-associated facial abrasions.

*Am J Forensic Med Pathol,* Vol. 15, No. 3, 1994