IN THE UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
JACKSONVILLE DIVISION

QINARD LAMAR COLLINS,                Jacksonville, Florida

                   Petitioner,      Case No. 3:14-cv-47-J-32PDB

  vs.                                June 6, 2017

SECRETARY OF THE FLORIDA             1:59 p.m.
DEPARTMENT OF CORRECTIONS,
et al.,                              Courtroom No. 10D

                   Defendants.
_____


                        ORAL ARGUMENT
           BEFORE THE HONORABLE TIMOTHY J. CORRIGAN
                UNITED STATES DISTRICT JUDGE


 PETITIONER'S COUNSEL:

        **MICHAEL ROBERT UFFERMAN, ESQ.**
        Michael Ufferman, PA
        2022-1 Raymond Diehl Road
        Tallahassee, Florida  32308

 DEFENSE COUNSEL:

        **ROBIN A. COMPTON, ESQ.**
        **KELLIE ANNE NIELAN, ESQ.**
        Office of the Attorney General
        444 Seabreeze Boulevard, Suite 500
        Daytona Beach, Florida  32118

 COURT REPORTER:

        Shannon M. Bishop, RDR, CRR
        221 North Hogan Street, #150
        Jacksonville, Florida  32202
        Telephone:  (904)549-1307
        dsmabishop@yahoo.com


     (Proceedings recorded by mechanical stenography;
transcript produced by computer.)

1                    P R O C E E D I N G S

2    June 6, 2017                              1:59 p.m.

3                         - - -

4              COURT SECURITY OFFICER:  All rise.  The United States

5    District Court in and for the Middle District of Florida is now

6    in session.  The Honorable Timothy J. Corrigan presiding.

7    Please be seated.

8              THE COURT:  Good afternoon.

9              MR. UFFERMAN:  Good afternoon, Your Honor.

10             MS. COMPTON:  Good afternoon.

11             THE COURT:  Sorry to bring y'all over here on such a

12   crummy day, but I didn't know it was going to rain when I set

13   the hearing, so...

14             This is *Collins versus Secretary*.  It's 3:14-cv-47.

15   Is it Uf-ferman or U-fferman?

16             MR. UFFERMAN:  Uf-ferman, Your Honor.

17             THE COURT:  Uf-ferman.  Mr. Ufferman represents the

18   petitioner.  Ms. Compton and Ms. Nielan represent the

19   Secretary.

20             We're here today for oral argument in this case.

21   There's a habeas petition that Mr. Collins has filed.  The

22   State says it's untimely, which it appears to be.  But there's

23   a question in the case as to whether any of the exceptions,

24   statutory or equitable, apply to this case in order to make it

25   timely.

1          I felt like -- unlike many of the cases that we get

2     where persons allege newly discovered evidence or some fact

3     that wasn't known at the time, this seemed to have a little

4     more substance to it.  And I thought we should talk about it.

5          This is a non-evidentiary hearing.  I suppose one of

6     the questions that we would be deciding today is whether an

7     evidentiary hearing is indicated or not.

8          So I've reviewed the entirety of the file.  And I've

9     got it right here with me.  And I have read the briefing.  And

10    I've also read some of the cases, the *Herrera* case again, then

11    some of the Eleventh Circuit cases, and also the Supreme Court

12    case *McQuiggin*.  So, anyway, that's what I've done to get

13    ready.

14         And, Mr. Ufferman, I'll hear from you, since you're

15    the moving party, and then we'll see where we go.

16         MR. UFFERMAN:  Thank you, Your Honor.  Would you like

17    me to stand at the podium, Your Honor?

18         THE COURT:  Please.

19         MR. UFFERMAN:  May it please the court.  Michael

20    Ufferman on behalf of the petitioner in this case, Mr. Collins.

21    Your Honor, you've asked in your order to address two aspects

22    of this case, the procedural issues as to whether or not

23    Mr. Collins can move forward and have anything considered on

24    the merits in federal court and the underlying merits of the

25    claim.  And I hope to address both of those.  I think I'll

1    address both of those in that order.

2         I'll concede up front that right now, under Eleventh

3    Circuit case law, a freestanding actual innocence claim is not

4    permitted.  And that's what Mr. Collins is presenting in this

5    case.

6         So, yes, your hands are tied.  Recently the State

7    just cited, in a recent pleading, Judge Davis' California

8    *Crawford* decision denying the 2254 and addressing an actual

9    innocence claim.

10        I don't think the merits of that innocence claim are

11   anywhere near what Mr. Collins is presenting, but he,

12   nevertheless, cited to the *Jordan* case, which I think is the

13   lead case from the Eleventh Circuit on this issue.  And the

14   Eleventh Circuit has said that we don't allow freestanding

15   actual innocence claims.

16        Other --

17        THE COURT:  So just so we're clear -- and you've

18   actually gotten right to one of the questions I wanted to ask

19   you -- this is not -- you're not trying to use the actual

20   innocence claim as a gateway to get to some underlying

21   constitutional claim.  You are admittedly trying to raise a

22   freestanding actual innocence claim?

23        MR. UFFERMAN:  The answer is yes, Your Honor.  I wish

24   that wasn't the case.  This was a plea, as Your Honor knows.

25   It was not a trial.  It's difficult in that context to raise

1    some ineffective assistance of counsel claims.

2          He could argue his plea was involuntarily.  And, in

3    essence, he's somewhat arguing that in this actual innocence

4    claim, that he entered a plea based on mistaken information.

5          And we have cited to the *Boykin* case for the idea

6    that every plea must be knowing, intelligent, and voluntary.

7    But from an ineffectiveness standpoint, on the one hand -- you

8    know, perhaps we could have pursued the idea that, yes, counsel

9    was ineffective at the time because counsel failed to challenge

10   the science behind the alleged shaken baby syndrome, but that's

11   the whole idea of this being newly discovered evidence.

12          If that claim -- that claim was raised in one of his

13   pro se post-conviction motions filed in state court.  But the

14   idea behind that is back in 2001, 2002, 2003, shaken baby

15   syndrome was still accepted, not only in the scientific

16   community, but in the legal community and in the courts.

17          THE COURT:  I saw that -- in my review of the state

18   court docket, I saw that Mr. Anthony, who I believe was trial

19   counsel --

20          MR. UFFERMAN:  Yes.

21          THE COURT:  -- or plea counsel, I guess -- he

22   requested and obtained permission to hire Dr. Siebel.

23          MR. UFFERMAN:  Yes.

24          THE COURT:  And it appeared that that doctor's

25   specialty was something that would have met the idea of whether

1  this was shaken baby syndrome or whether some other explanation

2  could have been put forward for the infant's death.  But that's

3  all I saw, was an order appointing him.

4          Is there anything in the record that you're aware of

5  that that doctor ever came forward?

6          MR. UFFERMAN:  I don't believe the record establishes

7  that, Your Honor.  You know --

8          THE COURT:  Okay.  And the other question I had, just

9  from a record standpoint, is the medical examiner report

10  anywhere in the record?  Or is it just talk about it that's in

11  the record?

12          MR. UFFERMAN:  His excerpt of his deposition is in

13  the record.

14          THE COURT:  Right.

15          MR. UFFERMAN:  I don't believe -- and we referred to

16  it as an incomplete autopsy report.  He apparently conducted

17  the autopsy report the day after the child died, which I want

18  to say was April 3rd --

19          THE COURT:  2001, right?

20          MR. UFFERMAN:  -- 2001.  But I do not believe that

21  the autopsy report itself is in the record.

22          THE COURT:  So how can you call it an incomplete

23  report if we don't have the report?  I couldn't quite figure

24  out where you were getting that from.

25          MR. UFFERMAN:  Well, obviously, I'm relying upon

1    things that have been alleged up until now.  And I only became

2    involved in this process when the 2254 was filed in this court.

3            Mr. Collins previously, in his pro se pleadings and

4    then he had an attorney, I guess, on the appeal from the denial

5    of the second 3.850, had referred to Dr. Steiner's autopsy

6    report as an incomplete report.

7            I believe it's because apparently he did a partial

8    autopsy on the day after the -- of the child's death, but he

9    didn't complete that.

10           I don't know what significance that has.  I'm not

11   sure that it does.  The bottom line is when you review his

12   deposition, he specifically says -- I think the quote -- or

13   near quote is the head injury and the eye injury are classic

14   for shaken baby syndrome.  So clearly he was asserting shaken

15   baby syndrome as the cause of death.

16           They referred to some other things such as abusive

17   head trauma.  And I -- you know, the response to that is --

18   and, of course, we would love to have an evidentiary hearing,

19   but I know we need to get over this procedural hurdle.

20           But the response to that is the reports that were

21   submitted by Mr. Collins in his second 3.850 motion, which I

22   give him credit as an attorney that only does post-conviction

23   matters -- he, on his own, reached out to some of the leading

24   experts in the country, if not the world, on this issue and

25   asked for their pro bono assistance to review his file.  And he

1  was able to get four of these experts, Buttram, Innis,

2  Mendelsohn and Stephens, to write back and give him reports.

3         And based on what they said, all of the injuries in

4  this case are explained by this child's very severe medical

5  issues that the child had coming on to this earth.

6         I know the court is aware of the facts regarding

7  that.  But I think the record establishes that this child lived

8  for 305 days.  And 277 of those days were spent in the

9  hospital.

10         This child was born extremely premature.  The child

11  had severe colitis, in addition to other major medical

12  deficits.  The child, when it -- when he was discharged from

13  the hospital, still came home on an IV with antibiotics.

14         And I think, to sum up from the idea of how shaken

15  baby syndrome has changed from 2001 to today, is that in 2001,

16  when someone like Dr. Steiner would see the eye injury and the

17  head injury that he observed in this case -- the science at the

18  time said there's only one cause for death, only one

19  explanation, and it must be shaken baby syndrome.

20         In a span of eight years the science completely

21  changed.  And in particular, in 2001 the American Academy of

22  Pediatrics published an official paper stating that short falls

23  do not cause these types of injuries, and other things do not

24  cause these types of injuries, only shaking violently can cause

25  this type of injury.

1          The 2009 paper put out by the American Academy of

2    Pediatrics -- and, obviously, these are all things if we had an

3    evidentiary hearing we would put on as evidence -- they receded

4    from that completely.  And now the American Academy of

5    Pediatrics does acknowledge that there are many potential

6    causes.

7          So it's -- on one hand, I would assert that shaken

8    baby syndrome is no longer a valid theory, but at the very

9    least I think the scientific community would agree with me that

10   whereas at the time of this child's death doctors were lining

11   up and saying this type of injury can only mean one thing, and

12   that's SBS -- and within a span of eight years the scientific

13   community changed and they -- even those that still believed in

14   SBS would have to concede that there may be other possibilities

15   that could cause these types of injuries that -- that someone

16   might rely upon to say that it is shaken baby syndrome.

17          One of the main things you would look at is:  Does

18   the child have some type of medical issue?  And this case

19   presents a child who had extreme medical issues.  And that's

20   what the experts that did submit the reports that Mr. Collins

21   attached to his second pro se 3.850 motion -- that's what they

22   agreed to, so --

23          THE COURT:  All right.  Well, take a breath here so I

24   can ask you a question.  Okay?

25          MR. UFFERMAN:  Yes.

```
1          THE COURT:  So at least one of the doctors -- and I
2   don't recall whether -- how many of them.  I think one of them
3   made a diagnosis, maybe others agreed with him.
4          But they were tending toward or believing that the
5   cause of the bleeding and much of the head trauma was actually
6   internal bleeding, and were caused by a clotting disorder, a
7   vitamin K deficiency or -- and is that -- remind me of what
8   the -- out of the four doctors that did -- how many of them
9   opined as to an actual alternative cause, as opposed to just
10  saying that shaken baby syndrome in and of itself didn't
11  explain the death?
12         MR. UFFERMAN:  Your Honor, I don't want to overstate
13  it.  I don't know if I can answer that question directly.  I
14  apologize.  I know at least one, if not two, if not all four,
15  reached the conclusion that the injuries in this case were not
16  the result of any intentional act by Mr. Collins and/or shaken
17  baby syndrome, but were instead the result of this child's
18  medical issues.
19         THE COURT:  And the other question I had for you is
20  Judge Traynor, in the post-conviction order, said --
21  paraphrasing, Even if it wasn't shaken baby syndrome, the
22  medical examiner alternatively found battered child syndrome,
23  which would be -- at least the way Judge Traynor wrote the
24  order, would be an alternative explanation for the baby's
25  death, which would still be attributable to the defendant, to
```

1    the petitioner.

2          What's your -- first of all, do you think that's an

3    accurate rendering of what Judge Traynor said?  And if it is,

4    what's your view of that?

5          MR. UFFERMAN:  Correct.  I do agree that that's what

6    he said.  But I disagree with the logic and/or potentially the

7    medical science that would support that.

8          And I think if Mr. Collins were given an evidentiary

9    hearing, his experts would come in and say, Those two terms are

10   really the same thing, that we've talked about abusive head

11   trauma, aggravated battery of the child.

12         And the basis for that would have been the injuries,

13   any bruising to the child that were seen about the head or

14   either -- other parts of the body.

15         And I think all of the experts have concluded that

16   that's really the same idea here, that it's their opinion that

17   all of that would be covered by this child's existing medical

18   condition and none of that was caused by Mr. Collins.

19         I think another point I want to make that's

20   important -- and this case is unique because he entered a plea.

21   And the State's obviously focusing on that.  And I understand

22   why.  And I think the courts have focused on that up until this

23   point that have looked at Mr. Collins' case.

24         You know, some of them have focused on something that

25   defense counsel said during the sentencing hearing.  I don't

1    think that's necessarily fair.

2           He said something to the effect that, you know, he

3    takes responsibility for some of the actions or things that

4    occurred to this child, but they weren't intentional, or

5    something along those lines.  I don't think that's at all what

6    Mr. Collins has ever said.

7           As Mr. Collins stated some things in his pro se

8    pleadings, I think this is clear.  One thing, when you look at

9    this original sentencing hearing transcript, Mr. Collins --

10   obviously, as the court knows, he was charged in Count One with

11   aggravated battery, Count Two, first degree murder.  And the

12   State was seeking the death penalty.

13          So Mr. Collins, facing the death penalty, having an

14   attorney that he's relying upon as to what's the next step, his

15   attorney comes to him and says, They're alleging this is shaken

16   baby syndrome.

17          Obviously, as the court knows, the indictment alleges

18   shaking as part of the language for Count Two.  When the judge

19   at the plea hearing asked for a factual basis, the State

20   referred to shaking and/or hitting.

21          So this is clearly one of the State's main theories.

22   And defense counsel is telling him, as it's been alleged, that

23   you have no defense to this, but I can get you a plea to second

24   degree murder and the sentencing range will be from 20 to 30

25   years.  You have no defense, you should take this deal, and

1   it's your only option.

2           Now, Mr. Collins said all along that's what he'd been

3   presented with and that's why he agreed to this, because he

4   didn't know -- had no idea himself that he could challenge

5   the -- and then, of course, Dr. Steiner is saying this in a

6   depo.  He had no idea that that was faulty science.

7           However, I think one thing that's very important is

8   at the sentencing hearing, the defense put on Dr. Krop as a

9   mitigation specialist, basically, to provide background into

10  Mr. Collins' background and see if there's any mental health

11  issues and/or mitigation issues.

12          And the State, in the cross-examination, specifically

13  asked Dr. Krop, Well, did you ask him did he commit the acts

14  that caused this child's death?

15          And Dr. Krop said, I did talk to him about that.  And

16  he denies any intentional act inflicting harm on this child.

17  And that was clear.

18          Now, as this court well knows, usually when someone

19  enters a plea and you're asking for the judge to give you 20

20  years, as opposed to 30 years, you would be throwing yourself

21  at the mercy of the court, and your attorney might even advise

22  you, Look, you need to accept -- take full responsibility for

23  your actions, that's your best chance of convincing this judge

24  to give you the lowest sentence possible.

25          I won a case in the Eleventh Circuit several years

1   back.  It went back for resentencing in front of Judge Mickle

2   and Judge Mickle specifically said to my client, I believe the

3   first step towards rehabilitation is full acceptance of

4   responsibility and I haven't heard that from you.

5           And fortunately my client did a 180 and got a reduced

6   sentence because of that.  But I believe that's a strategy that

7   you would employ for a plea, and yet in this case -- anything

8   that Mr. Collins said himself -- the affidavit statement said,

9   I committed no intentional acts, I in no way intended to kill

10  this child, my child, and Dr. Krop said that as well.  So I

11  think he's been adamant from day one on his statement that he

12  didn't do anything.

13          Now, the one thing he does acknowledge later in his

14  pro se pleadings is there were some minor bite marks on this

15  child's cheek.  And he says a couple of days earlier he was

16  engaging in some child -- playful nibbling.

17          THE COURT:  Well, is it your -- is it your view that

18  because there was -- apart from the head trauma and bleeding

19  that, at least according to the medical examiner would have

20  been the cause of death, there was -- the child did apparently

21  display upon other parts of his body bruising, marks, as you

22  say.

23          Are you -- there are two possibilities there, or at

24  least two that I thought of.  One is that all of that injury

25  pattern was caused by whatever internal illness or disease,

1  whether it be a clotting disorder or otherwise.

2           The other would be that while Mr. Collins may have

3  abused the child at earlier times, or may have been hands-on

4  with the child at other times, he didn't kill him.

5           And so that -- the thought would be that, well, he

6  could have been charged with child abuse or something like

7  that, but he shouldn't have been charged with killing the

8  child.

9           Which factual position is Mr. Collins taking?

10          MR. UFFERMAN:  Certainly the former, Your Honor.  And

11  there may even be a third, which possibly is that when

12  paramedics and other emergency response personnel came to the

13  scene that in the midst of CPR and/or whatever else was done,

14  that also could have caused some of the bruising to the chest

15  area.

16          By Mr. Collins' statements throughout his pro se

17  pleadings and any statements that he gave at the plea or

18  sentencing hearing, his -- he only acknowledges to causing the

19  little bite marks on the child's cheek, which he says, again,

20  were the result of playfulness, nibbling on the child's cheek.

21  The child in no way cried and, in fact, was enjoying that

22  playfulness.

23          There's no reason for him to have acknowledged that

24  he did that, but he's done that in his pro se pleadings.

25  Again, I wasn't counsel for him at the time that he was writing

1   those pleadings.

2          But he's been adamant in everything that he said

3   that --

4          THE COURT:  Well, there was evidence, was there

5   not -- and, again, I don't know how all this plays.  But there

6   was evidence that the State adduced either at the plea or at

7   the sentencing -- I think maybe at the sentencing, of the

8   mother of the child who attributed some fairly incriminating

9   type statements from Mr. Collins, both in terms of a way he had

10  treated a dog, I believe, or a puppy.

11         MR. UFFERMAN:  Yes.

12         THE COURT:  Also threatening -- it may have been

13  threatening her, but also threatening the child at some point.

14  And, I mean, I guess it would be fine if Mr. Collins wanted to

15  deny all that.  But that was evidence that at least was in the

16  record at the time of the plea, which at least would

17  potentially support the hypothesis that he had acted against

18  the child; would it not?

19         MR. UFFERMAN:  Certainly that evidence exists.  The

20  third thing that came out of that -- and I think defense

21  counsel addressed this during the sentencing hearing is this

22  idea that he did, in fact, have an IV when he was discharged

23  from the hospital.  And Mr. Collins took steps to try to make

24  it so the child couldn't grab the IV and pull it out.

25         THE COURT:  Well, that -- I mean, I don't know.  That

1   didn't bother me as much.  That seemed -- at least in its

2   benign state, that would seem to be somebody that just doesn't

3   know how to stop an infant from pulling out an IV.

4           MR. UFFERMAN:  I agree.

5           THE COURT:  And so while it might not be according

6   to -- to the way you're supposed to do it, I'm not sure it

7   would be considered abuse.  Maybe it is.  I don't know.  But --

8           MR. UFFERMAN:  I --

9           THE COURT:  -- certainly the other statements

10  attributable to Mr. Collins portrayed him as a violent person

11  who had been violent against an animal, who had threatened the

12  mother, and who had actually threatened the child.  And it

13  didn't -- it made him sound like kind of an ugly guy.

14          MR. UFFERMAN:  Two responses to that, Your Honor.

15  First, one, if she had said, I actually observed him be

16  physically abusive toward the child in the past, I'd have a

17  hard time making an argument in front of you today, because

18  that would be direct evidence of him physically abusing the

19  child.

20          Making statements that -- those are ill-advised

21  statements.  But we have -- certainly in our culture today,

22  many people perhaps make ill-advised statements.  It doesn't

23  mean they follow through on those statements.

24          We also have someone that maybe had a motive to be

25  pretty upset with Mr. Collins if she also believed that he was

1    the cause of her child's death.

2         THE COURT:  She was not -- she was not present at the

3    time of the 911 call?

4         MR. UFFERMAN:  To my knowledge, she's not.  I'm not

5    aware of that.

6         THE COURT:  Is there any tape of the 911 call?  Have

7    you ever heard it?

8         MR. UFFERMAN:  I have not.

9         THE COURT:  Because he tried to call 911.

10         MR. UFFERMAN:  He did call 911.  That's the reason

11    that the EMS people responded to the child and brought the

12    child to the hospital was because he called 911 and said he was

13    engaging in CPR when he found the child nonresponsive in the

14    crib.  So I don't think that -- so to --

15         THE COURT:  So let me -- I appreciate that.  Let me

16    ask you this.  Here's what I -- I've been trying to think of

17    this in terms of actual innocence.  And this is apart from any

18    procedural or other issues.  It's just trying to think of it in

19    terms of actual innocence.

20         So, you know, we don't -- we have all heard of -- and

21    I never had one myself.  But we have heard of cases in which a

22    person's innocence is demonstrated to a near certainty.  For

23    example --

24         MR. UFFERMAN:  DNA.

25         THE COURT:  -- DNA shows that he didn't do it.

1           MR. UFFERMAN:  Correct.

2           THE COURT:  Or, you know, I guess in another case the

3    victim comes forward and said, I lied, it wasn't him, or

4    whatever --

5           MR. UFFERMAN:  Yes.

6           THE COURT:  -- something like that.

7           MR. UFFERMAN:  Yes.

8           THE COURT:  This isn't exactly that.  This is -- this

9    is a medical examiner, although I'm -- I don't really know what

10   exactly all he said, because we don't have the report.  But we

11   kind of know what he said.

12          We know what he said from the State's recitation at

13   the sentencing.  And we know -- we have a little snippet of his

14   deposition in the record there that --

15          MR. UFFERMAN:  Yes.

16          THE COURT:  So we kind of know what he says.  And

17   then we have now medical evidence from medical professionals

18   who, while they may be very credible, obviously also have a

19   point of view about this.

20          This is a -- this is kind of like -- in another area

21   of law, this is kind of like the -- maybe the evolving thinking

22   about eyewitness testimony.  We used to think we knew something

23   and now maybe we're not sure anymore.

24          So this is -- these are these doctors saying, What we

25   used to think, we don't think anymore.  I did see, I think --

1   and you can correct me -- or verify it.

2          I did think that I saw you reference somewhere

3   that -- whatever the medical examiner union is now, they

4   don't -- they wouldn't probably give the same opinion that they

5   did before.  At least that was the intimation.

6          But the point of the matter is, is this really an

7   actual innocence claim, or is this just -- in other words,

8   could the State -- if they had to, could they come in with four

9   doctors that said, No, this is still what happened?

10          And so now all we have is just a battle of doctors as

11   to whether something is something or it isn't something.  And

12   if that's all we have, it makes actual innocence a tougher

13   thing to understand.

14          MR. UFFERMAN:  And so putting that -- I want to cite

15   to *Del Prete*, which obviously I cited in my reply.  *Del Prete*

16   is a true *McQuiggin* case, because it's a gateway to other

17   constitutional claims.

18          But I think *Del Prete* is the best thing I can rely

19   upon from another federal court sitting in the same seat that

20   you're sitting in, can only get to those other constitutional

21   claims if you meet the standard under actual innocence, which

22   is no juror acting reasonably would have voted to find him

23   guilty beyond a reasonable doubt -- now, this is a case we

24   didn't have a jury, but, nevertheless, that that still is the

25   standard that applies from *McQuiggin*, I'd suggest that in light

1    of -- at least the evidence that was presented and recited in

2    the *Del Prete* order -- you know, I don't doubt that the State,

3    if there was another trial in this case, would perhaps try to

4    put on an expert to say that my client still caused the

5    injuries.

6            I would hope that my client's experts would be more

7    convincing and no reasonable jury would have voted to find him

8    guilty with whatever the evidence is.

9            But the State's theory at the time was clearly based

10   on shaken baby syndrome.  And I think we know -- and these

11   other umbrella things that they also tried to say, aggravated

12   battery and/or some type of other head injuries that BCS,

13   battered child syndrome -- the doctors for Mr. Collins have

14   said it all falls under the umbrella of the now debunked shaken

15   baby syndrome.

16           And I believe that science has moved to at least

17   acknowledge if shaken baby syndrome hasn't been debunked

18   completely, they -- where they were in 2001 is very different

19   from where they are today.

20           And I said this earlier -- I apologize for repeating

21   it.  But in 2001, the science community, based on this American

22   Academy of Pediatrics, said that when you see these types of

23   injuries, it's only one possibility.  And that's shaken baby

24   syndrome.

25           And now the science community has moved completely to

1    the other side and at the very least acknowledged that these

2    types of injuries can be caused by a number of things, falling

3    out of a shopping cart innocently, and, most importantly,

4    preexisting the medical issues.

5           And maybe they also still could be the result of some

6    type of violent shaking or aggravated battery to the child, but

7    we can't say for certain when we see this type of eye injury

8    and head injury that it can only be one thing.  But that's what

9    they were saying back in 2001.

10          So -- and so the judge in the *Del Prete* case --

11          THE COURT:  Well, we also have in this case, do we

12   not -- and that's what I'm trying to -- I'm trying to think

13   through whether --

14          MR. UFFERMAN:  You asked a question that I was going

15   to get to.  If he's guilty of aggravated battery but not guilty

16   of murder, is he actually innocent?  I don't know the answer to

17   that question.

18          THE COURT:  Well, not so much that.  I'm really

19   thinking about -- I'm thinking about an actual innocence claim

20   where if -- if we find out ten years later that DNA shows that

21   he couldn't have done it -- and I don't mean this case, but I

22   mean a hypothetical case -- well, there's not going to be

23   another doctor who's going to come in and say either I don't

24   care what the DNA says or I'm reading the DNA differently, I

25   don't -- you know, that doesn't usually happen.

1          But in this case, what we might end up with is just a

2     battle of experts.  And a battle of experts doesn't sound like

3     actual innocence.

4          MR. UFFERMAN:  I agree.  I would think the same issue

5     was presented in *Del Prete* as well.  I think the State, as well

6     as the defense in these types of cases, can generally always

7     put their hands on an expert who is either going to say they

8     did or did not cause the accident that resulted in death in a

9     DUI manslaughter case or they did or did not do this.

10         I mean, but both parties are going to have their

11    experts -- and I can't tell you this is as conclusive as DNA

12    that shows that there's only one perpetrator and it's not my

13    client.  It's not that.

14         I would assume in *Del Prete* that the State would be

15    ready to line up again and put on an expert and potentially try

16    to say the defendant's guilty.

17         THE COURT:  So you've got -- I mean, as you know --

18    and you do this all the time.  You know, in order to get to the

19    finish line in one of these cases, it's pretty darn hard.  And

20    you've got the added problems here there wasn't a trial, he

21    pled guilty, we may not have a classic actual innocence type

22    scenario that you're talking about.

23         One other question I wanted to ask you about

24    timeliness.  What is the case -- let me make sure I'm

25    understanding.  So you're telling me that you are -- you are,

1   in fact, because you don't have any other choice -- you are, in

2   fact, asserting a freestanding actual innocence claim,

3   acknowledging that I would be bound by the Eleventh Circuit

4   authority not to be able to countenance it.

5           I assume then what you're trying to do is to get me

6   to at least acknowledge that you got something and to maybe

7   give you a certificate of appealability and try to go talk to

8   the Eleventh Circuit.  Is that what you're trying --

9           MR. UFFERMAN:  I would have concluded and asked for

10  that exact thing, Your Honor.  I would have said, Your hands

11  are tied, but I -- I believe that we're here because you --

12  you -- and especially with *Del Prete* being in the background,

13  as well, that the law is recognizing that the law has

14  changed -- the science has changed regarding SBS.

15          THE COURT:  So tell me what the case, though -- is

16  *McQuiggin* the case that I would use to -- what do I -- or is

17  *McQuiggin* not even relevant to a freestanding issue?

18          And the reason I'm asking is this, so I'm not beating

19  around the bush here.  If I read *McQuiggin*, it says not only

20  when we're looking at an untimely petition, which -- not only

21  are you looking at the actual innocence component of it, but

22  you still have to look at why it's untimely and what the --

23  what went into it.

24          And in this case -- you correct me if I'm wrong.  But

25  in this case, September 27th, 2010 -- let me make sure I've got

1    the right date.  That was the date of the last report that

2    arguably gave rise to this contention.

3           Do I have the right date?  Are you -- are you looking

4    at that?

5           MR. UFFERMAN:  I believe that's correct.

6           THE COURT:  Okay.

7           MR. UFFERMAN:  He, of course, turned right around and

8    filed --

9           THE COURT:  But listen to me a second.

10          MR. UFFERMAN:  Okay.

11          THE COURT:  All right.  So September -- let's say

12   September 27, 2010, and the State says it would have been a

13   whole lot better if you had filed it by a year from then.  We

14   might have something more to talk about.  But look what

15   happened.

16          And this is just the way that you count under the

17   federal law, for better or for worse.  So from September 27,

18   2010, to January 5th of 2011, when Mr. --

19          MR. UFFERMAN:  Collins.

20          THE COURT:  Yeah.  When your client filed his second

21   3.850 -- let me look at my draft here, because we have these

22   numbers in the -- in the draft that I was working with.  I

23   believe it was 99 days, and -- let me get it right here.

24          So the premise of my question is:  Even giving

25   Mr. Collins every kind of benefit of the timing doubt, by

1   September 27, 2010, he had enough information in hand to try to

2   start to assert this newly discovered evidence-type situation.

3   All right?

4           And on that -- so as of that date he had the

5   information.  Then he -- so that would mean, just under this

6   hypothetical, the clock starts running on -- the federal clock

7   starts running on September 28, 2010, 99 days ran.  Then he

8   files his state -- his second state petition on January 5th,

9   2011.

10          Putting aside the fact that the state court found

11  that was untimely, which probably means under the federal law

12  that it's not tolled, but just giving him the benefit of the

13  doubt -- it's tolled between January 5th, 2011, and March 8th

14  of 2013, when the mandate issues from the Fifth District Court

15  of Appeal.  He then did not file his federal petition until

16  January 13th, 2014, which is more than a year.

17          So if you add the 99 days plus the 266 days left to

18  make 365 days, you only get to November 30th, 2013.  He didn't

19  file his petition until January 13th, 2014, about

20  two-and-a-half months later.

21          So one thing that concerns me about the case is even

22  if I was willing to give him every benefit of every timing

23  doubt there was, he still is probably over the year.  And so

24  tell me about that.

25          MR. UFFERMAN:  Your Honor, I think he would rely upon

1  *McQuiggin* itself, which came out in May of 2013 and filed

2  within one year of that date, that -- that didn't go as far as

3  he would want him to to recognize a freestanding claim of

4  actual innocence, although they've at least acknowledged that

5  that's an open issue in that case.  But prior to that, there

6  really was not hope to even put this issue forward.  So I think

7  that would be his assertion.

8       THE COURT:  So that is he -- you're saying that until

9  *McQuiggin* was decided he didn't have anything?

10       MR. UFFERMAN:  I think that's right.

11       THE COURT:  Okay.  I don't know about that.  But in

12  any event, what is the -- if you're really just making a

13  freestanding claim, does the one-year rule apply at all?

14       MR. UFFERMAN:  I would think not.

15       THE COURT:  So as soon as -- or in any -- anytime

16  that somebody realizes they're actually innocent, no matter

17  when it is, they'd be able to file a federal habeas petition

18  and the federal habeas court would adjudicate whether, in fact,

19  they were actually innocent, and if they were they would get

20  habeas relief, and if they were not they wouldn't?

21       MR. UFFERMAN:  And I would say yes to that.  I would

22  say that for -- we know that the U.S. Supreme Court seems to

23  have acknowledged that there can be freestanding actual

24  innocence claims in capital cases.  They've left open the idea

25  as to whether or not those types of claims can be raised in

1    non-capital cases.

2          The Eleventh Circuit forecloses those.  The Ninth

3    Circuit, in a case called *Baker v Yates* -- the cite is

4    339 Fed.Appx. 690.  It's a 2009 case from the Ninth Circuit.

5    They specifically said we have assumed that freestanding

6    innocence claims are cognizable in a 2254 petition.

7          So to take the extreme scenario if you -- the idea --

8    if you allow for a freestanding actual innocence claim separate

9    from any type of constitutional claim, you have that defendant

10   that, for whatever reason, was told DNA exonerates you, and on

11   the one-year-and-two-day mark that guy, for whatever reason,

12   maybe didn't get relief in state court, but now tries to go to

13   federal court and says, I've got the DNA test attached that

14   shows one perpetrator in the sexual battery and it's not me,

15   DNA says 100 percent, I think that would be the classic example

16   of the district court saying, This is where we have to step up

17   and acknowledge that there is a freestanding actual innocence

18   claim and we're not going to let timeliness prohibit this

19   otherwise innocent person from getting relief.

20         THE COURT:  What's the Eleventh Circuit case or cases

21   that -- and I think -- I looked at some before the hearing.

22   But what is the case -- okay.  So is *Jordan* the case?

23         MR. UFFERMAN:  Yes, Your Honor.

24         THE COURT:  For what it is worth, our precedent

25   forbids granting habeas relief based upon a claim of actual

1   innocence, anyway, at least in non-capital cases, citing the
2   *Brownlee v Haley* --
3         MR. UFFERMAN:  Yes.
4         THE COURT:  -- and other things.  And that *Jordan*
5   case is still the law of the circuit, as far as you know?
6         MR. UFFERMAN:  It is, Your Honor.
7         THE COURT:  Okay.  So what you're looking -- what
8   you're looking for from me is to acknowledge that you're trying
9   to raise a freestanding actual innocence claim, acknowledge
10  that circuit precedent forbids me from considering that.  And
11  that would be true whether or not it was timely or not?
12        MR. UFFERMAN:  Correct.
13        THE COURT:  Okay.  So even if you filed it within the
14  year, circuit precedent would say it doesn't matter, right?
15        MR. UFFERMAN:  Correct.
16        THE COURT:  Okay.  So we're really not talking about
17  a timeliness issue.  We're really just talking about a
18  freestanding, whether --
19        MR. UFFERMAN:  Yes, Your Honor.
20        THE COURT:  Okay.  So you want me to say that's what
21  you're doing, acknowledge that circuit precedent forbids it.
22  In the best-case scenario, you'd want me to talk a little bit
23  about it, to say, Looks like maybe they've got a little
24  something going here, I can't really tell, but since I can't
25  consider it, I'm not going to go much farther than that, and

1  give you a certificate of appealability?

2          MR. UFFERMAN:  That's exactly right, Your Honor.  And

3  then it's my goal to either try to get the Eleventh Circuit to

4  recede en banc from *Jordan* or go up to the U.S. Supreme Court.

5          THE COURT:  Okay.

6          MR. UFFERMAN:  And the only -- again, I would just --

7  you know this, but I'll quote from it just briefly.  In the

8  *Herrera* case, the United States Supreme Court, that's where

9  they assumed without deciding that there would be a

10  freestanding innocence claim in a capital case.

11          And then there's a -- the Ninth Circuit has

12  recognized that a reading of *Herrera* suggested at least a

13  majority of the court might be willing to extend that to

14  non-capital cases.

15          They haven't done it yet.  They left open the

16  possibility of *McQuiggin*.  It's an open issue.  It's one that I

17  hope to be able to present to the Eleventh Circuit and/or the

18  U.S. Supreme Court moving forward.  But the only way that's

19  really going to happen is if we at least get a certificate of

20  appealability, Your Honor.

21          THE COURT:  Thank you.

22          MR. UFFERMAN:  Thank you, Your Honor.

23          MS. COMPTON:  Good afternoon.  May it please the

24  court.

25          THE COURT:  Yes, ma'am.

1          MS. COMPTON:  Robin Compton, Assistant Attorney

2     General, representing the Secretary, Department of Corrections.

3     It seems like what we've got here are two different, but

4     supported medical opinions as to the cause of death.

5          The doctor reports and all the articles that

6     Mr. Collins has presented, they're not evidence of actual

7     innocence, but they're evidence why the jury should believe his

8     experts over our experts.

9          And it's not the same as evidence that would exclude

10    him as a suspect or prove that the child did not die from

11    injuries inflicted on him.

12          They're credibility and jury issues.  They're not

13    evidence of innocence.  There's been no evidence the State's

14    experts would agree with Collins' experts.  And, in fact, I

15    think you touched upon that earlier.  That's exactly what it

16    would come down to, is a battle of the experts.

17          THE COURT:  Well, but it might be a little fairer

18    fight than it was back in -- in 2002 or '03 when this happened,

19    right?

20          I mean, it does appear that the medical community,

21    including the medical examiner community, has really started to

22    rethink how they looked at these cases.

23          Do you agree with that?

24          MS. COMPTON:  No.  No, I don't.  Because everything

25    you're seeing are all documents that they've submitted.  And,

1    you know, I've spoken with -- I know I'm supposed to confine my

2    argument to this record that's been submitted, but it's not

3    called shaken baby syndrome anymore.  It's abusive head trauma.

4    And it's still very much alive and well.  And the American

5    Academy of Pediatrics vigorously defends their position on

6    this.

7            And a major problem that we have in this case is the

8    fact that he entered a plea.  So we don't have all the evidence

9    that would have been admitted if we had gone to trial.

10           He gave up his right to contest the evidence.  And he

11   avoided a death penalty and a mandatory life sentence in doing

12   that.  He had competent counsel that did a lot of work on this

13   case, including consulting with the experts.

14           He had the Dr. Siebel that you had mentioned.  He was

15   the pathologist pediatric expert that had been the medical

16   director of a child protection team since 1985 to the time of

17   the case.

18           He had extensive training in child abuse and neglect

19   and had given a lot of presentations on the issue and published

20   material on it.

21           So he had also consulted with --

22           THE COURT:  And are you taking -- by the fact that

23   they didn't try to defend the case or they agreed to the nolo

24   plea, that Dr. Siebel was not favorable, or are you just saying

25   he had the benefit of good medical expert evaluation, or what?

1      MS. COMPTON:  Kind of both.  I mean, I don't know

2  what -- what Dr. Siebel ended up telling him, but he had been

3  appointed for a year.  He got appointed a year before he

4  entered the plea.

5      So I'm assuming he looked at a lot of -- a lot of the

6  evidence and didn't give a favorable opinion.  But he wasn't

7  the only expert that was appointed.

8      There was also a Dr. Souviron that was the chief

9  forensic odontologist -- I'm not sure if I'm pronouncing that

10  correct -- for a medical examiner office -- not this medical

11  examiner office in this record, but he was -- he was -- this

12  guy was in charge of the ValuJet identifications.  And he was

13  consulted in this case.

14      THE COURT:  How do you know that?

15      MS. COMPTON:  Because I've looked at the direct

16  appeal record.  Which I didn't submit the whole entire direct

17  appeal record because he entered a plea in this case.  And I

18  just submitted the documents that I thought were necessary to

19  prove that it wasn't timely.

20      You know, no good deed goes unpunished.  I was trying

21  to lighten the load for -- you know, the judges that work in

22  the federal courts, so they wouldn't have to wade through all

23  the endless documents, but -- anyway, I won't make that mistake

24  again.

25      He also had a toxicologist appointed.  And I did have

1  to dig for the medical examiner's report.  I do have it if --

2  and I made copies of it if you want it.

3          THE COURT:  Okay.  Yeah, I'd like to look at it.

4  Thanks.

5          MS. COMPTON:  Okay.  And there were autopsy photos

6  taken because defense counsel tried to move in limine to

7  exclude the autopsy pictures.  So --

8          THE COURT:  And I think -- I think Judge Mathis was

9  given some of the pictures at sentencing, if I recall

10  correctly.  I think --

11          MS. COMPTON:  There was reference.  But we don't know

12  if it was autopsy pictures or pictures -- I don't know, because

13  I -- I haven't seen any pictures myself.

14          But as you stated earlier, the abuse of head trauma

15  wasn't the only cause of death.  There was also the battered

16  child syndrome and --

17          THE COURT:  Well, it wasn't clear to me, though, if

18  you -- if you assume that the head trauma was caused -- and

19  this is just an assumption for purposes of discussion.

20          But if you assume that that was caused by the

21  clotting disorders as the experts that -- that your opponent

22  has gotten together said so -- it wasn't clear to me whether

23  the battered child syndrome would have been an actual cause of

24  death.  Would it?

25          MS. COMPTON:  Well, I think that -- the actual

1  autopsy report, I think, said it was a -- here's a copy of the

2  report.

3            MR. UFFERMAN:  Thank you.

4            MS. COMPTON:  Cause of death, abusive head injury.

5  Contributory cause was battered child syndrome.

6            THE COURT:  Right.

7            MS. COMPTON:  Manner of death, homicide.

8            THE COURT:  Yeah.

9            MS. COMPTON:  But we've got a lot of other evidence

10 that, you know, I could put my hands on, but I know that it

11 wasn't submitted as -- it never got into the court below

12 because he pled.

13           You know, there was -- what we do have in this record

14 is a notice of intent to rely on collateral crime evidence.

15 And there was a lot of things that the mom could have testified

16 about.  And I went back and I read her deposition.

17           She did witness him actually punching the child in

18 the head.  So hopefully she would come in and testify to that

19 if it -- if it got to that point.

20           What else?  You know, she had previously had a

21 restraining order against him.  He had stabbed her before.  And

22 then we've got the -- the matter with the child -- with the

23 puppy, that he beats the puppy, crushed the puppy's skull and

24 killed it and said, quote, If your son didn't get strong and

25 start acting right -- doesn't start acting right, I'm going to

1  kill his ass too.

2        So all of that is really, really damaging for him,

3  which, you know, I think has to be considered why he entered

4  this plea.  He avoided a death penalty and he avoided a

5  mandatory life sentence.  He got 30 years.  He's already

6  halfway into that.

7        You know, what's our remedy going to be?  We're going

8  to go back and have a trial at this point and seek the death

9  penalty again?  He could end up with a life sentence if he goes

10 back.  Or, you know, does this court want to just find that

11 he's actually innocent and, you know, let him go?  I don't

12 know.

13        But, you know, it's also our position that the

14 evidence isn't reliable that he did submit.  It's still a very

15 viable and accepted diagnosis in the medical community.  His

16 experts -- Dr. Buttram is deceased, if I'm not mistaken.  Is

17 that correct?

18        MR. UFFERMAN:   (Nods head affirmatively.)

19        MS. COMPTON:  He's dead.  This Dr. Holcomb, which he

20 lists in his appendix as a doctor.  And Mr. Holcomb is not a

21 doctor.  He's a paralegal.  And he's currently in prison.  He's

22 been in prison since 1992 for kidnapping and sexual assault.

23 So that's one of his experts.  The State would have a field day

24 with that.  Not to mention, how is he even going to get to

25 court to testify?

1       Dr. Stephens -- his report said the child was

2  demonstrably malnourished.  But the autopsy says that he's

3  well-nourished, if you look at the autopsy report.

4       And, also, a really bad damaging factor for him,

5  Dr. Stephens' report says, Does -- and I quote, Does not

6  exclude the possibility of superimposed inflicted injury.  So

7  that's at the appendix A6 on page two.

8       Also, Dr. Stephens --

9       THE COURT:  What does that mean?

10      MS. COMPTON:  Does not exclude the possibility of

11  superimposed inflicted injury -- that means even if he died

12  from -- I mean, even if there were all these -- these bleeds

13  that's going on, it doesn't rule out that he also could have

14  been smacked around.

15      But the -- he also doubted in Dr. Stephens' report

16  that the ME considered the medical history.  Well, we know from

17  the -- Dr. Steiner's deposition that he did consider the

18  medical history.

19      One other thing about the timeliness is that -- and I

20  know we were using the date September 27th, 2010.  And that's

21  being -- we're just really being generous giving that as the

22  date.

23      But if you go back as far as his very first 3.850

24  that he filed, the attachment that he files to his 3.850 has --

25  it's an article by Dr. Buttram.  And in that article he refers

1    to Dr. Innis' vitamin K deficiency.  And he attaches the second

2    attachment to that 3.850.

3           THE COURT:  One of the things I was going to ask -- I

4    guess your opponent, but I'll ask you.  It appeared to me the

5    first time that this issue of actual innocence came up, it

6    was -- the theory seemed to be that a vaccine caused the

7    deficiency that then led to the bleeding.  And it seemed to me

8    that later on that was not really what was being said.

9           Did you pick up on that?  Or do you know -- can you

10   help me with that at all?

11          MS. COMPTON:  It just appears to me that it morphed

12   from the -- the vaccine, and I guess into the -- that evidently

13   wasn't a very good argument or not reliable or not solid.  So

14   they switched it to it's a vitamin K deficiency.

15          THE COURT:  So your view of this is that if this case

16   was brought today with the same evidence that the State would

17   have the same position?

18          MS. COMPTON:  Absolutely.  We just don't call it

19   shaken baby syndrome anymore.  Now it's abusive head trauma,

20   which that's what the medical examiner report calls it.

21          THE COURT:  And do you know what the difference is?

22   Or why is it -- why do they not call it -- what --

23          MS. COMPTON:  I'm sure there's some medical reason

24   for that, but I am no medical expert by any means.  I mean, I

25   know a lot more about this stuff than I did two weeks ago, but

1  not by choice.

2          So he relies on the *Del Prete* case also.  And, you

3  know, a major difference between that and this case is

4  *Del Prete* had a trial.  So all that evidence -- they had a lot

5  of the evidence out there.

6          I think this is one of the major reasons why we're at

7  this point now, is because he entered a plea and we don't have

8  all of the evidence on the record, and the fact that both

9  3.850s were summarily denied.

10         So, you know, there was never an evidentiary hearing

11 below on any of his issues either.  And now he's just raising

12 the freestanding actual innocence claim.

13         THE COURT:  So is the -- just so I'm understanding,

14 one of the things -- you know, if you were -- and this

15 doesn't -- this really doesn't necessarily have to do with this

16 case, but I don't get to talk to y'all too much, because we --

17 most of these, as you know, are handled on the papers.  And so

18 every once in a while we do get to talk.

19         And so one of the things -- if you were to ask

20 somebody that wasn't a lawyer -- if it turns out that we were

21 wrong and that the person is actually innocent of the crime

22 that they're currently serving time for, is it the State of

23 Florida's position or the Secretary's position that in the

24 federal habeas context -- if that's all we know, that there's

25 no underlying claim, that federal habeas relief isn't

1    available?

2         MS. COMPTON:  That seems to be what the -- oh, you

3    said not a lawyer.

4         THE COURT:  I mean, if you were asking somebody,

5    just -- I mean, I'm just trying to --

6         MS. COMPTON:  Well, that doesn't make sense.

7         THE COURT:  We all get so used to talking about this

8    stuff, actual innocence is a gateway to something else, which

9    has always seemed kind of interesting to me.  Why would you

10   need -- why would you need to prove you're actually innocent in

11   order to actually assert something else?  I never have quite

12   understood that.  But that's one thing that people talked

13   about, gateway claims.  Actual innocence is a gateway to allow

14   you to raise ineffective assistance of counsel.

15        MS. COMPTON:  Like it's not a constitutional

16   violation.

17        THE COURT:  But now we're talking about a, quote,

18   freestanding actual innocence claim.  What that really means

19   is, I want to show you that I'm innocent and that it didn't

20   happen.  It absolutely didn't happen.

21        And I guess it just is an interesting thing to me

22   that we don't -- that we are discussing whether or not that's

23   something that we ought to be talking about.

24        And so if it -- so you've been doing this a long

25   time.  And I've seen your name on lots of things.  So is -- how

1   does this normally work if you really find somebody that's

2   actually innocent?  Does the State of Florida go in and ask the

3   charges to be dismissed?  Or how does it -- how does it work?

4           MS. COMPTON:  We're like one step removed from the

5   State Attorney's Office.  I mean, we do all the appeals, so --

6   and she's been doing this -- Ms. Nielan, she's been doing this

7   a lot longer than me.  She may have an answer for your

8   question.

9           THE COURT:  Well, I mean, you know, you hear on TV

10  that the Innocence Project determined that somebody's DNA --

11  and then the state district attorney goes in and dismisses the

12  charges, or whatever.  And there's happy faces outside and all

13  that.

14          MS. COMPTON:  Yeah, yeah.

15          THE COURT:  And, you know -- but what we're talking

16  about here is the idea that -- and, again, I'm not really

17  talking about this case.  I'm just talking about generally.

18  Because, as I said, I don't get to ask y'all these questions

19  very often.

20          What does it mean to say that we, the State of

21  Florida, will not countenance an actual innocence federal

22  habeas petition because actual innocence is not a grounds for

23  habeas relief?

24          MS. COMPTON:  That doesn't make sense.  And I

25  understand exactly what you're saying.  And, you know, that's

1    the perfect case for, like, when there's DNA.

2          And I think they do -- they do turn them loose then.

3    And I think you -- they get to walk.  I've had -- I've lost a

4    federal habeas.

5          THE COURT:  I think one answer to my -- Justice

6    Scalia wrote a concurrence in the *Herrera* case.  And he says --

7    he says that the reason that federal habeas relief -- and we're

8    not -- because, in fairness to you, there may be processes in

9    the State of Florida court system to address actual innocence.

10   There may be.

11         In other words, it may -- I don't know what -- all

12   the motions you can file in state court.  But if you come up

13   with -- even years later, if you come up with evidence that

14   you're actually innocent, it may be that the state courts will

15   entertain your case.  I don't know.

16         MS. COMPTON:  Based on newly discovered evidence.

17         THE COURT:  Okay.  Whatever.  But what we're talking

18   about here is the only thing I can talk about, which is federal

19   habeas, because obviously I don't have anything to do with the

20   state system.

21         I think one answer is that -- Justice Scalia would

22   say that federal habeas only stands to correct constitutional

23   error and doesn't stand to correct errors of fact.  And he, I

24   think, viewed actual innocence claims as being more factual

25   issues than legal issues.

1    So I guess that's one way to look at it.  Now, he was

2  not in the majority in -- well, he was concurring, I guess, in

3  *Herrera*.  But it -- just sometimes it bothers me when I write

4  an order and -- and this isn't really your problem, this is

5  really my problem, but that I -- that I write an order that, of

6  course, we don't countenance freestanding actual innocence

7  claims.  And I sometimes just wonder about that, but -- and I

8  understand.  I appreciate your being helpful in that.

9    MS. COMPTON:  I don't think I was.

10   THE COURT:  You would say -- you would say to me, it

11 sounds like, Well, I don't know about that, but I can tell you

12 in this case this is not a case of actual innocence anyway.

13   MS. COMPTON:  That's exactly right.  And that's our

14 position.

15   THE COURT:  And you've now recited to me a number of

16 other facts, some of which I knew, some of which I didn't,

17 because you have the benefit of -- of the direct appeal record

18 that I didn't have, that would make this a horse race, so to

19 speak; that is, this would be a classic case where Mr. Collins

20 would have his experts come in and say this -- there's no such

21 thing as shaken baby syndrome, and this was more likely a

22 clotting disorder, and the State would have a doctor that would

23 say to the contrary, and then the State would also have the

24 testimony of the mother and other things, and -- and a jury

25 would have to decide it, but we -- we don't get anywhere close

1    to the standard of -- that no reasonable juror could conclude

2    beyond a reasonable doubt that he did this, which is really

3    what you have to find, right?

4              MS. COMPTON:  Correct.  And it certainly doesn't rise

5    to the level that you would grant a certificate of

6    appealability on this issue.

7              THE COURT:  Yeah.  Okay.

8              MS. COMPTON:  Would you like the ME report?

9              THE COURT:  Sure.  That would be great.  Thank you.

10             Anything else you want to say?

11             MS. COMPTON:  I don't think so.

12             THE COURT:  Thanks.

13             MS. COMPTON:  Thank you.

14             THE COURT:  All right.  Rebuttal.

15             MR. UFFERMAN:  I'll be brief, Your Honor.  I just

16   want to address first the -- the idea this was a plea.  We know

17   of examples of people who have been exonerated who entered a

18   plea -- I don't know what goes through someone's mind, but I

19   would suggest that if there ever was a viable idea as to why

20   someone who knows they're innocent would enter a plea, this

21   would be a reasonable scenario.  He's very young --

22             THE COURT:  I don't doubt that.  The problem is the

23   whole *McQuiggin* -- everything about actual innocence is

24   predicated on a trial record, right?

25             I mean, there's not been a case -- at least -- unless

1    you know of one -- where this type of issue is really fleshed

2    out when somebody has pled -- and he didn't actually plead

3    guilty.  He pled nolo, which is kind of interesting.

4                MR. UFFERMAN:  Sure.

5                THE COURT:  Because in Florida -- unlike in federal

6    court -- you know, in federal court we don't let you do that.

7                MR. UFFERMAN:  Right.

8                THE COURT:  In federal court you've got to say you

9    did it --

10               MR. UFFERMAN:  Yeah.

11               THE COURT:  -- or else we don't let you plead.  But

12   in state court they let you say --

13               MR. UFFERMAN:  Best interest.

14               THE COURT:  -- it's in my best interest, because I'm

15   trying to avoid the death penalty, or I'm -- whatever -- it's

16   in my best interest to do so.  And that's what this was, right?

17               MR. UFFERMAN:  Exactly.  And, Your Honor, that's a

18   great example.  I practice in front of Judge Hinkle and

19   Judge Walker frequently, but I've reviewed many transcripts of

20   Judge Hinkle that if Mr. Collins had said what he said at

21   sentencing, about I didn't intentionally do anything, I

22   certainly didn't intend to kill this child and didn't do any

23   act to do that --

24               THE COURT:  He would have sent him to trial.

25               MR. UFFERMAN:  He would have said, Mr. Collins, we

1  have a real problem here, because you've entered a guilty plea.

2  And what you're telling me is you're not guilty.  And then I

3  need you to go talk to your counsel and either you're going to

4  come back and say something completely different or we're going

5  to trial, so --

6          THE COURT:  But it does complicate the case,

7  because --

8          MR. UFFERMAN:  It does.

9          THE COURT:  -- you heard your opponent say, Well, if

10  we got another crack at this, here's some other stuff that

11  would come in.  And so -- and, by the way, it's now called --

12  abusive head trauma?  Is that what it is -- and we would have

13  doctors that would support the State.

14          Now, you know, I mean, Ms. Compton is saying that and

15  she -- I'm sure she believes it.  And it -- but, as you

16  probably know, it's not -- especially when you're talking about

17  disputed areas of medicine, it's not altogether unheard of for

18  doctors to disagree.

19          MR. UFFERMAN:  Of course.

20          THE COURT:  And so why is this the case that you want

21  to take up to the Eleventh Circuit on a freestanding actual

22  innocence claim?

23          MR. UFFERMAN:  One, I do think -- I believe the case

24  law shows -- I think the *Del Prete* case -- I think there's a

25  *Bailey* case out of New York that does explain that -- that at

1   least from the publishing community of medical experts

2   that -- where they were in 2001 was, when you see these

3   injuries, that's the only explanation, and at least now the

4   publishing community medical community -- although they still

5   may say there's a criminal explanation, there are at least

6   other possibilities, including this child's medical condition

7   being the main other explanation.

8          So when you combine that with this child, I -- you

9   know, having -- I don't mean to make this personal.  But having

10  a special needs child myself, it can be difficult.  But we do

11  have a case here where this child spent, you know, the vast

12  majority of his ten months on this earth --

13         THE COURT:  This is a premature baby who had a lot of

14  medical problems and had spend two-thirds of his short life --

15  it was a male, right?

16         MR. UFFERMAN:  Yes.

17         THE COURT:  -- two-thirds of his short life in the

18  hospital, and who obviously came home on -- with IV and all

19  that.  And I --

20         MR. UFFERMAN:  Absent that -- if we had a completely

21  healthy child, you'd laugh me out of this courtroom.  But when

22  you have a child with that medical background, that's -- I

23  think many experts, at least -- and I don't doubt that the

24  State would have an expert that would disagree.

25         But many experts would say this is the type of child

1   that you would see these types of symptoms, would have this

2   type of clotting disorder, vitamin K disorder, whatever other

3   disorders this child had, and it could have been misdiagnosed

4   as some type of violent act when, in fact, it really is just

5   this child's medical condition.

6              THE COURT:  And what would have happened -- what

7   would have been the state of medical play if Mr. Collins had

8   said -- and I understand he would be running the risk of death

9   penalty or life in prison.

10             But what if he had said, I didn't do this and let's

11  go to trial?  What would he have been able to muster at that

12  point in time -- let's assume he could get good medical help.

13             And it sounded like from -- I mean, it sounded like

14  the expert he had and the other expert that I didn't know

15  anything about, but apparently was in the direct appeal file --

16  it sounded like he did have access to some medical --

17             MR. UFFERMAN:  I can't refute that.  Again, I think

18  the issue is that the science changed.

19             THE COURT:  So you're saying it wouldn't have done

20  him any good at that point in time, it only had become knowable

21  or accepted post-2010 --

22             MR. UFFERMAN:  Yes.

23             THE COURT:  -- that this is the way it is?

24             MR. UFFERMAN:  That's exactly right, Your Honor.

25  And, again -- he faces the death penalty now if he's

successful.  I don't know the answer to that either.

And I think if he were to be granted relief, I -- I believe that may lead to a new trial, simply because -- even if you look at the *Del Prete* case, that the actual innocence is a gateway to the constitutional claims.  If he wins on the constitutional claims, that results in a new trial on the ineffective assistance of counsel claim.

So he has a lot to risk even if he were to be successful if the State were to move forward and try to reprosecute him for first degree murder and seek the death penalty.

But, again, at the time, trying to explain why someone in his shoes, very young, going through this traumatic experience, would have entered a plea if they know they're actually innocent -- you know, when you're facing the death penalty and you're being told the science is against you, there's -- and we even have experts who agree that's what the science says, when you see this type of injury, the only explanation is shaken baby syndrome, it's a violent injury caused by you, you have no defense, but I can get you a deal that you might be able to get as low as 20, but the max you're looking at is 30 as opposed to either death or life.

THE COURT:  Can you talk to me real briefly about this vaccination theory and what that was about and why that is not what's being talked about now?

1          MR. UFFERMAN:  I think it's -- I think Mr. Collins'

2     case kind of was riding the wave of change from 2001 to 2010.

3     So he filed his initial 3.850 motion, I want to say, in 2006.

4          THE COURT:  Yes.  That's right.

5          MR. UFFERMAN:  And at that time the wave was just

6     starting.  And one of the ideas was maybe this actually is the

7     result of a vaccination.  And that's one of the theories that's

8     being put out by some of the doctors that were on the other

9     side.

10          And by the time he lost that, and by the time he now

11     gets more documents, and is able to actually send these

12     documents out to get his own defense team, apparently pro bono,

13     who would review this -- it's only at that point that the

14     science had changed to the point that it did in 2010.

15          THE COURT:  Is the theory here -- is the medical

16     theory here that the antibiotic therapy that the baby was

17     involved with because of his medical problems created the

18     clotting disorder or the clotting -- is the theory different

19     than that?

20          MR. UFFERMAN:  I don't know if I know the answer to

21     that, Your Honor.  I think it was an issue -- I think clotting

22     was an issue with prematurity that the baby had regardless.

23     Whether the antibiotic added to that, I'm not sure.

24          THE COURT:  So Ms. Compton isn't as impressed with

25     your lineup of four medical providers.

1          MR. UFFERMAN:  Certainly one of them.

2          THE COURT:  And talk to me about that a minute.

3          MR. UFFERMAN:  Well, one of them is dead.  That's

4     beyond our control, but I --

5          THE COURT:  I agree with that.

6          MR. UFFERMAN:  But I assume we'd be able to find

7     someone who would take Dr. Buttram's case.  I don't dispute her

8     at all about the paralegal.  To the extent I referred to that

9     person as a doctor or professional in that regard, I apologize.

10    I was not meaning to.  But, nevertheless, I do think he has an

11    impressive other lineup of doctors, putting that person aside.

12         But it's not beyond that.  If I was coming to you

13    with just that, that would be one thing.  But when I come to

14    you with the *Del Prete* case, the *Bailey* case, other cases

15    around -- you know, I quoted Judge Posner in one of my

16    pleadings as well.

17         I think the legal community is dealing with the

18    effects of shaken baby syndrome prosecutions in the early 2000s

19    that now we're causing to rethink those.

20         So it's not just this case.  It's not just these

21    experts.  I think there's any number of experts.  In preparing

22    for this I actually -- I used to be on the board of the

23    Innocence Project of Florida for a number of years.  And I

24    talked to someone in Wisconsin -- the Wisconsin Innocence

25    Project.  And her sole responsibility is handling these cases

1    around the country.  So I think, you know, there is --

2              THE COURT:  So this is a thing?

3              MR. UFFERMAN:  I think it is a thing.

4              THE COURT:  And is the *Del* -- what's the name?

5              MR. UFFERMAN:  *Del Prete*.

6              THE COURT:  Is that the only, like, written published

7    case that talks about this?  I know you quoted Judge Posner,

8    but I did not get a chance to read that.

9              MR. UFFERMAN:  Yeah.

10             THE COURT:  What's that about?

11             MR. UFFERMAN:  I apologize for not knowing the

12   answer.  But it's not obviously as good as *Del Prete* or I would

13   have had it in my reply.

14             I think *Del Prete* is the lead case from the

15   standpoint that here you have a judge in a similar context

16   saying that actual innocence leads to the gateway, and the next

17   words we get out of that judge's order are, So I'm going to

18   schedule the evidentiary hearing on those constitutional claims

19   that you now get to present, even though they were untimely.

20             That's a pretty astounding step in the wake of

21   *McQuiggin*, and even allowing those types of untimely claims to

22   be considered.

23             So I can't imagine there's too many *McQuiggin* cases

24   where judges -- federal judges around the country have found

25   that the actual innocence gateway has been met.  And it was met

1  in a shaken baby syndrome case in *Del Prete*.  And that's

2  obviously why we're relying upon it.

3          THE COURT:  Thank you.

4          MR. UFFERMAN:  Thank you, Your Honor.

5          THE COURT:  Ms. Compton, do you have anything else

6  you wanted to say?  Or did you get to say it all?

7          MS. COMPTON:  The only other thing I would add,

8  Judge, would be in that *Del Prete* case.  I think one of the

9  reasons why it got sent back for an evidentiary hearing was

10  because experts on both sides of those cases, for the state and

11  for the defendant, had agreed that there were old injuries.

12          THE COURT:  Yeah.

13          MS. COMPTON:  And that they -- the defendant could

14  not have been alone.

15          THE COURT:  I did notice there was more --

16          MS. COMPTON:  Right.

17          THE COURT:  -- uniformity of view about -- from both

18  sides than -- than we have here, although we don't -- as you

19  say -- and, you know, it's a fair point -- our record is not

20  the kind of record you would normally try to make

21  determinations from, because it's skewed by the fact there was

22  a plea.  And it just kind of stopped at that point.

23          MS. COMPTON:  Uh-huh (affirmative).

24          THE COURT:  So it's a fair point.

25          MS. COMPTON:  And interestingly enough, in the -- in

1   the ME report, there's -- you'll never find -- see the words

2   shaken baby syndrome.  They're not in there.  It's abusive head

3   trauma.

4               THE COURT:  Even in the -- this report?

5               MS. COMPTON:  In that report, yeah.  There's no

6   shaken baby syndrome.  He brings it up after being questioned

7   about it at the depo, but not in that record.

8               THE COURT:  It says, Cause of death, abusive head

9   injury, is that what you're talking about?

10              MS. COMPTON:  Right, right.

11              THE COURT:  Okay.  Thank you.

12              MS. COMPTON:  Thank you.

13              THE COURT:  All right.  Well, thank you all for your

14   time.  You know, obviously, I guess even the petitioner knows

15   the end result in this court is not -- you know, I'm not going

16   to be able to grant relief.

17              And the only question is -- now that I know for

18   sure -- I wasn't sure until you said so that you are just

19   asserting a freestanding actual innocence claim.  So I don't

20   have to do the analysis of whether there's an underlying claim

21   that we need to adjudicate.

22              So I -- but I'll think about -- I'll think about what

23   you said.  I'll think about whether I ought to write a little

24   bit about it.  I'll think about the certificate of

25   appealability.  I mean, ultimately this is going to be the

1   Eleventh Circuit's deal one way or the other.

2        I saw one of the cases the Eleventh Circuit was kind

3   of fussing at the district judge for granting the certificate

4   of appealability, although I noticed they did so after they had

5   stayed -- stayed an execution and then they unstayed it.  So at

6   least somebody in the Eleventh Circuit thought that it was

7   worth looking at.

8        All right.  I'm going to look at it.  I'll think

9   about it.  I will issue an opinion as soon as I can.  And then

10  the matter will go from there.  I appreciate everybody's help.

11        MR. UFFERMAN:  Thank you, Your Honor.

12        MS. COMPTON:  Thank you.

13        THE COURT:  All rise.

14    (The proceedings concluded at 3:13 p.m.)

15                - - -

16

17

18

19

20

21

22

23

24

25

**CERTIFICATE**

UNITED STATES DISTRICT COURT    )
                                )
MIDDLE DISTRICT OF FLORIDA      )


        I hereby certify that the foregoing transcript is a

true and correct computer-aided transcription of my stenotype

notes taken at the time and place indicated herein.


        DATED this 8th day of December, 2017.




        s/Shannon M. Bishop
        Shannon M. Bishop, RDR, CRR